Gregory B. Collins (#023158)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kflawaz.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald H. Pratte,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>Jeffrey Bardwell and Fanny F. Bardwell, husband and wife,<br><br>　　　　　　　Defendants. | Case No. 2:19-cv-00239-PHX-GMS<br><br>**PLAINTIFF RONALD PRATTE'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Ronald H. Pratte moves for partial summary judgment on his claims against Defendant Jeffrey Bardwell for breach of contract and unjust enrichment.[1] Mr. Pratte's claims are straightforward. Mr. Pratte included Bardwell in a substantial transfer of money and assets that he also made to several members of his family. In exchange, Bardwell agreed to work for Mr. Pratte on various tasks for the rest of Mr. Pratte's life.

Crucially, Bardwell did, in fact, work for Mr. Pratte for the next twelve years without further compensation. It was not easy work. Bardwell testified that he worked as many as 3,000 hours in a year and sometimes more than 80 hours in a single week and his disclosures in this case state that he did so "to the detriment of his health and family life."

---

[1] On both claims, Mr. Pratte moves for summary judgment on liability only, acknowledging that the amount of damages is in dispute and will require a trial (or other evidentiary hearing).

1

(Plaintiff's Statement of Facts ("SOF") at ¶ 34.) He joked that he was "going to be working until I'm 80 years old out there at the dunes." (SOF at ¶ 21.)

Mr. Pratte's case is simple and logical. Bardwell did this work as part of their contract. Half a dozen witnesses back that up—everyone from the other recipients of the transfer to Bardwell's own friends and neighbor. Emails show Bardwell seeking permission from Mr. Pratte to take days off or to travel on vacation. And then, Bardwell quit, thereby breaching his agreement.

Bardwell tells a different tale—but one that cannot meet the standard for a material factual dispute for purposes of summary judgment. He claims he worked for Mr. Pratte for twelve years without further compensation not out of an obligation, but just because he felt like it. He has no witness that backs this lie. No documents. Nothing. Indeed, he never even told Mr. Pratte about his secret "at will" status:

> Q. Do you ever remember telling Ron, hey, I don't have to do this any more, I'm doing this 'cause I want to?
>
> A. I never did.

(SOF at ¶ 38.)

Bardwell's defense "simply makes no economic sense." The notion that Mr. Pratte made Bardwell wealthy yet then Bardwell toiled away in the sand dunes for free is absurd. Accordingly, Bardwell "must come forward with more persuasive evidence to support [his] claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356 (1986) (citations omitted). He cannot. Summary judgment is appropriate.

I.   **UNDISPUTED FACTS**

In or about early 2002, Bardwell put his resume on monster.com. (SOF at ¶ 1.) Sometime after placing his resume on monster.com, he got a call to meet with Jaime Ziparo about a job running a lumberyard in Phoenix. (SOF at ¶ 2.) He ended up accepting the job and was in that role from 2002 until 2005. (SOF at ¶ 3.) During that time, the lumberyard grew in both employees and the kinds of work being done. (SOF at ¶ 4.)

Ron Pratte owned the lumberyard and Bardwell first met Mr. Pratte around the time he was hired, in either 2002 or 2003. (SOF at ¶ 5.) Soon after, Bardwell began receiving invitations to the Dunes, an area located in Winterhaven, California, about 25 miles West of Yuma, Arizona, where Ron Pratte and others would ride sand rails and camp. (SOF at ¶ 6.) Soon Bardwell was getting invited to the Dunes every time Mr. Pratte would go. (SOF at ¶ 7.) During "that time [Bardwell] was employed at Pratte Building Systems, a business jointly owned or controlled by Pulte Homes and Plaintiff." (SOF at ¶ 8.) "In 2005, Pulte Homes fully acquired the business from Plaintiff [Mr. Pratte] for a substantial sum of money." (SOF at ¶ 9.)

