Gregory B. Collins (#023158)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kflawaz.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald H. Pratte,<br><br>           Plaintiff,<br><br>vs.<br><br>Jeffrey Bardwell and Fanny F. Bardwell, husband and wife,<br><br>           Defendants. | Case No. 2:19-cv-00239-PHX-GMS<br><br>**PLAINTIFF RONALD PRATTE'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Ronald H. Pratte submits the following Statement of Facts in Support of Motion of his Motion for Summary Judgment:

1. In or about early 2002, Bardwell put his resume on monster.com. (J. Bardwell Depo. (3/6/20), attached as **Exhibit 1**, at 16:9-18:9.)

2. Sometime after placing his resume on monster.com, he got a call to meet with Jaime Ziparo about a job running a lumberyard in Phoenix. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 18:10-20:12.)

3. Bardwell ended up accepting the job and was in that role from 2002 until 2005. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 21:24-22:4.)

4. During that time, the lumberyard grew in both employees and the kinds of work being done. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 29:15-25.)

1

5. Ron Pratte owned the lumberyard and Bardwell first met Mr. Pratte around the time he was hired, in either 2002 or 2003. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 31:7-23.)

6. Soon after, Bardwell began receiving invitations to the Dunes, an area located in Winterhaven, California, about 25 miles West of Yuma, Arizona, where Ron Pratte and others would ride sand rails and camp. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 31:18-34:5.)

7. Soon Bardwell was getting invited to the Dunes every time Mr. Pratte would go. (*Id*.)

8. During "that time [Bardwell] was employed at Pratte Building Systems, a business jointly owned or controlled by Pulte Homes and Plaintiff." (Defendants' First Amended Mandatory Initial Discovery Responses at 13, attached as **Exhibit 2**.)

9. "In 2005, Pulte Homes fully acquired the business from Plaintiff [Mr. Pratte] for a substantial sum of money." (*Id*.)

10. In December 2005, Mr. Pratte gathered Bardwell, Jaime Ziparo, Justin Pratte, Todd Carriere, and Trevor Pratte for a meeting at a North Las Vegas airport. (R. Pratte Dep. (2/27/20), attached as **Exhibit 3**, at 20:8-21:5.)

11. Bardwell was the only attendee who was not connected to Mr. Pratte by family relation. (Defendants' First Amended Mandatory Initial Discovery Responses at 13, attached as Exhibit 2.)

12. At that time, Mr. Pratte handed each attendee, including Mr. Bardwell, a $2 million check. (R. Pratte Dep. (2/27/20) at 22:19-23:5.)

13. He also indicated that he wanted the group to form a building company with that money. (R. Pratte Dep. (2/27/20), attached as Exhibit 3, at 22:19-25:7.)

14. Prior to that meeting, Mr. Pratte entered into a fairly simple agreement with Bardwell. As Mr. Pratte explained:

> Q. And what was it -- what was your understanding with respect to the $2 million you gave Jeff Bardwell?

     A. It was a verbal contract that Jeff Bardwell would work for me until I died.

(R. Pratte Dep. (2/27/20), attached as Exhibit 3, at 27:14-24.)

    15.    At the meeting in North Las Vegas, Mr. Pratte announced the deal he had agreed to with Bardwell in front of Bardwell and the rest of the group. (R. Pratte Dep. (2/27/20), attached as Exhibit 3, at 28:22-29:7; *see also id*. at 47:21-48:9.)

    16.    Bardwell agreed. (R. Pratte Dep. (2/27/20), attached as Exhibit 3, at 48:6-24.)

    17.    In addition to the $2 million check, in the months after that meeting, Mr. Pratte transferred several properties to the group consisting of Bardwell, Jaime Ziparo, Justin Pratte, Todd Carriere, and Trevor Pratte. (R. Pratte Dep. (2/27/20), attached as Exhibit 3, at 35:16-37:5.)

    18.    This group set up various companies to receive each of several properties and Mr. Pratte transferred properties into the various entities. (*Id*.)

    19.    Mr. Pratte transferred via quit claim deed a property located at 600 N. 94th Ave, Tolleson, Arizona. This property was appraised on July 27, 2006 for $14,790,000 and was transferred to a Pratte Land Holdings LLC, a company in which Bardwell owned 20%. Mr. Pratte also transferred via quit claim deed a property located in Buckeye, Arizona. This property was appraised on October 12, 2006 for $3,798,000 and was transfer to Pratte Buckeye Property LLC, a company in which Bardwell owned 20%. Mr. Pratte also transferred via quit claim deed a property located at 2900 E. Lone Mountain Road, North Las Vegas, Nevada. This property was appraised on May 1, 2006 for $8,100,000.00 and was transferred to a Pratte Loan Mountain LLC, a company in which Bardwell owned 20%. (Expert Report of B. Taylor at 4-5, attached as **Exhibit 4**.)

