# EXHIBIT 1



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


| | |
|---|---|
| Ronald H. Pratte, | ) |
| | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| | ) Case No. |
|        vs. | ) 2:19-cv-00239-PHX-GMS |
| | ) |
| Jeffrey Bardwell and Fanny F. | ) |
| Bardwell, husband and | ) |
| wife, | ) |
| | ) |
| | ) |
|      Defendants. | ) |
| _____ | ) |



VIDEOTAPED DEPOSITION OF JEFFREY MICHAEL BARDWELL

Scottsdale, Arizona
March 6, 2020
9:39 a.m.



Prepared for:
COPY

Prepared by:                    CARRIE REPORTING, LLC
SHERYL L. HENKE                 Certified Reporters
Registered Professional Reporter 2415 E. Camelback Road
AZ CR No. #50745                Suite 700
carrie@carriereporting.com      Phoenix, AZ 85016
                                (480) 429-7573

Deposition of Jeffrey Bardwell

3/6/2020

Page 2

1                    I N D E X

2    WITNESS
                                                PAGE
3    JEFFREY MICHAEL BARDWELL

4        EXAMINATION BY MR. COLLINS                 6

5

6
                       E X H I B I T S
7

8    No.            Description                  Page

9
     Exhibit 1     Operating Agreement of Pratte    78
10                 Construction Company, L.L.C.,
                   Bates stamped Bard_TC0327 -
11                 Bard_TC0354

12   Exhibit 2     Amended and Restated Operating   84
                   Agreement of Pratte Companies,
13                 L.L.C., Bates stamped
                   Bard_TC0293 - Bard_TC0326
14
     Exhibit 3     Operating Agreement of Pratte    85
15                 Lone Mountain Property, L.L.C.,
                   Bates stamped Bard_TC0087 -
16                 Bard_TC0129

17   Exhibit 4     Separation Agreement, Bates     119
                   stamped Bard_TC0138 -
18                 Bard_TC0141

19   Exhibit 5     Redemption of Membership        126
                   Interest, Bates stamped
20                 Bard_TC0142

21   Exhibit 6     String of emails, Bates stamped 133
                   JB001494
22
     Exhibit 7     Two emails dated December 23,   135
23                 2014, Bates stamped JB002378

24   Exhibit 8     Email dated August 13, 2015,    138
                   Bates stamped JB002981
25

Deposition of Jeffrey Bardwell

3/6/2020

```
                                                    Page 4

 1            VIDEOTAPED DEPOSITION OF JEFFREY MICHAEL BARDWELL

 2   commenced at 9:39 a.m. on March 6, 2020 at the law offices

 3   of KERCSMAR & FELTUS PLLC, 7150 East Camelback Road, Suite

 4   285, Scottsdale, ARIZONA, before SHERYL L. HENKE, a

 5   Certified Reporter, in and for the County of Maricopa,

 6   State of Arizona.

 7                              * * *

 8

 9                    A P P E A R A N C E S

10   FOR THE PLAINTIFF:

11          KERCSMAR & FELTUS PLLC
            BY: Gregory B. Collins, Esq.
12          BY: Eric B. Hull, Esq.
               7150 East Camelback Road
13             Suite 285
               Scottsdale, Arizona 85251
14             gbc@kflawaz.com
               ebh@kflawaz.com
15

16   FOR THE DEFENDANTS:

17          LAW OFFICES OF THOMAS J. MARLOWE
            BY:  Thomas J. Marlow, Esq.
18               2425 East Camelback Road
                 Suite 880
19               Phoenix, Arizona 85016
                 tmarlowe2425@outlook.com
20

21          LAW OFFICES OF THOMAS M. CONNELLY
            BY:  Thomas M. Connelly, Esq.
22               2425 East Camelback Road
                 Suite 880
23               Phoenix, Arizona 85016
                 tconnelly@2425@aol.com
24

     ALSO PRESENT:
25
```

Deposition of Jeffrey Bardwell

3/6/2020

Page 16

1      A.     Two and a half.

2      Q.     If you remember, what did you make, what did you

3  get paid?

4      A.     When I left Foxworth it was $48,000 a year.

5      Q.     Any bonuses?

6      A.     No.  Salary.

7      Q.     Salary of 48,000?

8      A.     Yes.

9      Q.     And when did you leave Foxworth?

10     A.     2002.  Yeah, around there, 2001, 2002, maybe

11  early 2002.

12     Q.     Okay.

13     A.     Yeah.

14     Q.     And why did you leave?

15     A.     My goal at Foxworth was to be -- to work in the

16  office to be an estimator.  And I've made my rounds and

17  worked my way up from the bottom at $6 an hour and was a

18  lead man at every position.  I never called in sick, never

19  missed a day, never was late.  And I never said no to any

20  overtime.  So I wanted to get to the office.  And at about

21  year number eight, I expressed in my yearly review that I

22  wanted to go and work as an estimator.

23            I felt that knowing the floor, if I was an

24  estimator, I could learn how to design the trusses to make

25  it easier for the guys that built them, since that's what

Deposition of Jeffrey Bardwell

3/6/2020

Page 17

1   I've done.  So you can have the same jig and not have so

2   many moving parts and all the webs, which are the internal

3   part of the truss, will be in the same location for

4   different setups and you could get more production.

5           And I told my general manager, because I got

6   only one time a year to talk to him, that I wanted to move

7   up.  He said, well, you don't know estimating.  He said

8   you don't know how to read plans.  I said I understand

9   that.

10          So I took the following year, that was year

11  eight, I took the following year and I taught myself how

12  to read plans.  'Cause I had a friend that was an

13  estimator.  And we worked after work so I could learn how

14  to do that.

15          And I learned how to do a handwritten takeoff

16  and to turn blueprints into a truss by hand without using

17  the computer program.  So year number nine, I expressed,

18  hey, I still want to work upstairs.  And they're like,

19  yeah, yeah, yeah.  You know, you don't know estimating.

20  Yup, I do.  Taught myself.  Okay, here's some plans.  Show

21  me.

22          So I did it.  So pretty good, you know, you did

23  great.  So I'm thinking, okay, great, I might be able to

24  advance.  So then I stayed a whole another year.  And they

25  hired two -- two other estimators to go upstairs out of

Deposition of Jeffrey Bardwell

3/6/2020

Page 18

1    the company.  Which I don't -- you know, that's not hiring

2    from within, and I just didn't think that was right.

3              So I had my review the tenth year, and he said

4    sorry, you know, I really need you outside.  I need you

5    out there to run everything, you know.  So I said -- you

6    know, I was kind of disappointed.  So I put a resume on

7    Monster.com after my review.

8        Q.    After your tenth year review?

9        A.    Yes.

10       Q.    Okay.  And what happens after you put the resume

11   on Monster.com?

12       A.    I got called from a headhunter.

13       Q.    Okay.  At some point you end up meeting Jaime

14   Ziparo?

15       A.    Yeah.  Jaime Ziparo hired the headhunter that

16   called me.  So the headhunter called me and said, hey, I

17   like your resume that you made.  You know, would you be

18   interested in running a lumbar yard?  And I told the

19   headhunter, well, I don't know.  I know trusses, which we

20   have lumber, but a lumber yard is a little different.  I

21   said, but I can learn anything.  Yeah, I'm interested.

22   And then he got me in touch with Jaime.

23       Q.    Okay.  And what do you remember about that?

24   About getting in touch with Jaime, about meeting Jaime?

25       A.    Jaime had my resume and said your resume looks

Deposition of Jeffrey Bardwell

3/6/2020

Page 19

1  good, are you interested in a lumber yard?  And I said,

2  well, to tell you the truth it's -- I don't know lumber

3  because there is so many different grades, different

4  lengths, different sizes.  You know, I only know a certain

5  specific size for what we use to make trusses.  I said,

6  but, you know, I'm pretty sure I can learn anything, you

7  know.  If you give me a chance, not a problem.

8          And he says, okay, I like it.  So he says, okay,

9  let's -- let's meet.  Send me your resume to Phoenix.  I

10  said okay.  So I faxed a resume to Phoenix, which I felt

11  was weird, because he had my resume, why do I need to fax

12  it to Phoenix.  And then I never got a call back for like

13  two weeks.

14          So then Jaime called me and said, hey, are you

15  still interested?  And I said, yeah, I faxed my resume and

16  no one ever called me.  And he said, oh, 'cause they --

17  Pratte at the time owned a truss company and a lumber

18  company.  And he said, oh, your resume must have went to

19  the wrong department.  Okay.  So then I said, yeah, I'm

20  still interested.  And then he set up a meeting for me to

21  go to in Phoenix.

22      Q.    Okay.  And where was that meeting?

23      A.    51st Avenue and Lower Buckeye was at Pratte

24  Building Systems office.

25      Q.    Would it have been in about 2002?

Deposition of Jeffrey Bardwell

3/6/2020

Page 20

1    A.    Yeah.

2    Q.    Okay.  Who do you remember being at that

3 meeting?

4    A.    Jaime, Mark Furtman.  I just think those two, I

5 think, mm-hm.

6    Q.    Okay.  And at some point they end up offering

7 you a job, right?

8    A.    Yes.

9    Q.    Okay.  What was that job?

10    A.    The job was to run a lumber yard.

11    Q.    Where was the lumber yard located?

12    A.    In Phoenix.

13    Q.    Prior to taking that job, did you meet Ron

14 Pratte?

15    A.    No.

16    Q.    Okay.  Do you remember what your salary was when

17 you started that job?

18    A.    48,000.

19    Q.    How many employees did you supervise?

20    A.    I had 150.

21    Q.    Tell me about the lumber yard generally.

22    A.    Okay.  The lumber yard consists of -- we --

23 consists of lumber, all different sizes, different

24 lengths, glulam beams, cut and buck area, which is headers

25 for above doors when we frame houses that we would make on

Deposition of Jeffrey Bardwell

3/6/2020

Page 21

1    site.  It was a prefab facility which we built all

2    columns, arches, stairs.  We did everything in-house.  And

3    I would send that on the truck so the framers didn't have

4    to build it.

5           We had a bunk saw, which took units of lumber,

6    full units.  And we would cut them to stud length sizes so

7    the framers out in the field didn't have to cut the studs,

8    take the time to individually cut 500 studs.  We would cut

9    the whole unit.

10          It consisted of ECS Pro team, which was all the

11   cutting and all of the orders, all the paperwork,

12   dispatch.  We started out, I think we had 10 or 12 trucks.

13   You know, by the time it was done, you know, end of '05,

14   we had 25 trucks and 50 53-foot trailers.

15          So at the yard at 51st Avenue we would build the

16   packages.  The truss division was separate.  I was across

17   the street.  I was in charge of delivering my goods.  So

18   my goods would be all the prefab, all the wood packages.

19   And then I had my trucks.  Now it was different when we

20   moved into the main facility.

21          And I also got -- so I ran the lumber yard.  But

22   I also -- Ron was purchasing other companies.  And I also

23   started operating and running those companies.

24   Q.    Okay.  I think this is where you are going.

25   2002 you start running this lumber yard, right?

Deposition of Jeffrey Bardwell

3/6/2020

Page 22

1      A.    Yes.

2      Q.    And you're in that role basically until

3  December 2005, right?

4      A.    That's correct.

5      Q.    Okay.  How does the -- how do your

6  responsibilities change over the time that you started in

7  2002 and December 2005?

8      A.    Very good.  They -- at first I went to -- in

9  2002 I went to Las Vegas to train.  Okay.  So I was up

10  there for a few months to train.  And while I was up there

11  training, I worked all day first shift, all day second

12  shift, and I created an operator's manual on how to

13  operate and start up a lumber yard.

14          Now Ron Pratte had lumber down in Phoenix at the

15  time, but it wasn't a full operating lumber yard.  He had

16  a full operating lumber yard in Vegas.  So I went up there

17  to mimic that.  And I would work, like I said, first

18  shift, second shift.  One day I'd watch the guy work; so I

19  would pick a section.  I would sit there and watch him

20  work.  Then the next day I would have him watch me and I

21  would work.

22          So I did every single department like that on

23  first shift and second shift.  And then at night I would

24  go back to the hotel and write down what I did and make an

25  operator's manual, because I would need to do that in

Deposition of Jeffrey Bardwell

3/6/2020

Page 29

1   underneath you.

2          So then I ran the -- oversaw the door shop.  And

3   at the same time, and this was later on in '05, they said,

4   okay, you got the mechanic shop too.  So now you will

5   have -- by the time it's done, you will have the whole

6   yard, the whole manufacturing yard.  The only thing I did

7   not have there was the truss department.  Which I had

8   10 years in trusses so I already knew trusses.  But Don

9   Pratte was there running the trusses.  So I did not get

10  the truss yard.

11         So at the new facility with everybody being in

12  one location now, the door shop, the prefab, the plumbing,

13  not separating just the lumber yard, I want to say that

14  there was almost 400 employees there.

15  Q.    Okay.  So to kind of summarize, 2002 to

16  December 2005, you go from running a lumber yard that had

17  less than 100 employees when you started --

18  A.    That's correct.

19  Q.    -- to running a lumber yard that now includes a

20  door shop, a plumbing division, a post-tension cable

21  company and a mechanic shop that has roughly 400

22  employees, right?

23  A.    That's correct.  All of them together had that.

24  Q.    Yeah.  All of them together?

25  A.    Yes.  Yes.

Deposition of Jeffrey Bardwell

3/6/2020

Page 31

1    yard then, right?  Do you know what his role was?

2         A.    Right.  Jaime Ziparo was based out of Vegas.

3         Q.    Right.

4         A.    He ran the lumber yard in Vegas and then he

5    ended up running the field.  I don't think he did much in

6    Phoenix.

7         Q.    Okay.  When was the first time you met Ron

8    Pratte that you remember?

9         A.    I was in the office in North Las Vegas, and I

10   think I saw him in the hallway and met him.

11        Q.    The office in North Las Vegas, this probably

12   would have been during the training period when you

13   were --

14        A.    That's correct.

15        Q.    Okay.  So maybe 2002, maybe 2003; not too long

16   after you got hired, right?

17        A.    That's correct.

18        Q.    Okay.  Tell me how your relationship with Ron

19   Pratte develops between 2002 and 2005.

20        A.    Okay.  When I -- my very first bonus, Ron called

21   me in the office and he said, young man, I want to tell

22   you, you're doing a great job.  He gave me a $20,000 bonus

23   which I was shocked at.

24        Q.    You're making like 48 grand at the time?

25        A.    Yes.  I mean, I was drop dead, tickled pink,

Deposition of Jeffrey Bardwell

3/6/2020

Page 32

1    over the world.  I couldn't have been happier.  You know,

2    but I put a lot of work in, but I don't mind working.

3             So that's when I first saw him -- and not first

4    saw him, but that's when I first interacted with him.

5    Then maybe six months after I was hired, Jaime knew I went

6    to the sand dunes to play.  The sand dunes is out in

7    California; Winterhaven, California.  And he goes, oh, you

8    go out there.

9             And I said yeah, I have a sand rail.  Oh, yeah,

10   we go out there too.  Really?  Yeah.  Where do you guys

11   camp?  Because there is different locations.  I camped on

12   Gordon Wells, which is on the north side of the freeway.

13   They camped on Buttercup, which is on the south side of

14   the freeway.

15            And I said, yeah, I'm going to be out there for

16   New Year's -- for -- I don't know if it was New Year's Eve

17   or Christmas, one of the holidays.

18            And he goes, hey, you going to go out there?

19   Yeah, us too.  Okay, great.  He goes come and see us.  No

20   problem.  You know, where are you guys camping?  We're at

21   the cul-de-sac.  There is only one cul-de-sac.

22            So I go to see him and, you know, they have

23   these trucks and trailers and Taz cars and quads.  I mean,

24   they have everything known to man, right.

25            So I come up in this sand rail.  And I pull

Deposition of Jeffrey Bardwell

3/6/2020

Page 33

1   over.  And, hey, how it's going?  And Ron's there.  Hey,

2   how's it's going?  And we're just shooting the shit,

3   hanging out.  Had a campfire.  You know, I stayed until

4   probably midnight or 1:00.  And went on a -- I think

5   Justin was there as well.  Went out on a ride, you know.

6   And then when we left, I said, okay, well, I'm going back

7   to my camp.  Hey, okay, be careful, blah, blah, blah.

8   That was the first encounter.

9          So then after that Ron would -- I would go

10  through Jaime and then sometimes Ron would call me.  When

11  Ron would go, he would need firewood.  And Ron would say,

12  hey, give me some firewood.  Okay.  Well, what type of

13  firewood?  He goes use the bunk saw, which is the saw that

14  cuts the whole unit.  Band it every two feet, cut it and

15  I'm going to swing -- and have someone swing by and pick

16  it up.  That's going to be my firewood.  Okay.  I did what

17  the man wanted.

18          Then, you know, he said, hey, you should come

19  out and camp with us.  Okay.  Yeah, no problem.  So then

20  we get out.  You going to be at Buttercup?  Okay, when are

21  you going out?  Blah, blah, blah.  You know, I'm going to

22  go out on this date.  So I'll meet you out there.

23          So then the first time I camped with him was at

24  Buttercup where he camped.  It's not -- you know, he

25  didn't own the property.  He just went out there and

Deposition of Jeffrey Bardwell

3/6/2020

Page 34

1  camped like everybody else.  And I camped with him for the

2  weekend.  And then after that, he invited me every single

3  time he went, which he goes on every holiday.  You know,

4  but when he goes, he stays, you know, two weeks at a time.

5  And after that, and we would go six, seven times a year.

6      Q.    And this is 2002 to 2005?

7      A.    That's correct.

8      Q.    You go six, seven times a year to Buttercup,

9  which is a part of Winterhaven or part of the dunes?

10     A.    Part of the dunes, yes, Imperial Sand Dunes.

11     Q.    Sand dunes is a big area.  Part of it is called

12 Winterhaven?

13     A.    Winterhaven is the city.  The sand dunes is the

14 recreational area.

15     Q.    Okay.  Thank you.

16     A.    Mm-hm.

17     Q.    All right.  Do you remember -- so you get this

18 bonus, right?  And when you get this bonus, you hadn't

19 been to the dunes with Ron Pratte yet, right?

20     A.    That's correct.

21     Q.    Bonus probably 2003?

22     A.    I don't know if it was the end of 2002, in 2003;

23 one of the two, yes.

24     Q.    Okay.  And then how long after that do you

25 remember the first time you had this interaction at the

Deposition of Jeffrey Bardwell

3/6/2020

Page 72

1    retiring at all, right?

2        A.    Well, the assets got transferred to the entities

3    that we're going to set up.  I didn't think they're coming

4    to me, they're coming to my share.  And no, I'm not going

5    to retire, because we're starting a construction company.

6        Q.    Okay.  Did you feel obligated to start the

7    construction company?

8        A.    No.

9        Q.    Why not?

10        A.    Well, no one told me I had to start it.  I

11    wanted to start it.  I wanted to be involved with it.  I

12    mean, if we're going to have a lot of money going into it,

13    it's going to be a big company.  I wanted to be involved.

14        Q.    All right.  You find out these assets are going

15    to be transferred, the properties are going to be

16    transferred.  Do you remember having discussions with the

17    boys?  And we can use that term if it works for you.  The

18    boys would be Todd Carriere, Jaime Ziparo, Justin Pratte,

19    Trevor Pratte.

20        A.    Okay.

21        Q.    Okay?

22        A.    Yes.

23        Q.    Do you remember having discussions with the boys

24    as to how -- how this business should be set up?

25        A.    Yes.

Carrie Reporting, LLC
480.429.7573

Deposition of Jeffrey Bardwell

3/6/2020

Page 73

1      Q.    What do you remember about that?

2      A.    I remember talking to them about starting up a

3  construction company.  You know, and then they -- we all

4  agreed that my role in that company would be to keep Ron

5  off of everyone's back.  Jaime and Todd -- well, Jaime

6  more than anybody, but Jaime and Todd were like, hey, we

7  want to grow this company.  We need you to be on board.

8  You know, we're going to need your help.  But if Ron needs

9  something, you need to be the guy to go to help him.

10     Q.    And you said your role in the company would be

11  to keep Ron off everyone's back; is that right?

12     A.    Yeah.  Ron was very -- he was very demanding

13  upon everybody.  And we all agreed that if he needed

14  something, that I would help him.  So Jaime and Todd and

15  the boys could grow the company.  You know, while I

16  still -- you know, if they needed my help, I would go and

17  do what I needed to do there.  If Ron needed help, I would

18  go and help Ron.

19     Q.    Do you remember what Ron said your role would be

20  in the company?  Do you remember Ron ever dictating what

21  your role would be?

22     A.    Ron never said anything.

23     Q.    Okay.  Ron never said Jeff Bardwell works for

24  me?

25     A.    No, he did not.

Deposition of Jeffrey Bardwell

3/6/2020

Page 105

1      Q.    Okay.  How many hours a week were you doing

2  that, you were doing work that Ron asked you to do?

3      A.    It varied.  Sometimes I wouldn't do anything,

4  and some days I would be working seven days a week helping

5  him.

6      Q.    Any idea on a yearly basis how many hours you

7  worked?

8      A.    I mean, I never counted it out.  I know I wrote

9  it out.  I mean, if we do the math right here, sometimes

10  it was 80 hours, 60 hours, no hours.  I don't know exactly

11  the number of hours; 2,000, 3,000, 1,000.  It varied and

12  we're talking about 10, 12 years.

13      Q.    We're talking about a big stretch, right?

14      A.    Yeah, I mean, it's --

15      Q.    2005 to 2018, --

16      A.    Yes.

17      Q.    -- right?  And fair to say sometimes you would

18  be super busy with work that Ron asked you to do,

19  sometimes you wouldn't have anything to do, right?

20      A.    That's correct.

21      Q.    Okay.  Some weeks you would work more than

22  40 hours, right?

23      A.    At Stellar?

24      Q.    No.  For work that Ron asked you to do.

25      A.    For things that he asked me to do, yes,

Deposition of Jeffrey Bardwell

3/6/2020

Page 106

1    sometimes it would require more than 40 hours.

2         Q.    Okay.  Sometimes it might have been 80 hours in

3    a week; is that right?

4         A.    That's correct.

5         Q.    Okay.

6         A.    Not required, but I would do it.  And I would

7    stay.  I could have left at any time, but I stayed.

8         Q.    When you say you "could have left at any time,"

9    what does that mean?

10        A.    Well, I mean, he wasn't -- I wasn't his employee

11   where you have -- you clock in, you have to work, you

12   get -- I mean, I was there helping him.

13        Q.    Okay.  And you were there helping them -- him

14   why, again?

15        A.    Because that was my role in the companies, and

16   all the companies that all of us boys set up.

17        Q.    And so you couldn't leave, right, because that

18   was -- that was one of your responsibilities as a member

19   of those companies, right?

20        A.    I couldn't leave all the companies, or I

21   couldn't leave not helping Ron, or what's the question?

22        Q.    I mean, if your role as a member of these

23   companies was to help Ron, --

24        A.    Mm-hm.

25        Q.    -- if Ron asked you to do something, you did it,

Deposition of Jeffrey Bardwell

3/6/2020

Page 107

1  right?

2      A.    Yeah.  And if I didn't do it or couldn't do it,

3  I would go back to the boys.  And they would send Jaime.

4  I mean, there's times I didn't go to the dunes and Jaime

5  was down at the dunes.

6      Q.    Okay.  So somebody had to do it, right?

7  Somebody had to do what Ron asked?

8      A.    They didn't have to.  But, you know, Ron changed

9  our lives, okay, all of our lives.  So we wanted to help

10  him.  We truly wanted to help him.  That's that.

