LAW OFFICES OF THOMAS M. CONNELLY
Thomas M. Connelly (Az. Bar. No. 012987)
6720 North Scottsdale Road, Suite 305
Scottsdale, Arizona 85253
Phone: (602) 957-1993
Facsimile: (602) 957-2137
Tconnelly2425@aol.com

LAW OFFICES OF THOMAS J. MARLOWE
Thomas J. Marlowe (Az. Bar No. 016640)
6720 North Scottsdale Road, Suite 305
Scottsdale, Arizona 85253
Phone: (602) 957-1993
Facsimile: (602) 957-2137
Tmarlowe2425@outlook.com
Attorneys for Defendants Bardwell

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Ronald H. Pratte,<br><br>          Plaintiff,<br><br>vs.<br><br>Jeffrey Bardwell and Fanny F. Bardwell, husband and wife,<br><br>          Defendants. | Case No.: 2:19-cv-00239-PHX-GMS<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Oral Argument Requested) |

## INTRODUCTION

Defendants Jeffrey and Fanny Bardwell ("Bardwell") are defending against breach of contract, promissory estoppel and unjust enrichment claims brought by Bardwell's virtual father-figure, friend, mentor, benefactor, and previous employer, Plaintiff Ronald Pratte ("Pratte"). Pratte seeks damages totaling over $10,000,000, including a *pro-rata* portion of the amount of gift tax Pratte paid. Bardwell requests summary judgment in his

1

favor that under no theory of the case may Pratte rightfully recover from Bardwell, as damages, any portion of the gift tax paid to the IRS. Disposing of this aspect of Pratte's damages claim will narrow issues, will reduce the complexity of matters, and will reduce the amount of expert testimony required. Bardwell also requests summary judgment in his favor on Pratte's remaining claims.

## PREAMBLE

Pratte, now in his mid-70s, is an ultra-high net worth individual, i.e., a man worth hundreds of millions of dollars. Pratte claims that in exchange for money and property interests transferred to Bardwell, directly and indirectly, Bardwell agreed to work for him until Pratte died. It is this alleged promise that serves as the foundation for Pratte's three claims. Bardwell denies making any such promise or the existence of any contract.

Pratte, who acknowledges he suffers from memory problems, has provided testimony that is both inconsistent and insufficient to establish a contractual relationship. Further, there is no written agreement, term sheet, email, or other collateral documentation (W2s, 1099's, worker's compensation insurance, etc.) that supports Pratte's claim that Bardwell was "employed" by Pratte. There is, however, Pratte's 2006 Form 709 Federal Estate and Gift Tax return, which Pratte admits he signed under penalty of perjury and filed 18-months after all interests were transferred. The return characterizes the transfers to Bardwell as gifts.[1] Importantly, the gift made to Bardwell was not unique and Pratte made

---

[1] Pratte's gift tax return is not submitted as an exhibit at this time as there is no dispute as to what information is contained in the return, or what is omitted from the return, i.e., there is no reference to any consideration from Bardwell, or a contract with Bardwell.

2

simultaneous and identical gifts to five men, including Bardwell. It is Pratte's burden to prove the existence of a contract/promise. Although the existence of any contract/promise is a disputed issue of material fact, summary judgment in favor of Bardwell is nonetheless appropriate as Pratte's own testimony demonstrates he cannot sustain his burden of proving each necessary element.

