LAW OFFICES OF THOMAS M. CONNELLY
Thomas M. Connelly (Az. Bar. No. 012987)
6720 North Scottsdale Road, Suite 305
Scottsdale, Arizona 85253
Phone: (602) 957-1993
Facsimile: (602) 957-2137
Tconnelly2425@aol.com

LAW OFFICES OF THOMAS J. MARLOWE
Thomas J. Marlowe (Az. Bar No. 016640)
6720 North Scottsdale Road, Suite 305
Scottsdale, Arizona 85253
Phone: (602) 957-1993
Facsimile: (602) 957-2137
Tmarlowe2425@outlook.com
Attorneys for Bardwell Defendants

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Ronald H. Pratte,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Jeffrey Bardwell and Fanny F. Bardwell, husband and wife,<br><br>　　　　Defendants. | Case No.: 2:19-cv-00239-PHX-GMS<br><br>**DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Pursuant to L.R.Civ. 56.1, Defendants hereby submit their Separate Statement of Facts ("PSOF") in support of their Motion for Summary Judgment. The facts herein are material to the Court's resolution of issues and support said motion:

1. Pratte amassed his fortune largely through his life-long development of his construction business supplying lumber and trusses to home builders which he sold to Pulte Homes ("Pulte") in 2005. (*Exhibit 1 - Depo. R. Pratte, 2/27/20, Vol. 1,* 64:19-25.)

2. At its peak, Pratte's business employed approximately five-thousand people in Arizona and Nevada. (*Exhibit 1 - Depo. R. Pratte, 2/27/20, Vol. 1,* 69:14-19.)

-1-

3. In 2001 Bardwell was hired to manage and further develop the Phoenix lumberyard. (*Exhibit 1 - Depo. R. Pratte, 2/27/20, Vol. 1,* 90:8-13.)

4. Bardwell worked long hours and excelled at his job, drawing Pratte's attention, and garnering Pratte's respect. Pratte stated, "[h]is work ethic was excellent. He was very respectful, okay. That's big with me. Didn't lie to me, okay. If he made a mistake – hey, I screwed up. It was all that; all of that's huge." (*Exhibit 1 - Depo. R. Pratte, 2/27/20, Vol. 1*, 143:12-15.)

5. Pratte further described Bardwell as "very honest," a hard worker, and someone who always did what he said he would do. (*Exhibit 1 - Depo. R .Pratte, 2/27/20, Vol. 1*, 92:9-23.)

6. Over the next four-years, Bardwell and Pratte became close friends. Pratte stated that he was close to Bardwell and that he often introduced or referred to Bardwell as his "adopted son." (*Exhibit 1 - Depo. R. Pratte, 2/27/20, Vol. 1*, 92:5-6, 143:6-8.) And until recently, Pratte considered Bardwell as part of his family. Id. at142:8-19.

7. In 2005 Pratte was finalizing the sale of his business to Pulte. (*Exhibit 1 - Depo. R. Pratte, 2/27/20, Vol. 1*, 64:19-25.)

8. With a large sale pending, Pratte's long time CFO/CPA, William Shisler ("Shisler"), advised Pratte that under the then applicable estate tax regime it may be in Pratte's best interest to consider reducing his taxable estate by gifting some monies or properties. (*Exhibit 2, Depo. W. Shisler, 8/14/20,* 51:13-209.)

9. Several months later Pratte advised Shisler that he decided to make substantial gifts to various persons. (*Exhibit 2, Depo. W. Shisler, 8/14/20,* 55:16-56:5, 100:16-25.)

10. Pratte advised Shisler he was making gifts to five individuals, including his two natural sons (Trevor Pratte and Justin Pratte), his son-in-law (Jaime Ziparo), a man married

-2-

to Pratte's niece (Todd Carrier) and Bardwell (collectively referred to herein and in depositions as the "Five-Guys"). (*Exhibit 2, Depo. W. Shisler, 8/14/20,* 88:20-25, 104:20-24.)

11. In late December 2005, after selling to Pulte and deciding he would gift monies and properties, Pratte instructed Shisler to obtain five cashier's checks each in the amount of $2 Million. (*Exhibit 2, Depo. W. Shisler, 8/14/20,* 52:21-25.)

12. Pratte intended to surprise the Five-Guys with the checks at a meeting he arranged at the North Las Vegas airport. (*Exhibit 1, Depo. R. Pratte, 2/27/20,* 23:24-24:2.)

13. The Five-Guys did not know why Pratte had called the meeting, but all attended as instructed. The meeting was brief lasting under one hour. (*Exhibit 1, Depo. R. Pratte, 02/27/20,* 52:10-12.)

14. At the meeting Pratte handed each of the men an envelope containing a $2M check. (*Exhibit 1, Depo. R. Pratte, 02/27/20,* 23:3-5.)

15. The Five-Guys were all surprised when they received the checks. (*Exhibit 1, Depo. R. Pratte, 02/27/20,* 23:24-24:2.)

