Gregory B. Collins (#023158)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kflawaz.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald H. Pratte,<br><br>          Plaintiff,<br><br>vs.<br><br>Jeffrey Bardwell and Fanny F. Bardwell, husband and wife,<br><br>          Defendants. | Case No. 2:19-cv-00239-PHX-GMS<br><br>**PLAINTIFF RONALD PRATTE'S OPPOSITION TO DEFENDANT BARDWELL'S MOTION FOR SUMMARY JUDGMENT** |

In Defendant Jeffrey Bardwell's Motion for Summary Judgment ("Bardwell's MSJ"), he argues that Plaintiff Ronald Pratte cannot recover damages[1] for taxes Mr. Pratte paid on the wealth transfer he made to Bardwell. In support of this argument, Bardwell cites the tax code and regulations and questions whether the wealth transfer tax under Form 709 was appropriate or necessary. But Bardwell fails to address Arizona law regarding damages for breach of contract which holds, "The well-established rule in Arizona is that the damages for breach of contract are those which arise naturally from the breach itself or which may reasonably be supposed to have been within the contemplation of the parties at the time they entered into the contract." *S. Arizona Sch. For Boys, Inc. v. Chery*, 119 Ariz. 277, 280, 580 P.2d 738, 741 (App. 1978).

---

[1] In Plaintiff Ronald Pratte's Motion for Summary Judgment (the "Pratte MSJ"), he specifically reserved a determination on the amount of damages. (*See* Dkt. #55 at 1 n.1.)

1

At his deposition, Bardwell himself made it crystal clear that Mr. Pratte's payment of taxes due on the wealth transfer was part of the bargain. On describing his receipt of a check for $2 million, Bardwell recounted: "And I said it's like winning the lottery. And [Mr. Pratte] says, no, it's better than winning the lottery 'cause I'm paying the taxes on it." (Plaintiff's Controverting Statement of Facts ("PCSOF") at ¶ 31 (J. Bardwell Dep. at 56:17-57:3).) William Shisler, one of Mr. Pratte's former accountants (and a witness Bardwell repeatedly cites as an authority throughout his MSJ), testified that in paying the wealth transfer taxes, Mr. Pratte took on an obligation that otherwise would have fallen on Bardwell: "I'm positive that I told Mr. Pratte that he would owe less tax if he could pay Mr. Bardwell's, and Mr. Carriere's too, actually, amounts as payroll. That would shift the tax liability to the individuals from Mr. Pratte." (PCSOF at ¶ 36 (W. Shisler Dep. at 104:4-14).)

More fundamentally, Mr. Pratte's claims rest on the fact that had Bardwell not agreed to work for Mr. Pratte for life, he would not have transferred any money and assets to Bardwell—and, thus, no tax would have been due. Likely recognizing this logical tautology, Bardwell spends many pages of his Motion (and much of the fact section) arguing that Mr. Pratte cannot prove the existence of a contract between the two. Despite a lengthy examination of the facts (including seeking inferences that Mr. Pratte's memory does not allow him to sustain his claims), Bardwell conveniently omits the undisputed fact that he performed under the very terms of the agreement described by Mr. Pratte. For twelve years, Bardwell performed work for Mr. Pratte for no compensation even though he claims that work was "to the detriment of his health and family life." (Plaintiff's Statement of Facts ("PSOF") at ¶ 34-35.) During that time, Barwell worked as many as 3,000 hours in a year and sometimes more than 80 hours in a single week. (PSOF at ¶ 36.)

Bardwell does not address these facts—let alone explain them. Nor does Bardwell address or explain the testimony of six separate witnesses (several of whom have no interest whatsoever in this dispute) describing the exact agreement that Mr. Pratte

alleges—and whose knowledge is often based on conversations with Bardwell himself rather than Mr. Pratte. Instead, in an attempt to cast doubt on Mr. Pratte's ability to prove the contract, Bardwell blatantly misrepresents the testimony of Shisler, Mr. Pratte's former accountant. Furthermore, Bardwell suggests that IRS Form 709 definitively proves Bardwell's case when the evidence and law demonstrate that it simply does not.

