Gregory B. Collins (#023158)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kflawaz.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald H. Pratte,<br><br>              Plaintiff,<br><br>vs.<br><br>Jeffrey Bardwell and Fanny F. Bardwell, husband and wife,<br><br>              Defendants. | Case No. 2:19-cv-00239-PHX-GMS<br><br>**PLAINTIFF RONALD PRATTE'S SEPARATE CONTROVERTING STATEMENT OF FACTS IN SUPPORT OF HIS OPPOSITION TO BARDWELL'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Ronald H. Pratte submits the following Controverting Statement of Facts to the Statement of Facts filed by Jeffrey Bardwell and in Support of Mr. Pratte's Opposition to Bardwell's Motion for Summary Judgment:

1. Mr. Pratte disputes the characterization of his net worth as a "fortune" but otherwise does not dispute this fact.

2. Not disputed.

3. Not disputed.

4. Not disputed.

5. Not disputed.

6. Not disputed.

7. Not disputed.

8. Disputed. Bardwell misrepresents the cited testimony, adding references to "the then applicable estate tax regime" and "it may be in Pratte's best interest" that do not exist in the cited testimony. In addition, Bardwell does not cite Shisler's complete answer, editing out the actual question and the context Shisler used to preface his answer. Shisler was asked, "Q. You don't remember talking with Ron prior to any of the five guys getting their initial checks?" Shisler answered, "Ron was always, in my experience pretty typical, unwilling to discuss death or estate planning with either his attorneys, Sacks Tierney, or myself." He then stated the testimony paraphrased in this Statement of Fact, before concluding with: "And we talked about his three children. And I never heard anything again about it until approximately January 6th." In other words, after Mr. Pratte had met with the Five Guys. Accordingly, there is no direct connection between Shisler's testimony and the asset transfer that Mr. Pratte conducted.

9. Disputed. Again, Bardwell misrepresents the cited testimony to fit his narrative. Shisler does not use the term "substantial gift"—the testimony is vague as to Shisler's understanding. And Shisler makes it clear the term "advised" is a wild overstatement. Shisler was asked, "Did he explain what his plan was? I want you to cut these checks to these five guys and some spouses. Did he explain what he was going to do?" Shisler prefaced his answer with: "All he said was -- he gave me the list, the handwritten list, and there were a couple names on there." If anything, the cited testimony makes it clear that Shisler's involvement was minimal. In addition, when asked about what he told his accountant regarding the gift tax, Mr. Pratte testified: "I don't think I told him to prepare anything. I just told him what I was going to do. That was his job, to figure out how to get it done." (R. Pratte Dep. (8/10/20) at 22:9-16; *see also id*. at 32:2-33:24, 35:5-11, Attached as Exhibit 1.)

10. Disputed. All the cited testimony establishes is that Shisler had a list of recipients (and the fist cited testimony does not even include Shisler's answer, just counsel's question). Mr. Pratte disputes the use of the term "gift." Shisler testified: "I was not aware of any contingencies, so . . . yes, they could have been acknowledged on the

2

709." (W. Shisler Dep. at 127:15-21, Attached as Exhibit 2.) He also acknowledged that one can make gifts with contingencies attached and that "[c]ontingent gifts would still be reported on a Form 709[.]" (*Id*. at 110:16-111:2.) Consistent with Shisler's limited involvement, he was simply unaware of the agreement between Bardwell and Mr. Pratte. This comports with Mr. Pratte's testimony where he testified: "I don't think I told [Shisler] to prepare anything. I just told him what I was going to do. That was his job, to figure out how to get it done." (Exhibit 1, R. Pratte Dep. (8/10/20) at 22:9-16; *see also id*. at 32:2-33:24, 35:5-11.)

11. Not disputed that Mr. Pratte directed Shisler to obtain the checks. Disputed to the preface as to what Mr. Pratte "decided." Nothing in the cited testimony accounts for Mr. Pratte's intentions or decisions at the time he directed Shisler to cut the checks.

