LAW OFFICES OF THOMAS M. CONNELLY
Thomas M. Connelly (Az. Bar. No. 012987)
6720 North Scottsdale Road, Suite 305
Scottsdale, Arizona 85253
Phone: (602) 957-1993
Facsimile: (602) 957-2137
Tconnelly2425@aol.com

LAW OFFICES OF THOMAS J. MARLOWE
Thomas J. Marlowe (Az. Bar No. 016640)
6720 North Scottsdale Road, Suite 305
Scottsdale, Arizona 85253
Phone: (602) 957-1993
Facsimile: (602) 957-2137
Tmarlowe2425@outlook.com
Attorneys for Defendants Bardwell

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Ronald H. Pratte,<br><br>    Plaintiff,<br><br>vs.<br><br>Jeffrey Bardwell and Fanny F. Bardwell, husband and wife,<br><br>    Defendants. | Case No.: 2:19-cv-00239-PHX-GMS<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Defendants Jeffrey and Fanny Bardwell ("Bardwell") hereby respond to Plaintiff, Ronald Pratte's ("Plaintiff" or "Pratte") Motion for Summary Judgment (Doc. 56). This response is also supported by Defendants' Separate Controverting Statement of Facts.

Pratte claims that in exchange for upfront compensation comprised of money and property interests Bardwell agreed to work for Pratte until he died, or as he later clarified, until Bardwell turned 65. Bardwell denies making any such promise.

1

In responding to Pratte's Motion, Bardwell acknowledges there is a significant overlap of information that was provided in Bardwell's separate Motion for Summary Judgment and Statement of Facts (Docs. 57 and 58). That same information is, however, also pertinent to this Response. Accordingly, for purposes of clarity and because the Court must evaluate each motion separately, some of the same facts will be restated in this Response and in Defendants' Controverting Statement of Facts.

Distilled to its base level, Pratte argues he is entitled to summary judgment on his breach of contract and his unjust enrichment claims because:

1. Bardwell is lying and cannot produce any fact witnesses or documentation sufficient to preclude summary judgment in Pratte's favor;

2. Bardwell's statements that he helped Pratte for years out of love, affection, and loyalty, and continued to help Pratte even after his involvement in partnership entities terminated, makes no "economic sense"; and

3. Bardwell cannot rely upon Pratte's filing of a gift tax return because the return is irrelevant and Bardwell's use of the tax return as partial support for his defense that the transfers were gifts is an "excuse concocted during litigation." (Doc. 55 at 8:10).

Pratte's motion is ill conceived and is premised upon false contentions. Accordingly, summary judgment should be denied.

**FACTUAL BACKGROUND**

In 2001 Bardwell was hired to develop and manage the Phoenix lumberyard of Pratte's multi-state construction business. Bardwell worked hard and excelled at his job, drawing Pratte's attention, and garnering Pratte's respect. Pratte stated, "[h]is work ethic was excellent. He was very respectful, okay. That's big with me. Didn't lie to me, okay. If he made a mistake – hey, I screwed up. It was all that; all of that's huge." (*DCSOF, ¶ 1*)

Pratte further described Bardwell as "very honest," a hard worker, and someone who always did what he said he would do. (*DCSOF, ¶ 2*). These same opinions were expressed by other witnesses. (*DCSOF, ¶¶ 59,64*) Over the next four-years, Bardwell and Pratte became close friends. Pratte stated he was close to Bardwell and that he considered and referred to Bardwell as his "adopted son." (*DCSOF, ¶ 3*) Until recently, Pratte considered Bardwell a part of his family. *Id.*

In 2005, after finalizing the sale of his business to Pulte Homes, Pratte told his long time CFO/CPA, William Shisler ("Shisler"), that he decided to make substantial and identical gifts to his two natural sons (Trevor and Justin Pratte), his son-in-law (Jaime Ziparo), a man married to Pratte's niece (Todd Carrier) and Bardwell (collectively referred to as the "Five-Guys"). (*DCSOF, ¶¶21-23*) Pratte instructed Shisler to obtain five cashier's checks each in the amount of $2 Million. Pratte intended to surprise the Five-Guys with the checks at a meeting he arranged at the North Las Vegas airport in December 2005. (*DCSOF, ¶ 4*) The airport meeting was brief lasting under one hour. (*DCSOF, ¶ 4*) At the meeting Pratte handed each man an envelope containing a $2 Million check. (*DCSOF, ¶ 5*) The Five-Guys were surprised when they received the checks. (*DCSOF, ¶¶ 6, 77, 78*) Pratte told the Five-Guys he would also transfer other assets. Pratte also expressed his "hope" or "plan" that the Five-Guys would use a portion of the cash proceeds as seed money to jointly form, fund, and operate a home building company. (*DCSOF, ¶¶ 7, 32, 37, 66*) Pratte testified, "I wanted a family business" and that it was his "dream" the Five-Guys would become a premier home builder. (*DCSOF, ¶ 8*)