In December 2005, Mr. Pratte gathered Bardwell, Jaime Ziparo, Justin Pratte, Todd Carriere, and Trevor Pratte for a meeting at a North Las Vegas airport. (SOF at ¶ 10.) Bardwell was the only attendee who was not connected to Mr. Pratte by family relation. (SOF at ¶ 11.) At that time, Mr. Pratte handed each attendee, including Mr. Bardwell, a $2 million check. (SOF at ¶ 12.) He also indicated that he wanted the group to form a building company with that money. (SOF at ¶ 13.)

Prior to that meeting, Mr. Pratte entered into a fairly simple agreement with Bardwell. As Mr. Pratte explained:

> Q. And what was it -- what was your understanding with respect to the $2 million you gave Jeff Bardwell?
>
> A. It was a verbal contract that Jeff Bardwell would work for me until I died.

(SOF at ¶ 14.) At the meeting in North Las Vegas, Mr. Pratte announced the deal he had agreed to with Bardwell in front of Bardwell and the rest of the group. (SOF at ¶ 15.) Bardwell agreed. (SOF at ¶ 16.)

In addition to the $2 million check, in the months after that meeting, Mr. Pratte transferred several properties to the group consisting of Bardwell, Jaime Ziparo, Justin Pratte, Todd Carriere, and Trevor Pratte. (SOF at ¶ 17.) This group set up various companies to receive each of several properties and Mr. Pratte transferred properties into the various entities. (SOF at ¶ 18.) Mr. Pratte transferred via quit claim deed a property

located at 600 N. 94th Ave, Tolleson, Arizona. This property was appraised on July 27, 2006 for $14,790,000 and was transferred to a Pratte Land Holdings LLC, a company in which Bardwell owned 20%. Mr. Pratte also transferred via quit claim deed a property located in Buckeye, Arizona. This property was appraised on October 12, 2006 for $3,798,000 and was transferred to Pratte Buckeye Property LLC, a company in which Bardwell owned 20%. Mr. Pratte also transferred via quit claim deed a property located at 2900 E. Lone Mountain Road, North Las Vegas, Nevada. This property was appraised on May 1, 2006 for $8,100,000.00 and was transferred to a Pratte Loan Mountain LLC, a company in which Bardwell owned 20%. (SOF at ¶ 19.) In addition to these transfers, Ron Pratte paid the taxes on all of the assets he paid to Bardwell. (SOF at ¶ 20.)

Bardwell—and Bardwell alone—disputes one fact: that Mr. Pratte made clear that Bardwell's windfall was in exchange for Bardwell's promise to work for Mr. Pratte until Mr. Pratte passed away. While Bardwell disputes this fact, no witness or document backs him up. Instead, every witness called to testify stated that Bardwell and Mr. Pratte had an agreement by which Bardwell would receive the immense upfront compensation and in exchange for Bardwell's promise to work for Mr. Pratte until Mr. Pratte passed away. Todd Carriere testified, "I recall [Mr. Pratte saying]: Jeff works for me until I'm gone. And Jeff never saying anything different. And I recall on various occasions Jeff and I having discussions about how long could Ron live. You know, Jeff would come in and be, like: Man, I'm going to be working until I'm 80 years old out there at the dunes." (SOF at ¶ 21.)

Jaime Ziparo testified:

> Q. Do you remember Ron telling Jeff at the airport that I'll give you this gift, but you've got to work for me for life?
>
> A. Until he dies. Until Ron dies, I remember that.
>
> Q. Is that what Ron said?
>
> A. Yeah.
>
> Q. I'm asking you.

A. Yes, that's what he said.

(SOF at ¶ 22.)

Justin Pratte testified: "[I]t was made clear to us that -- and very clear to Jeff that if he wanted to go forward in this venture, the four of us in Pratte Companies would fund any expenses necessary for Jeff to operate in a facet -- or in a manner to which his sole responsibility was to do whatever Ron asked him to do." (SOF at ¶ 23.) He also testified, "And I remember very vividly that the structure -- or the notion of Jeff working for Ron was: Jeff -- and these were Ron's words. Jeff, you work for me and whatever I need for the rest of my life." (SOF at ¶ 24.) Bardwell "responded affirmatively, that he would. And after that, I remember all of us having direct conversation with Jeff, reminding him what he was signing up for. And I had many conversations with Jeff. Please be sure that you're aware of what you're signing up for." (SOF at ¶ 25.)