    20.    In addition to these transfers, Ron Pratte paid the taxes on all of the assets he paid to Bardwell. (*Id*. at 6.)

    21.    Todd Carriere testified, "I recall [Mr. Pratte saying]: Jeff works for me until I'm gone. And Jeff never saying anything different. And I recall on various occasions Jeff and I having discussions about how long could Ron live. You know, Jeff would come in

and be, like: Man, I'm going to be working until I'm 80 years old out there at the dunes." (T. Carriere Dep. (12/5/19), attached as **Exhibit 5**, at 248:22-250:4.)

    22.    Jaime Ziparo testified:

> Q. Do you remember Ron telling Jeff at the airport that I'll give you this gift, but you've got to work for me for life?
>
> A. Until he dies. Until Ron dies, I remember that.
>
> Q. Is that what Ron said?
>
> A. Yeah.
>
> Q. I'm asking you.
>
> A. Yes, that's what he said.

(J. Ziparo Depo. (12/4/19), attached as **Exhibit 6**, at 222:21-223:14; *see also* 206:1-10; 258:14-259:19.)

    23.    Justin Pratte testified: "[I]t was made clear to us that -- and very clear to Jeff that if he wanted to go forward in this venture, the four of us in Pratte Companies would fund any expenses necessary for Jeff to operate in a facet -- or in a manner to which his sole responsibility was to do whatever Ron asked him to do." (J. Pratte Dep. (11/26/19), attached as **Exhibit 7**, at 31:7-32:22.)

    24.    He also testified, "And I remember very vividly that the structure -- or the notion of Jeff working for Ron was: Jeff -- and these were Ron's words. Jeff, you work for me and whatever I need for the rest of my life." (*Id*. at 32:23-33:3.)

    25.    Bardwell "responded affirmatively, that he would. And after that, I remember all of us having direct conversation with Jeff, reminding him what he was signing up for. And I had many conversations with Jeff. Please be sure that you're aware of what you're signing up for." (*Id*. at 33:4-14; *see also* J. Ziparo Dep. (12/4/19), attached as Exhibit 6, at 247:18-248:12 (testifying to discussions with Bardwell regarding being sure about the task he was agreeing to).)

26. Bardwell's friend Larry Yonker testified, "From Mr. Bardwell's account, [the verbal contract] was until – work for Ron until he died. . . . [f]or money up front." (L. Yonker Dep. (2/14/20), attached as **Exhibit 8**, at 42:6-43:14; *see also id*. at 47:12-48:4.)

27. Bardwell's friend and neighbor Jeff Abendschein testified that Bardwell tired of working for Mr. Pratte but stayed on "[b]ecause he had a contract with him. He was supposed to work for him until Ron passed and that was their verbal agreement." (J. Abendschein Dep. (2/13/20), attached as **Exhibit 9**, at 44:15-46:8; *see also id*. at 63:10-19.)

28. When Bardwell showed Abendschein the $2 million check Bardwell had received from Mr. Pratte, Bardwell described it as "[l]ike a sign-on bonus to come work for [Mr. Pratte]." (*Id*. at 44:15-46:8; *see also id*. at 77:8-78:2.)

29. Daryl Wolfswinkel, a friend of Mr. Pratte and Bardwell, testified: "[Bardwell] said: This is the deal I made with Ron, that I get treated the same as the rest of the boys, but I have to work for Ron for the rest of my life." (D. Wolfswinkel Dep. (2/13/20), attached as **Exhibit 10**, at 61:14-62:20.)

30. Bardwell did not dispute that these conversations took place. (*See* Paragraphs 31-34 below.)

31. For example, he testified:

> Q. Okay. So you think you may have told Mr. Ziparo, Jaime, that, hey, I'm going to work for this man for the rest of my life?
>
> MR. MARLOWE: Objection, misstates.
>
> THE WITNESS: You know, it's -- could I have said, hey, I'm so thankful and I'll do whatever this man needs, probably. But did I have a contract with him to work for Ron his whole life, I did not.

(J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 181:7-14; *see also id*. at 182:11-19.)

32. Bardwell also testified:

> You know, could I have told him, hey, Ron made a life changing gift to me and I'm going to work for that man for the rest of my life? Could I have said that? You know, we were in opening companies.

5

>Okay. And my role in the company, in Stellar Development, was to -- and the other entities was to take care of Ron.

(J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 180:15-25.)

33. Bardwell conceded that his role in the new companies was to work for Ron: "Ron was very -- he was very demanding upon everybody. And we all agreed that if he needed something, that I would help him." (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 72:14-73:18.)

34. Bardwell disclosed:

>From the time of the gift (late 2005 and early 2006), through early 2018, Defendant continued to assist Plaintiff with various aspects of Plaintiff's myriad of business enterprises and work with Stellar. One such project involved Plaintiff's development project located in Winterhaven, California, about 25 miles West of Yuma, Arizona, colloquially referred to as "The Dunes." Defendant spent several years assisting Plaintiff with this project to the detriment of his health and family life.

(Defendants' First Amended Mandatory Initial Discovery Responses at 16-17, attached as Exhibit 2.)

35. Bardwell received no further compensation for more than twelve years of work. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 106:13-110:12.)