11      Q.    All of the boys?

12      A.    Yeah, I believe we all felt the same.

13      Q.    Okay.  And so your testimony is, look, if you

14  weren't able to do something that Ron asked, you would go

15  to the boys and ask them to do it; is that right?

16      A.    Yes.

17      Q.    Okay.  Do you ever remember doing that?  You

18  mentioned the one time where Jaime went to the dunes.

19      A.    Yeah.  I mean, there were times where Jaime

20  went, because he knew I wasn't going to go.  I don't

21  really remember going and saying, hey, I'm not doing this

22  and I'm not -- I don't remember going to the boys and

23  saying I can't do it.  I'm a guy that likes to get stuff

24  done, you know, at all costs.  I mean, I'll work 100 hours

25  a week because I want to get things done.

Deposition of Jeffrey Bardwell

3/6/2020

Page 108

```
 1      Q.    Okay.

 2      A.    I like to work.  Yeah, I like to work.

 3      Q.    Okay.  And so the only time you remember going

 4   to the boys and saying, hey, I can't do this, I need

 5   somebody else to do it, is the time that you referenced

 6   where you asked Jaime to go to the dunes?

 7                MR. MARLOWE:  Objection, misstates.

 8   BY MR. COLLINS:

 9      Q.    Go ahead.

10      A.    Yeah.  I don't think I went to them saying I

11   can't do this.  I don't think that was it.  It's, hey, I'm

12   not going to the dunes.  You know, I'm doing -- I'm going

13   camping, or I'm going with my family.  So Jaime went to

14   the dunes.  That was an example.  I didn't go to them and

15   say, hey, I couldn't do this.

16      Q.    Okay.  What would you do in the dunes?  What

17   would you be asked to do by Ron?

18      A.    Well, it depends on what project.  I mean, it's

19   so vague.  For 12 years of -- I mean, he bought the dunes

20   in '06 sometime.  And he bought it and it was just the

21   dunes.  You know, it was just sand.  You know, he would

22   ask me to help him out.  I would go down there.  And if

23   he's on the tractor, I would help him out on the tractor.

24   You know, we'd play on the sand rails.  We'd work.  You

25   know, it wasn't all just strictly work.  You know, it was
```

Deposition of Jeffrey Bardwell

3/6/2020

Page 109

1   hard for me to say exactly what I would help him out with

2   because the time span is so long.

3       Q.    That's right.  You did a lot of different things

4   over that time?

5       A.    That's correct.

6       Q.    Okay.  You would also help out with

7   Barrett-Jackson, right?

8       A.    Yes.

9       Q.    Okay.  Tell me generally what you did to help

10  out with Barrett-Jackson.

11      A.    Get the cars from the office building, 'cause

12  all his museum cars were at the office.  Set up transport,

13  get them there.  Make sure Ron's guys were cleaning them.

14  Because Ron's guys would go to the Barrett-Jackson and

15  clean them every morning to make sure they were clean.

16  Just make sure that they got started.

17           And Barrett-Jackson has drivers and they assign

18  drivers to cars.  And every car is different on how to

19  start it.  So you don't want to flood it.  Because if you

20  flood it and you can't drive it up on the block, it cuts

21  the price down, right.  So I had to make sure, you know,

22  that every car went through.

23      Q.    And that would be a lot of work leading up to

24  Barrett-Jackson and kind of right after Barrett-Jackson,

25  right?

Deposition of Jeffrey Bardwell

3/6/2020

Page 110

1    A.    That's correct.

2    Q.    And generally how much work, how many hours a
3 week?

4    A.    You know, he had somebody working on the cars,
5 the mechanic working on the cars.  You know, the hours I
6 don't -- I don't recall how many hours it was.  You know,
7 I never kept track.

8    Q.    More than 40?

9    A.    I'm sure sometimes, yeah.

10    Q.    And again, you didn't receive a paycheck for any
11 of this work you were doing for Ron, right?

12    A.    That's correct, I never received a paycheck.

13    Q.    If you took time off, did you ask Ron if you
14 could take time off?

15    A.    You know, out of respect I would tell him, hey,
16 I'm going on vacation, you know.  And I was always -- you
17 know, I was Ron's employee with Pratte Building Systems,
18 okay.  So we had that relationship.  And it kind of
19 just -- I kept it like that in the respects of the
20 vacation.  You know, I didn't know what he had planned,
21 what he was doing.  I was there, you know, helping him.

22    So I didn't want to just disappear.  So would I
23 ask him?  I would email him and say, hey, I'm going on
24 vacation or, hey, how do these days look, is that okay?
25 You know, and if he truly, truly needed me, and I didn't

Deposition of Jeffrey Bardwell

3/6/2020

Page 129

1    not Lone Mountain.

2        Q.    Okay.

3        A.    So it's Pratte Buckeye.  I think that's it.

4        Q.    And those are the two -- that's the company that

5    had the property, right?

6        A.    That was holding the property, yes.

7        Q.    Okay.  And the property gets sold a few months

8    after this?

9        A.    I think it got sold the end of the month.

10       Q.    Right.  Yeah.  Same timeframe?

11       A.    Yes.

12       Q.    Right before the end of 2014 the property sold?

13       A.    Yes.

14       Q.    Okay.  So after the property sold, the LLCs

15   gone?

16       A.    We're gone.

17       Q.    Okay.  So by the end of 2014, you don't have a

18   membership interest in any of these LLCs any more, right?

19       A.    I believe so.  That's correct.  I believe that's

20   correct.

21       Q.    You believe that's correct.  Okay.

22             Were you still working for Ron Pratte at the

23   time?  Were you still doing what Ron asked you to do?

24       A.    Was I helping Ron?  Yes, I was still helping

25   Ron.

Deposition of Jeffrey Bardwell

3/6/2020

Page 130

1     Q.    Why?

2     A.    You know, I was -- I was so grateful for what

3  Ron had given me.  You know, I was grateful in 2002, '3,

4  '4 for the work.  I was grateful for what he did.  He

5  changed my life.  You know, I was making $150,000 in '05,

6  which was a lot of money and it's still a lot of money

7  today.  And I was super thankful and loyal for that.  And

8  this man changed my life.  When he gave me that

9  $2 million, he changed my life.  So, you know, I got

10  kicked out of these companies, and I stayed, continued to

11  help him.

12     Q.    And let me ask you this.  From 2006,

13  January 2006 --

14     A.    Yup.

15     Q.    -- to the end of 2014 it's your testimony that

16  you did what Ron asked you to do because you were a member

17  in these companies and that was part of your

18  responsibilities as a member?

19     A.    My role, that is correct.

20     Q.    Okay.  And even when your membership in these

21  companies ended, you continued to do the same thing, you

22  continued to work for Ron Pratte, you continued to do what

23  he asked you to do, right?

24     A.    I continued to help him.  I was so thankful.

25  Okay.  I didn't -- I had enough money to live.  I didn't

Deposition of Jeffrey Bardwell

3/6/2020

Page 131

1    need to be like Ron and have, 3, 4, $500 million.  I

2    didn't need it.  I wasn't going to get up, walk away and

3    go find a job.  You know, I loved that man.  He changed my

4    life.  That's it.

5        Q.    Do you ever remember telling Ron, hey, I don't

6    have to do this any more, I'm doing this 'cause I want to?

7        A.    I never did.

8        Q.    Okay.  Do you ever remember telling him, huh,

9    hey, Ron, my membership interest got bought or repurchased

10   or redeemed?  Do you ever remember having this

11   conversation with him?

12       A.    Yes.

13       Q.    What did he say?

14       A.    I told Ron that the kids, that the boys were

15   kicking me out.

16       Q.    Okay.  What did he say?

17       A.    He turned around and walked away.

18       Q.    He didn't say anything?

19       A.    Not a word.

20       Q.    When did you tell him this?

21       A.    I told him, it had to be in August sometime.  I

22   remember I was at the sand dunes.

23       Q.    Okay.  So you think you told him before you

24   signed the separation agreement or after?

25       A.    I don't recall the exact time.

Deposition of Jeffrey Bardwell

3/6/2020

Page 166

1      Q.    Okay.  Was Jeff Abendschein still your neighbor
2  at this point?

3      A.    No.

4      Q.    You had moved, right?

5      A.    Yeah.  I moved I believe it was '08.

6      Q.    Okay.  So Jeff Abendschein calls your wife and
7  says that you're having an affair with Veronica, --

8      A.    That's correct.

9      Q.    -- Ms. Guzman.  Why did that affect whether or
10  not you were able to do what Ron asked?

11      A.    Well, I was -- I was -- needed to go home and
12  talk to my wife about it.  I needed some personal time.

13      Q.    Did you tell Ron that?

14      A.    I told Ron I had a family emergency, yes, and I
15  need some personal time.  And he didn't respond.

16            MR. COLLINS:  If you can grab that one for
17  me.

18            (Deposition Exhibit No. 16 was marked for
19  identification by the reporter.)

20  BY MR. COLLINS:

21      Q.    Mr. Bardwell, I've just handed you what's been
22  marked as Exhibit 16.  Take a second and review this.
23  Then I have some -- a few questions.

24      A.    Okay.  Okay.

25      Q.    Do you remember receiving this email from Ron?

Deposition of Jeffrey Bardwell

3/6/2020

Page 167

1      A.    I do.

2      Q.    And this is March 12, 2018 right?

3      A.    Yes.

4      Q.    And Ron states, "Jeff, I have tried many times

5  to reach you by phone and I thought I would try the email

6  to at least let you know my thoughts."  Do you see that?

7      A.    I do.

8      Q.    Do you remember Ron trying to reach you by phone

9  during this time?

10     A.    We -- when I -- okay.  Let's go back so we can

11 get it into where we're at, because you kind of jumped a

12 whole --

13     Q.    A couple of months, that's right.

14     A.    Yeah, yeah.  You jumped a whole deal.  I was

15 trying to get Ron to talk to me when I would go down to

16 the dunes in February.  When I came back -- because I

17 think I was gone a week, then I came back.  And Ron would

18 not talk to me.  He wouldn't look at me.  Okay.  That's

19 okay.  But I was still going down there.  The whole month

20 of February I still went down there, because it was

21 important to me that I talk to Ron.

22           So I even had a conversation with his brother.

23 I said Don, you know, Ron needs to talk to me.  He's

24 totally avoiding me.  You know, I would talk to Ron

25 face-to-face just like this.  Ron, we need -- and he would

Deposition of Jeffrey Bardwell

3/6/2020

Page 168

1   go the other way.  It was like an opposite side of a

2   magnet.

3           So I told Don; Don, I'm just going to leave at

4   the end of the month, never come back.  If he doesn't want

5   to talk to me, then he doesn't want to talk to me.  Okay.

6   There's nothing I can do.

7           So I went down, like I told you, that whole

8   month.  So the first week I took off, the next three weeks

9   I continued -- I went down there for I don't know how many

10  days of the week I went down.  I went a few days.  But it

11  was to the point, it's like why am I even coming down

12  here.  This man doesn't even want to talk to me.

13          So I loaded up on the last week that I made my

14  decision, I loaded up everything that I had down there.

15  My sand rail, my RZR, my parts.  I went home.  And as I

16  went home, I can't remember if it was a Wednesday or

17  Thursday, one of those two days, went home.  And Ron

18  called me the next day.

19          Okay.  And I answered the telephone.  Hello.

20  And he said, hey, Jeffy, we need to talk.  I said, yeah,

21  we need to talk.  I go, do you want me to go to your

22  house?  Do you want me to go to the hangar?  Would you

23  like me to go to the office?  Let's just meet at the

24  office tomorrow at 8:00.  Okay.  No problem.  I'll see you

25  then.

Deposition of Jeffrey Bardwell

3/6/2020

Page 169

1            Okay.  I go to the office at 8:00 in the

2    morning.  Ron doesn't show up.  9:00, Ron doesn't show up.

3    10:00, Ron doesn't show up.  10:30 I leave.  And at that

4    point when I left I was -- I was done.  I was totally

5    done.  I went and dropped -- you know, I had an obligation

6    to take a trailer and drop it off, because I brought it

7    back with me.  So I went to drop the trailer off, like I

8    told him I would drop, 'cause it was -- needed repair.  So

9    I had to take that trailer in.  And that was it.

10           Then he called maybe 11:00, maybe 11:30.  Jeff,

11   where are you at?  And I didn't answer.  That was it.  And

12   I wouldn't answer his phone calls.

13       Q.   After that?

14       A.   That's correct.

15       Q.   Okay.  So it's your testimony that you were

16   there starting at what time?

17       A.   We were supposed to meet at 8:00.

18       Q.   Okay.

19       A.   And he didn't show up while I was there until

20   10:30.

21       Q.   There were other people there during that time,

22   right?

23       A.   Yes.

24       Q.   Who did you talk to during that time period?

25       A.   Leo, his worker that cleans the airplanes.

Deposition of Jeffrey Bardwell

3/6/2020

Page 180

1   transferred funds to our -- transferred properties to our

2   entities.

3       Q.    Do you ever remember telling Mr. Yonker that you

4   -- you were going to work with -- for Mr. Pratte for the

5   rest of your life -- rest of his life?  I'm sorry.

6       A.    I do not.

7       Q.    Do you ever remember telling Mr. Yonker that you

8   had a contract or a deal with Mr. Pratte?

9       A.    I do not.

10      Q.    Do you ever remember telling Mr. Abendschein

11  that you had a contract or deal with Mr. Pratte?

12      A.    No.

13      Q.    You've read Jaime Ziparo's deposition, right?

14      A.    Not in full, but yes, I have seen it.

15      Q.    You're aware that Mr. Ziparo contends that you

16  told him that you had an agreement with Mr. Pratte to work

17  with -- for Mr. Pratte for the rest of Mr. Pratte's life,

18  right?

19              MR. MARLOWE:  Objection to form.

20              THE WITNESS:  You know, could I have told

21  him, hey, Ron made a life changing gift to me and I'm

22  going to work for that man for the rest of my life?  Could

23  I have said that?  You know, we were in opening companies.

24  Okay.  And my role in the company, in Stellar Development,

25  was to -- and the other entities was to take care of Ron.

Deposition of Jeffrey Bardwell

3/6/2020

Page 181

1   I thought Stellar was going to grow into this huge company

2   with the amount of money that we were going to put into

3   it.  Okay.  So if my role is going to be in that company,

4   I could have possibly stayed and, you know, helped Ron for

5   my whole life.

6   BY MR. COLLINS:

7       Q.    Okay.  So you think you may have told

8   Mr. Ziparo, Jaime, that, hey, I'm going to work for this

9   man for the rest of my life?

10              MR. MARLOWE:  Objection, misstates.

11              THE WITNESS:  You know, it's -- could I have

12  said, hey, I'm so thankful and I'll do whatever this man

13  needs, probably.  But did I have a contract with him to

14  work for Ron his whole life, I did not.

15  BY MR. COLLINS:

16      Q.    Okay.  And my question is what you told

17  Mr. Ziparo.

18      A.    Okay.

19      Q.    Right.  Do you remember having a conversation

20  with Mr. Ziparo where you said, look, I'm going to work

21  for Mr. Pratte for the rest of my life?

22      A.    I don't remember that exact conversation.  You

23  know, we were in the office joking around many times.  You

24  know, Todd would joke around saying Jeff is going to be

25  80 years old on a shovel, you know.  And what did I tell

Deposition of Jeffrey Bardwell

3/6/2020

Page 182

1    him?  I said, yeah, as long as Stellar's going, we're

2    making money.

3         Q.    You did tell him that?  You told him as long as

4    Stellar is going and making money I will be working for

5    Mr. Pratte?

6                   MR. CONNELLY:  Objection, form.

7                   THE WITNESS:  No.  I'm telling you

8    conversations that we've had.  I don't know exact

9    terminology and exact wording.

10   BY MR. COLLINS:

11        Q.    Okay.  Well, I think I just tried to use your

12   words, right, that, you know, somebody told you, and I

13   forget if it was Todd Carriere or Jaime Ziparo, that you

14   were going to be 80 years old and still working on a

15   tractor, still on a tractor, right?

16        A.    Somewhere along those lines.  I don't remember

17   the exact terminology --

18        Q.    Okay.

19        A.    -- that he used, the exact wording.

20        Q.    Who are we talking about, which one of those

21   two?

22        A.    We were in the office, Jaime, Todd, you know,

23   making jokes.  So, I mean, I don't really -- I don't have

24   a specific person.

25        Q.    Okay.  Somebody made that joke to you, right?

Deposition of Jeffrey Bardwell

3/6/2020

Page 213

```
 1     A.    Right.

 2     Q.    -- maybe --

 3     A.    Right.

 4     Q.    -- over that time.

 5           Okay.  Let's take a look at the gift tax return.

 6     A.    Same packet?

 7     Q.    No.

 8           (Deposition Exhibit No. 20 was marked for

 9     identification by the reporter.)

10     BY MR. COLLINS:

11     Q.    Mr. Bardwell, the court reporter has just handed

12     you Exhibit 20.  Do you recognize this document?

13     A.    I've only seen this document from when the

14     attorneys -- well, I don't even think I saw this one.

15     Maybe I have.

16     Q.    Okay.  What do you understand this document to

17     be?

18     A.    A gift tax return.

19     Q.    I want to turn to -- first of all, in the lower

20     right-hand corner here we've got some letters, we've got

21     some letters and numbers.

22     A.    Okay.

23     Q.    These are Bates labels, Bates numbers.  We put

24     them on there for litigation purposes so that we know --

25     we can reference easily --
```

Deposition of Jeffrey Bardwell

3/6/2020

Page 245

```
1    STATE OF ARIZONA   )
                        ) ss.
2    COUNTY OF MARICOPA )

3

4          BE IT KNOWN that the foregoing proceedings were
     taken by me, SHERYL L. HENKE, a Certified Reporter, in and
5    for the County of Maricopa, State of Arizona; that the
     witness before testifying was duly sworn to testify to the
6    whole truth; that the questions propounded to the witness
     and the answers of the witness thereto were taken down by
7    me in shorthand and thereafter reduced to typewriting
     under my direction; that the witness will read and sign
8    said deposition; that the foregoing pages are a true and
     correct transcript of all proceedings had, all done to the
9    best of my skill and ability.
           I FURTHER CERTIFY that I am in no way related to
10   any of the parties hereto, nor am I in any way interested
     in the outcome hereof.
11         I FURTHER CERTIFY that I have complied with the
     ethical obligations set forth in ACJA 7-206(J)(1)(g)(1)
12   and (2).

13

     Sheryl L. Henke                          50745
14   _____     _____
     Certified Reporter                       CR Number
15
16   Sheryl L. Henke                          3.12.20
     _____     _____
     Certified Reporter                       Date
17   (Signature)

18
           I CERTIFY that this Registered Reporting Firm has
19   complied with the ethical obligations set forth in
     ACJA 7-206(J)(1)(g)(1) and (2).
20

21   Carrie Reporting, LLC                    R1064
     _____     _____
22   Registered Reporting Firm               RRF Number

23   Michele Durrer                          3.12.20
     _____     _____
24   Registered Reporting Firm               Date
     (Signature)
25
```

Carrie Reporting, LLC
480.429.7573

# CARRIE•REPORTING LLC
### CERTIFIED REPORTERS

2415 East Camelback Road, Suite 700
Phoenix, Arizona 85016
Phone 480.429.7573 FAX 602.277.5576
Registered Reporter Firm. No. R1064

Please make all changes or corrections on this sheet showing page number, line number and reason, if any.  If no corrections are needed, write "none".  Please sign and date the form.

STATEMENT OF CHANGES AND/OR CORRECTIONS

Deposition of: Jeffrey Michael Bardwell
Case Name: Pratte vs. Bardwell, et al.
Case No.:  2:19-cv-00239-PHX-GMS
Date Taken:  03/06/2020

| PAGE | LINE | CHANGE and/or CORRECTION REASON |
|------|------|----------------------------------|
| 68 | 19 | transcript incorrect.  Watched video and read transcript, not 2 sentences should be 1 left out "and" |
| | | Corrected:  "excited that I got this gift from Ron and that I was going" |

_J. Bardwell_                    4-15-2020

SIGNATURE OF THE DEPONENT DATE

# EXHIBIT 2



LAW OFFICES OF THOMAS M. CONNELLY
Thomas M. Connelly (Az. Bar. No. 012987)
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Phone: (602) 957-1993
Facsimile: (602) 957-2137
Tconnelly2425@aol.com

LAW OFFICES OF THOMAS J.  MARLOWE
Thomas J. Marlowe (Az. Bar No. 016640)
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Phone: (602) 957-1993
Facsimile: (602) 957-2137
Tmarlowe2425@outlook.com

Attorneys for Bardwell Defendants

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald H. Pratte, | Case No.: 2:19-cv-00239-PHX-GMS |
| Plaintiff, | |
| vs. | **DEFENDANTS' FIRST AMENDED MANDATORY INITIAL DISCOVERY RESPONSES** |
| Jeffrey Bardwell and Fanny F. Bardwell, husband and wife, | |
| Defendants. | |

Pursuant to the Mandatory Initial Discovery Pilot ("MIDP") Project, Defendants

hereby provides the Mandatory Initial Discovery Responses as follows:

## I.      INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION

**State the names and, if known, the addresses and telephone numbers of all persons**

**who you believe are likely to have discoverable information relevant to any party's**

***Exhibit AA    Documents provided by Trevor Pratte (Bard_TP0001-0714).***

## IV.    FACTS AND LEGAL THEORIES:

A) <u>Factual Background</u>:

Jeffrey Bardwell ("Defendant" or "Bardwell") first met Plaintiff, Ron Pratte ("Plaintiff"), in or about 2001.  At that time Defendant was employed at Pratte Building Systems, a business jointly owned or controlled by Pulte Homes and Plaintiff.  In 2005, Pulte Homes fully acquired the business from Plaintiff for a substantial sum of money.  By the time ownership fully transferred to Pulte Homes, Defendant had developed a close working and personal relationship with Plaintiff.  Plaintiff treated Bardwell not only as a valuable employee, but also came to treat him like a virtual "son," or member of his family. Defendant appreciated this camaraderie, liked Plaintiff, and viewed his association with Plaintiff as an opportunity to learn from a self-made businessman worth several hundred million dollars.

At or about the time the sale and transfer of Pratte Building Systems to Pulte was complete, Plaintiff elected to make a substantial gift to four of his family members. Plaintiff also told Defendant that he was including him in the gift.  In fact, he advised Defendant he intended to gift him an amount equal to the amount he would give to the four members of Plaintiff's family.  Defendant, as a friend, expressed his extreme gratitude, but also questioned Plaintiff as to whether Plaintiff was certain about his decision, whether Plaintiff's family members would approve of the transfer, or would resent Defendant. Plaintiff stated it was his money and he could do what he wished to do with it and that

frequently expressed to Defendant.  Plaintiff, losing faith in his family's ability to operate a successful business development without his day-to-day guidance, and having a less than conducive relationship with his immediate family members, requested Defendant to spend more time assisting him on other projects as opposed to working with Stellar.  Defendant acquiesced to this request out of a sense of extreme gratitude for the life-changing gift and because Defendant hoped to learn additional business skills from Plaintiff.  Moreover, at that time and despite Plaintiff's often abrasive and demanding nature, Defendant still enjoyed Plaintiff's company and companionship and wished to continue to learn how Plaintiff operated his businesses.

Despite the departure of Plaintiff's two sons within its first year of operations, Stellar continued to operate with the three remaining men (Defendant, Jaime Ziparo and Todd Carriere).  About 8-years later, in or about 2014, Jaime Ziparo and Todd Carriere terminated Defendant's involvement telling Defendant that, in their view, he was allocating too much of his time to assisting Plaintiff with Plaintiff's personal projects as opposed to assisting them with Stellar.  Defendant understood their concerns and tried to explain his sense of loyalty, but Ziparo and Carriere made it clear to Plaintiff that they resented Defendant's continued close association with Plaintiff.