## FACTUAL BACKGROUND

Pratte/Bardwell and Their Relationship:

Pratte amassed his fortune largely through his life-long development of his construction business supplying lumber and trusses to home builders which he sold to Pulte Homes ("Pulte") in 2005. (*Defendants' Statement of Facts* ("DSOF"), ¶ 1) At its peak, Pratte's business employed approximately five-thousand people in Arizona and Nevada. (*DSOF,* ¶ 2) In 2001 Bardwell was hired to manage and further develop the Phoenix lumberyard. (*DSOF,* ¶ 3) Bardwell worked hard and excelled at his job, drawing Pratte's attention, and garnering Pratte's respect. Pratte stated, "[h]is work ethic was excellent. He was very respectful, okay. That's big with me. Didn't lie to me, okay. If he made a mistake – hey, I screwed up. It was all that; all of that's huge." (*DSOF,* ¶ 4) Pratte further described Bardwell as "very honest," a hard worker, and someone who always did what he said he would do. (*DSOF,* ¶ 5) Over the next four-years, Bardwell and Pratte became close friends. Pratte stated he was close to Bardwell and that he introduced or referred to Bardwell as his "adopted son." (*DSOF,* ¶ 6) Until recently, Pratte considered Bardwell a part of his family. *Id.*.

Pratte Sells His Business to Pulte and Decides to Make Gifts:

In 2005 Pratte finalized the sale of his business to Pulte. (*DSOF, ¶* 7) With the sale of his business, Pratte's long time CFO/CPA, William Shisler ("Shisler"), advised Pratte that under the then applicable estate tax regime it may be in Pratte's best interest to consider reducing his taxable estate by gifting monies or properties. (*DSOF, ¶* 8) Several months later Pratte told Shisler he decided to make substantial gifts to various persons. (*DSOF, ¶* 9) Pertinent to this case, Pratte advised Shisler he was making identical gifts to his two natural sons (Trevor and Justin Pratte), his son-in-law (Jaime Ziparo), a man married to Pratte's niece (Todd Carrier) and Bardwell (collectively referred to as the "Five-Guys"). (*DSOF, ¶* 10)

The December 2005 Airport Meeting:

In late December 2005, after selling to Pulte and deciding he would gift monies and properties, Pratte instructed Shisler to obtain five cashier's checks each in the amount of $2 Million. (*DSOF, ¶* 11) Pratte intended to surprise the Five-Guys with the checks at a meeting he arranged at the North Las Vegas airport. (*DSOF, ¶* 12)[2] The Five-Guys did not know why Pratte had called the meeting, but all attended as instructed. The meeting was brief lasting under one hour. (*DSOF, ¶* 13) At the meeting Pratte handed each man an envelope containing a $2M check. (*DSOF, ¶* 14) The Five-Guys were surprised when they received the checks. (*DSOF, ¶* 15) Pratte also told the Five-Guys he would transfer real

---

[2] Pratte arranged the meeting at the airport because Trevor Pratte, Jaime Ziparo, and Todd Carrier worked in Nevada. Pratte, Bardwell, and Justin Pratte flew from Phoenix to the meeting in Pratte's plane.

4

properties to them as a group. (*DSOF, ¶* 16) Pratte expressed his "hope" or "plan" that the Five-Guys would use a portion of the proceeds to jointly form, fund, and operate a home building company. (*DSOF, ¶* 17) Pratte testified, "I wanted a family business" and that it was his "dream" the Five-Guys would become a premier home builder. (*DSOF, ¶* 18) Pratte told the Five-Guys he was going to pay all gift taxes associated with the transfers. (*DSOF, ¶* 19), *Ex. 1,* 256:2-21.

<u>Pratte's Testimony Reveals that No Contract Was Formed</u>:

Pratte acknowledges that, at 73-years of age, he suffers from memory deficits. (*DSOF, ¶* 20) He also acknowledges he has trouble remembering events because they occurred more than 15 years ago. (*DSOF, ¶* 21) For example, Pratte cannot accurately recall when and where Bardwell allegedly promised to work for him in exchange for the monies and properties received. At varying times Pratte claimed Bardwell's promise had to have been made before the December 2005 airport meeting. At other times Pratte testified the airport meeting was the first meeting. (*DSOF, ¶* 22) In any event, Pratte testified that prior to the airport meeting, Bardwell must have made a promise to him, although he could not recall the meeting or what Bardwell may have said.  (*DSOF, ¶* 23)

When pressed further as to when Bardwell made the alleged promise and what Pratte actually said to Bardwell, Pratte testified as follows:

> A: I think [Bardwell] would have said it to me personally prior to [the airport meeting], or I would not have invited him to go on the trip.
>
> Q: And well, didn't you testify earlier – if he did that, then he would have known that you were giving everybody a $2 million check, right?
>
> A: No, no.