16. Pratte also told the Five-Guys that he would transfer real properties to them in the coming months. (*Exhibit 1, Depo. R. Pratte, 02/27/20,* 99:22-100:5).

17. Pratte also expressed his "hope" or "plan" that the Five-Guys would use a portion of the proceeds to jointly form, fund, and operate a residential and commercial building company. (*Exhibit 1, Depo. R. Pratte, 02/27/20,* 79:9-24.)

18. Pratte testified, "I wanted a family business" and that it was his "dream" that the Five-Guys would become a premier home builder. (*Exhibit 1, Depo. R. Pratte, 02/27/20*, 142:8-19, 79:9-14.)

-3-

19. Pratte also informed the Five-Guys that he was going to pay the gift taxes associated with the transfers. (*Exhibit 1, Depo. R. Pratte, 2/27/20*, 256:2-21.)

20. Pratte acknowledges that, at 73-years of age, he suffers from memory deficits. (*Exhibit 3, Depo. R. Pratte, Vol. II, 08/20/20,* 44:12-15.)

21. Pratte also acknowledges that he has trouble remembering various events because they occurred more than 15 years ago. (*Exhibit 3, Depo. R. Pratte, Vol. II, 08/10/20,* 13:25 - 14:14.)

22. Pratte cannot accurately recall when and where Bardwell allegedly promised to work for him in exchange for the monies and properties received. At varying times Pratte claimed Bardwell's promise had to have been made before the December 2005 airport meeting. At other times Pratte testified that the airport meeting was the first meeting. (*Exhibit 1, Depo. R. Pratte*, *2/27/20*, 27:9 through 28:4, 28:12 through 29:7, 132:21-22.)

23. Pratte testified that prior to the airport meeting, Bardwell must have made a promise to him, although he could not recall the meeting or what Bardwell may have said. (*Exhibit 1, Depo. R. Pratte*, *2/27/20*, 95:5-9.)

24. When pressed further as to when Bardwell made the alleged promise and what Pratte actually said to Bardwell, Pratte testified as follows:

> A: I think [Bardwell] would have said it to me personally prior to [the airport meeting], or I would not have invited him to go on the trip.
>
> Q: And well, didn't you testify earlier – if he did that, then he would have known that you were giving everybody a $2 million check, right?
>
> A: No, no.
>
> Q: Well, then why would he work for you for life if he didn't even know what you were going to give him?

-4-

| | | |
|---|---|---|
| 1 | A: | 'Cause **I told him he would be taken care of.** |
| 2 | Q: | **That's it?  You said:  You'll be taken care of?** |
| 3 | A: | **That's what I recall having said.** |
| 4-5 | Q: | But he didn't know what you were willing to give him to get that commitment back until the airport, correct? |
| 6-7 | A: | I would say if he was promised $100,000 a year, plus, you know, incremental raises, it's as good as what he had.  So I don't know how to answer your question. |
| 8 | Q: | Well, because you don't know? |
| 9-10 | A: | Because I don't know. |
| 11-12 | A: | **I didn't say:  Look, Bardwell.  I'm going to give you 10 million bucks.  You need to come to work for me for the rest of your life.** |
| 13 | Q: | You just said:  I'm going to take care of you.  Come work for me for the rest of my life? |
| 14 | A: | Right. |
| 15 | Q: | Is that what you're saying happened? |
| 16-17 | A: | Pretty much, pretty much. |

(*Exhibit 1, Depo. R. Pratte*, *2/27/20*, 196:21 through 198:9, 270:10-15 ("I don't remember what I said to him.").

25. Later in the deposition Pratte testified as follows:

| | | |
|---|---|---|
| 21-22 | Q: | Is it possible that what Jeff said is:  For this kind of gratuity – this kind of money, I'm going to work for this man for the rest of my life?  Is it possible that's what you heard? |
| 23 | A: | **I don't know what his exact verbiage was**. |
| 24 | Q: | You mean at the airport on 2005? |
| 25-26 | A: | **I don't remember the words he used.** |

-5-

(*Exhibit 1, Depo. R. Pratte*, *2/27/20*, 302:17-23.)

26. Pratte claimed he did not recall what he told Shishler. (*Exhibit 3, Depo. R. Pratte, Vol. II, 08/10/20,* 13:25-14:14.)  ("I don't remember what I told him. That was 15 years ago.").

27. Later Pratte claimed he told Shisler that Bardwell was going to work for him for life and that was the reason Bardwell was included in the transactions.  (*Exhibit 3, Depo. R. Pratte, Vol. II., 08/10/20*, 36:1-7.)

28. Subsequently Pratte backtracked or qualified his recollections:

> Q:  BY MR. MARLOWE:  And it's your testimony that you told him Bardwell was different?
>
> A:  **I think I told him that Bardwell had agreed to work for me for the rest of my life.**
>
> Q:  **Are you sure?**
>
> A:  **I'm as sure as I can be after 15 years.**
>
> Q:  Well, this answer was done nine months ago.
>
> A:  Okay.  But it still happened 15 years ago.
>
> Q:  **So you might not remember accurately; is that fair?**
>
> A:  **That's very fair.**

(*Exhibit 3, Depo. R. Pratte, Vol. II.*, *08/10/20*, 42:21 through 43:11.)