Indeed, Bardwell's arguments regarding Mr. Pratte's claims do not even raise a material factual issue—Shisler conceded he does not know if any contingencies existed related to the wealth transfer and that Form 709 was the appropriate tax form to report wealth transfers with contingencies attached. And that is all Bardwell presents in support of his defenses. Other than his own self-serving denial, he has no evidence that supports his side of this case. Not only should the Court deny Bardwell's MSJ, Bardwell does not even present factual issues countering Mr. Pratte's own summary judgment motion. The Court should deny the Motion and grant Mr. Pratte's motion for summary judgment against Bardwell.

## I.    FACTS

In his Motion for Summary Judgment, Bardwell provides background information to the transaction. Much of this background is not material to the arguments in Bardwell's MSJ.[2] Relative to the arguments in the Motion, Bardwell presents three categories of facts. First, Bardwell distorts the testimony regarding the meeting at the North Las Vegas airport where Mr. Pratte distributed the cash assets to Bardwell. Second, Bardwell disparages Mr. Pratte's memory in order to argue that he cannot prove the existence of a contract. Of course, in this section, Bardwell disregards the testimony of a half-dozen witnesses who corroborate Mr. Pratte's version of events. Third, Bardwell misrepresents the testimony of William Shisler, Mr. Pratte's former accountant, in an attempt to put words in Mr. Pratte's mouth. But an examination of the cited testimony reveals that Shisler lacked knowledge regarding the very facts that Bardwell now insists are undisputed.

---

[2] Regarding these background facts, Plaintiff incorporates the background facts stated in Pratte's Motion for Summary Judgment as if fully stated herein.

3

### A. The Meeting in North Las Vegas

Bardwell's account of the meeting at the North Las Vegas airport is largely accurate. But in a stretch that is indicative of the issues present throughout Bardwell's MSJ, Bardwell asserts that "Pratte told the Five-Guys he was going to pay all gift taxes associated with the transfers." (Dkt. #57 at 5:5-8 (citing Ex. 1, 256:2-21).) The cited testimony from Mr. Pratte never refers to what Mr. Pratte "told" the attendees at that meeting, let alone suggests that Mr. Pratte told the attendees that he would be paying "***gift*** taxes." Instead, in the cited testimony, Mr. Pratte explained that he paid the gift taxes so that the Five Guys would not have to pay taxes on the assets transferred to them. He does not mention whether he explained the tax mechanism he would use to make those payments.

In Bardwell's own testimony, he stated that Mr. Pratte told the Five Guys he would pay taxes on the assets but notably omits the word "gift": "And I said it's like winning the lottery. And [Mr. Pratte] says, no, it's better than winning the lottery 'cause I'm paying the taxes on it." (PCSOF at ¶ 36 (J. Bardwell Dep. at 56:17-57:3).) Mr. Pratte repeatedly testified that he had no concept of whether he needed to file a gift tax return. Instead, when asked about what he told his accountant regarding the gift tax, Mr. Pratte testified: "I don't think I told him to prepare anything. I just told him what I was going to do. That was his job, to figure out how to get it done." (PCSOF at ¶¶ 9-10, 37 (R. Pratte Dep. (8/10/20) at 22:9-16; *see also id.* at 32:2-33:24, 35:5-11).)

### B. Mr. Pratte's Memory

Bardwell's MSJ reads as if this case is simply Bardwell's word versus Mr. Pratte's word. It is not. Mr. Pratte adequately defined the terms of the contract. Bardwell denies the contract exists. But six witnesses, including several who heard the terms directly from Bardwell, support Mr. Pratte's description of the contract. (*See* Dkt. #55 at 4:11-6:9; PSOF at ¶¶ 21-33.) Bardwell even concedes that he made statements that comport with Mr. Pratte's allegations of a contract: "You know, it's -- could I have said, hey, I'm so thankful and I'll do whatever this man needs, probably." (PSOF at ¶ 31.) Bardwell

conceded, "And my role in the company, in Stellar Development, was to -- and the other entities was to take care of Ron [Pratte]." (PSOF at ¶ 32.) Bardwell agrees that he worked as many as 3,000 hours in a year and sometimes more than 80 hours in a single week for free. (PSOF at ¶ 36.) That he concedes he did so to "the detriment of his health and family life" all for free. (PSOF at ¶ 34.) During that time, Bardwell consistently asked for Mr. Pratte's approval for time off and vacations. (PSOF at ¶¶ 40-45.)