12. Disputed. The testimony does not establish that Mr. Pratte intended to surprise anyone. Mr. Pratte was asked, "Did the five fellows appear surprised -- happily surprised when they opened these envelopes?" He answered affirmatively. But in Bardwell's own Statement of Facts, he cites to testimony that Mr. Pratte had told Bardwell he would be receiving something—which was the entire reason he was invited on the trip to North Las Vegas. (*See* Bardwell's Statements of Facts 23-25 and corresponding Controverting Statements of Facts below.)

13. Not disputed that the meeting lasted under an hour. The cited testimony supports that statement (as does other evidence). Disputed as to the statement that "[t]he Five-Guys did not know why Pratte had called the meeting[.]" In Bardwell's own Statement of Facts, he cites to testimony that Mr. Pratte had told Bardwell he would be receiving something—which was the entire reason he was invited on the trip to North Las Vegas. (*See* Bardwell's Statements of Facts 23-25 and corresponding Controverting Statements of Facts below.)

14. Not disputed.

15. Disputed. In Bardwell's own Statement of Facts, he cites to testimony that Mr. Pratte had told Bardwell he would be receiving something—which was the entire

3

reason he was invited on the trip to North Las Vegas. (*See* Bardwell's Statements of Facts 23-25 and corresponding Controverting Statements of Facts below.)

  16. Not disputed.

  17. Not disputed.

  18. Not disputed.

  19. Disputed. The cited testimony never refers to what Mr. Pratte "told" the attendees at that meeting, let alone suggest that Mr. Pratte told the attendees that he would be paying "***gift*** taxes." Instead, in the cited testimony, Mr. Pratte explained that he paid the gift taxes so that the Five Guys would not have to pay taxes on the assets transferred to them. He does not mention whether he explained to the Five Guys which tax mechanism he would use to make those payments.

  20. Disputed. The cited testimony states: "I don't know if they're medical, but I have memory problems from time to time. I'm 73 years old." Mr. Pratte did not acknowledge memory "deficits." He stated he has memory "problems from time to time." At age 73, the occasional memory lapse is hardly a "deficit."

  21. Disputed. Anyone (at any age) who claims perfect recall of events 15 years in the past is either incredibly fortunate or lying.

  22. Disputed. Bardwell tries to create a discrepancy where none exists. In the first set of cited testimony, Mr. Pratte describes how he must have reached an agreement with Bardwell prior to going to North Las Vegas. He describes a meeting that must have taken place with just Bardwell. The second set of testimony refers to a meeting where all of the Five Guys discussed a potential venture at the North Las Vegas airport. The fact that he called this meeting "the first meeting" suggests nothing more than the first meeting of the Five Guys.

  23. Not disputed.

  24. Not disputed.

  25. Disputed. The testimony lacks context. Specifically, immediately before the quoted testimony, Mr. Pratte stated: "[Bardwell] said: I am going to work for him for life,

4

okay. . . . He said it to the group and he said it on many occasions to many people for many years since that time." (R. Pratte Dep. (2/27/20) at 302:8-16 (included in Exhibit 1 to Bardwell's SOF)).

26. Disputed. Mr. Pratte did not testify that he did not remember anything he ever told Shisler. In the cited testimony, he was asked specifically, "So let me ask you, what did you tell Mr. Shisler about your decision to give away some of these monies and property?" Mr. Pratte did not remember which, given Shisler's testimony, is not surprising. As stated in Controverting Fact #8 above, Shisler was asked, "Did he explain what his plan was? I want you to cut these checks to these five guys and some spouses. Did he explain what he was going to do?" Shisler prefaced his answer with: "All he said was -- he gave me the list, the handwritten list, and there were a couple names on there." Not exactly a memorable exchange.