It is undisputed that in 2006, the Five-Guys moved to Phoenix and into an office

3

building owned by Plaintiff, with who they shared office space. (*DCSOF, ¶ 67*) The Five-Guys knew that Plaintiff had a plethora of other interests from cars, to planes, to other development projects and that he could be very demanding. (DCSOF ¶¶ 56, 57, 63) This was a concern since they now shared office space. Bardwell and his partners agreed that if Plaintiff needed assistance (which any of them would otherwise provide), Bardwell would be the primary partner to provide that assistance as a duty to their partnership, i.e., to keep Plaintiff at arm's length unless he was needed. (*DCSOF, ¶¶ 56, 57, 63, 84*) Bardwell did not mind this role because he loved Pratte and welcomed the opportunity to be close to his mentor (which yielded other benefits like investment opportunities not offered to the others), and because he genuinely enjoyed Pratte's company until the last year or so of their association when Pratte became more curmudgeonly.

In early 2018, Bardwell and Pratte had a personal disagreement of comparatively minor import. Pratte was displeased with Bardwell and like a petulant child he refused to engage with Bardwell, ignoring Bardwell and consistently rebuffing Bardwell's efforts to communicate, telephonically and in-person. (*DCSOF, ¶ 95*) Finally, Pratte agreed to meet Bardwell at their office in Chandler, but Pratte failed to show up. (*DCSOF, ¶95*) After waiting and trying to reach Pratte, Bardwell tired of the petty games, and ceased associating or communicating with Pratte other than through counsel.  Pratte filed suit in December 2018.

## SUMMARY JUDGMENT STANDARD

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine

4

issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *see also Jesinger*, 24 F.3d at 1130.

A party seeking summary judgment must meet his initial burden of demonstrating the absence of material facts, but they are not required to negate the opponent's claim. "Rather, the moving party need only demonstrate that there is an absence of evidence to support the non-moving party's case." *Id.*; see also, *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998); *Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011). While all inferences must be drawn in favor of the non-moving party, they "cannot be created by pointing to some metaphysical doubt as to the material facts." *Id.*, *quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## **ARGUMENT AND ANALYSIS**

Pratte's counsel states this is a "he said/he said" case and acknowledges summary judgment in such cases is uncommon. (Doc. 55 at 15:23-26) Nonetheless Pratte argues this is a "rare" case where summary judgment is appropriate because Bardwell has no documents or witnesses that support his defense. Further, Pratte claims Bardwell's explanations as to why he helped Pratte for years are "absurd" because they make no "economic sense" and that Bardwell's claim this was a gift is a lie. *See* (Doc. 55 at 2:11-22; 11:18-22).

Pratte's contentions are wrong. Bardwell does have factual support for his defense. Further, Bardwell's explanation that he continually helped Pratte out of loyalty, love and devotion is not a position Bardwell simply created during this litigation as Pratte claims. Bardwell also is not a liar. The transfers were always intended as unconditional gifts not upfront compensation as now argued by Pratte.

**1. Bardwell Has Evidence and Witnesses Who Support His Defense:**

It is puzzling why Pratte would claim Bardwell has "nothing" to support his defense that the transfers were gifts. Pratte knew full well upon the filing of this motion that his former long-time CFO/CPA, William Shisler, who prepared the Form 709 Gift Tax Return, refuted Pratte's claims unequivocally. Shisler testified the monies and the properties transferred to the Five-Guys, including Bardwell, were represented by Pratte as gifts, and intended by Pratte to be gifts. (*DCSOF, ¶24*) Pratte never told Shisler Bardwell was different from the other gift recipients or that Bardwell made any contract or promise to work for Pratte for decades *in exchange* for the assets Pratte transferred. (*DCSOF, ¶26*) Shisler was unwavering in his testimony that Pratte's expressed intention was that the transfers were gifts. (*DCSOF, ¶¶ 26-29*)

Bardwell expects Pratte's counsel will attack Shisler to try to keep Pratte's case viable. This is not, however a case of omission, i.e., it is not a case where Shisler neglected to ask questions or clarify Pratte's intent. In fact, Shisler testified he specifically questioned Pratte about his intention to make gifts to both Bardwell and Carriere:

6

> "When Mr. Pratte instructed me to make the gift, I was surprised by two names on the list and I did ask him if he was sure; Mr. Bardwell and Mr. Carriere, if he was sure he wanted to do that. And his response was: Yes. I want to make them – as you call them, the five guys."