Bardwell's friend Larry Yonker testified, "From Mr. Bardwell's account, [the verbal contract] was until – work for Ron until he died. . . . [f]or money up front." (SOF at ¶ 26.) Bardwell's friend and neighbor Jeff Abendschein testified that Bardwell tired of working for Mr. Pratte but stayed on "[b]ecause he had a contract with him. He was supposed to work for him until Ron passed and that was their verbal agreement." (SOF at ¶ 27.) When Bardwell showed Abendschein the $2 million check Bardwell had received from Mr. Pratte, Bardwell described it as "[l]ike a sign-on bonus to come work for [Mr. Pratte]." (SOF at ¶ 28.) Daryl Wolfswinkel, a friend of Mr. Pratte and Bardwell, testified: "[Bardwell] said: This is the deal I made with Ron, that I get treated the same as the rest of the boys, but I have to work for Ron for the rest of my life." (SOF at ¶ 29.)

Bardwell did not dispute that these conversations took place. (SOF at ¶ 30.) For example:

> Q. Okay. So you think you may have told Mr. Ziparo, Jaime, that, hey, I'm going to work for this man for the rest of my life?
>
> MR. MARLOWE: Objection, misstates.

5

> THE WITNESS: You know, it's -- could I have said, hey, I'm so thankful and I'll do whatever this man needs, probably. But did I have a contract with him to work for Ron his whole life, I did not.

(SOF at ¶ 31.) He also testified:

> You know, could I have told him, hey, Ron made a life changing gift to me and I'm going to work for that man for the rest of my life? Could I have said that? You know, we were in opening companies. Okay. And my role in the company, in Stellar Development, was to -- and the other entities was to take care of Ron.

(SOF at ¶ 32.) And Bardwell conceded that his role in the new companies was to work for Ron: "Ron was very -- he was very demanding upon everybody. And we all agreed that if he needed something, that I would help him." (SOF at ¶ 33.)

And of course, Bardwell did show up to work for Mr. Pratte continuously from December 2005 through early 2018—for no further compensation. Bardwell himself disclosed:

> From the time of the gift (late 2005 and early 2006), through early 2018, Defendant continued to assist Plaintiff with various aspects of Plaintiff's myriad of business enterprises and work with Stellar. One such project involved Plaintiff's development project located in Winterhaven, California, about 25 miles West of Yuma, Arizona, colloquially referred to as "The Dunes." Defendant spent several years assisting Plaintiff with this project to the detriment of his health and family life.

(SOF at ¶ 34.)

Bardwell received no further compensation for more than twelve years of work. (J. Bardwell Depo. (SOF at ¶ 35.) Yet he continued to do it even "to the detriment of his health and family life." During that time, Barwell worked as many as 3,000 hours in a year and sometimes more than 80 hours in a single week. (SOF at ¶ 36.) Bardwell claims he did it because he was "thankful." (SOF at ¶ 37.) But, apparently, he kept this motive secret from Mr. Pratte:

> Q. Do you ever remember telling Ron, hey, I don't have to do this any more, I'm doing this 'cause I want to?
>
> A. I never did.

6

(SOF at ¶ 38.)