36. During that time, Barwell worked as many as 3,000 hours in a year and sometimes more than 80 hours in a single week. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 105:1-106:4.)

37. Bardwell claims he did it because he was "thankful." (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 129:17-131:4.)

38. Bardwell testified:

>Q. Do you ever remember telling Ron, hey, I don't have to do this any more, I'm doing this 'cause I want to?
>
>A. I never did.

(J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 131:5-7.)

39. During that time, Bardwell sought permission from Mr. Pratte regarding his work schedule. (*See* Paragraphs 40-45 below.)

40. On December 23, 2014, Bardwell wrote, "I am trying to plan a trip to Disney World with my kids on March 6 th thru the 14th. Is it possible to have these days off?" (JB002378, attached as **Exhibit 11**.)

41. On August 13, 2015, after Mr. Pratte had asked him when he was going to Florida, he wrote, "Sept 4th to 7th. Nothing is set in stone yet. Just talked to Don yesterday about it. Trip does not need to happen if I'm needed here." (JB002981, attached as **Exhibit 12**.)

42. On December 4, 2015, he wrote, "I was planning on working at the dunes next week Mon, Tue and Wed. I was talking to Don and he said he was leaving for an infusion Thursday after work. What days would you like me to be at the dunes? If for some reason I don't hear from you I will stick with these dates." (JB003630, attached as **Exhibit 13**.)

43. On May 23, 2016, he wrote, "Ron if it is alright with you I would like to work only a couple hours this Friday. Please let me know[.]" (JB003956, attached as **Exhibit 14**.)

44. On August 15, 2016, he wrote, "Ron. I would like to take off the 25 th and the 26 th of this month. Please let me know. Thanks[.]" (JB004458, attached as **Exhibit 15**.)

45. On February 15, 2017, "Ron it looks like my mom broke two ribs and fractured her hip. She doesn't seem to be doing well. I would like to work a 1/2 day tomorrow and go see her. Do you think that will be ok? Please let me know[.]" (JB005086, attached as **Exhibit 16**.)

46. After twelve years, Bardwell quit working for Mr. Pratte. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 166:21-169:14.)

47. Bardwell and Mr. Pratte got in a disagreement and after that, Bardwell would not return Mr. Pratte's phone calls. (*Id*.)

7

48. Bardwell testified:

> And at that point when I left I was -- I was done. I was totally done. I went and dropped -- you know, I had an obligation to take a trailer and drop it off, because I brought it back with me. So I went to drop the trailer off, like I told him I would drop, 'cause it was -- needed repair. So I had to take that trailer in. And that was it.

(*Id.*)

49. Bardwell had never seen the gift tax return until his deposition. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 213:5-18.)

50. Former Senior Attorney for the IRS Chief's Counsel Office, Tim Tarter, explained, "the filing of the Form 709 is consistent with Mr. Pratte making a conditional gift to Mr. Bardwell in exchange for Bardwell's promise of lifetime employment. Alternatively, the amounts transferred to Bardwell in 2006 resulted in the formation of a constructive trust, requiring repayment to Pratte when Bardwell failed to comply with their oral agreement." (Expert Report of T. Tarter at 3, attached as **Exhibit 17**.)

51. Mr. Tarter explained, 26 C.F.R. (Treas. Reg.) § 25.2511-2(a) provides clarification on this point as follows:

> The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the done at the time of the transfer. On the contrary, the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer, is measured by the value of the property passing from the donor, and attaches regardless of the fact that the identity of the donee may not then be known or ascertainable**.**

(Expert Report of T. Tarter at 4, attached as Exhibit 17.)

52. Mr. Tarter explained, by reporting this transfer of wealth to the IRS on Form 709, instead of reporting it as ordinary income to Bardwell, Mr. Pratte paid significantly more tax than he otherwise would have on this transfer:

> There was certainly no attempt to evade any taxes or commit fraud by Pratte. To the contrary, Mr. Pratte walked away from a valuable

8

business deduction and paid gift taxes on an incomplete or conditional gift to Bardwell, effectively overpaying taxes to the IRS of approximately $3,220,000. Although Mr. Pratte should be able to recover the cash and property transferred to Bardwell since his gift was conditional, he is unable to now recover the gift taxes he paid to the IRS on these transfers as reported on the Form 709. *See* 26 U.S.C. § 6511(a).

(Expert Report of T. Tarter at 5, attached as Exhibit 17.)

DATED this 18th day of December, 2020.

KERCSMAR & FELTUS PLLC

By: *s/ Greg Collins*
Gregory B. Collins
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
*Attorneys for Plaintiff*

# **CERTIFICATE OF SERVICE**

I certify that on December 18, 2020, I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following:

Thomas M. Connelly
**LAW OFFICES OF THOMAS M. CONNELLY**
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Tconnelly2425@aol.com

Thomas J. Marlowe
**LAW OFFICES OF THOMAS J. MARLOWE**
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Tmarlowe2425@outlook.com

*Attorneys for Defendants*


 *s/ Kelli Dunlap*