From the time of the gift (late 2005 and early 2006), through early 2018, Defendant continued to assist Plaintiff with various aspects of Plaintiff's myriad of business enterprises and work with Stellar.  One such project involved Plaintiff's development project located in Winterhaven, California, about 25 miles West of Yuma, Arizona, colloquially referred to as "The Dunes."  Defendant spent several years assisting Plaintiff

with this project to the detriment of his health and family life.  Over time, Plaintiff, who was always an opinionated and difficult individual, became even more petulant and abusive to many people, including Defendant.  Moreover, Defendant also became more exposed to Plaintiff's activities and business decisions which Defendant disagreed with, was uncomfortable with, or did not realize until later were potentially illegal in nature.

For example, Plaintiff routinely hired and paid undocumented workers in cash. Plaintiff would not always pay workers minimum wage, would rarely if ever pay overtime, only straight-time, regardless of the hours worked and often requested Defendant to take checks to the bank to cash, most of which were under the amounts which would have required CTR filings (typically all checks were made out for $9,900), which Plaintiff then used to pay his workers.  From 1/8/16 to 12/26/17 there were twelve checks totaling $118,000 and over $80,000 additional cash proceeds provided by Plaintiff for "off-book" employee payments.  Defendant also is aware that Plaintiff utilized his pilot's license to transport undocumented workers across state lines to minimize his labor costs and, in one instance, Defendant is aware Plaintiff personally flew an undocumented worker between constructions sites to avoid U.S. Customs and Border Patrol checkpoints.

The longer he worked with Plaintiff the more Defendant learned that Plaintiff frequently engaged in other "grey area" decisions or practices.  For example, he is aware that between $75-100 million worth of vehicles and planes were registered in Montana for the primary purpose of avoiding state use taxes otherwise due and owing on Plaintiff's airplanes and other vehicles.  Defendant also became aware that Plaintiff frequently "double-dipped" by not only paying undocumented workers in cash, but sometimes paying

**Specifically identify and describe any insurance or other agreement under which an insurance business or other person or entity may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse a party for payments made by the party to satisfy the judgment.  You may produce a copy of the agreement with your response instead of describing it.**

There are no applicable insurance agreements.

Dated this 4th of November, 2019.


By: /s/ Thomas J. Marlowe
LAW OFFICES OF THOMAS J.  MARLOWE
Thomas J. Marlowe
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Phone: (602) 957-1993
Tmarlowe2425@outlook.com

/s/ Thomas M. Connelly
LAW OFFICE OF THOMAS M. CONNELLY
Thomas M. Connelly
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Phone: (602) 957-1993
Tconnelly2425@aol.com

## CERTIFICATE OF SERVICE

I, Thomas J. Marlowe, hereby certify that on November 4, 2019 I mailed a copy of the foregoing and referenced exhibits on a flash-drive to:

Gregory B. Collins
Zachary R. Fort
Kercsmar & Feltus PLLC
7150 E. Camelback Road, Ste. 285
Scottsdale, Arizona 85251
gbc@kflawaz.com
zrf@kflawaz.com

# EXHIBIT 3



IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Ronald H. Pratte,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  ) No.
                                     ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.        ) PHX-GMS
Bardwell, husband and wife,          )
                                     )
        Defendants.                  )
                                     )

VIDEOTAPED DEPOSITION OF RONALD PRATTE

Scottsdale, Arizona
February 27, 2020
9:30 a.m.

REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1                    I N D E X

2

3   WITNESS                                    PAGE

4   RONALD PRATTE

5          Examination by Mr. Connelly        6, 316

6          Examination by Mr. Collins           315

7

8          QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

9                      Page     Line
                        44       07
10                      45       11
                        45       21
11                      45       24
                       134       18
12                     241       07
                       241       21
13                     242       19
                       252       14
14                     258       07
                       271       03
15                     294       17
                       295       01
16                     295       06
                       295       13
17                     295       19
                       295       25
18                     309       20

19

20         PORTIONS MR. CONNELLY REQUESTED MARKED

21                      Page     Line
                        242       19
22                      258       07

23

24              MR. CONNELLY'S REQUEST

25                      Page     Line
                        159       23

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1              VIDEOTAPED DEPOSITION OF RONALD PRATTE

2     was taken on February 27, 2020, commencing at 9:53 a.m.,

3     at the Law Offices of Kercsmar & Feltus, PLLC, 7150 East

4     Camelback Road, Suite 285, Scottsdale, Arizona, before

5     Anita Landeros, a Certified Reporter in the State of

6     Arizona.

7

8     COUNSEL APPEARING:

9     For the plaintiff:

10          By:  MR. GREGORY B. COLLINS
            Kercsmar & Feltus, PLLC
11          7150 East Camelback Road
            Suite 285
12          Scottsdale, Arizona  85251

13

14    For the defendants:

15
            By:  MR. THOMAS M. CONNELLY
16          Law Offices of Thomas M. Connelly
            2425 East Camelback Road
17          Suite 880
            Phoenix, Arizona  85016
18

19                  AND

20
            By:  MR. THOMAS J. MARLOWE
21          Law Offices of Thomas J. Marlowe
            2425 East Camelback Road
22          Suite 880
            Phoenix, Arizona  85016

23

24
      Also present was Mr. Christopher Eichler, Certified Legal
25    Video Specialist.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1  allege was made, when did that occur?

2      A.   I think it was late '05.

3      Q.   And where did that occur?

4      A.   Part of it occurred at the Las Vegas airport, but

5  it had to have occurred prior to going to the Las Vegas

6  airport for Bardwell to have been invited to go to the Las

7  Vegas airport, if that makes sense.

8      Q.   Okay.  Well, let's talk about the Las Vegas

9  airport.  Who was there at this -- I'll call it a

10 gathering, because we know there were several -- at least

11 several people there.

12          Do you remember who all was there?

13     A.   Myself and the five guys.

14     Q.   Okay.  And now here I'll name them for purposes

15 of the record.  So you were there, Todd Carriere, Jaime

16 Ziparo, Justin and Trevor Pratte and Jeff Bardwell?

17     A.   Yes, sir.

18     Q.   Okay.  Was anybody else there besides the six of

19 you?

20     A.   No, sir.

21     Q.   Okay.  And who called that gathering at the

22 Las Vegas airport?

23     A.   I did.

24     Q.   Okay.  Can you tell me about that?  How did that

25 come about that you called a meeting to get everybody

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1  together?

2      A.   I don't remember how it came about.

3      Q.   But you're sure that you're the one that invited

4  everybody?

5      A.   Yes, sir.

6      Q.   Okay.  Do you remember how you got there?

7      A.   My plane.

8      Q.   And did you travel with anyone up to North Las

9  Vegas?

10     A.   I think it was just Bardwell and myself, but I'm

11  not sure.

12     Q.   And where did you travel from?  Well, in other

13  words, you flew your plane from where?  Where were you at

14  the time?

15     A.   Deer Valley Airport.

16     Q.   So you were here in the greater Phoenix area?

17     A.   Yes, sir.

18     Q.   And the only one that you remember going up is

19  Jeff; nobody else offhand?

20     A.   Well, my son, Justin, may have been on the plane

21  as well, but I don't remember.

22     Q.   Okay.  And so the other three fellows that were

23  there, Todd, Jaime and Trevor, they met you at the

24  North Las Vegas airport?

25     A.   They all lived in Las Vegas.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    Q.   So they drove there?

2    A.   Yes, sir.

3    Q.   Okay.  Do you remember approximately what time

4  everybody got together there?  Was it evening?  Was it

5  afternoon?  Morning?

6    A.   It was late afternoon.

7    Q.   All right.  And do you recall where you met at

8  the airport?

9    A.   At the terminal building.

10   Q.   And were you -- you had invited everyone, so it

11  was your meeting basically; is that fair to say?

12   A.   They were always my meetings.

13   Q.   Okay.  That's a good way to put it.

14        So you were kind of running the show?

15   A.   Yes, sir.

16   Q.   So everybody gets there.  Did you wait until

17  everybody was there to start talking to them?

18   A.   Yes, sir.

19   Q.   Okay.  Everybody gathered around; everybody said

20  their hellos.  And you start out -- just, you know, as

21  best you can remember, in your own words, how did you

22  start out the conversation or the meeting?

23   A.   Well, they were aware that I was selling my

24  company to Pulte Homes.  And I said I would like to offer

25  them an opportunity to go do something on their own and

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    asked them if they were interested, and they all said

2    absolutely.

3        Q.   Okay.  And this is the same meeting where you

4    gave each of them a check for $2 million, correct?

5        A.   Yes, sir.

6        Q.   Okay.  So prior to giving them that check, you

7    were speaking to all of them as a group, correct?

8        A.   Yes, sir.

9        Q.   Okay.  And if you could -- and, look, I know

10   we're going back a ways.  I mean, this is '05.  It's 15

11   years ago.  I get it -- or 14.

12       A.   I was a lot younger then.

13       Q.   Weren't we all?

14            You know, leading up to that point with the

15   checks, do you remember anything you said to them as you

16   handed out the checks or how that happened?

17            That's a little awkward and let me, if I

18   could, rephrase.  Did you give each of the five fellows

19   their checks and then say something to them, or did you

20   hand them to them individually and make a particular

21   comment to each one as you were going around the group?

22   Or, if you recall, what happened?

23       A.   I don't recall how -- what the sequence was.

24       Q.   Okay.  Did the five fellows appear surprised --

25   happily surprised when they opened these envelopes?

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1      A.    I would say that would be an honest statement,

2  yes, sir.

3      Q.    Sure.

4            Because -- and you were looking for whatever

5  their reaction was going to be, correct?

6      A.    Not really.

7      Q.    Well, did they -- did the five fellows know that

8  you were going to be giving them a $2 million check?

9      A.    They did not.

10     Q.    So it was a surprise -- it would be a surprise

11  for them.  All right.

12            So you -- are there any -- if you recall,

13  did you make any comments that you wanted to make before

14  you handed out the checks to them about what it

15  represented or why you were giving them each $2 million?

16     A.    I told them that -- I said -- they didn't -- I

17  was giving them the money to start this perceived company

18  that we were talking about and that they should decide

19  amongst themselves what amount each person should put in

20  to start the company and that was basically it.

21     Q.    Did you leave that up to them?

22     A.    Absolutely.

23     Q.    So, at some point, you were contemplating or

24  hoped that the five of them would get together and form a

25  company to work together?

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1      A.   Yes, sir.

2      Q.   Is that fair; what you were expecting or hoping

3  for?

4      A.   Yes, sir.

5      Q.   And -- but how they did that or the structure of

6  things, you left up to the five of them?

7      A.   Yes, sir.

8      Q.   So if, for example -- Justin would have been the

9  youngest back then, right?  Well, he still is the

10  youngest, I guess, that doesn't change.  But Justin was

11  younger.  He was in his mid 20s, at that point, wasn't he?

12     A.   I think he was late 20s, wasn't he?

13          MR. COLLINS:  Yeah.

14     Q.   BY MR. CONNELLY:  Okay.  So if after giving

15  everybody the checks, if they had had a conversation

16  either that evening or -- let me rephrase the question.

17          Did they, the five of them, have a

18  conversation there, that you recall, at the North Las

19  Vegas airport about how to treat the $2 million regarding

20  the company expectations?

21     A.   Not that I'm aware of.

22     Q.   Okay.  So that conversation would have occurred

23  sometime after they got the checks at the airport?

24          MR. COLLINS:  Objection, foundation.

25          Go ahead.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1  be a gift to each of them, didn't you?

2          MR. COLLINS:  Objection, compound.

3          Go ahead.

4          THE WITNESS:  To my family, not to Jeff

5  Bardwell.

6     Q.   BY MR. CONNELLY:  Okay.  So -- and when you say

7  your family, who are referring to?

8     A.   Trevor, Justin, Jaime and Todd.

9     Q.   So to those that you considered family, it was a

10  gift?

11    A.   Yeah, I would say that.

12    Q.   An unconditional gift?

13    A.   Absolutely.

14    Q.   And what was it -- what was your understanding

15  with respect to the $2 million you gave Jeff Bardwell?

16    A.   It was a verbal contract that Jeff Bardwell would

17  work for me until I died.

18    Q.   And --

19    A.   That's --

20    Q.   Go ahead.

21    A.   -- exactly the way it was stated to Jeff

22  Bardwell.

23    Q.   And who stated that to him?

24    A.   I did.

25    Q.   And where did that occur?

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    A.   Well, like I said earlier, it had to have

2  occurred, although I don't remember it, prior to him going

3  to Las Vegas, or I can't imagine that he would have been

4  on the plane and in the meeting.

5    Q.   Why do you say it had to have occurred prior to

6  Las Vegas?

7    A.   Well, I just -- I just -- I don't remember having

8  a meeting with him about it prior to that.  But common

9  sense tells me that he wouldn't have been at the Las Vegas

10  meeting if there had not been some kind of prior agreement

11  to going to Las Vegas.

12    Q.   But, as you sit here today, you don't recall any

13  such meeting between and you Jeff?

14    A.   I do not.

15    Q.   And, as you sit here today, you don't recall any

16  such oral promise at the Las Vegas airport from Jeff to

17  you or you to Jeff?

18    A.   Him saying:  Yes, I agree to do that?

19    Q.   Well, you'd have to say something to him first so

20  he knew what he was agreeing to.

21    A.   Exactly.

22    Q.   Do you recall talking to Jeff in front of the

23  others at the Las Vegas airport about a promise to work

24  for you for life?

25    A.   I told the whole group:  Everybody needs to

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1  understand that Bardwell's going to work for me.  He's not

2  going to be working as part of this company that you guys

3  are going to form.

4              And everybody agreed to that, including

5  Bardwell.

6      Q.   Okay.  Is that exactly how you remember it?

7      A.   Yes, sir.

8      Q.   And, at that point, this -- the company or

9  companies that you were hoping or contemplating that the

10 five of them might form, nothing had actually been done

11 yet to form any such entity or entities, had it?

12     A.   Nothing at all.

13     Q.   So this was all -- well, maybe more of

14 conjecture, but it was just contemplated.  There wasn't --

15 nobody had taken any substantive action to form those

16 companies?

17     A.   No, sir.

18     Q.   In fact, weren't -- weren't the first of those

19 companies formed some several months or more later in the

20 spring of '06?

21     A.   I don't know exactly when they were formed,

22 because I didn't have anything to do with it.

23     Q.   Okay.  Do you know -- well, do you know who did

24 form those companies?

25     A.   I think Bill Shisler did, but I'm not for sure on

1  them ended up forming was a home building company,

2  correct, that the five of them were initially all a part

3  of?

4      A.   I think so.

5      Q.   And -- okay.  Let me -- well, and in that -- in

6  that building there were a couple of other entities they

7  formed, too, correct?

8      A.   I don't know that.

9      Q.   Okay.

10     A.   Let me share --

11     Q.   Sure.  Go ahead.

12     A.   I knew there were entities.  I didn't know the

13 names of them.  I didn't know what they were going to do,

14 la, la, la, so -- and I just learned about this a couple

15 of days ago.

16     Q.   Would it be fair to say that other than the home

17 building entity, the one I just asked you about, that the

18 other entities they formed were passive companies that

19 were collecting rents and things on property that you had

20 given subsequent -- several months after the North Las

21 Vegas meeting?

22              MR. COLLINS:  Objection, foundation.

23              Go ahead and answer, though.

24              THE WITNESS:  As far as I know.  And I don't

25 know specifically what each company was formed to do.  But

1  that's the way I understand it now, after having reviewed

2  the paperwork that they did.

3      Q.   BY MR. CONNELLY:   Well, you have independent

4  recollection of how much -- you know you gave each of the

5  five a $2 million check at the airport on -- roughly in

6  December of '05, correct?

7      A.   Yes, sir.

8      Q.   Do you remember several months later in the

9  spring of '06 transferring over certain properties to the

10  five of them?

11      A.   I do.

12      Q.   Actually, you transferred the properties over to

13  entities or businesses that they had formed, didn't you?

14      A.   Yes, sir.

15      Q.   And -- so you didn't transfer it over to each one

16  of the them individually.   You transferred it to a

17  business entity that the five of them were engaged in,

18  correct?

19      A.   Yes, sir.

20      Q.   And you specifically recall that.   And that's

21  what I'm asking you about now.   Do you recall that those

22  entities were passive entities and that they were

23  collecting rents off of these properties you transferred

24  in?

25      A.   I don't know your definition of a passive entity.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1   As far as I know, that's -- those are the entities that

2   they took ownership of the property.

3       Q.   Okay.   And they were collecting rents on those

4   properties?

5       A.   Yes, sir.

6       Q.   But unlike the building company that they had,

7   which required active daily work, these other companies

8   didn't require the same amount of work or attention to

9   exist, did they?

10               MR. COLLINS:   Objection, foundation.

11               Go ahead.

12               THE WITNESS:   I don't know the answer to

13   that.

14       Q.   BY MR. CONNELLY:   Let me rephrase.

15               The building company required each of them,

16   in some capacity, to work on a daily, if not at least

17   weekly, basis, correct?

18       A.   I would say hopefully, yes.

19       Q.   Yeah.   Well, Todd Carriere was the accountant.

20   Jaime Ziparo brought the building and lumberyard

21   background along with Jeff having the same personal

22   knowledge, right?

23               Trevor and Justin were also a part of --

24   we'll refer to it as Pratte Industries overall, before

25   they formed these companies together.   Is that all fair to

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1      (The requested portion of the record was

2  read by the certified reporter.)

3           MR. CONNELLY:  So do you think that question

4  falls within the client-accountant privilege?

5           MR. COLLINS:  I do.

6      Q.   BY MR. CONNELLY:  Okay.  Let me try and rephrase

7  then, because I'm not attempting to abridge that at this

8  point, because counsel and we have an agreement with

9  respect to our matter on our side and yours on yours.  So

10  that is not my intent here.

11           But at some point -- I mean, this is all

12  your money, right?  It's nobody else's money you're giving

13  away.  And at some point you have to decide why you're

14  giving this.  Are you giving this money to the five

15  individuals because you expect something back from them?

16      A.   No.

17      Q.   Did you give it to them with the hope that the

18  five of them would get together and work together and make

19  something of this money you were giving them?

20      A.   Yes, sir.

21      Q.   Is that why you -- you personally wanted to

22  caption the 10 million that you gave out that evening in

23  North Las Vegas as a gift to each of them?  You,

24  personally, is that why you did that?

25      A.   It was a gift to the four of them.  It was not a

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1   gift to Bardwell.

2       Q.   Okay.  And you made that clear at the airport --

3       A.   Absolutely.

4       Q.   -- to all of them?

5       A.   Absolutely.

6       Q.   Tell us how you made that clear at the airport to

7   the five of them?

8       A.   I said:  Bardwell's obligation is he'll work

9   specifically for me until I die.

10      Q.   Okay.

11      A.   No matter how long it takes.  No matter what I

12  ask him to do, okay.  And he agreed.

13      Q.   Who agreed?

14      A.   Bardwell agreed.

15      Q.   How did he agree with you on that?

16      A.   He told the other people that were there that he

17  had agreed to that.

18      Q.   He told them separately after you had made that

19  statement?

20      A.   He said:  I agree, okay.

21      Q.   In front of everyone?

22      A.   Yes, sir.

23      Q.   And in front of you?

24      A.   Yes, sir.

25      Q.   So you specifically -- I'll use the term

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1   STATE OF ARIZONA          )
                             ) ss.
2   COUNTY OF MARICOPA        )

3
            BE IT KNOWN that the foregoing proceedings
4   were taken before me; that the witness before testifying
    was duly sworn by me to testify to the whole truth; that
5   the foregoing pages are a full, true and accurate record
    of proceedings, all done to the best of my skill and
6   ability; that the proceedings were taken down by me in
    shorthand and thereafter reduced to print under my
7   direction.

8
            I certify that I am in no way related to any
9   of the parties hereto nor am I in any way interested in
    the outcome hereof.

10

11          [X]  Review and signature was requested.
            [ ]  Review and signature was waived.
12          [ ]  Review and signature not required.
            [ ]  Review and signature was requested, but
13  deponent did not do so within 30 days after notification.

14          I certify that I have complied with the
    ethical obligations set forth in ACJA 7-206(F)(3) and ACJA
15  7-206 J(1)(g)(1) and (2).  Dated at Phoenix, Arizona,
    this 3rd of March, 2020.

16

17          _____
                ANITA LANDEROS, RPR
18              Certified Reporter
                Arizona CR No. 50538
19

20          *    *    *    *    *    *

21          I certify that ANITA LANDEROS REPORTING, INC.,
    has complied with the ethical obligations set forth in
22  ACJA 7-206 (J)(1)(g)(1) through (6).

23
            _____
24              ANITA LANDEROS REPORTING, INC.,
                  Registered Reporting Firm
25                Arizona RRF No. R1077

# EXHIBIT 4



**Ronald H. Pratte,**
**Plaintiff,**

**v.**

**Jeffrey Bardwell and Fanny F. Bardwell,**
**husband and wife,**
**Defendants.**


**United States District Court for the**
**District of Arizona**

**Case No. 2:19-cv-00239-PHX-GMS**



*Expert Report of:*


**Brent H. Taylor**
**Fenix Financial Forensics LLC**


**August 31, 2020**

Ronald H. Pratte
v.
Jeffrey Bardwell, et al.
(Case No. 2:19-cv-00239-PHX-GMS)

Expert Report of Brent H. Taylor
August 31, 2020

**Background**[1]

1.  Ronald Pratte ("Plaintiff") is an individual residing in Maricopa County, Arizona. Jeffrey Bardwell ("Defendant") is a married man who has resided in Arizona and California.  Fanny Bardwell is Mr. Bardwell's wife and currently resides in California.  Collectively, Mr. and Mrs. Bardwell are referred to herein as "Defendants."

2.  Mr. Bardwell first met Mr. Pratte in or about 2001 when Mr. Bardwell was employed at Pratte Building Systems, a business jointly owned by or controlled by Mr. Pratte and Pulte Homes. In December 2005, Mr. Pratte held a meeting at the North Las Vegas airport with his sons Justin Pratte and Trevor Pratte, Todd Carriere (who is married to Mr. Pratte's niece), Jaime Ziparo (Mr. Pratte's son-in-law), and Mr. Bardwell (the "Team").  During the meeting Mr. Pratte told the attendees that he was planning to sell his company, and he wanted his family members in attendance to join in a new venture that would develop land and build homes in Arizona.  Mr. Pratte gave each of the meeting attendees, including Mr. Bardwell, a check for $2 million.[2]  Mr. Pratte informed the meeting attendees that Mr. Bardwell's payment was in exchange for agreeing to work for Mr. Pratte so long as Mr. Pratte was alive (the "Agreement").  A subsequent meeting was held in January 2006 among the same group where Mr. Pratte reiterated that amounts received by Mr. Bardwell were in exchange for Mr. Bardwell's promise to work for Mr. Pratte until Mr. Pratte's death.  In April 2006, Mr. Pratte transferred to Mr. Bardwell (and his then wife) a 20% interest in each of three real estate parcels located in Nevada and Arizona.

3.  From 2006 until March 2018, Mr. Bardwell managed Mr. Pratte's properties, handled insurance issues for Mr. Pratte's vehicles and provided labor on Mr. Pratte's properties.  In March 2018, Mr. Bardwell ceased communicating with and stopped working for Mr. Pratte.

4.  In December 2018, Plaintiff filed a Complaint against Defendant in Superior Court in Maricopa County, Arizona that included claims of breach of contract, promissory estoppel, and unjust enrichment against Defendant.  In January 2019, the case was removed from Maricopa County Superior Court to the United States District Court for the District of Arizona.