> Q: Well, then why would he work for you for life if he didn't even know what you were going to give him?
>
> A: **'Cause I told him he would be taken care of.**
>
> Q: **That's it? You said: You'll be taken care of?**
>
> A: **That's what I recall having said.**
>
> . . . .
>
> A: **I didn't say: Look, Bardwell. I'm going to give you 10 million bucks. You need to come to work for me for the rest of your life.**
>
> Q: You just said: I'm going to take care of you. Come work for me for the rest of my life?
>
> A: Right.
>
> Q: Is that what you're saying happened?
>
> A: Pretty much, pretty much.

(*DSOF*, ¶ 24)

Seeking further clarification counsel returned to the issue later in the deposition:

> Q: Is it possible that what Jeff said is: For this kind of gratuity – this kind of money, I'm going to work for this man for the rest of my life? Is it possible that's what you heard?
>
> A: **I don't know what his exact verbiage was**.
>
> Q: You mean at the airport on 2005?
>
> A: **I don't remember the words he used.**

(*DSOF*, ¶ 25)

<u>Pratte's Second Deposition</u>:

Pratte's second deposition focused upon what Pratte told Shisler about the gifts. Pratte's testimony reveals he has no clear memory of events and that his recollections are inconsistent at best, or potentially innocent or intentional fabrications.

Initially Pratte claimed he did not recall what he told Shishler. (*DSOF, ¶* 26) ("**I don't remember what I told him. That was 15 years ago.**"). Later Pratte claimed he told Shisler Bardwell was going to work for him for life and that was the reason Bardwell was included in the transactions. (*DSOF, ¶* 27) Subsequently Pratte backtracked or qualified his recollections:

> Q: And it's your testimony that you told him Bardwell was different?
>
> A: **I think I told him that Bardwell had agreed to work for me for the rest of my life.**
>
> Q: **Are you sure?**
>
> A: **I'm as sure as I can be after 15 years.**
>
> Q: Well, this answer [to interrogatories] was done nine months ago.
>
> A: Okay. But it still happened 15 years ago.
>
> Q: **So you might not remember accurately; is that fair?**
>
> A: **That's very fair.**

(*DSOF, ¶* 28.) Of course, he later stated he was "absolutely positive" he had told Shisler Bardwell was in a different position from the other four men. (*DSOF, ¶* 29)

Pratte's explanations related to Bardwell's involvement in the companies and assisting him also are inconsistent. On the one hand Pratte claims Bardwell was not to work in the companies and was to work only for him, but he also explained why he transferred the assets to all Five-Guys stating, "all five had their separate talents that gelled well together in my mind." (*DSOF, ¶* 30) Pratte confirmed two other facts. He confirmed his decision to pay the gift tax was not a subject of negotiation with any of the

Five-Guys, nor was it part of any "bargain." (*DSOF, ¶* 31) Second, Pratte testified he trusted Shisler implicitly and that Shisler was "very knowledgeable." (*DSOF, ¶* 32)

CFO/CPA Shisler's Testimony:

Unlike Pratte, Shisler has a clear recollection of these transactions and contradicted Pratte's testimony. Shisler testified the monies and the properties transferred to the Five-Guys, including Bardwell, were represented by Pratte as gifts, and intended by Pratte to be gifts. (*DSOF, ¶* 33) Pratte never told Shisler Bardwell was different from the other gift recipients. (*DSOF, ¶* 34) Pratte never told Shisler that Bardwell made any kind of agreement to work for Pratte in exchange for the assets transferred, and that Pratte's expressed intention was that the transfers were gifts. (*DSOF, ¶* 35)

Shisler's testimony is unambiguous. In fact, Shisler testified he specifically questioned Pratte about Pratte's intention to make gifts to both Bardwell and Carrier:

> "When Mr. Pratte instructed me to make the gift, I was surprised by two names on the list and I did ask him if he was sure; Mr. Bardwell and Mr. Carriere, if he was sure he wanted to do that. And his response was: Yes. I want to make them – as you call them, the five guys."