29. Pratte later stated he was "absolutely positive" he had told Shisler Bardwell was in a different position than the other four men. (*Exhibit 3, Depo. R. Pratte, Vol. II.*, *08/10/20*, 50:16-18).

30. Pratte claims Bardwell was not to work in the companies and was to work only for him, but at other times he testified that "all five had their separate talents that gelled well

together in my mind" justifying why he transferred the assets to all Five-Guys. (*Exhibit 1, Depo. R. Pratte, 02/27/20,* 132:4-9.)

31. Pratte confirmed his decision to pay the gift tax was not a subject of negotiation with any of the Five-Guys nor was it part of any "bargain." (*Exhibit 3, Depo. R. Pratte, Vol. II.*, *08/10/20*, 45:8-16, 47:22-25.)

32. Pratte testified that Shisler was his CFO, that he trusted him implicitly, and that he was "very knowledgeable." (*Exhibit 3, Depo. R. Pratte, Vol. II.*, *08/10/20*, 9:7-11, 10:12-14.)

33. Shisler testified the cash and the properties transferred to the Five-Guys, including Bardwell, were represented by Pratte and intended by Pratte to be gifts. (*Exhibit 2, Depo. W. Shisler, 8/14/20,* 55:16 through 56:5, 62:16-24, 63:6-9.)

34. Pratte never indicated Bardwell was different from any of the other gift recipients. (*Exhibit 2, Depo. W. Shisler, 8/14/20,* 86:19-24.)

35. Shisler confirmed Pratte never told him that Bardwell had made any kind of agreement to work for Pratte in exchange for the monies and properties transferred, and that the transfers were gifts. (*Exhibit 2, Depo. W. Shisler, 8/14/20,* 87:2-9, 88:20-89:4.)

36. Shisler testified he specifically questioned and discussed with Pratte his intention to make gifts to both Bardwell and Todd Carriere:

> "When Mr. Pratte instructed me to make the gift, I was surprised by two names on the list and I did ask him if he was sure; Mr. Bardwell and Mr. Carriere, if he was sure he wanted to do that. And his response was: Yes. I want to make them – as you call them, the five guys."

(*Exhibit 2, Depo. W. Shisler, 8/14/20,* 87:18-23.)

37. Shisler also reconfirmed that Pratte was clear that the monies and properties were intended to be gifts with no contingencies. (*Exhibit 2, Depo. W. Shisler, 8/14/20,* 88:20 through 89:4.)

38. Shisler provided the following testimony:

- He was "surprised by the magnitude of the gifts"
- He stated this was a very memorable event
- He discussed with Pratte the fact that the gift taxes would be exorbitant
- He confirmed Pratte used the word "gifts" not "payments" or other terms
- He advised Pratte that he would owe less tax and could shift tax liability to both Carriere and Bardwell by placing them on payroll versus making gifts
- Pratte intended the gifts to be unconditional to each of the Five-Guys.

(*Exhibit 2, Depo. W. Shisler, 8/14/20,* 102:19 through 104:24, 128:2-6.)

39. Pratte states in his complaint that he "paid taxes on behalf of Jeffrey Bardwell and his wife." (Complaint, ¶13, attached as Exhibit 4).

40. In his disclosure, Pratte identifies the taxes he claims as partial damages in the amount of $3,378,092 as being "paid on Bardwell's behalf" and characterizes the *pro rata* portion of the gift taxes as "Bardwell's taxes." (Plaintiff's Third Amended Mandatory Discovery Responses attached hereto as Exhibit 5 at 9:9-11 and 10:24-25).

41. In September 2015, long before there was any dispute between Pratte and Bardwell, Bardwell wrote an email to Pratte, the subject matter of which reads "Happy Birthday." Bardwell's email reads as follows:

Ron,

-8-

> I hope this day finds you well. I want to wish you a Happy Birthday. There is nothing in this world that I could buy for you that you can't buy yourself. As we all know. What I can give you is my loyalty, my trust and my dedication which we all know you can't buy. You are a man that has changed my life forever. I will be forever grateful. Please enjoy your day as life is too short. I love you.
>
> Jeff

Pratte responded the following day:

> Thank you Jeff that means a great deal to me.  Love you too.

(Attached hereto as Exhibit 6.)

Dated this 18th day of December, 2020.

                By: /s/Thomas J. Marlowe
                    LAW OFFICES OF THOMAS J. MARLOWE
                    6720 N. Scottsdale Road, Suite 305
                    Scottsdale, Arizona 85253
                    Attorney for Defendants

CERTIFICATE OF SERVICE

I, Thomas J. Marlowe, hereby certify that on December 18, 2020, I electronically transmitted the foregoing document with the Clerk's Office using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant(s) in this case and emailed a copy of this document to the following:

Gregory B. Collins
Eric B. Hull
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
gbc@kflawaz.com
ebh@kflawaz.com