Left with no explanation and no defense, Bardwell hopes that if he disparages Mr. Pratte's memory, it will distract from Bardwell's utter lack of any evidence supporting his defenses. Proving the deficiencies in his defense, Bardwell extensively cites Shisler's testimony regarding Form 709. But as demonstrated in the next section, Shisler did not testify that the contract did not exist—he testified that he was not aware of any contingencies. Shisler's lack of knowledge does not bolster Bardwell's claims. Shisler simply does not know. But the fact that Bardwell places so much emphasis on the testimony of someone who has no idea whether Bardwell made an agreement at all is telling. It shows that Bardwell stands alone. Not even his then-wife can support his theory of the case.

### C. Shisler's Testimony

Contrary to the citations in Bardwell's MSJ, Shisler absolutely did not "reconfirm[] that Pratte was clear that the monies and properties were intended to be gifts with no contingencies." (Bardwell MSJ at 8:20-9:5; Bardwell SOF at ¶ 37.) In the testimony cited as support, Shisler was asked, "***To your knowledge***, without any contingencies on them?" He answered "**Correct.**" The testimony does not reflect ***Mr. Pratte's intention***. It reflects ***Mr. Shisler's own knowledge***. Similarly, Bardwell's Statement of Facts states that Shisler testified, "Pratte intended the gifts to be unconditional to each of the Five-Guys." (Bardwell SOF at ¶ 38.) In support of that assertion, Bardwell cites testimony where Shisler was asked:

> Q. But it was not included, as I understand your testimony, because it was clear to you, based upon Mr. Pratte's intentions, that these were to be outright unconditional gifts to the five individuals, correct?

5

A. Yes.

But Bardwell hopes this Court will ignore the context—immediately before that exchange, Shisler testified: "I was not aware of any contingencies, so . . . yes, they could have been acknowledged on the 709." (PCSOF at ¶ 38 (W. Shisler Dep. at 127:15-21).) Accordingly, Shisler cannot, ***in any way***, testify whether Mr. Pratte intended for his gift to Bardwell to include any contingencies because Shisler simply was not aware of any contingencies. He never testified that no contingency existed—let alone what Mr. Pratte believed or intended.

## II.     ARGUMENT

### A.     Legal Standard

Bardwell largely states the correct legal standard for summary judgment. But notably he argues: "A party seeking summary judgment must meet their initial burden of demonstrating the absence of material facts precluding summary judgment, after which the burden shifts to the non-moving party to establish the existence of a genuine and material factual dispute." (Dkt. #57 at 9:18-22.) Bardwell has absolutely failed to meet his "initial burden of demonstrating the absence of material facts precluding summary judgment" in his favor.

### B.     Mr. Pratte's Payment of the Gift Tax is an Appropriate Component of Damages.

Mr. Pratte's claim for damages based on his payment of the gift tax is not complicated. It is undisputed that Bardwell was well aware that Mr. Pratte was paying the taxes on the windfall that he provided to Bardwell. Bardwell testified, "And I said it's like winning the lottery. And he says, no, it's better than winning the lottery 'cause I'm paying the taxes on it." (PCSOF at ¶ 36 (J. Bardwell Dep. at 56:17-57:3).) So from the outset, Bardwell knew that payment of the taxes were part and parcel to the agreement.