27. Disputed as to Bardwell's characterization of Mr. Pratte's testimony as "claimed." In addition, disputed as to the lack of context—Bardwell does not include the question asked or the beginning of Mr. Pratte's answer. The complete question and answer are found in Exhibit 1 at R. Pratte Dep. (8/10/20) at 35:19-36:7. The remainder of the fact is not disputed.

28. Disputed as to Bardwell's characterization of Mr. Pratte's testimony as "backtracked or qualified." In addition, once again, disputed as to the lack of context—Bardwell does not include the question asked or the beginning of Mr. Pratte's answer. The complete question and answer are found in Exhibit 1 at R. Pratte Dep. (8/10/20) at 42:9-43:11.

29. Not disputed.

30. Disputed. First, disputed as to Bardwell's characterization of Mr. Pratte's testimony as "claimed." Second, there is nothing contradictory about the two statements Bardwell juxtaposes. Even though Bardwell's role in the envisioned companies was to work for Mr. Pratte, Bardwell would still be a partner in the businesses as one of the Five

Guys. In order for the businesses to success, it was important the Five Guys "gelled." Third, disputed as, based on the foregoing, this is argument, not a fact.

31.  Disputed. Mr. Pratte did not testify that the payment of taxes was not "part of any bargain." This language comes from counsel's question, asking whether Mr. Pratte "negotiate[d] with them or bargain[ed] with them . . . ." In other words, the words "negotiate" and "bargain" were asked as synonyms. Bardwell now makes it sound like Mr. Pratte excluded the taxes from the agreement. Bardwell himself made clear that payment of the taxes was part of the agreement from the outset: "And I said it's like winning the lottery. And [Mr. Pratte] says, no, it's better than winning the lottery 'cause I'm paying the taxes on it." (J. Bardwell Dep. at 56:17-57:3, attached as Exhibit 3)

32.  Not disputed.

33.  Disputed. In the cited testimony, Shisler was asked, "Did he explain what his plan was? I want you to cut these checks to these five guys and some spouses. Did he explain what he was going to do?" Shisler prefaced his answer with: "All he said was -- he gave me the list, the handwritten list, and there were a couple names on there." If anything, the cited testimony makes it clear that Shisler's involvement was minimal. Furthermore, nothing in the cited testimony addresses whether Bardwell's gift was contingent upon his fulfilling his contractual obligations.

34.  Disputed. The cited testimony states only Shisler's understanding. Throughout Bardwell's Statement of Facts, he cites to testimony where Pratte testified that Bradwell was to be treated differently and that he had told Shisler this information. Indeed, after receiving the cash and real estate assets, Bardwell began work for Mr. Pratte and did so for more than 12 years without further payment, asking for permission for time off and vacation time, spending upwards of 80 hours a week and 3,000 a year working for Mr. Pratte. (PSOF at ¶¶ 35-36.) Half a dozen witnesses—including Bardwell's friends and neighbors—have testified to the existence of a contract. Bardwell's friend Larry Yonker testified, "From Mr. Bardwell's account, [the verbal contract] was until – work for Ron until he died. . . . [f]or money up front." (PSOF at ¶ 26.) Bardwell's friend and

neighbor Jeff Abendschein testified that Bardwell tired of working for Mr. Pratte but stayed on "[b]ecause he had a contract with him. He was supposed to work for him until Ron passed and that was their verbal agreement." (PSOF at ¶ 27.) When Bardwell showed Abendschein the $2 million check Bardwell had received from Mr. Pratte, Bardwell described it as "[l]ike a sign-on bonus to come work for [Mr. Pratte]." (PSOF at ¶ 28.) Bardwell even concedes he said to the Five Guys, "You know, could I have told him, hey, Ron made a life changing gift to me and I'm going to work for that man for the rest of my life? Could I have said that? You know, we were in opening companies. Okay. And my role in the company, in Stellar Development, was to -- and the other entities was to take care of Ron." (PSOF at ¶ 32.) He testified that as part of the venture that stemmed from the assets he received, it was his job to take care of Mr. Pratte's needs: "Ron was very -- he was very demanding upon everybody. And we all agreed that if he needed something, that I would help him." (PSOF at ¶ 33.)