*(DCSOF, ¶ 27)* Shisler testified Pratte was unequivocal and clearly expressed that the monies and properties given to Bardwell were intended to be gifts with no contingencies. (*DCSOF, ¶ 24-29*) In addition, Shisler testified that he was surprised by the magnitude of the gifts; that he recalled this quite well because it was a very memorable event; that he discussed with Pratte the fact the gift taxes would be exorbitant; that in speaking with Shisler Pratte used the word "gifts" not "payments" or other ambiguous terms suggested as possibilities by Plaintiff's counsel; that he advised Pratte that he would owe less gift tax if he placed Carrier and Bardwell on payroll versus making gifts; and that Pratte intended the gifts to be unconditional to each man. (*DCSOF, ¶ 29*)

Shisler's testimony by itself is more than sufficient to preclude Pratte's request for summary judgment. However, when Shisler's testimony is combined with the Gift Tax Return Pratte signed under penalty of perjury and Bardwell's specific denials and explanations, it is inconceivable that Pratte's motion could be granted. Bardwell, however, has more evidence.

Bardwell's former divorce attorney, Diana Rader ("Rader"), was also deposed. Rader represented Bardwell in his divorce from his first wife. At that time (2009-2010) Rader was a partner at Saks Tierney. (*DCSOF, ¶ 60*) Rader testified that she remembered Bardwell's divorce well, in part, because Bardwell's former spouse sought advanced payment of attorneys' fees of approximately $100,000, one of the largest applications she

can recall. (*DCSOF, ¶ 61*) She further remembered that one of the issues she had to investigate was whether the payment by Pratte to Bardwell was in fact a gift, or whether it was compensation for services. Rader testified that she cannot simply rely upon a client's statements (for somewhat obvious reasons) and before taking positions in court she conducts her own due diligence.

In Bardwell's case she confirmed to her satisfaction that the transfers made by Pratte to Bardwell were gifts, not compensation for services. (*DCSOF, ¶ 62*) Moreover, although the case settled before she fully drafted an affidavit, it was also her understanding that Pratte was willing to sign an affidavit (potentially in lieu of producing his gift tax return), attesting that the transfers made to Bardwell were a gift not compensation. Radar never completed the affidavit for Pratte because the case settled before it was needed. Radar successfully opposed Bardwell's ex-wife's motion, in which she referred to Pratte's transfers to Bardwell as gifts. (*Exhibit 16, Excerpt of Rader Response, 2:5-9).* Further, in various disclosures made in the divorce case Bardwell also made representations, under oath, that the transfers from Pratte were gifts.

**2. Bardwell's Explanation Why He Helped Pratte For Years Is Genuine:**

Throughout his motion Pratte attacks Bardwell's stated motivation for assisting Pratte over the years without remuneration. Pratte contends that it is "absurd" to believe Bardwell would work as hard as he did simply out of respect and gratitude. Pratte's counsel asserts such statements make no "economic sense" regardless of the magnitude of Pratte's gift.

Bardwell's explanations are not, as is claimed, self-serving statements created solely for Bardwell's defense in this litigation. This is true regardless of whether they make "economic sense" to Pratte's counsel. Rather than argue, however, Bardwell's counsel believe Mr. Bardwell said it best. In September 2015, nearly a decade after receiving the gift and more than 2.5 years before this dispute arose, Bardwell expressed the same feelings or motivations for his actions. Bardwell's birthday email to Pratte reads as follows:

> Ron,
>
> I hope this day finds you well. I want to wish you a Happy Birthday. There is nothing in this world that I could buy for you that you can't buy yourself. As we all know. **What I can give you is my loyalty, my trust and my dedication which we all know you can't buy. You are a man that has changed my life forever. I will be forever grateful.** Please enjoy your day as life is too short. I love you.
>
> Jeff

Pratte responded, "Thank you Jeff that means a great deal to me.  Love you too." *(DCSOF ¶ 103, Exhibit 15) (emphasis added).*

This is hardly the statement of a man who did not want to associate with Pratte as Pratte's witnesses now falsely claim. Nor is it the sentiments of a man who felt contractually obligated. While Bardwell's loyalty and devotion to Pratte may be atypical, it goes without saying that unlike for-profit businesses, not all persons are driven by purely economic motivations. For some persons, factors like love, gratitude and loyalty are cherished and "valuable" commodities. Pratte's economic sensibility argument does, however, come into play with respect to Pratte himself and, if applied with equal force,

effectively undermines Pratte's claims.