And during that time, Bardwell sought permission from Mr. Pratte regarding his work schedule. (SOF at ¶ 39.) For example:

- On December 23, 2014, Bardwell wrote, "I am trying to plan a trip to Disney World with my kids on March 6 th thru the 14th. Is it possible to have these days off?" (SOF at ¶ 40.)
- On August 13, 2015, after Mr. Pratte had asked him when he was going to Florida, he wrote, "Sept 4th to 7th. Nothing is set in stone yet. Just talked to Don yesterday about it. *Trip does not need to happen if I'm needed here*." (SOF at ¶ 41 (emphasis added).)
- On December 4, 2015, he wrote, "I was planning on working at the dunes next week Mon, Tue and Wed. I was talking to Don and he said he was leaving for an infusion Thursday after work. What days would you like me to be at the dunes? If for some reason I don't hear from you I will stick with these dates." (SOF at ¶ 42.)
- On May 23, 2016, he wrote, "Ron if it is alright with you I would like to work only a couple hours this Friday. Please let me know[.]" (SOF at ¶ 43.)
- On August 15, 2016, he wrote, "Ron. I would like to take off the 25 th and the 26 th of this month. Please let me know. Thanks[.]" (SOF at ¶ 44.)
- On February 15, 2017, "Ron it looks like my mom broke two ribs and fractured her hip. She doesn't seem to be doing well. I would like to work a 1/2 day tomorrow and go see her. Do you think that will be ok? Please let me know[.]" (SOF at ¶ 45.)

At the time Bardwell wrote each of these emails, Mr. Pratte had not paid him anything for several years (and by the last ones, for over a decade). In other words, while Bardwell denies an agreement existed, he performed his end of the bargain for twelve years. Then, after twelve years, Bardwell quit working for Mr. Pratte. (SOF at ¶ 46.)

7

Bardwell and Mr. Pratte got in a disagreement and after that, Bardwell would not return Mr. Pratte's phone calls. (SOF at ¶ 47.) As Bardwell explained:

> And at that point when I left I was -- I was done. I was totally done. I went and dropped -- you know, I had an obligation to take a trailer and drop it off, because I brought it back with me. So I went to drop the trailer off, like I told him I would drop, 'cause it was -- needed repair. So I had to take that trailer in. And that was it.

(SOF at ¶ 48.)

Bardwell has indicated that he will dispute his contract based on a gift tax return filed by Mr. Pratte—one that satisfied Bardwell's tax obligations from the money Bardwell received from Mr. Pratte. But that is an excuse concocted during litigation. Bardwell conceded that he had never seen the gift tax return until his deposition. (SOF at ¶ 49.) And the evidence shows that the gift return is not dispositive, in fact, its wholly consistent with Bardwell agreeing to work for Mr. Pratte for the rest of Mr. Pratte's life.

## II.     ARGUMENT

### A.     The Summary Judgment Standard

A motion for summary judgment may be granted when there are no material facts in controversy and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). In considering a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *In re Mariar*, 267 F.3d 749, 755 (8th Cir. 2001). After the moving party has shown facts entitling it to judgment as a matter of law, the opposing party has the burden to make a sufficient showing on an essential element of the case with respect to which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Importantly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-248, 106 S.Ct. 2505, 2511 (citations omitted). "Only disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, 106 S.Ct. 2505, 2511 (citations omitted). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id.* at 249-50, 106 S.Ct. 2505, 2511.

In *Matsushita Electric Industrial. Co. v. Zenith Radio Corp.*, the United States Supreme Court provided further guidance on what constitutes a "genuine" issue of material fact:

> "When the moving party has carried its burden under Rule 56(c), its opponent must do more than show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial…'
>
> Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'…
>
> [I]f the claim is one that simply makes no economic sense, respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary."

475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356 (1986) (citations omitted).

After *Matsushita Electric*, a "mere disagreement or the bald assertion that a genuine issue of material fact exists, no longer precludes the use of summary judgment." *United States v. 403 1/2 Skyline Dr., La Habra Heights, CA*, 797 F. Supp. 796, 798 (C.D. Cal. 1992); *see also Equal Employment Opportunity Comm'n v. ValleyLife*, No. CV-15-00340-PHX-GMS, 2017 WL 227878, at *3 (D. Ariz. Jan. 19, 2017) ("The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts"). And "[i]f the factual context makes the nonmoving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Tanner v. Heise*, 879 F.2d 572, 577 (9th Cir. 1989); *see also HiRel Connectors, Inc. v. United States*, No. CV01-11069 DSF VBKX, 2006 WL 3618007, at *3 (C.D. Cal. Sept. 5, 2006) ("The non-

movant's burden to demonstrate a genuine issue of material fact increases when the factual context renders the claim implausible").