**The Role of F3**

5.  Fenix Financial Forensics LLC ("F3") was retained by Kercsmar & Feltus PLLC ("Counsel") on behalf of Plaintiff to quantify alleged damages associated with the claims made.  In performing our work to date we have: 1) considered the documents listed in Exhibit A; 2) reviewed various financial records including Mr. Pratte's 2006 gift tax return and related documentation; 3) reviewed operating agreements and other records related to various companies Mr. Bardwell held an ownership interest in, that were capitalized in part by funds or properties transferred from Mr. Pratte to Mr. Bardwell; 4) analyzed independent data including life expectancy tables; 5) reviewed the deposition transcripts for

---

[1] Statements in the Background section of this report are sourced from the Complaint and various disclosure statements or other documents provided to F3.  These statements are made to provide a brief overview of this matter and are not intended to be an exact summary of facts or to provide any legal determinations or conclusions.
[2] The check to Mr. Bardwell was dated January 5, 2006 (Bard7115).

Mr. Pratte, Mr. Bardwell, Justin Pratte, Mr. Carriere, Mr. Ziparo, Daryl Wolfswinkel, Jeff Abendschein, and William Shisler; and 6) prepared this expert report.

6. This expert report summarizes the opinions of Brent H. Taylor, a Senior Managing Director for F3, based on the information made available to us as of the date of this report.  Mr. Taylor is a Certified Public Accountant, a Chartered Global Management Accountant and is Certified in Financial Forensics by the American Institute of Certified Public Accountants (AICPA).  A copy of Mr. Taylor's resume and recent testimony experience is attached as Exhibit B.

7. We express no opinion regarding liability in this matter.  We understand Plaintiff and Defendant dispute whether the amounts Plaintiff gave Defendant represented a gift or compensation for expected services.  We also understand if the amounts given to Defendant represented compensation, Plaintiff and Defendant dispute whether Defendant should have been considered an employee or a contractor. For purposes of determining alleged damages, we have assumed Plaintiff will be able to demonstrate liability and that the amounts given to Defendant represent compensation under a contractor relationship.  The opinions and conclusions expressed in this report are Mr. Taylor's, and are based on the information made available as of the date of this report.  Mr. Taylor was assisted by other F3 professionals, working under his direction and supervision.  This report refers to Mr. Taylor and other F3 professionals involved in the work collectively as "we," "us," "our," and/or F3.

## Opinions

    **I.**    **Mr. Bardwell received value of at least $7,335,800 from Mr. Pratte consisting of cash and property.**

    **II.**    **Mr. Pratte's damages range between $3,387,495 and $5,240,503 based on his claims that Mr. Bardwell terminated their Agreement in March 2018.**

* * * * * * *

## Detailed Findings in Support of Opinions

    **I.**    **Mr. Bardwell received value of at least $7,335,800 from Mr. Pratte consisting of cash and property.**

8. Table 1 shows the amounts received by Mr. Bardwell related to the Agreement with Mr. Pratte.  These amounts were reported in the 2006 United States Gift Tax Return (Form 709) filed by Mr. Pratte.[3]

---

[3] The Gift Tax Return indicates the cash and property given to Mr. Bardwell was split between Mr. Bardwell and his then wife, Maria Recendez.  We understand the amounts shown in Table 1 were considered Mr. Bardwell's sole and separate property in his divorce. (Rader Deposition Exhibit 11 at Bard0156-57 states that Bardwell's interests in Pratte Buckeye Property LLC, Pratte Lone Mountain LLC, Pratte Companies, Stellar Development LLC (Formerly Pratte Residential LLC), BCPPZ Investment Holdings LLC and BCPPZ Land Holdings LLC are his sole and separate property.)

**Table 1: Value Received by Mr. Bardwell**[4]

| Item | Description | Amount |
|---|---|---|
| A | Cash | $ 2,000,000 |
| B | 20% - Truss Plant & Fabrication Yard (94th Avenue, Tolleson, AZ) | $ 2,958,000 |
| C | 20% - 8 Industrial Lots (94th Ave, Tolleson, AZ) | $ 757,800 |
| D | 20% - Industrial Property with Excess Land (Lone Mountain Road, North Las Vegas, NV) | $ 1,620,000 |
| | **Value Received by Mr. Bardwell** | **$ 7,335,800** |

9.  The properties and a portion of the cash received by Mr. Bardwell and other Team members were used to capitalize several companies as discussed below.  We requested specific financial information (financial statements, tax returns, Schedule K-1s, etc.) related to these companies that would allow us to identify Mr. Bardwell's distributions, and share of net income from these companies as well as Mr. Bardwell's remaining equity.  However, we have been provided incomplete financial information to date.  We understand these requested documents have not been produced in this case.  Our analysis is therefore based on amounts initially received by Mr. Bardwell, although we have identified some distributions he received based on calculations prepared by Mr. Carriere.  Below we discuss each of the items (cash and property) Mr. Bardwell received.

**Item A - Cash**

10. As discussed above, Mr. Bardwell received a check for $2 million from Mr. Pratte at the Nevada meeting in December 2005.[5]  Mr. Pratte testified he told the Team he would like to see them work together to form a homebuilding company and perform commercial work.[6]  Mr. Pratte gave each of the meeting attendees a similar check for "seed money" to start the new company, but made it clear that Mr. Bardwell would work solely for Mr. Pratte even though he would be a part owner in the new company.[7]  Mr. Bardwell initially deposited his $2 million check into his bank account[8] and then contributed cash to various companies started by the Team as shown in the table below.

**Table 2: Mr. Bardwell Initial Cash Contributions**

| Company | Amount |
|---|---|
| BCPPZ Investment Holdings LLC | $ 875,000 |
| JTJ Development Company LLC / Pratte Construction Company LLC / Pratte Companies LLC / Stellar Commercial LLC | $ 100,100 |
| Pratte Residential LLC / Stellar Development LLC | $ 1,500 |
| Pratte Buckeye Property LLC | $ 500 |
| BCPPZ Land Holdings LLC | $ 3,500 |
| Pratte Lone Mountain Property LLC | $ 500 |
| **Mr. Bardwell Initial Cash Contributions** | **$ 981,100** |

---

[4] In addition to the cash and property Mr. Bardwell received from Mr. Pratte, Mr. Pratte also paid taxes of approximately $3.27 million related to the amounts given to Mr. Bardwell.  Mr. Pratte alleges he is entitled, pursuant to the Agreement, to recover from Mr. Bardwell all or a portion of the taxes he paid.  We understand Mr. Pratte is making this claim to recover taxes paid because it's believed the taxes cannot be recovered from the Unites States Treasury or Internal Revenue Service due to the amount of time that has passed between the date of the Agreement and when Mr. Bardwell allegedly breached the Agreement.  We have not quantified the alleged claim for recovery of these taxes, but may be asked to do so at a later date.

[5] The check was dated January 5, 2006 (Bard7115)

[6] Deposition of Ronald Pratte dated February 27, 2020, p. 34.

[7] Deposition of Ronald Pratte dated February 27, 2020, p. 195.

[8] Rader Deposition Exhibit 5, p. 3.

*BCPPZ Investment Holdings LLC*

11. Mr. Bardwell initially contributed $875,000 in exchange for a 20% interest in BCPPZ Investment Holdings LLC ("BCPPZ Investment"; the other four Team members made up the remaining 80% ownership of BCPPZ Investment), which was formed to serve as a holding company for liquid assets[9] in the event the Team's construction companies were sued.[10]

*Operating Construction Companies*

12. Mr. Bardwell invested a total of $101,600 in companies that were formed in 2006 to engage in construction development of real estate property and residential real estate development.  These companies were originally founded by all five Team members, with Mr. Bardwell owning a 20% interest. In 2007, Justin Pratte and Trevor Pratte left the construction companies, which were renamed Stellar Commercial LLC ("Stellar Commercial") and Stellar Development LLC ("Stellar Development").  Mr. Bardwell's interest in the companies was increased to 33.33% after Justin and Trevor Pratte left.

13. In January 2014, Mr. Bardwell transferred 13.33% of his ownership interest in Stellar Development back to the company, which reduced his interest back to his initial 20%.[11]  In August 2014, Mr. Bardwell ceased being a member of Stellar Development and executed a Separation Agreement.[12]  As part of the Separation Agreement, Mr. Bardwell received a payment of $66,794 and possession of a truck and two computers.

14. Mr. Ziparo testified that Mr. Bardwell was not involved in working for the operating companies such as Stellar.  Mr. Ziparo stated "[Mr. Bardwell] was consulted if we needed to consult on something, but the reality is that we were building homes and doing commercial work.  And he had no say in what was going on, because he was working for Ron and he understood that."[13] Mr. Ziparo also testified that Mr. Bardwell was given the same value as Mr. Ziparo in exchange for working for Mr. Pratte and Mr. Pratte only.[14]  Mr. Carriere testified that Mr. Bardwell was not involved in any of the day-to-day activity of the construction companies.[15]

**Item B - Pratte Buckeye Property LLC**

15. Mr. Pratte gave Mr. Bardwell a 20% interest in the Truss Plant and Fabrication Yard referred to in Table 1 valued at $2,958,000.[16]  This property was transferred to Pratte Buckeye Property LLC.  In January 2006, the Articles of Organization of an existing company named JTJ Properties LLC were amended to change the name of the company to Pratte Buckeye Property LLC ("Pratte Buckeye") and the list of members of the LLC were changed to include the five Team members.[17]  The Pratte Buckeye Operating Agreement stated the company was formed to own and lease commercial rental property located at 600 S. 94th Avenue in Tolleson, Arizona, and reflected that Mr. Bardwell acquired a 20% interest in Pratte Buckeye in exchange for a $500 capital contribution.[18]  Mr. Bardwell testified he received

---

[9] Carriere Deposition Exhibit 20, page A-1 (Bard_TC0220).
[10] Deposition of Todd Carriere dated December 5, 2019, p. 25.
[11] Bardwell Deposition Exhibit 5.
[12] Bardwell Deposition Exhibit 4.
[13] Deposition of Jaime Ziparo dated December 4, 2019, pp. 20-21.
[14] Deposition of Jaime Ziparo dated December 5, 2019, pp. 137-139.
[15] Deposition of Todd Carriere dated December 5, 2019, p. 220.
[16] This property was valued at $14,790,000 in Mr. Pratte's 2006 Gift Tax Return and 20% of the value ($2,958,000) was assigned to Mr. Bardwell.  See Bardwell Deposition Exhibit 20 at RHP000025.
[17] Carriere Deposition Exhibit 25.
[18] Carriere Deposition Exhibit 26.

distributions of $20,000 per month from Pratte Buckeye.[19]  It is our understanding that Mr. Bardwell received a total of $1.79 million in rent distributions related to Pratte Buckeye.  In August 2014, the property was sold to Next Gen Tolleson LLC for $12,750,000[20] and Mr. Bardwell received a distribution of $2,400,000.[21]

### Item C - BCPPZ Land Holdings LLC

16. BCPPZ Land Holdings LLC ("BCPPZ Land") was formed in April 2006 for the purpose of engaging in real estate acquisition, ownership and development.[22]  Mr. Bardwell initially contributed $3,500 in exchange for a 20% interest in BCPPZ Land (the other four Team members made up the remaining 80% ownership of BCPPZ Land).[23] In July 2006, Mr. Pratte transferred property to BCPPZ Land referred to in Table 1 as "8 Industrial Lots (94th Avenue, Tolleson, AZ)."[24]  We understand that this property consisted of vacant land.  The property was appraised at $3,789,000 in 2006.  Mr. Bardwell's 20% interest in the property at that time was valued at $757,800.  It is our understanding that the land was sold in May 2007 and Mr. Bardwell received a distribution of $1,707,000.[25]

### Item D - Pratte Lone Mountain Property LLC

17. Table 1 shows Mr. Pratte gave a 20% interest in North Las Vegas land and property to Mr. Bardwell valued at $1,620,000.[26]  In March 2006, Pratte Lone Mountain Property LLC ("Pratte Lone Mountain") was formed to own and lease certain commercial rental property located at 2900 E. Lone Mountain Road in North Las Vegas, Nevada.[27] Mr. Bardwell acquired a 20% interest in Pratte Lone Mountain in exchange for a $500 capital contribution.[28]   In May 2006, Pratte Development Company assigned a lease for certain property in North Las Vegas, Nevada to Pratte Lone Mountain.[29]  Also in May 2006, the Team transferred their ownership in the North Las Vegas property to a trust which conveyed the property to Pratte Lone Mountain.[30]  Mr. Bardwell testified he received monthly distributions of $8,000, which we understand cumulatively totaled $360,000 from Pratte Lone Mountain.[31]  In March 2014 Pratte Lone Mountain sold the North Las Vegas Property to MEC, Inc. for $5,200,000.[32]  Mr. Bardwell received a distribution of $1,008,000 related to the sale.[33]

**II.    Mr. Pratte's damages range between $3,387,495 and $5,240,503 based on his claims that Mr. Bardwell terminated their Agreement in March 2018.**

18. As discussed above, Plaintiff claims he entered into the Agreement with Mr. Bardwell in late 2005.  In return for the more than $7.3 million given to Mr. Bardwell (not considering any earnings, gains, or

---

[19] Deposition of Jeffrey Bardwell dated March 6, 2020, pp. 206-207.
[20] Carriere Deposition Exhibit 41.
[21] Bardwell Deposition Exhibit 19.
[22] Carriere Deposition Exhibits 17 and 18.
[23] Carriere Deposition Exhibit 18, page A-1 (Bard_TC0267).
[24] Deposition of Todd Carriere dated December 5, 2019, p. 148; Carriere Deposition Exhibit 29.
[25] Bardwell Deposition Exhibit 19; We note the BCPPZ Land Holdings balance sheet as of July 31, 2007 indicates Mr. Bardwell received total distributions of $1,798,280 (Bard_TC0601).
[26] The North Las Vegas property was valued at $8,100,000; see Bardwell Deposition Exhibit 20 at RHP000029.
[27] Carriere Deposition Exhibits 22 and 23.
[28] Carriere Deposition Exhibit 23.
[29] Carriere Deposition Exhibit 31.
[30] Carriere Deposition Exhibits 32 and 33.
[31] Bardwell Deposition Exhibit 19.
[32] Carriere Deposition Exhibit 37.
[33] Bardwell Exhibit 19.

appreciation of the assets), Mr. Pratte claims Mr. Bardwell agreed to work for Mr. Pratte until his death.

19. We reviewed statements prepared by Justin Pratte[34], Todd Carriere[35] and Jaime Ziparo[36] supporting Mr. Pratte's claim that the Agreement made with Mr. Bardwell was discussed in December 2005 and/or January 2006, and included the condition that Mr. Bardwell would work for Mr. Pratte until Mr. Pratte's death.  Mr. Carriere testified at his deposition that Mr. Pratte stated Mr. Bardwell would work for him until he was "gone", which Mr. Carriere understood to mean Mr. Pratte's death.  He also testified that Mr. Bardwell also used the term "gone" in terms of Mr. Pratte's death.[37]  Mr. Ziparo testified he believed Mr. Bardwell needed to honor his commitment to work for Mr. Pratte in order to receive the money paid to him by Mr. Pratte.[38] Mr. Abendschein, a friend of Mr. Bardwell's, testified Mr. Bardwell told him he made a commitment to work for Mr. Pratte until Mr. Pratte's death.[39]

20. For the purposes of calculating Mr. Pratte's alleged damages, we have assumed that the Agreement between the parties began on January 5, 2006.[40] Mr. Pratte was born on September 12, 1947, making him 58.3 years old at the date of the Agreement.  Since Mr. Pratte claims Mr. Bardwell agreed to work for him for the rest of his life, we obtained relevant life expectancy data to estimate the term of the Agreement.[41]  Life expectancy data is published by the Vital Statistics Division of the National Center for Health Statistics (part of the U.S. Department of Health and Human Services).  Life expectancy tables show the average number of years of life remaining for persons who have attained a given age and the probability of dying from year 0 to 100 and 100 and over.[42]  Based on Vital Statistics Division 2006 data, a white male with an age between 58 and 59 years had a remaining life expectancy of 22.6 years (i.e., estimated total years in the Agreement).

21. Mr. Pratte's 2006 Gift Tax Return indicates that Mr. Bardwell received cash in January 2006, property in April 2006, and Mr. Pratte paid taxes related to the value of the cash and property Mr. Bardwell received.  As shown in Exhibit C, we have assumed the value of the cash and property given to Mr. Bardwell was all received on January 5, 2006.[43]  Based on an estimated duration of 22.6 years, Mr. Bardwell would earn $324,579 for each full year worked during the Agreement.

22. Our analysis assumes that Mr. Bardwell terminated the Agreement on March 2, 2018.[44]  Therefore, Mr. Bardwell worked 12.2 years (or 54%) of the estimated 22.6 total years of the Agreement.  As shown on Exhibit C, based on the timing of the amounts Mr. Bardwell received, he would have earned $3,948,305

---

[34] RHP000001.

[35] RHP000003.

[36] RHP000005.

[37] Deposition of Todd Carriere dated December 5, 2019, pp. 189-190, 196-197.

[38] Deposition of Jaime Ziparo dated December 4, 2019, pp. 258-259.

[39] Deposition of Jeff Abendschein dated February 13, 2020, p. 78.

[40] It is our understanding the Agreement was discussed in December 2005 at the meeting in Nevada and again in January 2006 at the meeting in Arizona. We assume the Agreement started on the date of Mr. Pratte's $2 million check to Mr. Bardwell, January 5, 2006 (Bard7115).

[41] We understand that Mr. Pratte testified that Mr. Bardwell would have fulfilled the Agreement if he had worked for Mr. Pratte until Mr. Bardwell turned 65; because Mr. Pratte would have lived beyond his life expectancy at that point, we have not calculated damages based on this scenario, but are prepared to do so if asked at a later date.

[42] AICPA Forensic & Valuation Services Practice Aid *Measuring Damages Involving Individuals* (2019), pp. 32-33.

[43] Using April 1, 2006 instead as the date Mr. Bardwell received $5,335,800 of property from Mr. Pratte (based on Mr. Pratte's Gift Tax Return), damages to Mr. Pratte would be $3,413,473 (an increase of $25,978).

[44] Bardwell Deposition Exhibit 18; March 20, 2018 email from Mr. Pratte to Mr. Bardwell referencing a meeting on March 2, 2018 scheduled between Mr. Pratte and Mr. Bardwell.  We understand the meeting planned for March 2, 2018 did not occur, and Mr. Bardwell did not speak or respond to Mr. Pratte after this date (Bardwell Deposition pp. 172-173).

at the time the Agreement was terminated. Therefore, based on the claims made by Mr. Pratte, Mr. Bardwell had not earned $3,387,495 of the total paid to him under the Agreement, and this amount represents damages to Mr. Pratte.

23. Our work also includes two alternative calculations based on the nature of Mr. Pratte and Mr. Bardwell's relationship. Exhibit D represents our calculation of alleged damages using Consumer Price Index (CPI) data to determine what Mr. Bardwell's compensation would have been beginning in 2006 ($257,353). Using this CPI data, we increased Mr. Bardwell's assumed compensation over the period of the Agreement. Based on this analysis, Mr. Bardwell's compensation in the final year of the Agreement (2028) would have been $404,590 (of which $249,234 would have been earned as of Mr. Pratte's estimated date of death), and Mr. Bardwell would have earned the $7.3 million by the end of the Agreement. Based on Mr. Bardwell terminating the Agreement on March 2, 2018, he would have earned $3,521,989 and his unearned portion, or Mr. Pratte's damages total $3,813,811.

24. Exhibit E represents our calculation of alleged damages using Mr. Bardwell's actual salary in 2005 ($150,000). We understand Plaintiff's gift tax expert Mr. Tarter believes any amounts Mr. Bardwell received above his expected compensation would only be allowed to be kept as a gift if Mr. Bardwell had fulfilled his entire obligation to Mr. Pratte by working for him through his life expectancy. We again increased Mr. Bardwell's compensation by an average annual cost of living using CPI data over the period of the Agreement. Based on this analysis, Mr. Bardwell's compensation in the final year of the Agreement (2028) would have been $240,698 (of which $148,274 would have been earned as of Mr. Pratte's estimated date of death). Based on Mr. Bardwell terminating the Agreement on March 2, 2018, he would have earned $2,095,297 and his unearned portion, or Mr. Pratte's damages total $5,240,503.

### Other Matters

25. This expert report is based on information provided to F3 as of the date of this report. We reserve the right to modify or supplement this report should additional information become available to us or if we are requested to perform additional tasks including, but not limited to, analyses performed as a result of the production of additional documents, review and rebuttal of Defendants' expert report(s), or matters related to additional discovery. In addition, F3 may prepare illustrative or demonstrative exhibits for use during testimony from the information contained in this report, any supplemental report, our work papers, or the documents considered.

26. F3 is being compensated for Mr. Taylor's time at $400 per hour and for F3's other professional staff at billing rates which range between $75 and $350 for the services provided on this engagement. F3's compensation is not contingent on the conclusions contained herein or any supplemental report(s) prepared pursuant to this engagement, or the ultimate resolution of this matter.

27. This report has been prepared only for the purposes stated herein and shall not be used for any other purpose. Neither this report nor any portions thereof shall be disseminated to third parties by any means without the prior written consent and approval of F3.

Respectfully submitted,

Brent H. Taylor
Senior Managing Director
Fenix Financial Forensics LLC

Expert Report of Brent H. Taylor                                                                      EXHIBIT A

**Pratte v. Bardwell**
**List of Documents Considered**

<u>Purpose:</u> To list the documents considered by F3.

| Item | Description | Bates Start | Bates End |
|------|-------------|-------------|-----------|
| 1 | Complaint dated December 10, 2018 | - | - |
| 2 | Answer to Complaint dated January 11, 2019 | - | - |
| 3 | Plaintiff's Second Amended Mandatory Initial Discovery Responses dated October 4, 2019 | - | - |
| | Defendants' First Amended Mandatory Initial Discovery Responses dated November 4, 2019 | - | - |
| 4 | Plaintiff's First Supplemental Responses to Defendant Jeffrey Bardwell's First Set of Interrogatories to Plaintiff Ronald H. Pratte dated November 27, 2019 | - | - |
| 5 | Documents produced by Jeffrey Bardwell | Bard0001 | Bard7387 |
| 6 | Documents labeled Bard_DR | Bard_DR0001 | Bard_DR0003 |
| 7 | Documents labeled Bard_JZ | Bard_JZ0001 | Bard_JZ0030 |
| 8 | Documents labeled Bard_TC | Bard_TC0001 | Bard_TC0618 |
| 9 | Documents labeled Bard_TP | Bard_TP0001 | Bard_TP0714 |
| 10 | Documents labeled BardBills | BardBills0001 | BardBills0040 |
| 11 | Documents labeled BardPV (excluding privileged documents) | BardPV_DIR0001 | BardPV_DIR0368 |
| 12 | Documents labeled BardPV_STL (excluding privileged documents) | BardPV_STL0071 | BardPV_STL0485 |
| 13 | Documents labeled RHP | RHP000001 | RHP000257 |
| 14 | Documents labeled WS | WS001 | WS014 |
| 15 | Deposition Transcript of Jeff Abendschein with Exhibits | - | - |
| 16 | Deposition Transcript of Jeffrey Bardwell with Exhibits | - | - |
| 17 | Deposition Transcript of Todd Carriere with Exhibits | - | - |
| 18 | Deposition Transcript of Justin Pratte with Exhibits | - | - |
| 19 | Deposition Transcript of Ronald Pratte with Exhibits | - | - |
| 23 | Deposition Transcript of William Shisler | - | - |
| 24 | Deposition Transcript of Daryl Wolfswinkel | - | - |
| 26 | Deposition Transcript of Jaime Ziparo with Exhibits | - | - |
| 27 | Diana Rader Deposition Exhibit 5 | - | - |
| 28 | Diana Rader Deposition Exhibit 11 | - | - |

Exhibit B



# Fenix Financial Forensics LLC

10565 N. 114th Street, Suite 100, Scottsdale AZ  85259

www.F3AZ.com

## Brent H. Taylor, CPA, CFF, CGMA

### Senior Managing Director

*Tel: 480.717.6710        Fax: 480.717.6752        Email: btaylor@F3AZ.com*

Brent is a Senior Managing Director for Fenix Financial Forensics LLC (F3) who has more than 25 years of experience, focusing in litigation, financial and regulatory consulting, including investigations and healthcare.  His experience includes providing forensic accounting related to investigations and disputes, computing damages, and preparing expert witness reports for litigation and arbitration proceedings.  Brent also has significant experience preparing financial models and performing economic analysis with respect to disputes and feasibility studies.  Brent has provided expert witness testimony on a wide range of commercial damage issues in U.S. District and state courts as well as arbitrations, mediations and administrative proceedings.