(*DSOF, ¶* 36) Shisler testified Pratte was unequivocal and clearly expressed that the monies and properties given to Bardwell were intended to be gifts with no contingencies. (*DSOF, ¶* 37) In addition, Shisler testified that:

- He was "surprised by the magnitude of the gifts"
- "this was a very memorable event"
- He discussed with Pratte the fact the gift taxes would be exorbitant
- He testified Pratte used the word "gifts" not "payments" or other terms

- He advised Pratte that he would owe less gift tax and could shift tax liability to both Carrier and Bardwell by placing them on payroll versus making gifts

- And that Pratte intended the gifts to be unconditional to each man.

(*DSOF, ¶* 38)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the non-moving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A party seeking summary judgment must meet their initial burden of demonstrating the absence of material facts precluding summary judgment, after which the burden shifts to the non-moving party to establish the existence of a genuine and material factual dispute. *Id.* at 324.

## ARGUMENT AND ANALYSIS

**I.     Pratte Cannot Recover Damages for Any Portion of the Gift Tax Paid:**

Pratte states in his complaint that he "paid taxes on behalf of Jeffrey Bardwell and his wife." (*DSOF, ¶* 39) In his disclosure, Pratte identifies the taxes he claims as partial

9

damages ($3,378,092) as being "paid on Bardwell's behalf" and characterizes the *pro rata* portion of the gift taxes as "Bardwell's taxes." (*DSOF, ¶* 40)

Bardwell disputes these characterizations, but such disputes are not material. That is because no matter whose version of the facts are ultimately determined to be true, the gift tax Pratte paid would not, as a matter of law, constitute damages to Pratte. If, as Bardwell asserts, it is determined Pratte made a gift to Bardwell, the gift tax Pratte paid was appropriate. That leaves only one question, i.e., whether Pratte can recover, as damages, the gift tax he paid on his transfer of cash and property interests to Bardwell if, *as Pratte claims*, Bardwell made a contractual commitment?[3]

Pratte claims his purported contract with Bardwell was a "well-defined contract between two sophisticated, well-informed parties." (*DSOF, Ex. 5, p.* 8:9), and there was no donative intent on Pratte's part because the assets transferred to Bardwell were a substitute for Bardwell's previous salary. (*DSOF, Ex. 5, p. 15*:3-5). If the facts as Pratte has alleged them (but not as he's characterized them in his gift tax return or with respect to the gift tax he paid) are accepted as true, then under applicable tax law: (1) Pratte's payment of gift tax was neither payment of Bardwell's taxes nor payment of taxes on Bardwell's behalf; (2) Pratte's payment of gift tax did not relieve Bardwell of any tax liability he had for the compensation Pratte claims to have paid him; and (3) Pratte had no obligation to pay gift tax. As such, the gift tax Pratte paid cannot constitute damages recoverable from Bardwell.

---

[3] Nothing herein should be inferred as a concession to any factual matter. Further, although Pratte's testimony is helpful to Bardwell (*DSOF*, ¶ 31), it is Bardwell's position that the facts do not matter as this is an issue of law.

(1) <u>Pratte Did Not Pay Bardwell's Tax Nor Did He Pay Tax on Bardwell's Behalf</u>

Under 26 U.S.C. § 2501(a)(1), gift tax is imposed on the transfer of property. Accordingly, it is a liability of the transferor (Pratte), not the transferee (Bardwell). The Treasury Regulations are clear:

> The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the donee at the time of the transfer. **On the contrary, the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer**, is measured by the value of the property passing from the donor, and attaches regardless of the fact that the identity of the donee may not then be known or ascertainable.