"The well-established rule in Arizona is that the damages for breach of contract are those which arise naturally from the breach itself or which may reasonably be supposed to have been ***within the contemplation of the parties at the time they entered***

*into the contract*." *S. Arizona Sch. For Boys, Inc. v. Chery*, 119 Ariz. 277, 280, 580 P.2d 738, 741 (App. 1978). Put another way, "[c]ompensation for additional consequential injury may be recovered if at the time the contract was made the employee had reason to foresee that such injury would result from his breach." *Id*. at 280, 580 P.2d at 741; *see also* RAJI (Civil) CI 18 (5th ed.) ("Generally, consequential damages are those that may reasonably be within the contemplation of the parties at the time the contract was made").

Based on the testimony of Bardwell, Mr. Pratte, and numerous other witnesses, Mr. Pratte's payment of taxes on the assets provided to Bardwell was always part of the agreement contemplated by both parties. Indeed, Shisler (a witness treated as the ultimate authority on all things taxes throughout Bardwell's MSJ) testified, "I'm positive that I told Mr. Pratte that he would owe less tax if he could pay Mr. Bardwell's, and Mr. Carriere's too, actually, amounts as payroll. ***That would shift the tax liability to the individuals from Mr. Pratte***." (PCSOF at ¶ 36 (W. Shisler Dep. at 104:4-14 (emphasis added)).) Shisler also acknowledged that one can make gifts with contingencies attached and that "[c]ontingent gifts would still be reported on a Form 709[.]" (PCSOF at ¶ 37 (W. Shisler Dep. at 110:16-111:2).) Furthermore, Mr. Pratte presented an expert on taxation who found the 709 Form to be an appropriate mechanism for capturing the taxes due under the wealth transfer from Mr. Pratte to Bardwell. (*Id*. (Expert Report of Tim Tarter).)

Bardwell, however, argues that under Mr. Pratte's theory of the case, the taxes Mr. Pratte paid—and which Bardwell specifically acknowledged were part of the deal—was somehow "neither payment of Bardwell's taxes nor payment of taxes on Bardwell's behalf" and "did not relieve Bardwell of any tax liability" and that Mr. "Pratte had no obligation to pay gift tax." (Dkt. #57 at 10:17-25.) This argument defies reality.

As the saying goes, there are two certainties in life: death and taxes. Here, Mr. Pratte provided Bardwell with cash and assets totaling more than $10 million. As Bardwell testified, Mr. Pratte told him, "I'm paying the taxes on it." Regardless of whether there were contingencies attached to it, someone was paying taxes on that

transfer of wealth. Bardwell can argue that the gift tax was not the correct way to pay those taxes but, at bottom, the gift tax form (used for wealth transfers) allowed Mr. Pratte to pay the taxes that Shisler testified would have otherwise fallen on Bardwell, Shisler testified that the Form 709 is appropriate for wealth transfers with contingencies, and Mr. Pratte submitted an expert report demonstrating the same.

> 1. *26 U.S.C. § 2501(a)(1) and 26 C.F.R. § 25.2511-2 do not change the analysis.*

Bardwell's citation to 26 U.S.C. § 2501(a)(1) and 26 C.F.R. § 25.2511-2 has no bearing whatsoever on whether Mr. Pratte can claim amounts paid pursuant to Form 709 as damages. Those sections establish nothing more than that the law considers the tax due from the donor, not the donee, in a gift tax scenario. But here, Mr. Pratte made the payment of taxes part of the agreement—and Bardwell testified that he understood that Mr. Pratte was offering to pay the taxes on the deal. Bardwell claimed the asset transfer was "like winning the lottery" and Mr. Pratte stated, "no, it's better than winning the lottery 'cause I'm paying the taxes on it." (PCSOF at ¶¶ 31, 36 (J. Bardwell Dep. at 56:17-57:3).)