35. Disputed. Mr. Pratte incorporates Controverting Facts Numbers 33 and 34 as if fully stated herein.

36. Disputed as to the characterization. Elsewhere, Shisler explained his questioning of the inclusion of Bardwell and Carriere, testifying: "I'm positive that I told Mr. Pratte that he would owe less tax if he could pay Mr. Bardwell's, and Mr. Carriere's too, actually, amounts as payroll. That would shift the tax liability to the individuals from Mr. Pratte." (Exhibit 2, W. Shisler Dep. at 104:4-14.) Bardwell made it clear that Mr. Pratte's payment of the taxes was part of the agreement: "And I said it's like winning the lottery. And [Mr. Pratte] says, no, it's better than winning the lottery 'cause I'm paying the taxes on it." (Exhibit 3, J. Bardwell Dep. at 56:17-57:3.)

37. Disputed. Shisler absolutely did not "reconfirm [] that Pratte was clear that the monies and properties were intended to be gifts with no contingencies." In the cited testimony, Shisler was asked, "***To your knowledge***, without any contingencies on them?" He answered "Correct." The testimony does not reflect Mr. Pratte's intention. It reflects Shisler's own belief. This comports with Mr. Pratte's testimony. When asked about what

he told his accountant regarding the gift tax, Mr. Pratte testified: "I don't think I told him to prepare anything. I just told him what I was going to do. That was his job, to figure out how to get it done." (Exhibit 1, R. Pratte Dep. (8/10/20) at 22:9-16; *see also id*. at 32:2-33:24, 35:5-11.) Shisler also acknowledged that one can make gifts with contingencies attached and that "[c]ontingent gifts would still be reported on a Form 709[.]" (Exhibit 2, W. Shisler Dep. at 110:16-111:2.) Furthermore, Mr. Pratte presented an expert on taxation who found the 709 Form to be an appropriate mechanism for capturing the taxes due under the wealth transfer from Mr. Pratte to Bardwell. (*See* Expert Report of Tim Tarter, attached as Exhibit 4.)

38. Disputed. This statement is not a fact but argument, paraphrasing multiple snippets of Shisler's testimony out of context in order to make an argument. For example, Bardwell contends that "Pratte intended the gifts to be unconditional to each of the Five-Guys." But in support of that assertion, Bardwell cites testimony where Shisler was asked:

> Q. But it was not included, as I understand your testimony, because it was clear to you, based upon Mr. Pratte's intentions, that these were to be outright unconditional gifts to the five individuals, correct?
>
> A. Yes.

But Bardwell hopes this Court will ignore the context—immediately before that exchange, Shisler testified: "I was not aware of any contingencies, so . . . yes, they could have been acknowledged on the 709." (Exhibit 2, W. Shisler Dep. at 127:15-21.) Accordingly, Shisler cannot, ***in any way***, testify whether Mr. Pratte intended for his gift to Bardwell to include any contingencies because Shisler simply was not aware of any contingencies. He never testified that no contingency existed—let alone what Mr. Pratte believed or intended.

39. Not disputed.

40. Not disputed.

41. Not disputed.

8

DATED this 16th day of February, 2021.

          KERCSMAR & FELTUS PLLC

         By: *s/ Greg Collins*
           Gregory B. Collins
           7150 East Camelback Road, Suite 285
           Scottsdale, Arizona 85251
           *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on February 16, 2021, I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following:

Thomas M. Connelly
**LAW OFFICES OF THOMAS M. CONNELLY**
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Tconnelly2425@aol.com

Thomas J. Marlowe
**LAW OFFICES OF THOMAS J. MARLOWE**
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016
Tmarlowe2425@outlook.com

*Attorneys for Defendants*

 *s/ Alexis Adelman*