By way of background, in late 2014 Pratte suggested that Bardwell invest some of his money into a REIT investment, JDM. Upon information and belief, JDM owns the State Farm complex on Tempe Town Lake and possibly other locations as well. Pratte used his contacts to enable a comparatively small investor like Bardwell to participate in the fund. Bardwell's minimum investment was to be $2 Million. Bardwell was interested in the investment but advised Pratte that until a pending sale of one of the transferred properties held by the Five-Guys closed in 30-45 days, he would not have access to enough money to make the time-sensitive investment. Pratte offered to loan Bardwell the money and Bardwell accepted Pratte's offer and invested in JDM which, as Pratte predicted, is a successful investment.

Pratte did not offer this opportunity to any of the other gift recipients, including his own children. This is an example of one of the tangential benefits Bardwell derived from his close and continued association with Pratte. This transaction is, however, interesting for more than simply demonstrating Pratte's preferential treatment of Bardwell. It also serves to demonstrate that Pratte documents personal transactions where he is expecting something in return for his largesse.

Pratte testified that Bardwell was honorable, trustworthy and a man of his word. (*DCSOF, ¶¶ 1-2*) Accordingly, Pratte could have loaned Bardwell the money on a handshake. After all, that is what Pratte claims he did with respect to the fictional contract he now seeks to enforce. Moreover, there would have been little risk of Bardwell's default because the proceeds Bardwell was intending to use to repay Pratte in

just 30-45 days were coming from the sale of one of the properties held in an LLC managed by the Five-Guys, i.e., under the control of Carrier and the members of Pratte's family. In other words, Pratte could not have much better security as he could have easily called and told Carriere not to distribute the money to Bardwell or ensured Bardwell authorized Carriere to wire the proceeds directly to Pratte.

But Pratte did not do that. Instead, Pratte had Carriere draft a promissory note which he required Bardwell and his wife to sign and personally guaranty. (*DCSOF, Exhibit 18*) The note reveals Pratte charged Bardwell $500 per day in accruing interest, a $15,000 transaction fee, and separately secured the loan with Bardwell's investment. *Id.*

In summary, Pratte required a written contract, charged fees, interest, and required security and personal guarantees for a short-term 30-45-day $2 Million loan. Yet for what he claims is a $10 Million contract made in exchange for decades of personal services he did not bother to have Shisler attach any addendums to his Form 709 Gift Tax Return, he did not have Carriere or Shisler draft a memorandum of understanding, he did not send a brief confirming email to Bardwell or anyone else, he did not even scratch a note on a napkin.

This is a textbook example of a claim that makes no "economic sense."

**3. The Form 709 Gift Tax Return is Relevant to Bardwell's Defense:**

Pratte asserts the Gift Tax Return is irrelevant to this litigation, does not support Bardwell's defense, and was properly filed because this was a conditional gift. The problem with Plaintiff's argument and indeed with his expert's analysis, is that it is premised upon flawed assumptions. Assumptions which improperly and illogically merge conflicting

concepts of compensation, contracts, and contingent gifts in a concerted effort to reconcile Prate's current claims with Shisler's controverting testimony and the tax return Pratte signed under penalty of perjury declaring the transfers as gifts.

As these are somewhat esoteric topics requiring some specialized knowledge, Bardwell retained the expert services of tax attorney, Robert J. Lord. Mr. Lord provided both a comprehensive expert opinion (*DCSOF, Exhibit, 19*) and a rebuttal to Mr. Tarter's report *(Exhibit 20)* which directly addresses the flaws in Mr. Tarter's reasoning. Plaintiff did not rebut Mr. Lord's report *(Exhibit 19)*.

In his rebuttal opinion Mr. Lord states: "Mr. Tarter's application of the rules regarding conditional gifts to the contract into which Pratte claims to have entered with Bardwell defies common sense. If Mr. Tarter were correct, any contract which required future performance could be cast as a conditional gift." *(Exhibit 20, p.10, ¶ 3)*. Further, Mr. Lord disagrees with Pratte's claim that because so much gift tax was paid, no losses were suffered by any taxing authority. Mr. Lord opines that if Pratte's current claims are true, i.e., that Pratte intended to treat his transfers to Bardwell as upfront compensation but instead chose to report the transaction on a Gift Tax Return, the US Treasury, the State of Arizona, and the Trustees of the Medicare and Social Security trust funds suffered a combined loss of approximately $1.6 Million. *(Exhibit 20, pgs. 19-20)*.