### B. Summary Judgment is Appropriate on Mr. Pratte's Breach of Contract Claim.

"To prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract between the plaintiff and defendant, a breach of the contract by the defendant, and resulting damage to the plaintiff." *Frank Lloyd Wright Found. v. Kroeter*, 697 F. Supp. 2d 1118, 1125 (D. Ariz. 2010). "Based on the undisputed facts, [Mr. Pratte] has provided evidence sufficient to establish a prima facie case of breach of contract." *Id*. (granting summary judgment).

Mr. Pratte explained the contract:

> Q. And what was it -- what was your understanding with respect to the $2 million you gave Jeff Bardwell?
>
> A. It was a verbal contract that Jeff Bardwell would work for me until I died.

(SOF at ¶ 14.) In addition, Bardwell received millions of dollars in real estate investments. And Bardwell, in fact, worked for Mr. Pratte for more than 12 years without further payment, asking for permission for time off and vacation time, spending upwards of 80 hours a week and 3,000 a year working for Mr. Pratte. (SOF at ¶¶ 35-36.) He then quit during Mr. Pratte's life, causing damages.

Bardwell admits that he received the money and real estate. He admits that for twelve years he worked long hours for Mr. Pratte without pay. The one event immediately followed after the other. Mr. Pratte has demonstrated that these events are connected through a contract. Half a dozen witnesses—including Bardwell's friends and neighbors—have testified to that contractual connection between the two. Bardwell concedes he talked about the connection:

> You know, could I have told him, hey, Ron made a life changing gift to me and I'm going to work for that man for the rest of my life? Could I have said that? You know, we were in opening companies.

> Okay. And my role in the company, in Stellar Development, was to -- and the other entities was to take care of Ron.

(SOF at ¶ 32.) He even testified that as part of the venture that stemmed from the assets he received, it was his job to take care of Mr. Pratte's needs: "Ron was very -- he was very demanding upon everybody. And we all agreed that if he needed something, that I would help him." (SOF at ¶ 33.)

Yet Bardwell denies that a contract exists. Bardwell's story is that he received a gift and was so thankful he worked for over a decade for free. That he worked as many as 3,000 hours in a year and sometimes more than 80 hours in a single week for free. (SOF at ¶ 36.) That he did so to "the detriment of his health and family life" all for free. (SOF at ¶ 34.) Indeed, Bardwell alleges he could have walked away at any time, was not bound by anything, but did not even while his family life and health suffered. Yet even while maintaining he could simply leave, he consistently asked for Mr. Pratte's approval for time off and vacations. (SOF at ¶¶ 40-45.) No witness supports Bardwell's lie. And no document supports it either.

"[I]f the claim is one that simply makes no economic sense, respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356 (1986) (citations omitted). If ever there was a case where one side's claim makes no economic sense, this is it. Bardwell's claim requires this Court to accept that Mr. Pratte made Bardwell independently wealthy, causing Bardwell to walk away from his well-paying job, so that for the next twelve years Bardwell could toil away in the sand dunes for free.

Mr. Pratte's asserted contract—one that provided Bardwell with a great deal of wealth (equal to that Mr. Pratte provided family members) in exchange for Bardwell's promise to work for Mr. Pratte for the rest of Mr. Pratte's life—fully explains Bardwell's actions (and demonstrates the breach when Bardwell suddenly quit). This version of the facts is supported by first-hand accounts and the accounts of witnesses who heard

Bardwell explain these exact terms. It is supported by the documents where Bardwell asks permission to take time off of work.

Bardwell has his own word (against the word of half a dozen others) and a gift tax return (which, as explained below is wholly irrelevant) that he admits he had never seen until his deposition. (SOF at ¶ 49.) No witness supports Bardwell's account. And it "simply makes no economic sense," so Bardwell "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356 (1986) (citations omitted). He cannot.