Brent has many years of experience in the healthcare industry.  His healthcare experience includes regulatory and financial statement auditing, fraud and investigation consulting, Medicare cost report preparation and auditing and Medicare reimbursement consulting.

In addition to healthcare, Brent has significant industry experience which includes telecommunications and voice over internet technology, airlines, public utilities, government services (including police and fire professionals), laboratory services and pharmaceuticals, real estate, banking, education, retail services, hospitality and timeshare operations, casino operations, golf course operations, professional sports, manufacturing, construction, pest control, solar energy, moving services, business incubation, professional services (including legal and accounting services), payment processing services, consumer products including multi-level marketing, manufactured homes, equestrian and railway industries and HOA and COA operations.  Brent also has extensive experience handling employment-related or lost earnings cases including wrongful termination, wrongful death, personal injury and medical malpractice matters.

Prior to establishing F3, Brent was a Managing Director at FTI Consulting, Inc., a Director with KPMG LLP in the Dispute Advisory Services Practice, and a Director in the Business Consulting Practice of Arthur Andersen LLP.

## Professional History

- Fenix Financial Forensics LLC (F3) – Senior Managing Director – Scottsdale, AZ (10/08 – Present)
- FTI Consulting, Inc. (FTI) – Managing Director – Forensic and Litigation Consulting – Phoenix, AZ (11/03 – 10/08)
- KPMG LLP – Director – Dispute Advisory Services – Phoenix, AZ (06/02 – 10/03)
- Arthur Andersen LLP – Manager – Business Consulting – Phoenix, AZ (10/97 – 06/02)
- Blue Cross Blue Shield of Arizona – Auditor – Medicare Part A – Phoenix, AZ (03/95 – 10/97)

## Education

- Bachelor of Science in Accounting, DeVry University

## Certifications

- Certified Public Accountant (CPA) licensed in Arizona
- Certified in Financial Forensics (CFF)
- Chartered Global Management Accountant (CGMA)

## Professional Affiliations

- American Institute of Certified Public Accountants
- Arizona Society of Certified Public Accountants
- Association of Certified Fraud Examiners (Associate Member)
- Healthcare Financial Management Association

## Civic Affiliations

- United Cerebral Palsy of Central Arizona – Board Treasurer (2017 – 2019)
- United Cerebral Palsy of Central Arizona – Board Member (2016 – 2019)
- City of Peoria – Parks and Recreation – Board Chair (2018 – 2020)
- City of Peoria – Parks and Recreation – Board Vice Chair (2015 – 2018, 2020 – Present)
- City of Peoria – Parks and Recreation – Board Member (2012 – Present)
- Rosie's House: A Music Academy for Children – Board Member (2003 – 2016)
- Rosie's House: A Music Academy for Children – Board President (2008 – 2009)
- Rosie's House: A Music Academy for Children – Board Treasurer (2003 – 2008 and 2009 – 2010)
- City of Peoria – Youth Sports Coach (2009 – 2012)
- City of Glendale – Youth Sports Coach (1998 – 2003)

## Publications and Presentations

- Medicare Cost Reporting Update – Arizona HFMA Spring Conference – March 24, 2011
- ESRD PPS and the Implications to Children's Hospitals – National Association of Children's Hospitals & Related Institutions (NACHRI) – October 11, 2010
- Medicare Cost Report Update – Arizona HFMA Fall Conference – September 16, 2004
- APC Insights Seminar: The Medicare Outpatient Prospective Payment System – Taking APC's Further: Beyond Compliance – June 9, 2000

## Deposition and Testimony Experience (Last 5 Years)

- Charles Irion v. Grant Stoaks, et al., American Arbitration Association, 01-19-0002-7348. Testimony (2020)
- Charles Irion v. Grant Stoaks, et al., American Arbitration Association, 01-19-0002-7348. Deposition (2020)
- Darren Udd and Amy Udd v. The City of Phoenix and Mary Roberts.  United States District Court for the District of Arizona, 2:18-CV-01616-GMS.  Deposition (2019)
- AB Staffing Solutions LLC v. Rickey L. Gross et al. and John J. Shufeldt et al. Superior Court of Arizona, Maricopa County, CV2015-010843.  Deposition (2018)

- William Molim Siu v. The Cavanagh Law Firm, P.A.  Superior Court of Arizona, Maricopa County, CV2015-012851.  Deposition (2016)

- Stacia C. Hill v. City of Phoenix et. al.  United States District Court for the District of Arizona, CV2013-02315-PHX-DGC.  Testimony (2016)

- Shannon Erickson v. Randolph and Heather Litchfield and HR 326, LLC.  Arbitration, CV2015-010771.  Testimony (2016)

- Kathy Bruno, Renee Bruno, Anne Bruno, Nina Bruno and Desiree Sierra v. Michelin North America, Inc., Discount Tire Co., Inc., Landstar System, Inc., and Hyundai Translead Inc.  Superior Court of Arizona, Maricopa County, CV2013-094384. Testimony (2015)

- Laurie Miller, Brian Dimas, Kim Mills, Anthony Soza, Bruce Campbell, Kellie Bowers, Tim Hunter, Brian Saylor, Michael Schamadan and Joi Klages  v. York Risk Services Group.  United States District Court for the District of Arizona, 2:13-CV-01419-JWS.  Deposition (2015)

- Kathy Bruno, Renee Bruno, Anne Bruno, Nina Bruno and Desiree Sierra v. Michelin North America, Inc., Discount Tire Co., Inc., Landstar System, Inc., and Hyundai Translead Inc.  Superior Court of Arizona, Maricopa County, CV2013-094384.  Deposition (2014)

Expert Report of Brent H. Taylor

Exhibit C

**Pratte v. Bardwell**

**Calculation of Alleged Damages**

**Purpose:**   To calculate alleged damages using amounts received by Mr. Bardwell over Mr. Pratte's expected life span.

**Source:**   Deposition of Jeffrey Michael Bardwell, Ronald H. Pratte 2006 Form 709 United States Gift Tax Return; Revised United States Life Tables, 2006 (National Vital Statistics Reports); Bard7115; Deposition of Ronald Pratte (Pratte Date of Birth)

|  |  | Amount | Years to Pratte Expected Death | Amount per Year |
|---|---|---|---|---|
| Date of Cash Payment: | 01/05/2006 | $ 2,000,000 | 22.60 | $ 88,492 |
| Date of Property Transfer [1]: | 01/05/2006 | $ 5,335,800 | 22.60 | $ 236,087 |
| Total Value Received: | | $ 7,335,800 | | |
| Mr. Pratte's DOB: | 09/12/1947 | | | |
| Mr. Pratte's Age at Initial (Cash) Payment: | 58.3 | | | |
| Expected Years of Life: | 22.6 [2] | | | |
| Mr. Pratte's Life Expectancy: | 80.9 | | | |
| Mr. Pratte's Expected Death: | 08/12/2028 | | | |

| Year | Year Begin | Year End | RHP Age | Portion of Year Earned (Cash) | Portion of Year Earned (Property) | Cash Earned | Property Earned | Total Earned | Total Unearned |
|---|---|---|---|---|---|---|---|---|---|
| 2006 | 01/01/2006 | 12/31/2006 | 58 | 0.9890 | 0.9890 | $ 87,522 | $ 233,500 | $ 321,022 | $ 7,014,778 |
| 2007 | 01/01/2007 | 12/31/2007 | 59 | 1.0000 | 1.0000 | $ 88,492 | $ 236,087 | $ 324,579 | $ 6,690,199 |
| 2008 | 01/01/2008 | 12/31/2008 | 60 | 1.0027 | 1.0027 | $ 88,734 | $ 236,734 | $ 325,468 | $ 6,364,730 |
| 2009 | 01/01/2009 | 12/31/2009 | 61 | 1.0000 | 1.0000 | $ 88,492 | $ 236,087 | $ 324,579 | $ 6,040,151 |
| 2010 | 01/01/2010 | 12/31/2010 | 62 | 1.0000 | 1.0000 | $ 88,492 | $ 236,087 | $ 324,579 | $ 5,715,572 |
| 2011 | 01/01/2011 | 12/31/2011 | 63 | 1.0000 | 1.0000 | $ 88,492 | $ 236,087 | $ 324,579 | $ 5,390,993 |
| 2012 | 01/01/2012 | 12/31/2012 | 64 | 1.0027 | 1.0027 | $ 88,734 | $ 236,734 | $ 325,468 | $ 5,065,524 |
| 2013 | 01/01/2013 | 12/31/2013 | 65 | 1.0000 | 1.0000 | $ 88,492 | $ 236,087 | $ 324,579 | $ 4,740,945 |
| 2014 | 01/01/2014 | 12/31/2014 | 66 | 1.0000 | 1.0000 | $ 88,492 | $ 236,087 | $ 324,579 | $ 4,416,366 |
| 2015 | 01/01/2015 | 12/31/2015 | 67 | 1.0000 | 1.0000 | $ 88,492 | $ 236,087 | $ 324,579 | $ 4,091,787 |
| 2016 | 01/01/2016 | 12/31/2016 | 68 | 1.0027 | 1.0027 | $ 88,734 | $ 236,734 | $ 325,468 | $ 3,766,319 |
| 2017 | 01/01/2017 | 12/31/2017 | 69 | 1.0000 | 1.0000 | $ 88,492 | $ 236,087 | $ 324,579 | $ 3,441,739 |
| 2018 [3] | 01/01/2018 | 03/02/2018 | 70 | 0.1671 | 0.1671 | $ 14,789 | $ 39,456 | $ 54,245 | $ 3,387,495 |
| 2019 | 01/01/2019 | 12/31/2019 | 71 | - | - | $ - | $ - | $ - | $ 3,387,495 |
| 2020 | 01/01/2020 | 12/31/2020 | 72 | - | - | $ - | $ - | $ - | $ 3,387,495 |
| 2021 | 01/01/2021 | 12/31/2021 | 73 | - | - | $ - | $ - | $ - | $ 3,387,495 |
| 2022 | 01/01/2022 | 12/31/2022 | 74 | - | - | $ - | $ - | $ - | $ 3,387,495 |
| 2023 | 01/01/2023 | 12/31/2023 | 75 | - | - | $ - | $ - | $ - | $ 3,387,495 |
| 2024 | 01/01/2024 | 12/31/2024 | 76 | - | - | $ - | $ - | $ - | $ 3,387,495 |
| 2025 | 01/01/2025 | 12/31/2025 | 77 | - | - | $ - | $ - | $ - | $ 3,387,495 |
| 2026 | 01/01/2026 | 12/31/2026 | 78 | - | - | $ - | $ - | $ - | $ 3,387,495 |
| 2027 | 01/01/2027 | 12/31/2027 | 79 | - | - | $ - | $ - | $ - | $ 3,387,495 |
| 2028 | 01/01/2028 | 08/12/2028 | 80 | - | - | $ - | $ - | $ - | $ 3,387,495 |
| | | | | | **Total** | $ 1,076,448 | $ 2,871,857 | $ 3,948,305 | |

**Notes:**

[1] Property was received on April 1, 2006, but we have assumed all cash and property were received on January 5, 2006.

[2] Calculated per National Center for Health Statistics Data as of 2006.

[3] Mr. Bardwell is assumed to have stopped working on March 2, 2018.

**Pratte v. Bardwell**
**Calculation of Alleged Damages**
**Alternative Scenario 1**

<u>Purpose:</u> To calculate Pratte damages under Alternative Scenario 1.

<u>Source:</u> Bardwell Deposition Exhibit 20; Bureau of Labor Statistics CPI-U West Region Data; Revised United States Life Tables, 2006 (National Vital Statistics Reports);  Deposition of Ronald Pratte (Pratte Date of Birth).

Compensation
Growth Rate                    2.1%                    CPI-U West Region 2006-2018 CAGR

|  | **Bardwell Termination Year** | **Agreement End Year** |
|---|---|---|
| Begin Date | 1/1/2018 | 1/1/2028 |
| End Date | 3/2/2018 | 8/12/2028 |
| Days | 61 | 225 |
| Annual Periods | 0.17 | 0.62 |

| Year | Projected Compensation | Earned Compensation |
|---|---|---|
| 2006 [1] | $257,373 | $257,373 |
| 2007 | $262,720 | $262,720 |
| 2008 | $268,178 | $268,178 |
| 2009 | $273,749 | $273,749 |
| 2010 | $279,436 | $279,436 |
| 2011 | $285,241 | $285,241 |
| 2012 | $291,166 | $291,166 |
| 2013 | $297,215 | $297,215 |
| 2014 | $303,389 | $303,389 |
| 2015 | $309,692 | $309,692 |
| 2016 | $316,126 | $316,126 |
| 2017 | $322,693 | $322,693 |
| 2018 | $329,396 | $55,012 |
| 2019 | $336,239 | |
| 2020 | $343,224 | |
| 2021 | $350,355 | |
| 2022 | $357,633 | |
| 2023 | $365,062 | |
| 2024 | $372,646 | |
| 2025 | $380,388 | |
| 2026 | $388,290 | |
| 2027 | $396,356 | |
| 2028 | $249,234 | |
| **Total** | **$7,335,800** | **$3,521,989** |
| **Less: Earned Compensation** | **($3,521,989)** | |
| **Damages** | **$3,813,811** | |

**Note:**
[1] This calculation imputes 2006 compensation assuming that annual compensation will grow at 2.1% per year (based on 2006-2018 compound annual growth rate ("CAGR") of CPI for West Region per Bureau of Labor Statistics) so that Mr. Bardwell would have earned a total of $7,335,800 by August 12, 2028 (Mr. Pratte's estimated date of death).

**Pratte v. Bardwell**
**Calculation of Alleged Damages**
**Alternative Scenario 2**

**Purpose:** To calculate Pratte damages under Alternative Scenario 2.

**Source:** Bardwell Deposition Exhibit 20; Bardwell Deposition p. 71; Bureau of Labor Statistics CPI-U
West Region Data; Revised United States Life Tables, 2006 (National Vital Statistics Reports);
Deposition of Ronald Pratte (Pratte Date of Birth).

| Compensation Growth Rate | 2.1% | CPI-U West Region 2006-2018 CAGR |
| --- | --- | --- |

| | **Bardwell Termination Year** | **Agreement End Year** |
| --- | --- | --- |
| Begin Date | 1/1/2018 | 1/1/2028 |
| End Date | 3/2/2018 | 8/12/2028 |
| Days | 61 | 225 |
| Annual Periods | 0.17 | 0.62 |

| Bardwell Compensation 2005 | $150,000 | Bardwell Deposition p. 71 |
| --- | --- | --- |

| Year | Projected Compensation | Earned Compensation |
| --- | --- | --- |
| 2006 [1] | $153,116 | $153,116 |
| 2007 | $156,297 | $156,297 |
| 2008 | $159,544 | $159,544 |
| 2009 | $162,858 | $162,858 |
| 2010 | $166,241 | $166,241 |
| 2011 | $169,695 | $169,695 |
| 2012 | $173,220 | $173,220 |
| 2013 | $176,819 | $176,819 |
| 2014 | $180,492 | $180,492 |
| 2015 | $184,242 | $184,242 |
| 2016 | $188,069 | $188,069 |
| 2017 | $191,976 | $191,976 |
| 2018 | $195,964 | $32,728 |
| 2019 | $200,035 | **$2,095,297** |
| 2020 | $204,191 | |
| 2021 | $208,432 | |
| 2022 | $212,762 | |
| 2023 | $217,182 | |
| 2024 | $221,694 | |
| 2025 | $226,300 | |
| 2026 | $231,001 | |
| 2027 | $235,800 | |
| 2028 | $148,274 | |
| Total Compensation | $4,364,204 | |
| Gift | $2,971,596 | |
| **Total** | **$7,335,800** | |
| | | |
| Total Compensation | $4,364,204 | |
| Less: Earned Compensation | ($2,095,297) | |
| Unearned Compensation | $2,268,907 | |
| Unearned Gift | $2,971,596 | |
| **Total Damages** | **$5,240,503** | |

**Note:**
[1] This calculation grows Mr. Bardwell's 2005 compensation at 2.1% per year (based on 2006-2018 compound annual growth rate ("CAGR")
of CPI for West Region per Bureau of Labor Statistics) until Mr. Pratte's estimated date of death to determine the total amount paid to Mr.
Bardwell considered compensation; per Mr. Tarter, the remainder of the amount paid to Mr. Bardwell is considered a contingent gift that
became unearned when Mr. Bardwell terminated the Agreement.

# EXHIBIT 5



IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Ronald H. Pratte,                         )
                                          )
        Plaintiff,                        )
                                          )
vs.                                       ) No.
                                          ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.             ) PHX-GMS
Bardwell, husband and wife,               )
                                          )
        Defendants.                       )
                                          )




DEPOSITION OF TODD CARRIERE

Phoenix, Arizona
December 5, 2019
10:00 a.m.




REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF TODD CARRIERE
December 5, 2019

```
1                    I N D E X

2

3  WITNESS                                    PAGE

4  TODD CARRIERE

5        Examination by Mr. Connelly      10, 177

6        Examination by Mr. Marlowe          119

7        Examination by Mr. Collins          248

8

9                  E X H I B I T S

10 Deposition
11 Exhibits      Description                 PAGE

12 1         Sacks Tierney Interoffice         42
             Memorandum dated April 13, 2006, to
13           Steven Goldstein from Shannon Mason
             (Bates Bard_TP0665 through 667)
14           (3 pages)

15
   2         Articles of Organization of JTJ    47
16           Development Company, L.L.C. (Bates
             Bard_TC0292, 290, 291) (3 pages)
17

18 3         Articles of Amendment to Articles  48
             of Organization of JTJ Development
19           Company, L.L.C. (Bard_TC0288)
             (1 page)
20

21 4         Operating Agreement of Pratte      49
             Construction Company, L.L.C.
22           (formerly known as JTJ Development
             Company, L.L.C.) (Bates Bard_TC0327
23           through 349, 352 through 354)
             (26 pages)

24

25
```

1               DEPOSITION OF TODD CARRIERE

2  was taken on December 5, 2019, commencing at 10:13 a.m.,

3  at the Law Offices of Thomas M. Connelly,

4  2425 East Camelback Road, Suite 880, Phoenix, Arizona,

5  before Anita Landeros, a Certified Reporter in the State

6  of Arizona.

7

8  COUNSEL APPEARING:

9  For the plaintiff:

10      By:  MR. GREGORY B. COLLINS
         Kercsmar & Feltus, PLLC

11     7150 East Camelback Road
         Suite 285

12     Scottsdale, Arizona  85251

13

14  For the defendants:

15
      By:  MR. THOMAS M. CONNELLY

16     Law Offices of Thomas M. Connelly
         2425 East Camelback Road

17     Suite 880
         Phoenix, Arizona  85016

18

19             AND

20
      By:  MR. THOMAS J. MARLOWE

21     Law Offices of Thomas J. Marlowe
         2425 East Camelback Road

22     Suite 880
         Phoenix, Arizona  85016

23

24

25

DEPOSITION OF TODD CARRIERE
December 5, 2019

1  Jupiter, the later meeting in May, you never heard Jeff

2  specifically -- Jeff now commit to Ron to work for him for

3  life?  And I mean coming out of Jeff's mouth.

4      A.   No.

5      Q.   All right.  Thanks.

6      A.   But he did tell it to me.

7      Q.   I asked if you ever heard him --

8      A.   Say it to Ron?

9      Q.   -- say it to Ron?

10     A.   Not to my recollection.

11              MR. CONNELLY:  Okay.

12              MR. COLLINS:  Mr. Carriere, it's been a long

13  day.  I'll try and be quick.

14              MR. CONNELLY:  Do you want a break?

15              MR. COLLINS:  No, unless you do.

16              THE WITNESS:  No.

17              MR. COLLINS:  If you need a break,

18  Mr. Carriere, let me know.

19

20                       EXAMINATION

21  BY MR. COLLINS:

22     Q.   Mr. Connelly just asked you if you ever heard

23  Mr. Bardwell commit to Ron -- and I will use Ron as

24  opposed to Mr. Pratte, because there were multiple

25  Mr. Prattes at that meeting -- that he would work for him

DEPOSITION OF TODD CARRIERE
December 5, 2019

1  for the rest of his life at the meeting in the North Vegas

2  airport or in the meeting at Jupiter, which is the street

3  in Phoenix, right?

4      A.   Yes.

5      Q.   And you testified, no, that you didn't hear

6  Mr. Bardwell say that, right?

7      A.   I don't recall him saying those specific words.

8  But I recall:  Jeff works for me.  And the check going to

9  him.

10         I recall:  Jeff works for me until I'm gone.

11         And Jeff never saying anything different.

12  And I recall on various occasions Jeff and I having

13  discussions about how long could Ron live.  You know, Jeff

14  would come in and be, like:  Man, I'm going to be working

15  until I'm 80 years old out there at the dunes.

16         Or as I said in that letter -- I think I had

17  it in the note -- at one point, Jeff had discussed with me

18  that there was going to be a trust set up for the sand

19  dunes and Jeff was going to have to run the trust -- run

20  the sand dunes, per se, after Ron died.

21         And Jeff would, you know -- my deal was I

22  work for Ron until he dies.  I don't want to be working

23  for him after he's dead.  And conversations like that had

24  been instilled all -- you know, throughout the time.

25         I mean, so it was -- I mean, it was just

1  implied that Jeff works for Ron until he dies.

2      Q.   It was more than implied.  Mr. Bardwell actually

3  told you that?

4      A.   Yes.

5      Q.   Okay.

6              MR. CONNELLY:  Well --

7      Q.   BY MR. COLLINS:  I only have a few more

8  questions.  Can you pull Exhibit 44 up, if we can get to

9  it.  And now we want to go to Page 17.

10             MR. CONNELLY:  Which exhibit are you on?

11  44?

12             MR. COLLINS:  44.

13     Q.   BY MR. COLLINS:  Mr. Carriere, there was a

14  conversation where -- there was testimony about whether or

15  not you prepared a shorter statement and then were asked

16  to prepare a longer statement and --

17     A.   Yes.

18     Q.   -- then there were questions about whether or not

19  the shorter statement was deleted or gone.

20             Can you take a look at this Bard JZ0017

21  page?

22     A.   Yes.

23     Q.   And tell me if that's your shorter statement.

24     A.   I don't know.  I'd have to see my other

25  statement, because I thought my other statement started

DEPOSITION OF TODD CARRIERE
December 5, 2019

1  STATE OF ARIZONA        )
                           ) ss.
2  COUNTY OF MARICOPA      )

3
         BE IT KNOWN that the foregoing proceedings
4  were taken before me; that the witness before testifying
   was duly sworn by me to testify to the whole truth; that
5  the foregoing pages are a full, true and accurate record
   of proceedings, all done to the best of my skill and
6  ability; that the proceedings were taken down by me in
   shorthand and thereafter reduced to print under my
7  direction.