26 C.F.R. § 25.2511-2(a)(emphasis added). This not subject to dispute. Pratte's gift tax payment was <u>not</u> a payment of "Bardwell's tax" or a payment on Bardwell's behalf.

(2) <u>Pratte's Payment of Gift Tax Could Not Relieve Bardwell of Tax Liability</u>

Pratte appears to contend that his payment of gift tax benefitted Bardwell indirectly by relieving Bardwell of his tax liabilities. That contention is untenable. There is no provision of the tax law that allows for the payment of gift tax by a person who pays *compensation for services* as a substitute for payment of income or employment tax by the person receiving the compensation. *See, Farid-Es-Sultaneh v. Commissioner,* 160 F.2d 812, 814 (2d. Cir. 1947)("But we find nothing in this decision to show that a transfer, taxable as a gift under the gift tax, is *ipso facto* to be treated as a gift in construing the income tax law.")

Under 26 U.S.C. § 61(a)(1), compensation for services is subject to income tax. It also is subject to employment tax under 26 U.S.C. §§ 1401 and 3101. Thus, under Pratte's theory of the case (compensation), the assets transferred to Bardwell were, by law, subject

to both income and employment tax. Although the enforcement of Bardwell's obligation for those taxes would now be time-barred, they nonetheless would have been Bardwell's obligations and Pratte's payment of gift tax would not alter that fact.

In *Commissioner v. Duberstein*, 363 U.S. 278 (1960), the Supreme Court considered whether amounts transferred to a person who performs services for the transferor are taxable as income to the transferee or treated as a gift for income tax purposes. The Court held that the dispositive fact is whether the transferor had donative intent. *Id*. at 286. "The parties' expectations or hopes as to the tax treatment of their conduct, in themselves, have nothing to do with the matter." *Id.* To be excluded from income, the transfer must proceed from a "detached and disinterested generosity, out of affection, respect, admiration, charity, or like impulses." *Id.* at 285. Pratte claims he had no donative intent as the assets were transferred to Bardwell pursuant to a contract in exchange for future services. Accordingly, under *Duberstein*, if the facts Pratte alleges to support his contract claim are accepted, then the assets Pratte transferred to Bardwell were subject to income tax. Accordingly, Pratte's payment of gift tax did not, as a matter of law, benefit Bardwell and Bardwell's personal tax position was entirely unaffected.

(3) <u>Under Pratte's Theory No Gift Tax Was Due for the Transfers to Bardwell</u>

Under 26 U.S.C. § 2512, only transfers made for less than "adequate and full consideration in money or money's worth" are gifts for federal gift tax purposes. The amount of a taxable gift is limited under that section to the excess of the value of the property transferred over the amount of consideration in money or money's worth. Pratte cannot have it both ways. Pratte's asserted position is that Bardwell's services were

valuable consideration sufficient to form a contract, yet he paid gift tax as if Bardwell's services had a value of zero. It is either that conclusion or that Bardwell's services were meaningless and not consideration for the transferred assets, i.e., a gift. Treasury Regulations make it clear that under Pratte's theory, Bardwell's services had a value for gift tax purposes equal to the value of the assets Pratte transferred to him. Accordingly, Pratte owed no gift tax:

> However, a sale, exchange, or other transfer of property made in the ordinary course of business (**a transaction which is bona fide, at arm's length, and free from any donative intent**), will be considered as made for adequate and full consideration in money or money's worth.

26 C.F.R. § 25.2512-8 (emphasis added).

If the contract Pratte claims he had with Bardwell was as he described it, "a well-defined contract between two sophisticated, well-informed parties," then it would have been bona fide and at arm's length. And Pratte unambiguously represents he had no donative intent. (Ex. 5, p. 15:3) Thus, according to Pratte's own pleadings, 26 C.F.R. § 25.2512-8 would squarely govern this situation and Pratte had no gift tax liability for his transfers to Bardwell rendering his *pro rata* payment of $3.3 Million of gift tax unnecessary.