So whether the Internal Revenue Service considers the tax due from the donor or donee is immaterial to the issues at hand. Instead, the issue is whether Bardwell accepted Mr. Pratte's deal—which indisputably included the tax payment. Had Bardwell not accepted the deal, no tax would have been due at all because the transfer would not have taken place *at all*. Accordingly, Bardwell's academic discussion on whom the I.R.S. assesses taxes ignores the fundamental issue: Mr. Pratte did not have to provide Bardwell with any of the assets transferred to him, let alone pay taxes on it; Mr. Pratte did so in exchange for Bardwell's promise to work for him—a fact the Motion assumes without conceding. And Bardwell was well aware that the taxes were being paid. The taxes are a proper component of the damages.

### 2. *Shisler testified clearly that Bardwell received a benefit through the payment of taxes.*

In an odd twist, Bardwell argues that the gift tax did not benefit Bardwell at all because he would have had to pay income tax on the asset transfer, rendering the payment of the gift tax moot. Fundamentally, no one thinks of their net salary as their actual salary—when asked for our income, we all answer with our gross income. The money paid as taxes is still a benefit and considered income. In arguing that he did not receive a benefit, Bardwell either ignores or does not figure out that the income taxes he would have paid would be subtracted from the assets transferred to him—in other words, he would have ended up with only half of the assets that he received because he would have paid the other half as taxes. Because Mr. Pratte paid the taxes on the wealth transfer, Bardwell got to keep far more money than he would have netted had Mr. Pratte treated the payment as income.

Accordingly, Bardwell again denies the very benefit of the bargain he agreed to. Bardwell claimed the asset transfer was "like winning the lottery" and Mr. Pratte stated, "no, it's better than winning the lottery 'cause I'm paying the taxes on it." (PCSOF at ¶¶ 31, 36 (J. Bardwell Dep. at 56:17-57:3).) Even at his deposition years later, Bardwell did not claim that the payment of taxes did not benefit him. Instead, Bardwell clearly realizes Mr. Pratte's payment of the taxes allowed Bardwell to keep more of the money than he otherwise would have netted. Indeed, Shisler testified, "I'm positive that I told Mr. Pratte that he would owe less tax if he could pay Mr. Bardwell's, and Mr. Carriere's too, actually, amounts as payroll. ***That would shift the tax liability to the individuals from Mr. Pratte***." (PCSOF at ¶¶ 36 (W. Shisler Dep. at 104:4-14 (emphasis added)).)

In other words, Mr. Pratte bestowed a sizeable benefit on Bardwell.

### 3. *Whether the Gift Tax was due is irrelevant.*

Bardwell argues that under 26 U.S.C. § 2512, the gift tax was not yet due when Mr. Pratte paid it. Again, Bardwell ignores that the two certainties in life are death and taxes. Bardwell is really arguing that Mr. Pratte should have waited to see whether Bardwell breached his agreement before paying the gift tax. Mr. Pratte paid the tax

trusting Bardwell to uphold his word. Bardwell did not. But regardless, the I.R.S. was not going to wait to receive the taxes on the wealth transfer from Mr. Pratte to Bardwell until it was determined that Bardwell would not breach. Bardwell received over $10 million in cash and assets. He worked for Mr. Pratte for no further compensation for 12 years before abandoning his bargain. The I.R.S. was not going to wait 12 years for payment. And Mr. Pratte promised to pay the taxes on the wealth transfer. The result was the payment of a gift tax with the contingencies the parties agreed to.

### B. Mr. Pratte can Prove his Contract and it is Enforceable.

Mr. Pratte explained the contract in straightforward terms:

> Q. And what was it -- what was your understanding with respect to the $2 million you gave Jeff Bardwell?
>
> A. It was a verbal contract that Jeff Bardwell would work for me until I died.

(PSOF at ¶ 14.) In addition to the $2 million, Bardwell received millions of dollars in real estate investments. Upon receipt, Bardwell immediately began work for Mr. Pratte and did so for more than 12 years without further payment, asking for permission for time off and vacation time, spending upwards of 80 hours a week and 3,000 a year working for Mr. Pratte. (PSOF at ¶¶ 35-36.) He then quit during Mr. Pratte's life, causing damages.