The glaring inconsistencies between Shisler's testimony, the Gift Tax Return, and Plaintiff's current claims make the tax return extremely important and relevant for both the Court and any future jury to recognize the untenable nature of Pratte's claims.

**There Never Was a Contract and Plaintiff's Gift to Bardwell Is Not Unjust**

To prevail on his claim for breach of contract, Pratte must prove three elements: (1) the existence of a contract, (2) its breach, and (3) resulting damages. *Graham v. Ashbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975). A valid contract requires proof of "an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained." *Savoca Masonary Co. v. Homes & Son Constr. Co.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975); *See also, Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 270 P.3d 852 (App. 2011)(a valid contract requires an offer, acceptance, consideration, and the intent of both parties to be bound by the agreement); *Brookhaven Housing Coalition v. Solomon,* 583 F2d 584, 593 (2nd Cir. 1978)("If essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result")(citations omitted).

To prevail under his alternative theory of Unjust Enrichment, Pratte must prove Bardwell was enriched, that Pratte suffered a loss, that the two results were connected, that there is no other reason Bardwell was enriched, and that he [Pratte] has no legal remedy. *See Wang Elec., Inc. v. Smoke Tree Resort, LLC,* 230 Ariz. 314, 283 P.3d 45 (App. 2012); *See also Trustmark Insurance Company v. Bank One, Arizona*, 202 Ariz. 535, 48 P.3d 485 (2002). "The mere fact that one party confers a benefit on another, however, is not of itself sufficient to require the other to make restitution. Retention of the benefit must be unjust." *See Freeman v. Sorchych,* 226 Ariz. 242, 245 P.3d 927 (App. 2011)(quoting *Pyeatte v. Pyeatte,* 135 Ariz. 346, 352, 661 P.2d 196, 202 (App. 1983)).

Pratte is not entitled to summary judgment on either claim because his own

testimony is vague, admittedly unreliable, and internally inconsistent. Pratte cannot overcome these critical failures by referring to a few emails where Bardwell is discussing his schedule. Finally, Pratte's witnesses have credibility issues caused, to some degree, by Pratte's own manipulations—issues which should be resolved by a jury if Bardwell is not separately granted summary judgment.

        a. <u>Pratte's flawed Memory and Inconsistent Testimony</u>:

Pratte cannot accurately recall when and where Bardwell allegedly promised to work for him in exchange for the monies and properties received. Pratte testified the airport meeting was the first meeting. (*DCSOF,* ¶¶ 9-14) In correspondence with his family members in September 2018, Pratte reiterated his claim the purported contract was formed at the airport meeting. *(DCSOF, ¶ 20, Exhibit 17)* Confused about his story, Pratte also testified that prior to the airport meeting, Bardwell must have made a promise to him, although he could not recall the meeting or what Bardwell may have said. (*DCSOF, ¶¶ 11-13*)

Pratte casually dismisses these critical failures by claiming, falsely, that he restated his deal in front of other witnesses and, depending upon who is questioned, Bardwell either said nothing, or confirmed the existence of a contract. Of course, if Pratte cannot remember his original offer or what Bardwell said in response, one can only speculate as to the accuracy of alleged subsequent summaries. That is, however, Pratte's default approach, i.e., "I can't get my story straight, but don't worry, others can tell you what Bardwell and I agreed to at some other time."

      b. <u>Bardwell's Emails to Pratte Prove Nothing</u>:

Pratte cites to 6 emails Bardwell sent to Pratte over a more than 2-year period in which Bardwell was discussing his schedule and endeavoring to ensure his schedule meshed with Pratte's needs. *(Doc. 55 at 7)*. Pratte characterizes these emails as Bardwell's efforts to obtain Pratte's permission which, in turn, Pratte bootstraps into a claim that such correspondence proves Bardwell was contractually obligated to Pratte.