"If the factual context makes the nonmoving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Tanner v. Heise*, 879 F.2d 572, 577 (9th Cir. 1989). In addition to making no economic sense, Bardwell's defense is implausible—the notion that for twelve years he undertook voluntary duties that by his own admission were to the "the detriment of his health and family life." (SOF at ¶ 34.) He has no persuasive evidence that explains his position. Instead, common sense aligns with Mr. Pratte's evidence that Bardwell took on these duties out of a contractual obligation.

As a matter of law, the Court should render judgment against Bardwell and in favor of Mr. Pratte on Mr. Pratte's breach of contract claim.

**C.     Summary Judgment is Appropriate on Mr. Pratte's Unjust Enrichment Claim.**

"A claim of unjust enrichment under Arizona law has five elements: '(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law.'" *Perez v. First Am. Title Ins. Co.*, 810 F. Supp. 2d 986, 991 (D. Ariz. 2011) (quoting *Freeman v. Sorchych*, 226 Ariz. 242, 245 P.3d 927, 936 (App. 2011)). "'Thus, a plaintiff must demonstrate that the defendant received a benefit, that by receipt of that benefit the defendant was unjustly enriched at

the plaintiff's expense, and that the circumstances were such that in good conscience the defendant should provide compensation." *Id*. (quoting *Freeman*, 226 Ariz. 242, 245 P.3d 927, 936).

There is no dispute that there was an enrichment and impoverishment and connection between the two. Mr. Pratte provided Bardwell with over $10 million in cash and real estate investments. Bardwell admitted that as part of his windfall, he would take care of Mr. Pratte: "Ron was very -- he was very demanding upon everybody. And we all agreed that if he needed something, that I would help him." (SOF at ¶ 33.)

Yet Bardwell abandoned that role, but kept the money and real estate. If Bardwell convinces this Court that he did not enter a contract, there will be an absence of a remedy provided by law to set matters right. Mr. Pratte is entitled to summary judgment on his enrichment claim against Bardwell.

**D.    The Form 709 Gift Tax Return Does Not Support Bardwell's Lie.**

Mr. Pratte fully expects that Bardwell will respond by arguing that—despite all of the evidence detailed above, including the uncontradicted testimony of Bardwell's own friends and Bardwell's own emails with Mr. Pratte asking for vacation time—that Mr. Pratte's filing of IRS Form 709, commonly referred to a Gift Tax Form, supports Bardwell's story and requires the parties to proceed to trial. It does not.

Because the filing of IRS forms is not typically within the knowledge of the average juror, Mr. Pratte retained the services of a former Senior Attorney for the IRS Chief's Counsel Office, Tim Tarter, to explain when, why, and how IRS Form 709 is filed. As Mr. Tarter explains, "the filing of the Form 709 is consistent with Mr. Pratte making a conditional gift to Mr. Bardwell in exchange for Bardwell's promise of lifetime employment. Alternatively, the amounts transferred to Bardwell in 2006 resulted in the formation of a constructive trust, requiring repayment to Pratte when Bardwell failed to comply with their oral agreement." (SOF at ¶ 50.)

Unpacking Mr. Tarter's explanation, subtitle A of the Federal Tax Code, specifically, 26 U.S.C. §§ 61 – 63, provides that, generally, the receipt of any and all

income and property is taxable as income. But property acquired through gift or inheritance is generally excluded from gross taxable income, although gifts from an employer to an employee are included in an employee's taxable income as compensation. *See* U.S.C. § 102(c)(1). Subtitle B of the Federal Tax Code applies to gifts: "transfers of wealth not otherwise taxed by Subtitle A." But, not all transfers of wealth are fairly characterized as either income or gifts on the date that they are made; put another way, some transfers of wealth are undeterminable whether they fall under Subtitle A or B on the date the transfer occurs; in these cases, like the transfer to Bardwell here, IRS Form 709 is the correct way to report the transfer to the IRS.