8
         I certify that I am in no way related to any
9  of the parties hereto nor am I in any way interested in
   the outcome hereof.

10

11       [X]  Review and signature was requested.
         [ ]  Review and signature was waived.
12       [ ]  Review and signature not required.
         [ ]  Review and signature was requested, but
13 deponent did not do so within 30 days after notification.

14       I certify that I have complied with the
   ethical obligations set forth in ACJA 7-206(F)(3) and ACJA
15 7-206 J(1)(g)(1) and (2).  Dated at Phoenix, Arizona,
   this 8th of January, 2020.

16

17       _____
                 ANITA LANDEROS, RPR
18               Certified Reporter
                 Arizona CR No. 50538
19

20            *     *     *     *     *     *

21       I certify that ANITA LANDEROS REPORTING, INC.,
   has complied with the ethical obligations set forth in
22 ACJA 7-206 (J)(1)(g)(1) through (6).

23

24       _____
              ANITA LANDEROS REPORTING, INC.,
                 Registered Reporting Firm
25                Arizona RRF No. R1077

# EXHIBIT 6



```
            IN THE UNITED STATES DISTRICT COURT

                   DISTRICT OF ARIZONA



Ronald H. Pratte,                  )
                                   )
        Plaintiff,                 )
                                   )
vs.                                ) No.
                                   ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.      ) PHX-GMS
Bardwell, husband and wife,        )
                                   )
        Defendants.                )
                                   )




                 DEPOSITION OF JAIME ZIPARO

                   Scottsdale, Arizona
                   December 4, 2019
                      10:00 a.m.





REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:
```

DEPOSITION OF JAIME ZIPARO
December 4, 2019

```
                          I N D E X


WITNESS                                              PAGE

JAIME ZIPARO

        Examination by Mr. Connelly        10, 190, 261

        Examination by Mr. Marlowe              170

        Examination by Mr. Collins             257




                  MR. CONNELLY'S REQUESTS

                      Page     Line
                      228       11
                      240       03




                     E X H I B I T S

Deposition
Exhibits       Description                          PAGE

1          Sacks Tierney Interoffice               27
           Memorandum dated April 13, 2006, to
           Steven Goldstein from Shannon Mason
           (Bates Bard_TP0665 through 667)
           (3 pages)


2          Articles of Organization of JTJ         42
           Development Company, L.L.C. (Bates
           Bard_TC0292, 290, 291) (3 pages)


3          Articles of Amendment to Articles       45
           of Organization of JTJ Development
           Company, L.L.C. (Bard_TC0288)
           (1 page)
```

1            DEPOSITION OF JAIME ZIPARO

2   was taken on December 4, 2019, commencing at 10:09 a.m.,

3   at the Law Offices of Kercsmar & Feltus, PLLC, 7150 East

4   Camelback Road, Suite 285, Scottsdale, Arizona, before

5   Anita Landeros, a Certified Reporter in the State of

6   Arizona.

7

8   COUNSEL APPEARING:

9   For the plaintiff:

10          By:  MR. GREGORY B. COLLINS
               MR. ZACHARY R. FORT
11          Kercsmar & Feltus, PLLC
            7150 East Camelback Road
12          Suite 285
            Scottsdale, Arizona  85251
13

14

15  For the defendants:

16          By:  MR. THOMAS M. CONNELLY
            Law Offices of Thomas M. Connelly
17          2425 East Camelback Road
            Suite 880
18          Phoenix, Arizona  85016

19
                    AND
20

21          By:  MR. THOMAS J. MARLOWE
            Law Offices of Thomas J. Marlowe
22          2425 East Camelback Road
            Suite 880
23          Phoenix, Arizona  85016

24

25

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    Q.   And what about the property that -- was the

2   specific property discussed at the airport meeting or was

3   it more talking about the companies and the plant, maybe

4   setting up companies?  Was it more in theory or -- I mean,

5   were there specifics discussed about the companies?

6    A.   There were no specifics discussed about the

7   companies.  The checks, the rent distributions, Jeff

8   working solely for Ron, construction company.

9           I mean, those are the key points that I

10   remember.  It was a long time ago.

11    Q.   Well, let's talk about the leases.  That actually

12   was specifically discussed at the meeting?

13    A.   Yes.

14    Q.   And in what context?

15    A.   You know, the properties would be turned over to

16   us and we would be receiving the rent incomes and whenever

17   the leases ran out, the properties would be ours to do

18   whatever we wanted.

19    Q.   And so -- well, that's fairly specific.

20    A.   Yes.

21    Q.   And was any of this followed up with an e-mail by

22   Ron or from any of you back to Ron subsequent to this

23   meeting, like within a week?

24    A.   He did give us an opportunity to decide what we

25   wanted to do, if we were all going to do it or not.  I

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    Q.    Okay.  So Ron is not writing you asking you to

2  recall what was said at the meeting or what happened.  He

3  was writing you and explaining what his position was with

4  respect to this suit or claim that he's brought against

5  Jeff Bardwell?

6              MR. COLLINS:  Objection to form.

7    Q.    BY MR. CONNELLY:  Is that how you would read it?

8    A.    Initially, I read that he wanted us to recall

9  what was discussed at the meeting, so -- and if we were

10  thorough enough, we wouldn't have to, you know -- we --

11  you know, I took it for what it says.

12    Q.    Well, let's look at what it says.  Let's look at

13  the first paragraph, the last full sentence, which states:

14              "I remember our meeting at the Las Vegas

15              airport in 2006 and it was my understanding that

16              I had an agreement and a commitment from him at

17              that time and also on subsequent occasions."

18              The "him" he's referring to is Jeff

19  Bardwell?

20    A.    Correct.

21    Q.    And what he's saying is that apparently he's

22  claiming that Jeff had made some agreement with him,

23  correct?

24    A.    He could have made that agreement with him

25  already, for all I know.

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    Q.    Well, he says:  "I remember our meeting at the

2          Las Vegas airport."

3    A.    Yes.

4    Q.    So it didn't happen previously.  He's talking

5    about the airport.

6    A.    Yes, and that's because we were all there, right.

7    Q.    Do you remember Ron telling Jeff at the airport

8    that I'll give you this gift, but you've got to work for

9    me for life?

10   A.    Until he dies.  Until Ron dies, I remember that.

11   Q.    Is that what Ron said?

12   A.    Yeah.

13   Q.    I'm asking you.

14   A.    Yes, that's what he said.

15   Q.    And then this e-mail goes on to say:

16         "The lawyers will issue subpoenas for you

17          guys soon to take your statements regarding what

18          your memories are of how the deal went down."

19         Do you see that?

20   A.    Uh-huh, yes.

21   Q.    And then instead of just saying:  So go ahead and

22   jot down your thoughts here so that your memory is good

23   and that you won't get caught off guard -- but he doesn't

24   say that, does he?

25         He goes on to indicate:  In order to save

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    Q.   Okay.  So if you left that meeting with that

2  impression, it wouldn't be unusual if somebody else at the

3  meeting had the same impression?

4    A.   I've already -- yeah, I've already said that I

5  felt that way.

6    Q.   Okay.  I've got to ask you -- I've asked you

7  about, you know, the comments you made in your statements

8  about not really interacting much with Jeff for ten years

9  post the companies being formed.

10         You had offices near each other.  You've

11  walked through and tried to explain that.  And I think

12  we've covered a little bit about personal discussions that

13  you might have had.

14         And, as I recall, you guys really didn't

15  have personal discussions related to family or business or

16  other things?

17    A.   Other than the couple that we talked about.

18    Q.   One you didn't talk about was one that's in your

19  statement that indicates that you -- did you caution Ron

20  (sic) about taking this obligation on with the companies?

21    A.   No, I never said that.

22    Q.   Well, the commitment to the companies and to work

23  for Ron?

24    A.   Where did I say that?

25         MR. COLLINS:  Did you caution Ron or caution

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1  Jeff?

2     Q.   BY MR. CONNELLY:  Jeff.  Did you caution Jeff?

3  Did I say Ron?  Pardon me.  I meant Jeff.

4           Did you caution Jeff about making this

5  commitment?

6     A.   I recall Jeff saying:  What do you think about

7  this deal for me?

8           And me saying:  Think.  You know, make your

9  decision wisely.

10     Q.   And when did that happen?

11     A.   It happened some -- it may have happened that day

12  or sometime in between that day and the next meeting.

13     Q.   Well, did all of you walk out of there with a

14  $2 million check in your pocket?

15     A.   Yes.

16     Q.   And how was that left?  I mean, if you decided

17  I'm not going to go forward, those checks still belonged

18  to the five people they were given to, didn't they?

19     A.   To a certain degree.  But I already told you that

20  if I wasn't going to go forward, I would have gave him the

21  check back.

22     Q.   That's you.

23     A.   I can't speak for everybody else.  And I wish I

24  could remember more of the details, but all I can remember

25  are the big-ticket items that happened that day.

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    You said that you -- at one point in

2  response to Mr. Connelly's questions, I have in my notes

3  that you said that you viewed the check as a gift when you

4  received it at the North Vegas airport meeting?

5      A.   Yes.

6      Q.   Do you remember saying that?

7      A.   Yes.

8      Q.   And then you also said that you think everyone

9  else did, too.  Do you remember saying that?

10     A.   Yes.

11     Q.   Is that accurate?  That's your recollection, that

12  you think that everyone else viewed it as a gift?

13     A.   I would assume.  How else would you view it?

14     Q.   Okay.  Do you think that Mr. Bardwell had any

15  reason to view it as anything other than a gift?

16     A.   I mean, other than the fact that he was the only

17  one that had another commitment on the table, which was

18  that he was going to be working for Ron personally, you

19  know.  Where the rest of us -- like I said, we didn't

20  really know what we were going to be doing yet.

21     Q.   Okay.

22     A.   So --

23     Q.   So you would say that Mr. Bardwell had been

24  presented with a commitment that he needed to honor in

25  order to receive that money; is that your testimony?

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1      MR. CONNELLY:  Object to form.

2      THE WITNESS:  Yes.

3    Q.    BY MR. COLLINS:  Let me ask you this.  When you

4  said that he had a commitment, what did you mean?

5    A.    Well, like I said, I don't know the specifics of

6  what their deal was that they discussed.  All I remember

7  is, from that meeting, Bardwell is going to be working for

8  me.

9          You know, and if -- we all had to make a

10  decision as to whether we were going to do this or not.

11          And my decision wasn't based on that I'm

12  going to be going to Phoenix and, you know, making sure

13  that Ron has enough people to clean his plane and make

14  sure all of his cars work and can get to Barrett-Jackson.

15          My decision is to go there to still be in

16  some kind of a construction company and do something else

17  to make a living, other than what we have.  Whereas Jeff's

18  was when he took that money he was signing up to work for

19  Ron.

20    Q.    Okay.  And you said you would return the check if

21  you weren't going to move to Phoenix and do what

22  Mr. Pratte outlined -- what Ron outlined at that meeting.

23  Is that what your testimony was earlier?

24    A.    Yes.

25    Q.    Okay.  Do you think that you were obligated to

DEPOSITION OF JAIME ZIPARO
December 4, 2019



1   STATE OF ARIZONA          )
                              ) ss.
2   COUNTY OF MARICOPA        )

3
            BE IT KNOWN that the foregoing proceedings
4   were taken before me; that the witness before testifying
    was duly sworn by me to testify to the whole truth; that
5   the foregoing pages are a full, true and accurate record
    of proceedings, all done to the best of my skill and
6   ability; that the proceedings were taken down by me in
    shorthand and thereafter reduced to print under my
7   direction.

8
            I certify that I am in no way related to any
9   of the parties hereto nor am I in any way interested in
    the outcome hereof.

10

11          [X]  Review and signature was requested.
            [ ]  Review and signature was waived.
12          [ ]  Review and signature not required.
            [ ]  Review and signature was requested, but
13  deponent did not do so within 30 days after notification.

14          I certify that I have complied with the
    ethical obligations set forth in ACJA 7-206(F)(3) and ACJA
15  7-206 J(1)(g)(1) and (2).  Dated at Phoenix, Arizona,
    this 20th of December, 2019.

16

17                    _____
                      ANITA LANDEROS, RPR
18                    Certified Reporter
                      Arizona CR No. 50538
19

20              *     *     *     *     *     *

21          I certify that ANITA LANDEROS REPORTING, INC.,
    has complied with the ethical obligations set forth in
22  ACJA 7-206 (J)(1)(g)(1) through (6).

23

24                    _____
                      ANITA LANDEROS REPORTING, INC.,
                      Registered Reporting Firm
25                    Arizona RRF No. R1077

# EXHIBIT 7



IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Ronald H. Pratte,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  ) No.
                                     ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.        ) PHX-GMS
Bardwell, husband and wife,          )
                                     )
        Defendants.                  )
                                     )

DEPOSITION OF JUSTIN PRATTE

Phoenix, Arizona
November 26, 2019
10:00 a.m.

REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

```
1                    I N D E X

2

3   WITNESS                              PAGE

4   JUSTIN PRATTE

5        Examination by Mr. Connelly      7, 134

6        Examination by Mr. Marlowe         80

7        Examination by Mr. Collins        129

8

9

10                   E X H I B I T S

11  Deposition
    Exhibits     Description              PAGE

12  1        Arizona Corporation Commission    39
13           Application for Reservation of a
             Corporate Name - Stellar
14           Development, L.L.C., Affidavit of
             Publication (2 pages)
15

16  2        E-mail chain between several      58
             parties (Bates Bard_JZ0012 through
17           15; Bard_JZ0018, 19) (6 pages)

18
    3        E-mail chain amongst several      63
19           parties (4 pages)

20
    4        E-mail dated 1/19/2015 from Justin   68
21           Pratte to Dad (3 pages)

22
    5        Sacks Tierney Interoffice        72
23           Memorandum dated April 13, 2006, to
             Steven Goldstein from Shannon Mason
24           (Bates Bard_TP0665 through 667)
             (3 pages)
25
```

1            DEPOSITION OF JUSTIN PRATTE

2  was taken on November 26, 2019, commencing at 10:01 a.m.,

3  at the Law Offices of Thomas M. Connelly, 2425 East

4  Camelback Road, Suite 880, Phoenix, Arizona, before Anita

5  Landeros, a Certified Reporter in the State of Arizona.

6

7  COUNSEL APPEARING:

8  For the plaintiff:

9          By:  MR. GREGORY B. COLLINS
            Kercsmar & Feltus, PLLC
10         7150 East Camelback Road
            Suite 285
11         Scottsdale, Arizona  85251

12

13

   For the defendants:
14
           By:  MR. THOMAS M. CONNELLY
15         Law Offices of Thomas M. Connelly
            2425 East Camelback Road
16         Suite 880
            Phoenix, Arizona  85016

17

18                 AND

19
           By:  MR. THOMAS J. MARLOWE
20         Law Offices of Thomas J. Marlowe
            2425 East Camelback Road
21         Suite 880
            Phoenix, Arizona  85016

22

23

24

25

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1        MR. COLLINS:  Object to form.

2        THE WITNESS:  Ask the question again.

3    Q.   BY MR. CONNELLY:  When Counsel objects like that

4  to form, it's fine.  You still have to answer the

5  question, okay?

6    A.   Understood.

7    Q.   Okay.  Well, it was more than a suggestion from

8  Ron on how to structure these companies when he gave each

9  of you the $2 million.  There was a plan on setting these

10  companies up, that he was going to put assets into these

11  companies and that a portion of the $2 million that each

12  of you received was also going to help fund and move these

13  companies forward, correct?

14    A.   Correct.

15        MR. COLLINS:  Objection, form.

16    Q.   BY MR. CONNELLY:  And was that part of the

17  conversation that occurred at the airport?

18    A.   Somewhat, yes.

19    Q.   Okay.  Well, when you say "somewhat," what do you

20  recall of that conversation?

21    A.   Okay.  Once again, Ron handed us all checks for

22  $2 million.  It was at that time he suggested that we form

23  an entity to form a home building company.

24        The other entities which you speak of,

25  Pratte Lone Mountain, Pratte Buckeye, there wasn't much --

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1  there didn't need to be a real discussion on what to do

2  there.  We knew that we were going to inherit those

3  properties and that we needed to form an LLC to own them.

4  So there's -- there isn't really much to talk about there.

5  This is what the rent payments are.  These are the

6  contracts for them.  We knew we needed to form an entity

7  in order to receive those funds.

8         At that time, the deal was:  I suggest to

9  you guys that you guys start your own home building

10  company.  And the way it's going to work is this:  The

11  four of you, Trevor, myself, Todd, Jaime, you guys will be

12  the principal operators of this company.

13         However, Jeff will be an equal owner.  This

14  company -- and as an equal owner, Jeff was privy to any

15  revenue as well as he was to any expenses at the same pro

16  share that other four owners were.

17         However, we -- it was made clear to us

18  that -- and very clear to Jeff that if he wanted to go

19  forward in this venture, the four of us in Pratte

20  Companies would fund any expenses necessary for Jeff to

21  operate in a facet -- or in a manner to which his sole

22  responsibility was to do whatever Ron asked him to do.

23     Q.   And still he was a member of these entities?

24     A.   That's correct.  And I remember very vividly that

25  the structure -- or the notion of Jeff working for Ron

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1  was:  Jeff -- and these were Ron's words.

2          Jeff, you work for me and whatever I need

3  for the rest of my life.

4     Q.   And do you recall what Jeff responded to that?

5     A.   Yes, he responded affirmatively, that he would.

6  And after that, I remember all of us having direct

7  conversation with Jeff, reminding him what he was signing

8  up for.  And I had many conversations with Jeff.

9          Please be sure that you're aware of what

10  you're signing up for.  Because the five of us -- the four

11  of us knew my father much more intimately for a longer

12  period of time, because we're family.  And we all know how

13  difficult he could be.  And this was a big ask and a very

14  large responsibility.

15     Q.   So if I'm hearing this correctly, you were

16  warning Jeff Bardwell be careful about taking this

17  opportunity on?

18     A.   Yes.

19     Q.   Is that a fair statement?

20     A.   Yes.

21     Q.   Why were you concerned about that?

22     A.   Because taking one job for the rest of your life

23  or for one person is -- and changing exactly what you've

24  been doing your entire life up until that point is, you

25  know, a very large decision.

```
 1  STATE OF ARIZONA        )
                            ) ss.
 2  COUNTY OF MARICOPA      )

 3
            BE IT KNOWN that the foregoing proceedings
 4  were taken before me; that the witness before testifying
    was duly sworn by me to testify to the whole truth; that
 5  the foregoing pages are a full, true and accurate record
    of proceedings, all done to the best of my skill and
 6  ability; that the proceedings were taken down by me in
    shorthand and thereafter reduced to print under my
 7  direction.

 8
            I certify that I am in no way related to any
 9  of the parties hereto nor am I in any way interested in
    the outcome hereof.
10

11          [X]  Review and signature was requested.
            [ ]  Review and signature was waived.
12          [ ]  Review and signature not required.
            [ ]  Review and signature was requested, but
13  deponent did not do so within 30 days after notification.

14          I certify that I have complied with the
    ethical obligations set forth in ACJA 7-206(F)(3) and ACJA
15  7-206 J(1)(g)(1) and (2).  Dated at Phoenix, Arizona,
    this 11th of December, 2019.

16

17          _____
                 ANITA LANDEROS, RPR
18               Certified Reporter
                 Arizona CR No. 50538
19

20               *    *    *    *    *    *

21          I certify that ANITA LANDEROS REPORTING, INC.,
    has complied with the ethical obligations set forth in
22  ACJA 7-206 (J)(1)(g)(1) through (6).

23
            _____
24               ANITA LANDEROS REPORTING, INC.,
                  Registered Reporting Firm
25                 Arizona RRF No. R1077
```

# EXHIBIT 8



IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Ronald H. Pratte,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  ) No.
                                     ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.        ) PHX-GMS
Bardwell, husband and wife,          )
                                     )
        Defendants.                  )
                                     )




DEPOSITION OF LARRY YONKER

Scottsdale, Arizona
February 14, 2020
10:00 a.m.




REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF LARRY YONKER
February 14, 2020

                        I N D E X


WITNESS                                          PAGE

LARRY YONKER

        Examination by Mr. Connelly                4




                    MR. CONNELLY'S REQUESTS

                        Page      Line
                         73        10




                        E X H I B I T S

Deposition
Exhibits        Description                      PAGE

1          E-mail dated October 8, 2018, to Ron    80
           Pratte from Lawrence Yonker (1 page)

1            DEPOSITION OF LARRY YONKER

2  was taken on February 14, 2020, commencing at 10:02 a.m.,

3  at the Law Offices of Kercsmar & Feltus, PLLC, 7150 East

4  Camelback Road, Suite 285, Scottsdale, Arizona, before

5  Anita Landeros, a Certified Reporter in the State of

6  Arizona.

7

8  COUNSEL APPEARING:

9  For the plaintiff:

10        By:  MR. GREGORY B. COLLINS
          Kercsmar & Feltus, PLLC
11        7150 East Camelback Road
          Suite 285
12        Scottsdale, Arizona  85251

13

14
   For the defendants:
15
          By:  MR. THOMAS M. CONNELLY
16        Law Offices of Thomas M. Connelly
          2425 East Camelback Road
17        Suite 880
          Phoenix, Arizona  85016
18

19

20  Also present was Mr. Jeff Bardwell.

21

22

23

24

25

DEPOSITION OF LARRY YONKER
February 14, 2020

1  explain what those shared values were.

2      A.   It grew into a friendship over the years, and

3  trust.

4      Q.   Between you and Ron Pratte?

5      A.   Yes.

6      Q.   So who would you say that you were closer friends

7  with, Ron Pratte or Jeff Bardwell?

8      A.   Jeff Bardwell.

9      Q.   And so I go back to my question:  What is it that

10  made you upset in speaking with Ron Pratte about the

11  relationship between Jeff Bardwell and Ron Pratte?

12      A.   Because I had some loyalties to Jeff Bardwell.

13      Q.   Okay.  So whose side were you taking in the

14  dispute?

15              MR. COLLINS:  Object to the form.

16              Go ahead.  You can answer.

17      Q.   BY MR. CONNELLY:  Was there a dispute between

18  Jeff Bardwell and Ron Pratte?

19      A.   When he quit, yes.

20      Q.   And a lawsuit came of it?

21      A.   Yes, from my understanding.

22      Q.   So based upon your understanding -- what is your

23  understanding of the suit?  What's your understanding of

24  the claim that Mr. Pratte is making against Mr. Bardwell?

25      A.   From my understanding, from what Mr. Bardwell has

1  told me in the past, is that he is being sued by Ron for

2  terminating the contract of his employment.

3      Q.   What contract?

4      A.   A verbal contract.

5      Q.   Between?

6      A.   Mr. Bardwell and Mr. Pratte.

7      Q.   And do you know what the terms of that alleged

8  verbal contract were?

9      A.   From Mr. Bardwell's account, it was until -- work

10  for Ron until he died.

11      Q.   That he had agreed to work for him until he died?

12      A.   Yes.

13      Q.   In exchange for what?

14      A.   For money up front.

15      Q.   How much was that?

16      A.   I have no idea.  There's rumors of -- I never saw

17  it or, you know, saw what the money was.

18      Q.   And did Mr. Bardwell deny that was how things

19  happened?