In summary, Pratte alleges he had a contract with Bardwell where Bardwell's services were consideration for the assets Pratte transferred. If this is presumed true, Pratte would have owed no gift tax related to the Bardwell transfers. Put another way, his payment of gift tax was itself a gift, not to Bardwell, but to the U.S. Treasury.

Accordingly, Bardwell is entitled to summary judgment disallowing Pratte's damage claim for the gift tax paid.

## II.     **Bardwell is Entitled To Summary Judgment on Pratte's Contract Claim**

A)     Pratte Cannot Prove the Existence of a Contract:

Under Arizona law, Pratte must prove three elements: (1) the existence of a contract, (2) its breach, and (3) resulting damages. *Graham v. Ashbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975). A valid contract requires proof of "an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained." *Savoca Masonary Co. v. Homes & Son Constr. Co.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975); *See also, Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 270 P.3d 852 (App. 2011)(a valid contract requires an offer, acceptance, conside ration, and the intent of both parties to be bound by the agreement); *Brookhaven Housing Coalition v. Solomon,* 583 F2d 584, 593 (2nd Cir. 1978)("If essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result")(citations omitted).

Pratte's testimony demonstrates that he cannot prove he made a clear offer, let alone that Bardwell knowingly accepted an offer intending to be contractually bound. Moreover, the fictitious oral contract would be simply too vague to be enforceable.

B)     Even if Pratte Could Prove a Contract Exists, It Would Be Unenforceable:

Pratte asserts he had an oral contract with Bardwell. It is, therefore, axiomatic that Pratte's understanding and interpretation of his contract is paramount. Although he and his counsel have claimed the oral contract was of indefinite duration (life), Pratte clarified his position as to the contract's duration:

>    Q:…[H]ow long did Jeff have to work for you?
>
>    A:  I would think he would be done by 65.

    Q: Why do you think that?

    A: I just think that's – he would have fulfilled his obligation by then.

Dep. R. Pratte, 2/27/2020, 207:19-24.

  Pratte's sworn testimony clarifies that the alleged contract is squarely within the Statute of Frauds, A.R.S. § 44-101(5), rendering it invalid or unenforceable if not in writing signed by both parties. *See also* A.R.S. § 23-1501(A)(2); *White v. AKDHC*, 664 F.Supp.2nd 1054 (D. Ariz. 2009). Contracts for an indefinite period may not be subject to the statute, but here Pratte persuasively interprets his own "contract" as binding on Bardwell until retirement age, thereby requiring it to be in writing. *See Mullins v. Southern Pacific Transportation*, 174 Ariz. 540, 851 P.2d 839 (1992), *review denied*, June 2, 1993 (discussing differences between indefinite and definite term employment contracts).

  Further, Pratte's fictitious contract, i.e., upfront compensation paid in a lump-sum for 30-years of services, should be deemed against public policy for a myriad of tax and related reasons.

### III. Bardwell Should Be Granted Summary Judgment In His Favor on Pratte's Promissory Estoppel Claim

  Pratte's promissory estoppel claim is, factually, indistinguishable from his contract claim. Here, Pratte must prove Bardwell made an actual promise <u>to Pratte</u>, that Bardwell should have reasonably foresaw Pratte would rely upon the promise, and that he (Pratte) did rely upon the promise to his detriment. *See Higginbottom v. State*, 203 Ariz. 139, 142 (2002). Pratte cannot prove each element. While the parties dispute whether a promise was made or could be reasonably relied upon, Pratte cannot prove the reliance was to his

detriment as his plan was to gift properties to both reduce his taxable estate and to perpetuate the Pratte name. Further, to prevail, Pratte must also prove a second promise, i.e., that Bardwell promised not to rely upon any statute, rule or principle of law that may invalidate an oral personal services contract if not in writing, or that Bardwell promised to reduce the "contract" to writing. *See Mullins, supra.* Pratte claims, however, that Bardwell made only one promise. (*DSOF*, ¶ 25)