Half a dozen witnesses—including Bardwell's friends and neighbors—have testified to the existence of a contract between the two. Bardwell's friend Larry Yonker testified, "From Mr. Bardwell's account, [the verbal contract] was until – work for Ron until he died. . . . [f]or money up front." (PSOF at ¶ 26.) Bardwell's friend and neighbor Jeff Abendschein testified that Bardwell tired of working for Mr. Pratte but stayed on "[b]ecause he had a contract with him. He was supposed to work for him until Ron passed and that was their verbal agreement." (PSOF at ¶ 27.) When Bardwell showed Abendschein the $2 million check Bardwell had received from Mr. Pratte, Bardwell described it as "[l]ike a sign-on bonus to come work for [Mr. Pratte]." (PSOF at ¶ 28.)

Bardwell even concedes that he talked to the Five Guys about it:

10

> You know, could I have told him, hey, Ron made a life changing gift to me and I'm going to work for that man for the rest of my life? Could I have said that? You know, we were in opening companies. Okay. And my role in the company, in Stellar Development, was to -- and the other entities was to take care of Ron.

(PSOF at ¶ 32.) He even testified that as part of the venture that stemmed from the assets he received, it was his job to take care of Mr. Pratte's needs: "Ron was very -- he was very demanding upon everybody. And we all agreed that if he needed something, that I would help him." (PSOF at ¶ 33.) Mr. Pratte can prove the terms of the contract.

And the contract is enforceable. Bardwell cites the statute of frauds in an attempt to undermine his agreement, but "'[i]f an oral agreement can possibly be performed within one year, the statute of frauds does not apply.'" *Diaz-Amador v. Wells Fargo Home Mortgages*, 856 F. Supp. 2d 1074, 1080 (D. Ariz. 2012) (quoting *Healey v. Coury,* 162 Ariz. 349, 353, 783 P.2d 795, 799 (App. 1989)); *see also W. Chance No. 2, Inc. v. KFC Corp.*, 957 F.2d 1538, 1541 (9th Cir. 1992) ("The mere possibility that performance can be completed within one year—even if not contemplated by the parties—is usually sufficient to remove the agreement from the statute of frauds"). "The fact that performance is completed in more than a year is immaterial." *W. Chance No. 2*, 957 F.2d at 1541.

Indeed, Arizona law has long recognized that contract like the one between Mr. Pratte and Bardwell are not covered by the statute of frauds. In 1934, the Arizona Supreme Court rejected this exact argument, holding that this situation "would not bring [the contract] within the statute, because it was to continue until the death of Martin Gold, and this was an event that could or might happen within a year." *Gold v. Killeen*, 44 Ariz. 29, 37, 33 P.2d 595, 598 (1934). In 1949, the Arizona Supreme Court held, "The alleged oral contract . . . does not fall within subsection 5 of the above section for the reason that death of the promisor might have occurred within one year from the date of making of the oral contract. The possibility of performance within one year is sufficient to take such an oral agreement out of the operation of the statute of frauds." *Waugh v. Lennard*, 69 Ariz. 214, 226, 211 P.2d 806, 813–14 (1949).

11

Just as in those cases, Mr. Pratte's death "might have occurred within one year from the date of making of the oral contract." Accordingly, "[t]he possibility of performance within one year is sufficient to take such an oral agreement out of the operation of the statute of frauds." Bardwell's citation to Mr. Pratte's testimony that Bardwell's agreement might end by the time Bardwell is 65 changes nothing. Mr. Pratte's testimony on this point is vague and is not tied to the terms of the contract at all. Mr. Pratte could be talking about his own death. He could be talking about a decision he would make at a later date to terminate the contract and release Bardwell's obligations.