Bardwell's explanation for the emails demonstrates that courtesy and deference do not establish the existence of a contract. (*DCSOF, ¶ 94*)

      c. <u>Pratte Suggested the Testimony He Needed to Support His Case</u>:

Pratte, by his own admission, loved and respected Bardwell. Pratte also treated Bardwell like his own son, including gifting him monies and properties like his other family members and including him in his dream that Bardwell and the others would establish a successful family business. Pratte provided Bardwell investment opportunities he did not share with anyone else and Bardwell demonstrated his appreciation unlike Pratte's other family members. For example, when Pratte loaned Bardwell the money to make the JDM investment Bardwell wrote to Pratte to let him know he had received the wire transfer and thanked him for his help. Pratte responded: "You're welcome **and deserving of all you have been given** and thanks for your appreciation. **I don't hear that from the others**. Hope all is well." (*DCSOF, Exhibit _*) (emphasis added).

It is therefore easy to understand that when Bardwell ceased his association with Pratte, Pratte was disappointed, hurt, and angry. Pratte had already suffered great disappointment from the way his other family members had treated his gift and suffered

their comparative lack of gratitude as he expressed in his email. Now the man he treated like a son had also ceased contact. But Bardwell is not his son and that is where Pratte, a task-oriented individual, took on a new retirement project. Pratte made Bardwell rich, so now he would make Bardwell bend to his will, or he would financially ruin him.

The witnesses against Bardwell are three of the four other gift recipients—all members of Pratte's family, a lifelong friend of Pratte (Wolfswinkle) who only knew Bardwell casually, a former neighbor and friend of Bardwell who has a deeply rooted personal grudge against Bardwell (Abendschein), and a Ron Pratte sycophant (Yonker).

Rather than letting his lawyers determine what the witnesses may recall, Pratte wanted to handle matters personally. His first step was to contact the very persons who, in his view, had shown a lack of gratitude (Justin Pratte, Ziparo, and Carrier). In September 2018, several months before he filed suit, Pratte emailed the men and asked them to document their recollection of events taking place at the airport meeting. (*DCSOF, ¶ 20*) Pratte did not, however, stop there. He chose to telegraph the testimony he needed.

Pratte wrote, in pertinent part:

In order to save legal fees, I would appreciate it if each of you could sit down and write out your recollections of the event and email them to me in a PDF file format.  My position is that I agreed to take Bardwell into the group with you guys and his responsibility was to work for me how ever [sic] long it took until I died. Plain and simple.  He is saying that never happened and even if it did it was not written down so it is not enforceable.  **My attorneys say verbal contracts are the same as written contracts <u>if there were witnesses to the event.</u>**

<u>**So help me out here**</u> if you will please and send me your thoughts.  **Thanks for your help.**

*(DCSOF, Exhibit 3, pp. 1-2) (emphasis added).*

Of course, the three men provided the requested statements after conferring and sharing their recollections--allegedly to ensure they remembered the situation accurately. (*DCSOF, ¶71, 81*) That, however, was not enough for Pratte. Upon receiving their statements Pratte requested they modify their statements to provide greater detail. (*Exhibit 3, p.3 (middle).* Again, the men complied with Pratte's request.

Pratte did not stop there. He also invited a former neighbor and friend of Bardwell (Abendschein) to join him and Yonker for dinner. (*DCSOF, ¶¶ 40-41*) At dinner Pratte requested Abendschein's help with his case against Bardwell. (*DCSOF, ¶42*) Abendschein, was more than willing to learn about Pratte's case and offer his "help" against Bardwell who he no longer likes. (*DCSOF, ¶ 43*) This dinner meeting was the first and only time Pratte dined with Abendschein, a man he only knew in passing after Bardwell invited Abendschein to the Dunes.

## **CONCLUSION**

Plaintiff moved for summary judgment while wholly ignoring the testimony of one of the key witnesses, Shisler. As noted, Shisler's unequivocal testimony alone demonstrates that there are material factual issues that would preclude Pratte's requested relief. For the foregoing reasons Pratte's Motion for Summary Judgment should be denied.

Dated this 16th day of February, 2021.

        By: /s/ Thomas J. Marlowe
            LAW OFFICES OF THOMAS J. MARLOWE
            Thomas J. Marlowe
            2425 East Camelback Road, Suite 880

Phoenix, Arizona 85016<br>
Phone: (602) 957-1993<br>
Tmarlowe2425@outlook.com

### CERTIFICATE OF SERVICE

I, Thomas J. Marlowe, hereby certify that on February 16, 2021, I electronically transmitted the foregoing document with the Clerk's Office using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant(s) in this case and emailed a copy of this document to the following:

Gregory B. Collins
Eric B. Hull
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
gbc@kflawaz.com
ebh@kflawaz.com