As Mr. Tarter explained, 26 C.F.R. (Treas. Reg.) § 25.2511-2(a) provides clarification on this point as follows:

> The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the done at the time of the transfer. On the contrary, ***the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer, is measured by the value of the property passing from the donor, and attaches regardless of the fact that the identity of the donee may not then be known or ascertainable.***

(SOF at ¶ 51 (emphasis added).) Applying this treasury regulation, in IRS Private Letter Ruling 200308046, the IRS determined a son's oral promise to their father to return a gifted residence back to him at his request, resulted in an incomplete gift and a constructive trust in favor of their father, requiring the sons' reconveyance of the home back to their father. *See also* IRS Revenue Ruling 54-537, 1954-2 C.B. 316 (where the right to revest the beneficial title to property transferred in trust by the donor is an incomplete gift); *see also* Revenue Ruling 74-365, 1974-2 C.B. 324 (where the IRS determined a gift was not a completed gift because the gift was revocable).

Thus, IRS Form 709 should be filed whenever there is a transfer of wealth that involves a contingent gift. Here, there can be no dispute that Mr. Pratte's enormous transfer of wealth to Bardwell was, at least in part, a contingent gift requiring the filing of

IRS Form 709. As Bardwell testified, he could not have hoped to earn the monies that Mr. Pratte transferred to him in one fell-swoop in early 2007, even if he worked for the rest of his life. But, as all the evidence shows, with the only exception being Bardwell's own unsupported lie, the transfer of wealth to Bardwell came with strings attached. IRS Form 709 was the appropriate way to document this transfer.

Importantly, as Mr. Tarter explained, by reporting this transfer of wealth to the IRS on Form 709, instead of reporting it as ordinary income to Bardwell, Mr. Pratte paid significantly more tax than he otherwise would have on this transfer. As Mr. Tarter explained:

> There was certainly no attempt to evade any taxes or commit fraud by Pratte. To the contrary, Mr. Pratte walked away from a valuable business deduction and paid gift taxes on an incomplete or conditional gift to Bardwell, effectively overpaying taxes to the IRS of approximately $3,220,000. Although Mr. Pratte should be able to recover the cash and property transferred to Bardwell since his gift was conditional, he is unable to now recover the gift taxes he paid to the IRS on these transfers as reported on the Form 709. *See* 26 U.S.C. § 6511(a).

(SOF at ¶ 52.)

Accordingly, the filling of IRS Form 709 does not support Bardwell's story that Mr. Pratte made him a no-strings attached gift. IRS Form 709 is wholly consistent with Bardwell agreeing to work for Mr. Pratte for the rest of his life, in exchange for the enormous transfer of wealth he received. IRS Form 709 does not preclude summary judgment in Mr. Pratte's favor—nor does it lend credence to Bardwell's tale.

## **CONCLUSION**

Typically, a he said/he said situation cannot be determined on summary judgment. But when one side has little to no evidentiary support and makes no economic sense, the Court may enter summary judgment. This is that rare case. The only person who supports Bardwell's defense is Bardwell. And it requires this Court to believe that Bardwell worked as many as 3,000 hours a year doing work that was to the detriment of his health and family—for no compensation at all. "If the factual context makes the nonmoving

party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Tanner v. Heise*, 879 F.2d 572, 577 (9th Cir. 1989). Here, Bardwell does not have that "more persuasive evidence." He simply hopes this Court will let him tell his fanciful tale at trial in hopes that someone believes his word over that of a bevy of witnesses and scores of documents.

DATED this 18th day of December, 2020.

KERCSMAR & FELTUS PLLC

By: *s/ Greg Collins*
Gregory B. Collins
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on December 18, 2020, I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following:

Thomas M. Connelly
**LAW OFFICES OF THOMAS M. CONNELLY**
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Tconnelly2425@aol.com

Thomas J. Marlowe
**LAW OFFICES OF THOMAS J. MARLOWE**
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Tmarlowe2425@outlook.com

*Attorneys for Defendants*

 *s/ Kelli Dunlap*

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001