20      A.   Never to me.

21      Q.   And did you discuss these same things with

22  Mr. Pratte?

23      A.   No.

24      Q.   So you discussed it only with Mr. Bardwell, but

25  you were also friends with Mr. Pratte.  Why didn't you

1    A.    Ron.

2    Q.    To anybody else?

3    A.    No.

4    Q.    Do you recall what it said?

5    A.    I can't -- I don't recall.

6    Q.    And your recollection is that he talked about the
7  case to you up at the dunes and then asked you to do a
8  statement back to him on not what you recalled about
9  things, but what Mr. Bardwell had told you?  Because you
10 didn't know anything about the matter, did you?

11   A.    Only what Bardwell had told me.

12   Q.    Let me rephrase.  Did you have any independent
13 knowledge of the relationship between Ron Pratte and Jeff
14 Bardwell in this engagement that they were in, the
15 business relationship they had?

16   A.    I was witness to it?

17   Q.    Yes.  Did you have any personal knowledge of it?

18   A.    Yes.

19   Q.    What was your personal knowledge?

20   A.    Can you be more specific?

21   Q.    I can't be more specific than what your personal
22 knowledge was.

23   A.    Well, my knowledge was that there was a deal
24 between Mr. Bardwell and Mr. Pratte.

25   Q.    What was the deal?

1    A.    That Mr. Bardwell work for Mr. Pratte for the

2    rest of his life.

3    Q.    And where did you get that information from?

4    A.    From Mr. Bardwell.

5    Q.    Besides information you may have gleaned from

6    Mr. Bardwell, something else besides Mr. Bardwell, what

7    other source did you have information from regarding the

8    relationship between Ron Pratte and Mr. Bardwell?

9    A.    The business associates of Mr. Bardwell.

10   Q.    Who?

11   A.    Justin Pratte, Jaime, Trevor -- not Trevor.

12   Trevor was a business partner, but I never talked to

13   Trevor.  And the accountant.

14   Q.    What did you talk -- Bill Shisler?

15   A.    No, Todd.

16   Q.    Todd Carriere?

17   A.    Yes.

18   Q.    What did you talk to Todd Carriere about?

19   A.    Todd would to talk to me about stuff, complain to

20   me about stuff.  And complain about other things related

21   to some of the work and some of the work that was going

22   on.

23   Q.    By who?  By other members of their group?

24   A.    By Todd and by other members of the group, yeah.

25   Q.    Who made up the group?

DEPOSITION OF LARRY YONKER
February 14, 2020

```
 1   STATE OF ARIZONA        )
                             ) ss.
 2   COUNTY OF MARICOPA      )

 3
            BE IT KNOWN that the foregoing proceedings
 4   were taken before me; that the witness before testifying
     was duly sworn by me to testify to the whole truth; that
 5   the foregoing pages are a full, true and accurate record
     of proceedings, all done to the best of my skill and
 6   ability; that the proceedings were taken down by me in
     shorthand and thereafter reduced to print under my
 7   direction.

 8
            I certify that I am in no way related to any
 9   of the parties hereto nor am I in any way interested in
     the outcome hereof.
10
11          [X]  Review and signature was requested.
            [ ]  Review and signature was waived.
12          [ ]  Review and signature not required.
            [ ]  Review and signature was requested, but
13   deponent did not do so within 30 days after notification.

14          I certify that I have complied with the
     ethical obligations set forth in ACJA 7-206(F)(3) and ACJA
15   7-206 J(1)(g)(1) and (2).  Dated at Phoenix, Arizona,
     this 17th of February, 2020.

16

17          _____
                 ANITA LANDEROS, RPR
18               Certified Reporter
                 Arizona CR No. 50538
19

20          *      *      *      *      *      *

21          I certify that ANITA LANDEROS REPORTING, INC.,
     has complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23
            _____
24               ANITA LANDEROS REPORTING, INC.,
                   Registered Reporting Firm
25                 Arizona RRF No. R1077
```

# EXHIBIT 9



IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Ronald H. Pratte,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  ) No.
                                     ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.        ) PHX-GMS
Bardwell, husband and wife,          )
                                     )
        Defendants.                  )
                                     )


DEPOSITION OF JEFF ABENDSCHEIN

Scottsdale, Arizona
February 13, 2020
3:30 p.m.


REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

I N D E X

WITNESS                                          PAGE

JEFF ABENDSCHEIN

        Examination by Mr. Connelly              4, 85

        Examination by Mr. Collins               75


                    MR. CONNELLY'S REQUEST

                        Page    Line
                         41      15




                    E X H I B I T S

Deposition
Exhibits        Description                      PAGE

            (No exhibits marked.)

1            DEPOSITION OF JEFF ABENDSCHEIN

2   was taken on February 13, 2020, commencing at 3:24 p.m.,

3   at the Law Offices of Kercsmar & Feltus, PLLC, 7150 East

4   Camelback Road, Suite 285, Scottsdale, Arizona, before

5   Anita Landeros, a Certified Reporter in the State of

6   Arizona.

7

8   COUNSEL APPEARING:

9   For the plaintiff:

10          By:  MR. GREGORY B. COLLINS
            Kercsmar & Feltus, PLLC
11          7150 East Camelback Road
            Suite 285
12          Scottsdale, Arizona  85251

13

14   For the defendants:

15
            By:  MR. THOMAS M. CONNELLY
16          Law Offices of Thomas M. Connelly
            2425 East Camelback Road
17          Suite 880
            Phoenix, Arizona  85016
18

19

20

21

22

23

24

25

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1    Q.    Okay.   Counsel for Mr. Pratte?

2    A.    Yes.

3    Q.    And the declaration letter that you did

4    subsequent to this dinner, did you do it that night?

5    A.    About a week later.

6    Q.    Okay.   And was that declaration based upon the

7    conversation that you had had with Ron at dinner, and then

8    after talking with Ron, your declaration then was your

9    memorialization of speaking with Ron and hearing about the

10   case and what you recalled?

11   A.    He just wanted me to write what I remembered from

12   prior to Jeff working for him, in my own words.

13   Q.    Do you remember what you wrote?

14   A.    Vaguely.   I'd have to read it.   It's been --

15   Q.    Tell us what you remember.   We know that you

16   don't have it in front of you.

17   A.    It's basically everything that I told you right

18   now.  That Jeff and I were friends.   He got an offer to go

19   work for Ron.  He got excited about the check, called me

20   and that's really it.

21           I know that within, like, two or three

22   years, Jeff was tired of working for Ron and he wanted

23   out.  Just didn't want to work for him no more.

24   Q.    So two or three years?  So that would have been

25   around --

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1    A.   Maybe '07, '08.

2    Q.   -- '07, 08.

3    A.   Yes, he was done.

4    Q.   But yet he continued working for him until 2018?

5    A.   Yeah.

6    Q.   So he couldn't have wanted out that much.

7    A.   He did.

8    Q.   Well, you perceived he did.

9         But you're telling us this came up in '07,

10   '08.  He worked for him for ten years after that.

11   A.   I know.

12   Q.   So apparently you either misunderstood or misread

13   the depth of his concern?

14   A.   No.

15   Q.   Okay.

16   A.   He was tired of working for him.

17   Q.   But stayed for ten more?

18   A.   Yes.

19   Q.   Did he tell you why he did that?

20   A.   Because he had a contract with him.  He was

21   supposed to work for him until Ron passed and that was

22   their verbal agreement.

23   Q.   Well, you said that they had a contract together.

24   Did they have a written contract?

25   A.   I don't know if it was written up or not.  I

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1   think it was verbal.

2        Q.   How do you know?

3        A.   I asked Jeff if -- that day he showed me the

4   check, I said:  Did you get that in a contract or is it

5   just verbal?

6              And he told me it was written.

7        Q.   Didn't Jeff tell you it was a gift?

8        A.   No.  Like a sign-on bonus to come work for him.

9        Q.   But I wonder why -- you saw the check and you

10  said, you know:  Did you get a contract for that, or is it

11  just oral?

12             That seems like an odd thing to say to

13  somebody when they show you a $2 million check.

14       A.   I know.

15       Q.   You know, too.  So it sounds odd to you as well?

16       A.   The way you worded it.  To me, I would have

17  everything in writing, but ...

18       Q.   One would think?

19       A.   Uh-huh.

20       Q.   But, to your knowledge, this wasn't in writing?

21       A.   I don't think it was.  I think it was just an

22  oral contract.

23       Q.   Well, didn't you know it was oral based upon on

24  the dinner conversation you had with Ron, when he told you

25  this alleged commitment was just between us and a promise

1   Q.   You just said it was verbal.

2   A.   Apparently, it's verbal.  I don't know.

3   Q.   So you don't know either way?

4   A.   I've never seen a contract.

5   Q.   So you don't know if it was a verbal --

6            THE REPORTER:  Hold on.  Hold on.

7            (A portion of the record was read by the

8   certified reporter.)

9            THE WITNESS:  I've never seen a contract?

10   Q.   BY MR. CONNELLY:  So you've never seen a written

11   contract and you don't know if it was a verbal contract?

12   A.   It's a verbal contract is what Jeff told me,

13   because he's the one that told -- all I know is from what

14   Jeff told me.

15   Q.   And you're testifying here under oath that Jeff

16   told you that he had a verbal contract with Ron Pratte?

17   A.   Yes.

18   Q.   Did he tell you why it wasn't in writing?

19   A.   No.

20   Q.   Did you find that odd that somebody would get

21   millions of dollars and not have anything in writing?

22   A.   Yeah, I do.

23   Q.   I would think you'd find it very odd when you're

24   the very one that allegedly mentored him about getting a

25   writing from an employment deal.

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1   period of time.  He did well for himself and sold in the

2   nick of time.

3       Q.    And how do you know that?

4       A.    Just through Jeff.  From what Jeff has told me.

5       Q.    Okay.  And that would have been conversations you

6   had with Jeff while you were hanging out with him, right?

7       A.    Yes.

8       Q.    And so December 2005 or around that period, do

9   you remember a time when Jeff called you and said:  Hey, I

10  have got this check.  You have to come see it?

11      A.    Yes.

12      Q.    Tell me about that.

13      A.    So he called me up and I went over and he came

14  out in his garage and showed me a check for $2 million.

15  And I was, like, just excited for him, you know.  So ...

16      Q.    What did he tell you about the check?

17      A.    That it was a sign-on bonus going to work for

18  Ron.

19      Q.    What did he tell you that he would be doing for

20  Ron?

21      A.    Basically, answering the phone whenever Ron

22  called.  He'd have to answer the phone.  It could be in

23  the middle of the night, which it was several times, and

24  he would just have to do what he needed done, having a

25  truck carrier -- he had so many different -- I don't even

1   know what all he did.  A lot of contract jobs, digging

2   holes in the desert, planting trees.

3       Q.   I want to stop you here just -- you had a

4   relationship with Jeff Bardwell for a period of time where

5   you saw him working -- actually doing the work for Ron

6   Pratte, right?

7       A.   Yeah.  I mean, for the most part.  When I was out

8   at the dunes for like a holiday weekend, yeah, he'd be

9   working.

10      Q.   Okay.  I want to -- well, also you knew that he

11  worked for Ron Pratte and what he did for Ron Pratte from

12  later conversations --

13      A.   Yes.

14      Q.   -- that you had with Mr. Bardwell while you were

15  working out and hanging out, right?

16      A.   Yes.

17      Q.   What do you remember Jeff Bardwell telling you,

18  on the day that he showed you that check, about what he

19  had to do to get that check?

20      A.   Basically, he made a commitment to work for Ron

21  until Ron passed away.  He said:  I have to work for this

22  guy until he passes away.  That was his contract with him.

23      Q.   Do you remember him saying whether or not he

24  thought it was a good deal?  Whether or not it was a tough

25  decision?

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1  STATE OF ARIZONA          )
                            ) ss.
2  COUNTY OF MARICOPA        )

3
            BE IT KNOWN that the foregoing proceedings
4  were taken before me; that the witness before testifying
   was duly sworn by me to testify to the whole truth; that
5  the foregoing pages are a full, true and accurate record
   of proceedings, all done to the best of my skill and
6  ability; that the proceedings were taken down by me in
   shorthand and thereafter reduced to print under my
7  direction.

8
            I certify that I am in no way related to any
9  of the parties hereto nor am I in any way interested in
   the outcome hereof.
10

11          [X]  Review and signature was requested.
            [ ]  Review and signature was waived.
12          [ ]  Review and signature not required.
            [ ]  Review and signature was requested, but
13 deponent did not do so within 30 days after notification.

14          I certify that I have complied with the
   ethical obligations set forth in ACJA 7-206(F)(3) and ACJA
15 7-206 J(1)(g)(1) and (2).  Dated at Phoenix, Arizona,
   this 17th of February, 2020.
16

17          _____
                ANITA LANDEROS, RPR
18              Certified Reporter
                Arizona CR No. 50538
19

20          *     *     *     *     *     *

21          I certify that ANITA LANDEROS REPORTING, INC.,
   has complied with the ethical obligations set forth in
22 ACJA 7-206 (J)(1)(g)(1) through (6).

23
            _____
24              ANITA LANDEROS REPORTING, INC.,
                 Registered Reporting Firm
25               Arizona RRF No. R1077

# EXHIBIT 10



IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Ronald H. Pratte,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  ) No.
                                     ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.        ) PHX-GMS
Bardwell, husband and wife,          )
                                     )
        Defendants.                  )
                                     )




DEPOSITION OF DARYL WOLFSWINKEL

Scottsdale, Arizona
February 13, 2020
11:00 a.m.




REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

I N D E X

WITNESS                                        PAGE

DARYL WOLFSWINKEL

        Examination by Mr. Connelly              4

E X H I B I T S

Deposition
Exhibits        Description                    PAGE

              (No exhibits marked.)

1    DEPOSITION OF DARYL WOLFSWINKEL

2  was taken on February 13, 2020, commencing at 11:12 a.m.,

3  at the Law Offices of Kercsmar & Feltus, PLLC, 7150 East

4  Camelback Road, Suite 285, Scottsdale, Arizona, before

5  Anita Landeros, a Certified Reporter in the State of

6  Arizona.

7

8  COUNSEL APPEARING:

9  For the plaintiff:

10        By:  MR. GREGORY B. COLLINS
          Kercsmar & Feltus, PLLC
11        7150 East Camelback Road
          Suite 285
12        Scottsdale, Arizona  85251

13

14  For the defendants:

15        By:  MR. THOMAS M. CONNELLY
16        Law Offices of Thomas M. Connelly
          2425 East Camelback Road
17        Suite 880
          Phoenix, Arizona  85016

18

19

20

21

22

23

24

25

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    if you had had knowledge, and you said no knowledge?

2        A.    I have no knowledge.

3        Q.    Were you present when Jeff Bardwell allegedly

4    made this commitment or promise to Ron Pratte?

5        A.    No.

6        Q.    Do you know if anybody else was present?

7        A.    I have no idea.

8        Q.    Did Ron Pratte ever tell you that Jeff Bardwell

9    had ever made such a promise to him?

10       A.    I would guess that he had.

11       Q.    But you guess that he had.  You don't recall him

12   saying that to you?

13       A.    I don't recall exactly, no.

14       Q.    Is it also possible that presupposing Jeff made

15   any comments to you at all over this period of time that

16   he said:  I got a windfall gift from Ron Pratte.  I'm

17   going to work for that guy for the rest of my life?  Is

18   that equally plausible in the context in which you related

19   it?

20       A.    I don't know if the wording is exactly right,

21   what you just said.

22       Q.    I understand.

23             But you have already said that you don't

24   remember the exact wording.  And I'm not trying to put

25   words in your mouth, but because you don't remember the

1   exact wording, I'm asking you -- there's a number of way

2   things can be said or phrased to have different meanings,

3   potentially, legally, you're aware of that.

4           And because you don't specifically recall

5   the words, is it equally plausible or likely that when

6   Jeff was explaining this to you, he was telling you how

7   grateful he was for having received such a magnanimous

8   gift from Mr. Pratte, along with the other four, and would

9   work for him for the rest of his life, if need be?

10     A.   I think you're putting words in my mouth by

11   saying it was a gift. I don't know that he would have

12   said that it was a gift.

13           He said: This is the deal I made with Ron,

14   that I get treated the same as the rest of the boys, but I

15   have to work for Ron for the rest of my life.

16     Q.   He said -- he used the term:  "This is the deal"?

17     A.   To the best of my knowledge, that's the way it

18   was related to me.

19     Q.   By Jeff Bardwell?

20     A.   Yes.

21     Q.   And where did that occur?

22     A.   I don't recall.

23     Q.   And when you say the best that I recall, you

24   don't recall, as you sit here today, under oath, whether

25   those were the words that he used or not, do you?

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020



STATE OF ARIZONA        )
                        ) ss.
COUNTY OF MARICOPA      )


        BE IT KNOWN that the foregoing proceedings
were taken before me; that the witness before testifying
was duly sworn by me to testify to the whole truth; that
the foregoing pages are a full, true and accurate record
of proceedings, all done to the best of my skill and
ability; that the proceedings were taken down by me in
shorthand and thereafter reduced to print under my
direction.


        I certify that I am in no way related to any
of the parties hereto nor am I in any way interested in
the outcome hereof.


        [X]  Review and signature was requested.
        [ ]  Review and signature was waived.
        [ ]  Review and signature not required.
        [ ]  Review and signature was requested, but
deponent did not do so within 30 days after notification.

        I certify that I have complied with the
ethical obligations set forth in ACJA 7-206(F)(3) and ACJA
7-206 J(1)(g)(1) and (2).  Dated at Phoenix, Arizona,
this 17th of February, 2020.


                _____
                ANITA LANDEROS, RPR
                Certified Reporter
                Arizona CR No. 50538


            *    *    *    *    *    *

        I certify that ANITA LANDEROS REPORTING, INC.,
has complied with the ethical obligations set forth in
ACJA 7-206 (J)(1)(g)(1) through (6).


        _____
        ANITA LANDEROS REPORTING, INC.,
            Registered Reporting Firm
            Arizona RRF No. R1077

1                         SIGNATURE PAGE

2

3

4

5           I, the undersigned, say that I have read the

6    foregoing transcript of testimony taken on February 13,

7    2020, and I declare, under penalty of perjury, that the

8    foregoing is a true and correct transcript of my testimony

9    contained therein.

10           EXECUTED this _18_ day of _Feb_____,

11   2020.

12

13

14   _____

15   DARYL WOLFSWINKEL

16

17

18

19

20

21

22

23

24

25

**ANITA LANDEROS REPORTING, INC.**
Registered Reporting Firm Number R1077
P. O. Box 51826
Phoenix, Arizona 85076-1826
(602) 230-8793 Fax: (602) 265-4391

## STATEMENT OF CHANGES AND/OR CORRECTIONS

Case Name:  Pratte v. Bardwell
Deponent: Daryl Wolfswinkel      Taken:  02/13/2020

| Page | Line | Correction and/or Change | Reason |
|------|------|--------------------------|--------|
| | | None | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Signature of Deponent**                    **Date** 2/18/20

# EXHIBIT 11



**From:** "Jbardwell <jbardwell@pratte.net>" <Jbardwell <jbardwell@pratte.net>>
**Sent:** Fri, 27 Feb 2015 23:04:02 +0000
**To:** ["Ron Pratte <prattepx1@cox.net>"]
**Subject:** Fwd: vacation

FYI.

Begin forwarded message:

> **From:** Jbardwell <jbardwell@pratte.net>
> **Date:** December 23, 2014 at 9:16:09 PM MST
> **To:** Ron Pratte <prattepx1@cox.net>
> **Subject: Re: vacation**
>
> Perfect.  Thank you.
>
> On Dec 23, 2014, at 7:03 PM, Ron Pratte <prattepx1@cox.net> wrote:
>
>> Yea no worries.  Whatever you need.
>>
>> _____
>>
>> **From:** Jeff Bardwell [mailto:JBardwell@stellardevelopment.net]
>> **Sent:** Tuesday, December 23, 2014 6:50 PM
>> **To:** Ron Pratte
>> **Cc:** Jeff Bardwell
>> **Subject:** vacation
>>
>> Ron
>>
>>    I am trying to plan a trip to Disney World with my kids on March 6 th thru the 14th.  Is it possible to have these days off?
>>
>> Jeff

JB002378

# EXHIBIT 12



**From:** "Ron Pratte <prattepx1@cox.net>" <Ron Pratte <prattepx1@cox.net>>
**Sent:** Thu, 13 Aug 2015 20:15:30 +0000
**To:** ["Jeff Bardwell <jbardwell@pratte.net>"]
**Subject:** Re: Florida

No problem

> On Aug 13, 2015, at 6:10 AM, Jbardwell <jbardwell@pratte.net> wrote:
>
>
> Sept 4th to 7th.  Nothing is set in stone yet.  Just talked to Don yesterday about it.  Trip does not need to happen if I'm needed here.
>
>> On Aug 13, 2015, at 5:59 AM, Ron Pratte <prattepx1@cox.net> wrote:
>>
>> Jeff what dates are you going to be gone to florida?

JB002981

# EXHIBIT 13



**From:** "Jeff Bardwell <JBardwell@stellardevelopment.net>" <Jeff Bardwell
<JBardwell@stellardevelopment.net>>
**Sent:** Fri, 04 Dec 2015 22:54:05 +0000
**To:** ["\"prattepx1@cox.net\" <prattepx1@cox.net>"]
**Subject:** week of 12/7/2015

Ron,

      I was planning on working at the dunes next week Mon, Tue and Wed.  I was talking to
Don and he said he was leaving for an infusion Thursday after work.  What days would you like me
to be at the dunes?  If for some reason I don't hear from you I will stick with these dates.


Jeff

JB003630

# EXHIBIT 14



**From:** "Ron Pratte <prattepx1@cox.net>" <Ron Pratte <prattepx1@cox.net>>
**Sent:** Thu, 24 Mar 2016 09:52:11 +0000
**To:** ["Jeff Bardwell <jbardwell@pratte.net>"]
**Subject:** Re: This Friday

ok

> On Mar 23, 2016, at 7:42 PM, Jeff Bardwell <jbardwell@pratte.net> wrote:
>
>
> Ron if it is alright with you I would like to work only a couple hours this Friday.  Please let me know
> Jeff

JB003956

# EXHIBIT 15



**From:** "Ron Pratte <prattepx1@gmail.com>" <Ron Pratte <prattepx1@gmail.com>>
**Sent:** Mon, 15 Aug 2016 22:39:46 +0000
**To:** ["Jeff Bardwell <jbardwell@pratte.net>"]
**Subject:** Re: Aug 25th and 26th

No Problem

> On Aug 15, 2016, at 3:47 AM, Jeff Bardwell <jbardwell@pratte.net> wrote:
>
>
> Ron.  I would like to take off the 25 th and the 26 th of this month. Please let me know. Thanks

JB004458

# EXHIBIT 16



**From:** "Jeff Bardwell <jbardwell@pratte.net>" <Jeff Bardwell <jbardwell@pratte.net>>
**Sent:** Thu, 16 Feb 2017 21:21:59 +0000
**To:** ["Ron Pratte <prattepx1@cox.net>"]
**Subject:** Fwd:

Begin forwarded message:

**From:** Jeff Bardwell <jbardwell@pratte.net>
**Date:** February 15, 2017 at 6:24:43 PM MST
**To:** prattepx1@cox.net

Ron it looks like my mom broke two ribs and fractured her hip.  She doesn't seem to be doing well.
 I would like to work a 1/2 day tomorrow and go see her.  Do you think that will be ok? Please let
me know

JB005086

# EXHIBIT 17



# WOOLSTON & TARTER, P.C.

*Practice Limited To Tax Controversy*
*(Including Civil Tax Litigation and Criminal Tax Defense)*
*www.woolston-tarter.com*

**Arizona Office**

**Suite B-218**
**2525 East Arizona Biltmore Circle**
**Phoenix, Arizona 85016-2133**
**Telephone (602) 532-9199**
**Facsimile (602) 532-9193**

***Tim A. Tarter, Esq.***
*Kacie N. Dillon, Esq.*
*Philip C. Wilson, Esq.*
*Jonathan A. Halmi, Esq.*
*Terence D. Woolston, Esq., Of Counsel*
*Anne W. Durning, Esq., Of Counsel*

**Idaho Office**

**Suite 660**
**250 South 5th Street**
**Boise, Idaho 83702-7735**
**Telephone (602) 532-9199**
**Facsimile (602) 532-9193**

August 31, 2020

Kercsmar & Feltus PLLC
c/o Gregory B. Collins, Esq.
7150 E. Camelback Road, Suite 285
Scottsdale, AZ  85251

>     **Re:**    **Pratte *v. Bardwell, et al.; Case No. 2:19-cv-00239-PHX-GMS***
>              ***EXPERT REPORT OF TIM A. TARTER, ESQ.***

Dear Mr. Collins:

As you requested, I am providing you with a written expert opinion regarding Federal tax issues related to the above-referenced litigation.  I am not an attorney for any party to this litigation nor have I ever provided legal advice to any party to this litigation.  My opinions below are based on my 35 years of Federal tax legal experience and knowledge.