### IV.     **Bardwell Was Not Unjustly Enriched**

To prevail Pratte must prove Bardwell was enriched, that Pratte suffered a loss, that the two results were connected, that there is no other reason Bardwell was enriched, and that he [Pratte] has no legal remedy. *See Wang Elec., Inc. v. Smoke Tree Resort, LLC,* 230 Ariz. 314, 283 P.3d 45 (App. 2012); *See also Trustmark Insurance Company v. Bank One, Arizona*, 202 Ariz. 535, 48 P.3d 485 (2002). "The mere fact that one party confers a benefit on another, however, is not of itself sufficient to require the other to make restitution. Retention of the benefit must be unjust." *See Freeman v. Sorchych,* 226 Ariz. 242, 245 P.3d 927 (App. 2011)(quoting *Pyeatte v. Pyeatte,* 135 Ariz. 346, 352, 661 P.2d 196, 202 (App. 1983)).

The undisputed facts are that Pratte treated Bardwell like family, considered Bardwell to be part of his family, that Pratte decided to make gifts long before any of the Five-Guys knew Pratte would be gifting them assets, and that Bardwell did not solicit the gifts. (*DSOF*, ¶¶ 6, 11-12, 15-16). Further, based upon Pratte's inconsistent testimony, Shisler's testimony, the gift tax return, and Bardwell's belief these were

gifts, coupled with the fact Pratte admitted he intended to transfer the properties to the Five-Guys collectively and of his own accord, Pratte cannot sustain his burden of proving the transfers were not gratuitous sufficient to prevail on this claim.

## V. **Pratte Is Estopped From Denying the Transfers Were Gifts to Bardwell**

It is undisputed that the gifts to the Five-Guys were simultaneous and identical. It is undisputed that Pratte signed and filed his gift tax return under penalty of perjury. It is undisputed the transfers disclosed in the gift tax return were characterized as gifts. It is undisputed that the properties transferred were transferred to LLCs not individuals and that Pratte relinquished all dominion, ownership, possession, and control over the properties. It is also undisputed Bardwell's interests were not differentiated in the tax return or in any other document. Accordingly, by virtue of his tax filings, 15-years later Pratte is estopped from denying that the property transferred was anything other than a gift. *See Mahoney-Buntzman v. Buntzman*, 12 N.Y. 3d 415, 422, 990 N.E.2d 62 (2009)("A party to litigation may not take a position contrary to a position taken in an income tax return…in which he swore that the representations contained within it were true….We cannot, as a matter of policy, permit parties to assert positions in legal proceedings that are contrary to declarations made under penalty of perjury on income tax returns."); *see also Livathinos v. Vaughn*, 121 A.D. 3d 485 (1st Dept. 2014); *Walsh v. Blaggards III Restaurant Corp.*, 131 A.D. 3d 854 (1st Dept. 2015).

For the foregoing reasons and based upon any arguments made at any hearing in this matter, Bardwell requests the Court grant summary judgment in his favor.

Dated this 18th day of December, 2020.

By: /s/ Thomas J. Marlowe
LAW OFFICES OF THOMAS J. MARLOWE
Thomas J. Marlowe
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Phone: (602) 957-1993
Tmarlowe2425@outlook.com

CERTIFICATE OF SERVICE

I, Thomas J. Marlowe, hereby certify that on December 18, 2020, I electronically transmitted the foregoing document with the Clerk's Office using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant(s) in this case and emailed a copy of this document to the following:

Gregory B. Collins
Eric B. Hull
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
gbc@kflawaz.com
ebh@kflawaz.com