But that testimony absolutely does not say the contract had a termination date outside of one year. Mr. Pratte merely says, "I would think he would be done by 65. . . . I just think that's – he would have fulfilled his obligation by then." He does not say that the contract had a termination date other than the one that everyone but Bardwell agrees with—Mr. Pratte's death. In fact, immediately after the cited passage, Mr. Pratte testified, "Well, if [Bardwell] was 65[,] I would be what, 90-something. I don't think I'm going to be riding any sand dunes at 90 years old." (R. Pratte Dep. (2/27/20) at 207:24-208:4.)[3]

Indeed, that is precisely how Bardwell's counsel understood Mr. Pratte's answer. Counsel followed this answer by summarizing and asking for Mr. Pratte agreement with the characterization:

> Q. Well, whatever you were doing though, based on the allegations you've made in the complaint, you could have required him to work beyond that. But what you're saying is: No, I would think there would come a time when I would say: You fulfilled your lifelong obligation to me, even though you were still alive; is that fair?
>
> A. Yeah, that's fair.

(R. Pratte Dep. (2/27/20) at 208:5-12.)[4]

---

[3] For some reason, Bardwell did not include these facts as part of his Statement of Facts. Accordingly, this controverting statement of fact is not included in Plaintiff's submission. But Plaintiff has included the context pages cited here as part of Exhibit 1 to Plaintiff's Controverting Statement of Facts.

[4] The statement in Footnote 3 applies to this excerpt as well.

### C. Mr. Pratte Has Properly Supported his Claim for Promissory Estoppel.

In seeking summary judgment on Mr. Pratte's promissory estoppel claim, Bardwell attacks only one element of the claim: "Pratte cannot prove the reliance was to his detriment as his plan was to gift properties to both reduce his taxable estate and to perpetuate the Pratte name." (Dkt. #57 at 15:27-16:6.) Tellingly, Bardwell cites no evidence in the record for this sweeping proclamation. Indeed, it does not even make sense—providing Bardwell with assets would not "perpetuate the Pratte name" (obviously Bardwell and Pratte have different names) and, as argued throughout Bardwell's MSJ, considering Mr. Pratte paid the taxes on the wealth exchange, the wealth transfer to Bardwell did nothing to "reduce his taxable estate."

Simply put, Mr. Pratte did not have to provide Bardwell with anything. And the entire basis of the Complaint is that Mr. Pratte expected something from Bardwell in return for the wealth transfer—namely Bardwell's agreement to work for Mr. Pratte until Mr. Pratte's death. Bardwell complied with the agreement for twelve years and then quit—keeping the wealth that was transferred but not fulfilling his promise. So Mr. Pratte relied on Bardwell's promise to the detriment of over $10 million.

Bardwell further argues that Mr. Pratte "must also prove a second promise" to prevail. (Dkt. #57 at 15:2-6.) While not explained in Bardwell's MSJ, this argument relies on the notion (disproven above) that the contract between Mr. Pratte and Bardwell is subject to the statute of frauds. It is not. See *Mullins v. S. Pac. Transp. Co.*, 174 Ariz. 540, 542, 851 P.2d 839, 841 (App. 1992) (cited in Bardwell's MSJ at 15:2-6) ("Promissory estoppel is applied to defeat the Statute of Frauds only where there is a second promise not to rely on the statute").

But the contract here is not subject to the statute of frauds. "'[I]f an oral agreement can possibly be performed within one year, the statute of frauds does not apply.'" *Diaz-Amador*, 856 F. Supp. 2d at 1080 (quoting *Healey,* 162 Ariz. at 353, 783 P.2d at 799). Mr. Pratte could have died within one year so the statute of frauds does not apply. And

Mr. Pratte's vague testimony regarding what might have happened when Bardwell turned 65 does not change the analysis.

### D. Mr. Pratte Has Properly Supported his Claim for Unjust Enrichment.

Bardwell's argument that Mr. Pratte cannot prove unjust enrichment is rote and at odds with the evidence. Everyone agrees that Bardwell received cash and assets totaling over $10 million. Mr. Pratte has alleged that he only made the wealth transfer to Bardwell because Bardwell promised to work for Mr. Pratte until Mr. Pratte's death. Six witnesses back up Mr. Pratte's assessment of the deal. No one backs up Bardwell's assessment. And it is undisputed that Bardwell operated under the terms of his promise for 12 years.