## BACKGROUND

I am the co-founder and president of the law firm Woolston & Tarter, P.C.  My practice focuses exclusively on Federal tax disputes including IRS civil and criminal tax audits and investigations, administrative appeals, litigation and IRS collection matters.  My background includes serving as a senior attorney with the IRS Chief Counsel's office (1988 – 1995) while concurrently working for the U.S. Justice Department as a Special Assistant United States Attorney, representing the IRS in Federal bankruptcy proceedings.  As tax counsel to IRS revenue agents, collection officers and criminal agents, I worked extensively in the settlement and litigation of international and domestic tax audit issues.  Additionally, I served as an instructor to the IRS's Examination, Collection and Criminal Divisions, teaching a variety of subjects, including information gathering techniques and fraud case development.

Leaving government practice in 1995, I worked at KPMG as a Tax Manager in its Boston office before joining Snell & Wilmer's Phoenix office as a senior tax associate in 1996.  Since 1999 I have owned and managed Woolston & Tarter, P.C., a tax defense and litigation focused law firm.  In 2007, I became Counsel to Ahrens DeAngeli, a Federal gift and estate planning and audit defense firm with offices in California, Washington and Idaho.

## *WOOLSTON & TARTER, P.C.*

Pratte v. Bardwell, et al.
Expert Report of Tim A. Tarter
August 31, 2020
Page 2

In addition to being licensed in all Arizona and Idaho Federal and State courts, I am also licensed in the U.S. Tax Court and the U.S. Court of Federal Claims.  I have also been admitted *pro hac vice* in various Federal District Courts, including the southern and central districts of California and the eastern district of Texas.  I received my law degree from Willamette University College of Law in 1986 and my undergraduate degree from Oregon State University in 1983.  A complete copy of my *Curriculum Vitae* is attached.

Although I continue to lecture at various tax forums, I have not authored any publications in the past ten years.  In the past four years I have not testified as an expert at a hearing or trial.

In preparing this opinion, I did not correspond with or speak directly to any parties (other than their counsel), but relied exclusively on the pleadings and various documents that were provided for my review in reaching my conclusions.  These include:

- Ronald H. Pratte's 2006 Form 709 (United States Gift (and Generation -Skipping Transfer)) Tax Return with Exhibits;

- Plaintiff's First Amended Mandatory Initial Discovery Responses with Exhibits.

- Transcript of Deposition of Ronald Pratte on February 27, 2020; and

- Transcript of Deposition of William Shisler, CPA, on August 14, 2020.

This report focuses on issues surrounding Mr. Pratte's use of an IRS Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return (herein referred to as the "Form 709") to report transfers of various assets to Mr. Bardwell in 2006.

## RELEVANT FACTS

I have been asked to assume the following facts:

As reported or otherwise alleged in Plaintiff's First Amended Mandatory Initial Discovery Reponses and attached exhibits, in December 2005, Ronald Pratte ("Plaintiff" or "Pratte") gathered Jeffrey Bardwell ("Defendant" or "Bardwell"), Justin Pratte, Trever Pratte, Todd Carriere (married to Mr. Pratte's niece), and Jaime Ziparo (Mr. Pratte's son-in-law) for a meeting at the North Las Vegas airport.  There, Mr. Pratte told the five attendees that he was planning to sell his company, and that he wanted his family members in attendance to join in a

## WOOLSTON & TARTER, P.C.

Pratte v. Bardwell, et al.
Expert Report of Tim A. Tarter
August 31, 2020
Page 3

new venture that would develop land and build homes in Arizona.  Mr. Bardwell, a long-time Pratte employee, was the only attendee who was not connected to the Mr. Pratte by family relation.

In exchange for $2,000,000 and identical interests in various properties transferred to the four family members in attendance, Mr. Bardwell agreed to work without salary solely for Mr. Pratte until Mr. Pratte died.  Combined with the $2,000,000, the value of assets transferred to Mr. Bardwell (and his then wife) in exchange for his promise, totaled over $7,000,000.  After making the transfers, Mr. Pratte worked with his CPA, William Shisler, and in early 2007, they filed an IRS Form 709, reporting all of the property (wealth) transfers made to Mr. and Mrs. Bardwell to the IRS.  The other transfers of wealth made to Mr. Pratte's family members were also reported on this same IRS form.

From 2006 until around March 2018, Mr. Bardwell kept his promise and worked for Mr. Pratte.  But in March 2018, Mr. Bardwell ceased communicating with, and stopped working for, Mr. Pratte.  In December 2018, Mr. Pratte filed this suit which included claims of breach of contract, promissory estoppel, and unjust enrichment.

**SCOPE OF ENGAGEMENT AND SUMMARY OF OPINIONS**

With this factual background assumed, I have been asked to provide an opinion regarding whether reporting the cash and property transfers of wealth to the Bardwells as reported on Form 709 was appropriate and whether reporting these transfers on Form 709 is evidence that Mr. Pratte intended these transfers to be an unconditional gift.

I find no legal or factual support for a thesis that reporting the cash and other assets transferred to Bardwell on Pratte's 2006 Form 709 precludes a finding of compensatory intent by Pratte.  Rather, the filing of the Form 709 is consistent with Mr. Pratte making a conditional gift to Mr. Bardwell in exchange for Bardwell's promise of lifetime employment.  Alternatively, the amounts transferred to Bardwell in 2006 resulted in the formation of a constructive trust, requiring repayment to Pratte when Bardwell failed to comply with their oral agreement.

**ANALYSIS**

Subtitle A of the Federal Tax Code, specifically, 26 U.S.C. §§ 61 – 63, generally includes the receipt of any and all income and property as taxable income.  Although property acquired through gift or inheritance is generally excluded from gross taxable income, gifts from an employer to an employee are included in an employee's taxable income as compensation.  See U.S.C. § 102(c)(1).

## *WOOLSTON & TARTER, P.C.*

Pratte v. Bardwell, et al.
Expert Report of Tim A. Tarter
August 31, 2020
Page 4

Subtitle B of the Federal Tax Code, specifically, 26 U.S.C. §§ 2001 – 2801, generally subjects the transfers of wealth not otherwise taxed by Subtitle A, to Estate and Gift taxes. These Estate and Gift taxes are more properly referred to as "Wealth Transfer" or excise taxes since the tax obligation falls on the transferor, not the recipient.  26 U.S.C. §§ 2501 – 2502. 26 C.F.R. (Treas. Reg.) § 25.2511-2(a) provides clarification on this point as follows:

> The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the done at the time of the transfer.  On the contrary, the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer, is measured by the value of the property passing from the donor, and attaches regardless of the fact that the identity of the donee may not then be known or ascertainable.

However, the gift tax is not imposed on incomplete gifts.  Treas. Reg. § 2511-2(b).  If the donor reserves any power over the property's disposition, the gift may be wholly or partially incomplete.  Treas. Reg. § 25.2511-2(c) provides that a gift is incomplete in every instance in which a donor reserves the power to revest the beneficial title to the property in himself.  For example, in IRS Private Letter Ruling 200308046, the IRS determined the sons' oral promise to their father to return a gifted residence back to him at his request, resulted in an incomplete gift and a constructive trust in favor of their father, requiring the sons' reconveyance of the home back to their father.  See also IRS Revenue Ruling 54-537, 1954-2 C.B. 316, where the right to revest the beneficial title to property transferred in trust by the donor is an incomplete gift, and Revenue Ruling 74-365, 1974-2 C.B. 324, where the IRS determined a gift was not a completed gift because the gift was revocable.

The Form 709 has been used to eliminate income taxes otherwise due by the recipient (donee) of transferred property.  This was apparently one reason why Pratte used it here.  See Deposition of Ronald Pratte dated February 27, 2020, p. 256.  But as mentioned above, gifts between employer and employee are presumptively subject to the income tax regime of Subtitle A of the Internal Revenue Code.  By treating the transfer of property to an employee as a gift, the employer (donor) loses a valuable tax deduction (employee compensation expense) and incurs a substantial gift tax liability.

Similar facts to those here were discussed by the Supreme Court of Wyoming in Ewing v. Hladky Construction, Inc., 48 P.3d 1086 (2002), where the court reviewed a gift of shares between the company and an employee reported on a Form 709.  The court noted that reporting the transfer on a Form 709 had the intended benefit of saving the employee income taxes on the transfer.  Although the court found that both parties agreed the stock was a "gift" the court also found the gift had a reversionary interest, to be returned to the donor upon the employee's

# WOOLSTON & TARTER, P.C.

Pratte v. Bardwell, et al.
Expert Report of Tim A. Tarter
August 31, 2020
Page 5

termination of employment.  As cited in the court's opinion, Section 4552 of the Restatement of the Law Second, Property 2d, at § 31.2 provides that:

> The owner of personal property may make a gift thereof to another person (the donee) in which the donor retains a reversionary interest by delivering the personal property to the donee ... with the manifested intention that the donee acquire an ownership that terminates ... on the occurrence or non-occurrence of some special event or condition.

The Wyoming court ultimately upheld the trial court's findings that the stock gift was conditional and required its return upon the employee's termination of employment.

In 2006 the Federal tax rate on reportable gifts over $2,000,000 was 46 percent.  That same year, Bardwell's tax rate on income over $336,550 was 35 percent.  In effect, Mr. Pratte, by reporting the transfer of cash and property to Bardwell on Pratte's 2006 Form 709, effectively saved Bardwell at least $2,450,000 ($7,000,000 x .35) in personal income taxes.  Mr. Pratte effectively lost the value of an income tax deduction of the same amount and incurred a gift tax on the transfer of over $3,220,000 (7,000,000 x .46).

Therefore, the IRS was certainly not harmed by how this transfer of wealth to Bardwell was reported by Mr. Pratte on his Form 709.  There was certainly no attempt to evade any taxes or commit fraud by Pratte.  To the contrary, Mr. Pratte walked away from a valuable business deduction and paid gift taxes on an incomplete or conditional gift to Bardwell, effectively overpaying taxes to the IRS of approximately $3,220,000.  Although Mr. Pratte should be able to recover the cash and property transferred to Bardwell since his gift was conditional, he is unable to now recover the gift taxes he paid to the IRS on these transfers as reported on the Form 709. See 26 U.S.C. § 6511(a).

## CONCLUSION

The filing of Form 709, reporting the property (wealth) transfers to Bardwell, is consistent with Mr. Pratte making a conditional gift to Bardwell.  Pratte was certainly not aware in 2007 that Bardwell would later violate the agreement between them.  Reporting the transfers to Bardwell on the Form 709 does not preclude the return of the property back to Pratte. Notwithstanding the use of the Form 709 to report the transfers to Bardwell, they were subject to a reversionary interest, or alternatively, subject to the terms of a constructive trust.  In addition, Pratte's reliance on Bardwell's promise of life-time employment resulted in Pratte overpaying gift taxes on the conditional gift.

## WOOLSTON & TARTER, P.C.

Pratte v. Bardwell, et al.
Expert Report of Tim A. Tarter
August 31, 2020
Page 6

I reserve the right to supplement this opinion if additional documents, depositions or other materials are provided to me.  My hourly rate for providing this report and any additional expert services is $560.00 per hour.

Very truly yours,

WOOLSTON & TARTER, P.C.

Tim A. Tarter, Esq.

TAT:cjw
Encl.

# *WOOLSTON & TARTER, P.C.*

## TIM A. TARTER, ESQ.
2525 East Arizona Biltmore Circle
Suite B-218
Phoenix, Arizona 85016
Tel: 602.532.9197
Fax: 602.532.9193

✦——— **PROFESSIONAL EXPERIENCE** ———✦

1999 - Present   ***Co-Founder and President, Woolston & Tarter, P.C.***
Former IRS senior attorney, now leading a national tax practice representing clients in all aspects of federal, state and international tax matters, including Internal Revenue Service audits and appeals, Tax Court litigation and foreign competent authority matters. In addition to handling a wide range of substantive and compliance matters, also experienced in handling procedural and litigation issues, including FATCA reporting matters, discovery disputes, lien and levy collection matters, and attorney-client privilege issues.

1998-1999   ***Of Counsel, Streich Lang, P.A., Phoenix, Arizona***
Practice focused on international, IRS and state tax controversy and audit resolution, including criminal tax defense.

1996-1998   ***Senior Associate, Snell & Wilmer, LLP, Phoenix, Arizona***
Practice focused on Tax Court litigation and IRS audit resolution, including criminal tax defense.

1995-1996   ***Tax Manager, KPMG Peat Marwick, Boston, Massachusetts***
Responsible for planning and supervising all federal and state tax compliance functions for corporations and individuals. Coordinated and resolved tax audits and FASB 109/FIN 48 reporting issues.

1988-1995   ***Senior Trial Attorney, Office of IRS Chief Counsel***
Tax Counsel and Legal Coordinator to IRS CEP (Large Case) audit program, with direct responsibility for development and litigation of cases. Duties included serving as tax counsel to IRS examination teams of several Fortune 500 corporations. Also served as an adviser to IRS Examination, Collection and Criminal Divisions. Appointed National Issue Specialist (IRC § 263A) and Special Assistant United States Attorney.

1986-1988   ***Tax Accountant, Arthur Young & Company, Portland, Oregon***
Completed and reviewed federal and state tax returns for corporations, partnerships, estates and individuals. Designed and implemented federal, international and state tax strategy

✦——— **SIGNIFICANT REPRESENTATIONS** ———✦

- $100 million transfer pricing litigation and subsequent settlement involving Japan and U.S. taxing authorities.  Transfer Pricing Reporter describes the settlement as "a result unprecedented in Japanese competent authority negotiations."  BNA Tax Management, Vol.11 No. 10 (9/18/02) at 423.

- $100 million IRS Extraterritorial Income ("ETI") exemption audit and Tax Court mediation.

- $40 million IRS employment tax litigation under IRC § 419A.

- $22 million IRS trust fund recovery assessments against company executives for unpaid excise taxes.

- $20 million IRS disallowance of international hotel chain's pre-paid expenses.

- $10 million IRS disallowance of investment and energy tax credits.

- $8 million tax shelter losses and civil fraud penalties.

- Multiple gift and estate disputes exceeding $5 million.

- $3.5 million innocent spouse tax abatement.

- Tax-exempt entity dispute resolution (private foundations and universities).

- Multiple Captive Insurance premium cases in audit, IRS Appeals and Tax Court.

✦——— **SELECTED OPINIONS** ———✦

Avrahami v. Commissioner, 149 T.C. 144 (2018) (Captive Insurance)

Minnick v. Hawley Troxell Ennis & Hawley, LLP, 157 Idaho 863 (2015) (Tax malpractice)

Evans v. Commissioner, T.C. Memo. 2014-237 (Business promotional expenses)

Deihl v. Commissioner, 134 T.C. 156 (2010) (Innocent Spouse)

Aloe Vera of America, Inc., v. U.S., 580 F.3d 867 (9th Cir. 2009) (Wrongful disclosure litigation)

Nakano v. U.S., 2009 WL 2176311 (D. Ariz., July 21, 2009) (Trust fund recovery)

U.S. v. Fitzpatrick, 2008 WL 853055, 101 A.F.T.R.2d 2008-1180 (D. Ariz., Feb. 04, 2008) (Summons enforcement contempt proceeding)

U.S. v. Landon, 98 A.F.T.R.2d 2006-7518 (N.D. Cal. Oct. 30, 2006) (IRS Summons enforcement limitations in partnership gift context). Opinion analyzed in Akers, Steven R. "Attorney-Client Privilege Issues for Estate Planning Attorneys in Tax Litigation," *ABA eReport*, 2007

<u>Harkins v. Commissioner</u>, T.C. Memo. 2001-100, 2001 WL 427629, (2001) (pre-paid income recognition issues)

<u>Booth v. Commissioner</u>, 108 T.C. 524, 1997 WL 328581, 21 Employee Benefits Cas. 1494, (1997) (test cases for over 2000 pending cases involving employee benefit deductions)

<u>Salih v. Commissioner</u>, T.C. Memo. 1994-627, 1994 WL 706221 (1994) (home office deductions)

<u>Laird v. Commissioner</u>, T.C. Memo. 1994-564, 1994 WL 621976 (1994) (tax shelter promoter and fraud penalty issues)

<u>Bliss Valley Growers v. Commissioner</u>, T.C. Memo. 1994-533, 1994 WL 579951 (1994) (administrative and litigation costs)

<u>In re Stevenson</u>, 153 B.R. 52, 1993 WL 108051 (Bkrtcy. D. Idaho 1993) ("substantive consolidation" in bankruptcy context)

<u>Estate of Ravetti v. Commissioner</u>, T.C. Memo. 1993-343, 1993 WL 289270 (1993) (tax shelter issues)

<u>Oregon Trail Mushroom Co. v. Commissioner</u>, T.C. Memo. 1992-293, 1992 WL 104783 (1992) (investment and energy tax credit issues)

✦——— **SPEECHES/PUBLICATIONS** ———✦

Speaker, Gem State Tax Symposium, IRS Compliance Campaigns, June, 2019
Speaker, Arizona State Bar Convention, The New Partnership Tax Audit Rules, June 2018
Panelist, Delaware Captive Insurance Assoc., IRS Challenges to Micro-Captives, Sept. 2016
Speaker, N.C. Captive Insurance Assoc., Defending Micro-Captives from IRS Attack, Aug. 2016
Speaker, Gem State Tax Symposium, Nuts & Bolts of IRS Controversies, June 2016
Panelist, Captive Insurance Company Assoc., Small Captives:  As the World Turns, April 2016
Panelist, Captive Insurance Company Assoc., IRS Scrutiny of Small Captives, March 2016
Panelist, ABA Tax Section May Meeting, Micro-Captive Insurance Update, 2015
Expert Panelist, Bisk Education Inc., Monthly Federal Tax Updates, 1999 – 2017
Speaker, Idaho State Bar Annual Meeting, Federal Trust Fund Liability, July 2011
Speaker, Southwest Tax Conference, IRS Document Requests, Dec. 2010
Speaker, Estate Planning Council, Estate and Gift Audit Process, Feb. 2010
Speaker, Annual Advanced Estate Planning Seminar, IRS Appeals, Sept. 2009
Speaker, Idaho Family Law Section, IRS Tax Relief for Innocent Spouses, May 2008
Speaker, Idaho Society of CPAs, Tax Practice Ethics and Quality Control, Dec. 2007
Speaker, Estate Planning Council, IRS Summons Authority, Oct. 2007
Speaker, Law Education Institute, various topics, 2002 – 2004
Speaker, Phoenix Tax Workshop, Disclosure Forms 8275 and 8275R, Feb. 2002
Speaker, Tax Executives Institute, IRS Audit Issues, Nov. 1999
Speaker, National Business Institute, Federal Tax Update in Arizona, Nov. 1999
Speaker, Lorman Educ. Services, Federal & Arizona Employment Tax Update, Nov. 1999
Speaker, IRS Restructuring and Reform Act of 1998, Tax Executives Institute, September 1998

Speaker, Valley Estate Planners, Family Limited Partnerships, September 1997
Instructor, Keller University, "Federal Tax & Management Decisions," Summer, 2003
Author, "You Can Reduce the Chance of an Audit," Idaho Business Rev., Jan. 2007
Author, "Circular 230 in Estate Planning:  A Primer," J. of Pract. Estate Planning, Dec. 2006
Author, "Tax Court Rule 155:  Avoiding a Lose-Lose Situation," Tax Notes, June 14, 1999
Author, "TEFRA Audit Provisions: Don't Wait for an Audit to Understand Them," Tax Notes, July
   26, 1999
Author, "CPAs: Are You Privileged," Arizona AICPA NewsLedger, November 1998

## ✦——— IRS PUBLISHED MEMORANDA ———✦

Field Service Advisory, 1995 WL 1918301 (IRS FSA, Sep 12, 1995) (foreign tax credits).

Non-Docketed Service Advice Review, 1995 WL 1922024, 1995 IRS NSAR 5093 (IRS NSAR, Sep 12, 1995) (foreign tax credits).

Field Service Advisory, 1995 WL 1918535 (IRS FSA, Aug 16, 1995) (wage and accountable plan issues).

Field Service Advisory, 1995 WL 1770806 (IRS FSA, Jan 06, 1995) (transferred stock gains).

Field Service Advisory, 1994 WL 1725566 (IRS FSA, Nov 23, 1994) (disguised dividends).

Non-Docketed Service Advice Review, 1994 WL 1868740, 1994 IRS NSAR 5774 (IRS NSAR, Nov 23, 1994) (allocation of value to covenant not to compete).

Field Service Advisory, 1994 WL 1725548 (IRS FSA, Oct 21, 1994) (use of noninterest bearing debt to compute the avoided cost interest percentage under § 263A).

Non-Docketed Service Advice Review, 1994 WL 1868694, 1994 IRS NSAR 5295 (IRS NSAR, Sep 12, 1994) (various capitalization issues under § 263A(f)).

Non-Docketed Service Advice Review, 1994 WL 1868693, 1994 IRS NSAR 5294 (IRS NSAR, Sep 09, 1994) (capitalization of training costs).

Non-Docketed Service Advice Review, 1994 WL 1868780, 1994 IRS NSAR 6221 (IRS NSAR, Mar 17, 1994) (employee liability for employer's failure to withhold employment taxes).

Non-Docketed Service Advice Review, 1994 WL 1868692, 1994 IRS NSAR 5293 (IRS NSAR, Jan 10, 1994) (capitalization of interest expense applicable to development costs under § 263A).

Non-Docketed Service Advice Review, 1993 WL 1611342, 1993 IRS NSAR 5292 (IRS NSAR, Nov 09, 1993) (deductibility of undisbursed litigation deposits).

Non-Docketed Service Advice Review, 1991 WL 11239244, 1991 IRS NSAR 8695 (IRS NSAR, Sep 26, 1991) (interest accrued on split-dollar life insurance policies for key employees).

## ✦——— HONORS AND AWARDS ———✦

- 2013 – Present    Mountain States "Super Lawyer" by Thomson-Reuters
- 2016    Enterprise Risk Captive Insurance Pioneer by London-based Captive Review

## ✦——— EDUCATION ———✦

J.D. 1986   ***Willamette University College of Law*** (Salem, Oregon)
B.S. 1983   ***Oregon State University*** (Finance/Accounting)

## ✦——— LICENSES/CERTIFICATIONS ———✦

2007      State Bar of Idaho
1999      State Bar of Arizona
1986      State Bar of Oregon (inactive)
1988      United States Tax Court

## ✦——— PROFESSIONAL MEMBERSHIPS ———✦

American Bar Association, Tax Section
Arizona State Bar Association & Tax Section
Idaho State Bar Association & Tax Section