It is equally undisputed that Bardwell quit during Mr. Pratte's life. Accordingly, Bardwell has been unjustly enriched by keeping the entirety of the more than $10 million in cash and assets that he did not earn. If Bardwell is correct that there is no binding contract, then Mr. Pratte is left with no legal remedy—in other words, the very scenario in which unjust enrichment must apply. Bardwell broke his promise and has been unjustly enriched. He cannot simply keep his windfall after breaking his promise.

### E. The Gift Tax Does Not Estop Mr. Pratte from Enforcing the Terms of the Contract.

Shisler, Mr. Pratte's accountant and a witness given credence throughout Bardwell's MSJ, testified that "[c]ontingent gifts would still be reported on a Form 709[.]" (PCSOF at ¶¶ 10, 37 (W. Shisler Dep. at 110:16-111:2).) While the Form 709 here states no contingencies, Shisler testified: "I was not aware of any contingencies, so . . . yes, they could have been acknowledged on the 709." (PCSOF at ¶ 38 (W. Shisler Dep. at 127:15-21).) In addition, Mr. Pratte presented an expert on taxation who found the 709 Form to be an appropriate mechanism for capturing the taxes due under the wealth transfer from Mr. Pratte to Bardwell. (PCSOF at ¶ 38 (Expert Report of Tim Tarter).) Accordingly, the Form 709 does not foreclose Mr. Pratte's position that his wealth transfer to Bardwell had contingencies attached to it via their agreement.

As such, this case is not analogous to the situations in Bardwell's cited New York state cases where a party submitted a position that directly contradicted an income tax. Indeed, Bardwell does not present any case law that involves a gift tax at all. But it is not as if that case law does not exist. In 2002, the Supreme Court of Wyoming decided a case that rested on some similar facts. There, the owner of a business "made a gift of a thousand shares of stock to [the employee] in March of 1995." *Ewing v. Hladky Const., Inc.*, 2002 WY 95, ¶ 7, 48 P.3d 1086, 1087 (Wyo. 2002). The owner filed a "gift tax return [that] reflected the transfer of a thousand shares of stock from himself to [the employee]." *Id*.

> The gift's purpose was intended to provide [the employee] a portion of stock that he would not later have to purchase if something happened to [the owner]. [The owner] admitted that [the employee] had earned the stock but claimed that the gift carried a condition. [The owner] testified that it was always understood between himself and [the employee] that the continued ownership of [the employee's] shares in the company was conditioned on [his] continued employment.

*Id*.

After a bench trial, "[t]he trial court found that the gift was delivered with the intent that it should be returned to [the owner] in the event that [the employee's] employment terminated." *Id*. at ¶ 9, 48 P.3d at 1088. The Wyoming Supreme Court determined, "The trial court's finding that [the owner] had gifted the stock and placed conditions when it was made is supported by this record, and, under our proper standard of review, we must affirm the trial court's decision." *Id*. at ¶ 14, 48 P.3d at 1089–90. In doing so, the Wyoming Supreme Court did not make any determination that somehow the title of Form 709—the gift tax form—meant that the owner was estopped from proving an agreement between the parties. The same should hold here.

## CONCLUSION

Bardwell's Motion for Summary Judgment attempts to take short cuts that allow Bardwell to avoid the aspects of this case that he simply cannot explain—namely the fact that after the wealth transfer, he continued to work full time for Mr. Pratte without pay

(as if he was under contract). And the fact that six witnesses (including his own friends) support Mr. Pratte's understanding of the contract between the two men. And the fact that the only person supporting Bardwell's claim that his work was gratuitous is Bardwell himself—not even his then-wife could lend support to Bardwell's position.

Instead, Bardwell misstates Shisler's testimony and faults Mr. Pratte's memory. Not only does Bardwell lack a basis for summary judgment, his unsupported Motion further demonstrates that summary judgment should be entered against him.

DATED this 16th day of February, 2021.

KERCSMAR & FELTUS PLLC

By: *s/ Greg Collins*
Gregory B. Collins
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
*Attorneys for Plaintiff*