LAW OFFICES OF THOMAS M. CONNELLY
Thomas M. Connelly (Az. Bar. No. 012987)
6720 North Scottsdale Road, Suite 305
Scottsdale, Arizona 85253
Phone: (602) 957-1993
Facsimile: (602) 957-2137
Tconnelly2425@aol.com

LAW OFFICES OF THOMAS J.  MARLOWE
Thomas J. Marlowe (Az. Bar No. 016640)
6720 North Scottsdale Road, Suite 305
Scottsdale, Arizona 85253
Phone: (602) 957-1993
Facsimile: (602) 957-2137
Tmarlowe2425@outlook.com
Attorneys for Defendants Bardwell

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald H. Pratte, | Case No.: 2:19-cv-00239-PHX-GMS |
| Plaintiff, | |
| vs. | **DEFENDANTS' CONTROVERTING STATEMENT OF FACTS IN SUPPORT OF THEIR RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Jeffrey Bardwell and Fanny F. Bardwell, husband and wife, | |
| Defendants. | |

Pursuant to L.R.Civ. 56.1(b) and in response to Plaintiff's Statement of Facts (Doc. 56), Defendants by and through counsel hereby submit their objections and/or responses to Plaintiff's Statement of Facts ("PSOF") as well as Defendants' Controverting Statement of Facts ("DCSOF").

1

## UNCONTESTED STATEMENTS

For the sole purpose of Plaintiff's Motion for Summary Judgment Defendants have no material objections to the following enumerated paragraphs contained in PSOF:

1-13, 18, 34, 36, 38, and 48.

## CONTESTED/DISPUTED STATEMENTS

Defendants hereby respond and object, in whole or in part, to the following enumerated paragraphs contained in PSOF.[1]  Before providing their response to each paragraph, Defendants will restate Plaintiff's assertions verbatim, or will include minor editions in brackets to clarify positions if prior dates or times are referenced in Plaintiff's prior numbered and uncontested paragraphs.

14.     Prior to that meeting [at the North Las Vegas Airport in December 2005], Mr. Pratte entered into a fairly simple agreement with Bardwell. As Mr. Pratte explained:

> Q. And what was it -- what was your understanding with respect to the $2 million you gave Jeff Bardwell?
> A. It was a verbal contract that Jeff Bardwell would work for me until I died.

(R. Pratte Dep. (2/27/20), attached as Exhibit 3, at 27:14-24.)

**Bardwell Response:**  Disputed. Bardwell denies any prior meeting with Pratte took place at which any form of a contract as alleged herein was discussed. Bardwell also denies the existence of the alleged contract. *See DCSOF ¶¶ 86, 87, 91, 91.*

---

[1] Citations referring to Defendants' Controverting Statement of Facts are designated as "DCSOF" and appear below.

15.   At the meeting in North Las Vegas, Mr. Pratte announced the deal he had agreed to with Bardwell in front of Bardwell and the rest of the group. (R. Pratte Dep. (2/27/20), attached as Exhibit 3, at 28:22-29:7; *see also id*. at 47:21-48:9.)

**Bardwell Response:**  Disputed. Bardwell denies these statements and asserts this never occurred.  Further witnesses provide varying accounts or deny independent recollection.  *See also DCSOF ¶¶ 36, 65, 69, 72-75, 78-79, and 85.*

16.   Bardwell agreed. (R. Pratte Dep. (2/27/20), attached as Exhibit 3, at 48:6-24.)

**Bardwell Response:**  Disputed. See above.

17.   In addition to the $2 million check, in the months after that meeting, Mr. Pratte transferred several properties to the group consisting of Bardwell, Jaime Ziparo, Justin Pratte, Todd Carriere, and Trevor Pratte.  (R. Pratte Dep. (2/27/20), attached as Exhibit 3, at 35:16-37:5.)

**Bardwell Response:**  Mischaracterizes facts. Ambiguous. The $2 million checks were gifted to each individual present at the meeting. Bardwell does not deny that properties were later transferred by Pratte, but clarifies they were not transferred to the individuals as joint tenants in common. Rather, the properties were transferred to entities in which each man had a membership interest.

19.   Mr. Pratte transferred via quit claim deed a property located at 600 N. 94th Ave, Tolleson, Arizona. This property was appraised on July 27, 2006 for $14,790,000 and was transferred to a Pratte Land Holdings LLC, a company in which

Bardwell owned 20%. Mr. Pratte also transferred via quit claim deed a property located in Buckeye, Arizona. This property was appraised on October 12, 2006 for $3,798,000 and was transfer to Pratte Buckeye Property LLC, a company in which Bardwell owned 20%. Mr. Pratte also transferred via quit claim deed a property located at 2900 E. Lone Mountain Road, North Las Vegas, Nevada. This property was appraised on May 1, 2006 for $8,100,000.00 and was transferred to a Pratte Loan Mountain LLC, a company in which Bardwell owned 20%. (Expert Report of B. Taylor at 4-5, attached as **Exhibit 4**.)

**Bardwell Response:** Bardwell does not dispute the appraisals for purposes of this motion, however, the implication that the values can be readily converted to a simple 20% interest of each property as the "value" of the gift to Bardwell individually is disputed. See above.

20.    In addition to these transfers, Ron Pratte paid the taxes on all of the assets he paid to Bardwell. (*Id.* at 6.)

**Bardwell Response:** Bardwell does not dispute that Plaintiff paid gift taxes to the Internal Revenue Service based upon the value of his gifts. Bardwell does, however, dispute the characterization that Plaintiff "paid Bardwell." Not all assets were transferred to Bardwell, but rather to entities. Further, nothing was "paid" to Bardwell, the monies and properties were gifted to the individuals and the separate entities.

21.    Todd Carriere testified, "I recall [Mr. Pratte saying]: Jeff works for me until I'm gone. And Jeff never saying anything different. And I recall on various

occasions Jeff and I having discussions about how long could Ron live. You know, Jeff would come in and be, like: Man, I'm going to be working until I'm 80 years old out there at the dunes." (T. Carriere Dep. (12/5/19), attached as **Exhibit 5**, at 248:22-250:4.)

**Bardwell Response:** Mischaracterizes prior testimony which was represented as jokes not factual statements.

22.    Jaime Ziparo testified:

Q:  Do you remember Ron telling Jeff at the airport that I'll give you this gift, but you've got to work for me for life?

A:  Until he dies. Until Ron dies, I remember that.

Q:  Is that what Ron said?

A:  Yeah.
Q:  I'm asking you.

A:  Yes, that's what he said.

(J. Ziparo Depo. (12/4/19), attached as **Exhibit 6**, at 222:21-223:14; *see also* 206:1-10; 258:14-259:19.)

**Bardwell Response:** Disputed and incomplete.  *See DCSOF ¶¶ 81-83, 85.*

23.    Justin Pratte testified: "[I]t was made clear to us that -- and very clear to Jeff that if he wanted to go forward in this venture, the four of us in Pratte Companies would fund any expenses necessary for Jeff to operate in a facet -- or in a manner to which his sole responsibility was to do whatever Ron asked him to do." (J. Pratte Dep. (11/26/19), attached as **Exhibit 7**, at 31:7-32:22.)

**Bardwell Response:** Disputed.  *See DCSOF ¶¶ 90, 91, 100, 101.*

24.     He also testified, "And I remember very vividly that the structure -- or the notion of Jeff working for Ron was: Jeff -- and these were Ron's words. Jeff, you work for me and whatever I need for the rest of my life." (*Id*. at 32:23-33:3.)

**Bardwell Response:** Disputed.

25.     Bardwell "responded affirmatively, that he would. And after that, I remember all of us having direct conversation with Jeff, reminding him what he was signing up for. And I had many conversations with Jeff. Please be sure that you're aware of what you're signing up for." (*Id*. at 33:4-14; *see also* J. Ziparo Dep. (12/4/19), attached as Exhibit 6, at 247:18-248:12 (testifying to discussions with Bardwell regarding being sure about the task he was agreeing to).)

**Bardwell Response:** Disputed.  *See DCSOF ¶¶ 90, 91, 100, 101.*

26.     Bardwell's friend Larry Yonker testified, "From Mr. Bardwell's account, [the verbal contract] was until – work for Ron until he died.    [f]or money up front." (L. Yonker Dep. (2/14/20), attached as **Exhibit 8**, at 42:6-43:14; *see also id*. at 47:12-48:4.)

**Bardwell Response:** Disputed.  *See DCSOF ¶¶ 96.*

27.     Bardwell's friend and neighbor Jeff Abendschein testified that Bardwell tired of working for Mr. Pratte but stayed on "[b]ecause he had a contract with him. He was supposed to work for him until Ron passed and that was their verbal agreement." (J. Abendschein Dep. (2/13/20), attached as **Exhibit 9**, at 44:15-46:8; *see also id*. at 63:10-68:19.)

**Bardwell Response:** Disputed. *See DCSOF ¶¶ 91, 97.*

28.    When Bardwell showed Abendschein the $2 million check Bardwell had received from Mr. Pratte, Bardwell described it as "[l]ike a sign-on bonus to come work for [Mr. Pratte]." (*Id*. at 44:15-46:8; *see also id*. at 77:8-78:2.)

**Bardwell Response:** Disputed. *See DCSOF ¶¶ 43, 88, 97.*

29.    Daryl Wolfswinkel, a friend of Mr. Pratte and Bardwell, testified: "[Bardwell] said: This is the deal I made with Ron, that I get treated the same as the rest of the boys, but I have to work for Ron for the rest of my life." (D. Wolfswinkel Dep. (2/13/20), attached as **Exhibit 10**, at 61:14-62:20.)

**Bardwell Response:** Disputed and incomplete. *See DCSOF ¶¶ 46, 47, 50,51-53.*

30.    Bardwell did not dispute that these conversations took place. (*See* Paragraphs 31-34 below.)

**Bardwell Response:** Mischaracterizes prior testimony. See above.

31.    For example, he testified:

> Q: Okay. So you think you may have told Mr. Ziparo, Jaime, that, hey, I'm going to work for this man for the rest of my life?
>
> MR. MARLOWE: Objection, misstates.
>
> THE WITNESS: You know, it's -- could I have said, hey, I'm so thankful and I'll do whatever this man needs, probably. But did I have a contract with him to work for Ron his whole life, I did not.

(J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 181:7-14; *see also id*. At 182:11-19.)

**Bardwell Response:** Mischaracterizes prior testimony discussing expressions of

gratitude characterizing them as obligations and incomplete. *See DCSOF ¶¶ 103.*

32.     Bardwell also testified:

> You know, could I have told him, hey, Ron made a life changing gift to me and I'm going to work for that man for the rest of my life? Could I have said that? You know, we were in opening companies. Okay. And my role in the company, in Stellar Development, was to -- and the other entities was to take care of Ron.

(J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 180:15-25.)

**Bardwell Response:** See above response.

33.     Bardwell conceded that his role in the new companies was to work for Ron: "Ron was very -- he was very demanding upon everybody. And we all agreed that if he needed something, that I would help him." (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 72:14-73:18.)

**Bardwell Response:** Mischaracterizes Bardwell's testimony. Bardwell simply agreed that among his partners, the Five-Guys, if Pratte requested assistance with some task, Bardwell would be first in line to assist Pratte. This was an internal arrangement between Bardwell and his partners, not a contract with Pratte. *See DCSOF, ¶¶ 56, 57, 84, 85.*

35.     Bardwell received no further compensation for more than twelve years of work. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 106:13-110:12.)

**Bardwell Response:** Mischaracterizes testimony by falsely implying Bardwell ever received compensation for his efforts.

37.     Bardwell claims he did it because he was "thankful." (J. Bardwell

Depo. (3/6/20), attached as Exhibit 1, at 129:17-131:4.)

**Bardwell Response:** Incomplete.  *See DCSOF ¶¶ 103.*

39.     During that time, Bardwell sought permission from Mr. Pratte regarding his work schedule. (*See* Paragraphs 40-45 below.)

**Bardwell Response:** Mischaracterizes testimony. Bardwell explained he was not, as is characterized "seeking permission," rather he was demonstrating respect and courtesy.  *See DCSOF ¶¶ 94.*

**NOTE: Paragraphs 40-45 are emails sent from Bardwell to Pratte.  Bardwell does not dispute the contents of any email or that he authored the email.  He does, however, dispute the inferences and motives Plaintiff ascribes to his emails, i.e, that he was seeking or was required to seek Plaintiff's permission.**

46.     After twelve years, Bardwell quit working for Mr. Pratte.  (J.  Bardwell Depo. (3/6/20), attached as Exhibit 1, at 166:21-169:14.)

**Bardwell Response:** Mischaracterizes testimony. Bardwell was not working "for" Mr. Pratte as Plaintiff infers.

47.     Bardwell and Mr. Pratte got in a disagreement and after that, Bardwell would not return Mr. Pratte's phone calls. (*Id.*)

**Bardwell Response:**  Incomplete and conveys false impression as to the timing of events.  *See DCSOF ¶¶ 95.*

49.     Bardwell had never seen the gift tax return until his deposition. (J. Bardwell Depo. (3/6/20), attached as Exhibit 1, at 213:5-18.)

**Bardwell Response:** Mischaracterizes testimony. Bardwell agrees he never saw the tax return prior to this litigation, however, it misstates his testimony which was he could not recall when or if he saw it before the deposition.

50.    Former Senior Attorney for the IRS Chief's Counsel Office, Tim Tarter, explained, "the filing of the Form 709 is consistent with Mr. Pratte making a conditional gift to Mr. Bardwell in exchange for Bardwell's promise of lifetime employment. Alternatively, the amounts transferred to Bardwell in 2006 resulted in the formation of a constructive trust, requiring repayment to Pratte when Bardwell failed to comply with their oral agreement." (Expert Report of T. Tarter at 3, attached as **Exhibit 17**.)

**Bardwell Response:** Bardwell does not dispute the contents of Mr. Tarter's report, he does, however, dispute the validity of his conclusions conveyed in the report.

51.    Mr. Tarter explained, 26 C.F.R. (Treas. Reg.) § 25.2511-2(a) provides clarification on this point as follows:

> The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the done at the time of the transfer. On the contrary, the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer, is measured by the value of the property passing from the donor, and attaches regardless of the fact that the identity of the donee may not then be known or ascertainable.

(Expert Report of T. Tarter at 4, attached as Exhibit 17.)

**Bardwell Response: Same as above.**

52.     Mr. Tarter explained, by reporting this transfer of wealth to the IRS on Form 709, instead of reporting it as ordinary income to Bardwell, Mr. Pratte paid significantly more tax than he otherwise would have on this transfer:

> There was certainly no attempt to evade any taxes or commit fraud by Pratte. To the contrary, Mr. Pratte walked away from a valuable business deduction and paid gift taxes on an incomplete or conditional gift to Bardwell, effectively overpaying taxes to the IRS of approximately $3,220,000. Although Mr. Pratte should be able to recover the cash and property transferred to Bardwell since his gift was conditional, he is unable to now recover the gift taxes he paid to the IRS on these transfers as reported on the Form 709.  *See* 26 U.S.C. § 6511(a).

(Expert Report of T. Tarter at 5, attached as Exhibit 17.)

**Bardwell Response: See above**

## DEFENDANTS' CONTROVERTING STATEMENT OF FACTS

Ronald Pratte's Testimony:

1.     Describing Bardwell's character, Pratte testified, "[h]is work ethic was excellent. He was very respectful, okay. That's big with me. Didn't lie to me, okay. If he made a mistake – hey, I screwed up. It was all that; all of that's huge." (*Exhibit 1 - Depo. R. Pratte, 2/27/20, Vol. 1*, 143:12-15.)

2.     Pratte further described Bardwell as "very honest," a hard worker, and someone who always did what he said he would do.  (*Exhibit 1 - Depo. R .Pratte, 2/27/20, Vol. 1*, 92:9-23.)

3.     Over a period of four-years, Bardwell and Pratte became close friends. Pratte stated that he was close to Bardwell and that he often introduced or referred to

Bardwell as his "adopted son." (*Exhibit 1 - Depo. R. Pratte, 2/27/20, Vol. 1*, 92:5-6, 143:6-8.) And until recently, Pratte considered Bardwell as part of his family. *Id*. at 142:8-19.

4.      Pratte called a meeting at the North Las Vegas Airport instructing Todd Carriere, Jaime Ziparo, Trevor Pratte, Justin Pratte and Defendant Bardwell to attend the meeting (hereinafter collectively, the "Five-Guys"). The Five-Guys did not know why Pratte had called the meeting, but all attended as instructed.  The meeting was brief lasting under one hour. (*Exhibit 1, Depo. R. Pratte, 02/27/20,* 52:10-12.)

5.      At the meeting Pratte handed each of the men an envelope containing a $2 Million check. (*Exhibit 1, Depo. R. Pratte, 02/27/20,* 23:3-5.)

6.      The Five-Guys were all surprised when they received the checks. (*Exhibit 1, Depo. R. Pratte, 02/27/20,* 23:24-24:2.)

7.      Pratte expressed his "hope" or "plan" that the Five-Guys would use a portion of the proceeds to jointly form, fund, and operate a residential and commercial building company. (*Exhibit 1, Depo. R. Pratte, 02/27/20,* 79:9-24.).

8.      Pratte testified, "I wanted a family business" and that it was his "dream" that the Five-Guys would become a premier home builder. (*Exhibit 1, Depo. R. Pratte, 02/27/20*, 142:8-19, 79:9-14.)

9.      Pratte acknowledges that, at 73-years of age, he suffers from memory deficits. (*Exhibit 2, Depo. R. Pratte, Vol. II, 08/20/20,* 44:12-15.)

10.     Pratte also acknowledges that he has trouble remembering various events because they occurred more than 15 years ago. (*Exhibit 2, Depo. R. Pratte, Vol. II, 08/10/20,* 13:25 -14:14.)

11.     Pratte cannot accurately recall when and where Bardwell allegedly promised to work for him in exchange for the monies and properties received. At varying times Pratte claimed Bardwell's promise had to have been made before the December 2005 airport meeting. At other times Pratte testified that the airport meeting was the first meeting. (*Exhibit 1, Depo. R. Pratte*, *2/27/20*, 27:9 through 28:4, 28:12 through 29:7, 132:21-22.)

12.     When Pratte testified that he may have had a meeting with Bardwell prior to the airport meeting where Bardwell may have made a promise to him, he also stated that he could not recall the meeting or what Bardwell may have said.  (*Exhibit 1, Depo. R. Pratte, 2/27/20*, 95:5-9.)

13.     When pressed further as to when Bardwell first made the alleged promise and what Pratte said to Bardwell, Pratte testified as follows:

> A:  I think [Bardwell] would have said it to me personally prior to [the airport meeting], or I would not have invited him to go on the trip.
>
> Q:  And well, didn't you testify earlier – if he did that, then he would have known that you were giving everybody a $2 million check, right?
>
> A: No, no.
>
> Q:  Well, then why would he work for you for life if he didn't even know what you were going to give him?
>
> A:  'Cause **I told him he would be taken care of.**

Q:  **That's it?  You said:  You'll be taken care of?**

A:  **That's what I recall having said.**

Q:  But he didn't know what you were willing to give him to get that
commitment back until the airport, correct?

A:  I would say if he was promised $100,000 a year, plus, you know,
incremental raises, it's as good as what he had.  So I don't know how to
answer your question.

Q:  Well, because you don't know?

A:  Because I don't know.

A:  **I didn't say:  Look, Bardwell.  I'm going to give you 10 million bucks.
You need to come to work for me for the rest of your life.**

Q:  You just said:  I'm going to take care of you.  Come work for me for the
rest of my life?

A:  Right.

Q:  Is that what you're saying happened?

A:  Pretty much, pretty much.

(*Exhibit 1, Depo. R. Pratte*, *2/27/20*, 196:21 through 198:9, 270:10-15 ("I

don't remember what I said to him.").

14.    Later in the deposition Pratte testified as follows:

Q:  Is it possible that what Jeff said is:  For this kind of gratuity – this kind of
money, I'm going to work for this man for the rest of my life?  Is it
possible that's what you heard?

A:  **I don't know what his exact verbiage was**.

Q:  You mean at the airport on 2005?

A:  **I don't remember the words he used.**

(*Exhibit 1, Depo. R. Pratte*, *2/27/20*, 302:17-23.)

15.     Pratte's second deposition focused upon his discussions with his former CFO/CPA, William Shisler. Pratte claimed he did not recall what he told Shishler. (*Exhibit 2, Depo. R. Pratte, Vol. II, 08/10/20,* 13:25-14:14.)  ("I don't remember what I told him. That was 15 years ago.").

16.     Later Pratte claimed he told Shisler that Bardwell was going to work for him for life and that was the reason Bardwell was included in the transactions.  (*Exhibit 2, Depo. R. Pratte, Vol. II., 08/10/20*, 36:1-7.)

17.     Pratte admits his recollection of events and what he may have said to Bardwell is poor at best after 15 years and that his present recollections may not be accurate.  (*Exhibit 2, Depo. R. Pratte, Vol. II*., *08/10/20*, 42:21 through 43:11.)

18.     Pratte confirmed his decision to pay the gift tax was not a subject of negotiation with any of the Five-Guys nor was it part of any "bargain."  (*Exhibit 2, Depo. R. Pratte, Vol. II*., *08/10/20*, 45:8-16, 47:22-25.)

19.     Pratte testified that Shisler was his CFO, that he trusted him implicitly, and that he was "very knowledgeable." (*Exhibit 2, Depo. R. Pratte, Vol. II*., *08/10/20*, 9:7-11, 10:12-14.)

20.     On September 12, 2018 Ron Pratte emailed Justin, Jaime and Todd.  The email read:

> "As you all know I am pursuing a judgement against Bardwell for his Breach of Contract.  What I am asking each of you is for you to sit down and think through your recollections, conversations, statements made etc concerning Bardwell's initial commitment to work for me until my demise.  I remember our meeting at

the Las Vegas Airport in 2006 and it was my understanding that I had an agreement and a commitment from him at that time and also on subsequent occasions.

The lawyers will issue subpoenas for you guys soon to take your statements regarding what your memories are of how the deal went down.  In order to save legal fees, I would appreciate it if each of you could sit down and write out your recollections of the event and email them to me in a PDF file format.  My position is that I agreed to take Bardwell into the group with you guys and his responsibility was to work for me how ever [sic] long it took until I died.  Plain and simple.  He is saying that never happened and even if it did it was not written down so it is not enforceable.  **My attorneys say verbal contracts are the same as written contracts if there were witnesses to the event.**

**So help me out here if you will please and send me your thoughts.  Thanks for your help.**
RP"

(*Exhibit 3*)

William Shisler's Testimony:

21.     In 2005, Pratte's long time CFO/CPA, "Shisler", advised Pratte that under the then applicable estate tax regime it may be in Pratte's best interest to consider reducing his taxable estate by gifting some monies or properties. (*Exhibit 4, Depo. W. Shisler, 8/14/20,* 51:13-209.)

22.     Several months later Pratte advised Shisler that he decided to make substantial gifts to various persons.  (*Exhibit 4, Depo. W. Shisler, 8/14/20,* 55:16-56:5, 100:16-25.)

23.     Pratte advised Shisler he was making gifts to five individuals, including his two natural sons (Trevor Pratte and Justin Pratte), his son-in-law (Jaime Ziparo), a man married to Pratte's niece (Todd Carrier) and Bardwell (the "Five-Guys"). (*Exhibit 4, Depo.*

*W. Shisler, 8/14/20,* 88:20-25, 104:20-24.)

24.   Shisler testified the cash and the properties transferred to the Five-Guys, including Bardwell, were represented by Pratte and intended by Pratte to be gifts. (*Exhibit 4, Depo. W. Shisler, 8/14/20,* 55:16 through 56:5, 62:16-24, 63:6-9.)

25.   Pratte never indicated Bardwell was different from any of the other gift recipients. (*Exhibit 4, Depo. W. Shisler, 8/14/20,* 86:19-24.)

26.   Shisler confirmed Pratte never told him that Bardwell had made any kind of agreement to work for Pratte in exchange for the monies and properties transferred, and that the transfers were gifts. (*Exhibit 4, Depo. W. Shisler, 8/14/20,* 87:2-9, 88:20-89:4.)

27.   Shisler testified he specifically questioned and discussed with Pratte his intention to make gifts to both Bardwell and Todd Carriere:

> "When Mr. Pratte instructed me to make the gift, I was surprised by two names on the list and I did ask him if he was sure; Mr. Bardwell and Mr. Carriere, if he was sure he wanted to do that.  And his response was:  Yes.  I want to make them – as you call them, the five guys."

(*Exhibit 4, Depo. W. Shisler, 8/14/20,* 87:18-23.)

28.   Shisler also reconfirmed that Pratte was clear that the monies and properties were intended to be gifts with no contingencies. (*Exhibit 4, Depo. W. Shisler, 8/14/20,* 88:20 through 89:4.)

29.   Shisler provided the following testimony:

   a.   He was "surprised by the magnitude of the gifts"
   b.   He stated this was a very memorable event
   c.   He discussed with Pratte the fact that the gift taxes would be exorbitant
   d.   He confirmed Pratte used the word "gifts" not "payments" or other terms

e.   He advised Pratte that he would owe less tax and could shift tax liability to both Carriere and Bardwell by placing them on payroll versus making gifts

f.   Pratte intended the gifts to be unconditional to each of the Five-Guys.

(*Exhibit 4, Depo. W. Shisler, 8/14/20,* 102:19 through 104:24, 128:2-6.)

30.   Pratte states in his complaint that he "paid taxes on behalf of Jeffrey Bardwell and his wife." (Complaint, ¶13, attached as Exhibit 5).

31.   In his disclosure, Pratte identifies the taxes he claims as partial damages in the amount of $3,378,092 as being "paid on Bardwell's behalf" and characterizes the *pro rata* portion of the gift taxes as "Bardwell's taxes." (Plaintiff's Third Amended Mandatory Discovery Responses attached hereto as Exhibit 6 at 9:9-11 and 10:24-25).

Justin Pratte's testimony:

32.   Justin Pratte testified about Pratte's suggestion that the Five-Guys use a portion of the $2 Million as seed money to build a jointly owned construction business. In Justin Pratte's view was that at the airport meeting this was little more than an "idea" and he stated:   "At that point the offer—I wouldn't call it an offer.   And it wasn't an opportunity. It was simply an idea. If you guys want to do this, great. Either way you are all going to still get these checks regardless.   (*Exhibit 7, Depo. J. Pratte, 11/26/19,* 21:2-5).

33.   Justin Pratte demonstrated his need to garner his father's approval. Specifically, when he was questioned early on his deposition, he testified that he had a good relationship with Pratte from 2005 to the present.   (*Exhibit 7, Depo. J. Pratte,*

*11/26/19,* 10:17-11:3.)

34.     Later, when confronted with an email in which he complained about Plaintiff ignoring him for years and in which he effectively begged for his father's attention and approval (something Bardwell already had in abundance) Justin admitted his relationship was strained.  (Exhibit 4 to depo and *Exhibit 7, Depo. J. Pratte, 11/26/19,* 67:14-68:24.)

35.     Justin Pratte stated "Those assets, which were real estate, were gifted to the five of us." (*Exhibit 7, Depo. J. Pratte, 11/26/19,* 37:1-4.)

36.     Justin testified, inaccurately, that all other witnesses would have heard the same statements at the airport meeting. (*Exhibit 7, Depo. J. Pratte, 11/26/19,* 44:17-21.)

37.     In Justin's view, his father only suggested they form a home building company, but he did not require the Five-Guys to use a portion of the money as seed capital for a jointly controlled home building company, they alone decided what to do with the money.  (*Exhibit 7, Depo. J. Pratte, 11/26/19,* 45:20-46:25.)

38.     Justin confirmed that if Plaintiff had decided not to transfer the various parcels or interests in real properties the Five-Guys would still have gotten to keep the $2 Million. (*Exhibit 7, Depo. J. Pratte, 11/26/19,* 52:10-24.)

Jeff Abendschein's testimony:

39.     Jeff Bardwell's former neighbor, Jeff Abendschein, first met Ron Pratte after being invited to the Dunes in or about 2005-2006.  He was not a close friend of

Pratte's just an acquaintance who, like Jeff Bardwell, shared a common hobby he described as "[e]verybody out there, you know, racing around the desert."  (*Exhibit 8, Depo. J. Abendschein, 02/13/20,* 10:4-11:3.)

40.     In October 2018, Pratte invited Abendshein to dinner to discuss his case against Bardwell and how Abendshein may be able help him and what he knew. (*Exhibit 8, Depo. J. Abendschein, 02/13/20,* 13:22-14:23.)

41.     Abendschein met both Larry Yonker and Pratte at dinner and this was the one and only time Ron Pratte invited Abendschein out to dinner since they had met and Abendschein didn't know about the lawsuit prior to attending the dinner.  (*Exhibit 8, Depo. J. Abendschein, 02/13/20,* 37:1-22; 38:11-14.)

42.     At the meeting Pratte advised Abendschein about his lawsuit against Bardwell and eventually asked Abendschein to write a letter or declaration summarizing his recollections.  (*Exhibit 8, Depo. J. Abendschein, 02/13/20,* 28:21-25; 30:20-32:9; 37:1-22; 38:11-1439:10-40:4.)

43.     Abendschein doesn't like Bardwell and less than a year before he met Pratte for dinner Bardwell had an affair with his fiancé. (*Exhibit 8, Depo. J. Abendschein, 02/13/20,* 66:24-67:8.)

Daryl Wolfswinkle's testimony:

44.     Daryl Wolfswinkle has known Ronald Pratte since the mid-80's and they are close friends.  (*Exhibit 9, Depo. D. Wolfswinkle, 02/13/20,* 10:7-14; 11:2-5.)

45.     He described Ronald Pratte as a "workaholic."  (*Exhibit 9, Depo. D.*

*Wolfswinkle, 02/13/20,* 11:13-15; 13:13-14.)

46.     His discussions with Jeff Bardwell mostly involved "[j]ust shooting the shit." (*Exhibit 9, Depo. D. Wolfswinkle, 02/13/20,* 19:18-25.)

47.     Wolfswinkle testified that he told Plaintiff's counsel "I don't know why they'd [Bardwell's counsel] want to talk to me, because I don't know a damn thing about it." (*Exhibit 9, Depo. D. Wolfswinkle, 02/13/20,* 25:20-26:12.)

48.     Wolfswinkle said that Pratte treated Bardwell like his own child and that he had seen little interaction between Pratte and his own sons.  (*Exhibit 9, Depo. D. Wolfswinkle, 02/13/20,* 34:5-10.)

49.     Wolfswinkle testified that although he never discussed business with Bardwell, he believed Bardwell was an honest and credible person. "You could go to the bank on his word."  (*Exhibit 9, Depo. D. Wolfswinkle, 02/13/20,* 39:7-17.)

50.     Although Wolfswinkle claims that Bardwell told him he had a deal with Ron Pratte, he also stated that he has no idea when Bardwell may have conveyed that information between 2006 and 2018, that he has no specific recollection of what Bardwell told him, and that it was not a serious business discussion just a social conversation. (*Exhibit 9, Depo. D. Wolfswinkle, 02/13/20,* 41:1-42:19.)

51.     Wolfswinkle testified that he cannot recall what Jeff allegedly said about his relationship with Pratte or the alleged contract. (*Exhibit 9, Depo. D. Wolfswinkle, 02/13/20,* 62:13-63:3.)

52.     Daryl Wolfswinkle was asked what he knew about the alleged agreement

and he said, "I don't know.  Other than he got treated the same as the children got treated."  (*Exhibit 9, Depo. D. Wolfswinkle, 02/13/20,* 56:24-57:6.)

53.     Wolfswinkle acknowledged that much of his testimony was based upon assumptions versus his personal knowledge.  (*Exhibit 9, Depo. D. Wolfswinkle, 02/13/20,* 60:11-14.)

Trevor Pratte's testimony:

54.     Trevor Pratte, Plaintiff's oldest son, testified that he and the other Five-Guys each received a check for $2 Million and that the check was a gift to each of them.  (*Exhibit 10, Depo. T. Pratte, 01/22/20,* 21:3-20; 55:1-8.)

55.     Trevor never heard Bardwell make any promise to Pratte.  (*Exhibit 10, Depo. T. Pratte, 01/22/20,* 56:7-20.)

56.     Trevor confirmed that Jeff's role was to both work for the entities belonging to the Five-Guys as well as assisting Plaintiff. He confirmed that they all knew Plaintiff was demanding, they all agreed to help him, and they all agreed that part of Jeff's role as their partner was to be the primary person to help Plaintiff as needed. (*Exhibit 10, Depo. T. Pratte, 01/22/20,* 88:1-9; 96:17-21.)

57.     Trevor confirmed that if Ron Pratte called Jeff, himself, or any of the Five-Guys they would all do whatever he requested.  (*Exhibit 10, Depo. T. Pratte, 01/22/20,* 113:2-16.)

58.     Trevor testified that the properties were transferred to entities the Five-Guys formed and that no individual partner had the right to cash out their interest, that

there were holding companies, two operating companies a commercial and a residential construction company, that each member invested approximately $1 Million of the $2 Million gifted to each of them by Ron Pratte.  (*Exhibit 10, Depo. T. Pratte, 01/22/20,* 23:5-26:9.)

59.     Trevor also found Jeff to be reliable, honest and to have a good work ethic.  (*Exhibit 10, Depo. T. Pratte, 01/22/20,* 42:4-21.)

Testimony of Diana Rader:

60.     Diana Rader is a licensed attorney who was previously a partner at Sacks Tierney.  She represented Bardwell in his divorce from his first wife, in or about 2009 through the Decree of Dissolution issued in 2010.  (*Exhibit 11, Depo. D. Rader, 01/24/20,* 11:12-25; 20:12-21.)

61.     Rader remembered Bardwell's case because his ex-wife filed a motion requesting $100,000 in advanced payments of attorneys' fees stating, "I'll never forget that one." (*Exhibit 11, Depo. D. Rader, 01/24/20,* 27:21-25)

62.     Ms. Rader stated, as part of her due diligence, that she verified the monies received by Jeff Bardwell from Ron Pratte were a gift and not wages or compensation for services.  (*Exhibit 11, Depo. D. Rader, 01/24/20,* 33:4-34:22.)

Jaime Ziparo testimony:

63.     Ziparo admitted that if Pratte instructed the Five-Guys, or any one of them to do something, they would do it. For example, he told them he wanted the name of the company and they changed the name per his direction.  (*Exhibit 12, Depo. J.*

*Ziparo, 12/04/19,* 67:3-11.)

64.   Jaime Ziparo testified Bardwell was trustworthy, honest, hard-working, and would do whatever it took to get a job done.  (*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 85:13-86:3.)

65.   With respect to meetings between Ron and the Five-Guys in late December 2005, Ziparo testified as follows:

"[T]here wasn't anything documented in those meetings.  I didn't take notes. We didn't sign anything.  We were handed checks and Ron gave us---laid out a plan for us. And, you know, that's what we ---all moved here under the assumption that's how life was going to be." (*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 107:23-108:3).

66.   The plan as originally discussed was to build a family business which the Five-Guys would manage, but which Ron would be involved as well with the home building business.  "Initially he—it was laid out to us that we were going to build homes together and he was going to be involved in it, you know.  Fast forward a year later and he was retired and had other interests . . . And after that, you know, we were pretty much on our own.  He wasn't involved in the process." (*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 108:25-109:9.)

67.   The "deal" as Plaintiff refers to it was less than clear and mutated over time.  Ziparo testified, "Here's what it boils down to. I mean, the deal that we made was --- you know, we talked about paying the rent [on Pratte's building where the Five-Guys officed].  Jeff was going to be part of our business.  We were going to pay for his

incidentals and whatever money we made, he got an equal share of.  And Trevor and Justin left and we didn't end up developing real estate in the way that Ron had laid it out in the beginning.  So what was proposed at the beginning and what it evolved into were two different things."  (*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 113:14-23; 129:2-6; 130:4-11.)

68.    Ziparo was clear that the $2 Million was a gift to each of them and was their money:

A: We all set out with the game plan to start a construction business.

Q:  With his money?

A:  No, it was our money.  He gave it to us.

(*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 130:15-18.)

69.    Ziparo acknowledged that the airport meeting happened so long it was hard to remember:

"I mean it happened so long ago, it's hard to---all I remember for the most part is him giving us a check and talking about properties being signed over to us, talking about starting a construction company all of us moving to Phoenix, starting a construction company in Phoenix and we'd be developing land and building houses and maybe doing some commercial development as well….he said—he explained why he was bringing Jeff in and what Jeff's role was going to be in the process, that he would be working solely for him."  (*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 199:9-24)

70.     Ziparo remembered that Pratte indicated he, Justin and Trevor may inherit monies in the future, but Bardwell and Carriere was only getting these monies. (*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 203:6-119). Ziparo clarified that the $2 Million they each received was a gift and again stated it was difficult to remember accurately due to the passage of time:

Q:  So, when you got your check, what did you view it as?

A:  A gift.

Q:  And how do you think that everybody else viewed their checks?

A:  The same; how else do you?

Q:  And what about the property that—was the specific property discussed at the airport meeting or was it more talking about the companies and the plant, maybe setting up companies?  Was it more in theory or—I mean were there specifics discussed about the companies?

A:  There were not specifics discussed about the companies.  The checks, the rent distributions, Jeff working solely for Ron, construction company.  I mean those are the key points that I remember.  It was a long time ago.

(*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 205:20-206:10)

71.     Ziparo provided Pratte a written statement in late 2018 pursuant to Pratte's email and request and also did a second statement because Ron asked him to do so and he and Carriere and Justin exchanged and discussed their statements.  (*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 240:5-241:12).

72.     Later when again questions about the airport meeting Ziparo stated:

Q:  Would you agree that the meeting was somewhat confusing at the airport?

A:  Oh, yeah.  I mean, confusing to a certain degree.  Ambiguous more than

confusing.

Q:  As to where things were and where they were going when you all left the airport?

A:  Yes.

(*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 246:2-16)

73.     In response to Mr. Collins' questions Ziparo testified as follows:

Q:  And do you remember anything else that he [Ron] said to you or Jeff?

A:  No, not necessarily.

Q:  So when he handed Jeff that check, you don't have any independent recollection of what he might have said to him or what Jeff said to him?

A:  Other than the---what he had lined out as far as Jeff's role would be, working solely for Ron.

Q:  You remember him saying that to Jeff as he gives him the check?

A:  He didn't say—I already said that he didn't say anything specific to any of us when he handed the checks.  It was a general discussion.  You know, pretty much a general discussion."

(*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 251:11-24).

74.     Ziparo reiterated his view that the check was a gift to each of the men:

Q:  You said that you – at one point in response to Mr. Connelly's questions, I have in my notes that you said that you viewed the check as a gift when you received it at the North Vegas airport meeting?

A:  Yes.

Q:  Do you remember saying that?

A:  Yes.

Q:  And then you also said that you think everyone else did, too.  Do you

remember saying that?

A:  Yes.

Q:  Is that accurate?  That's your recollection, that you think everyone else viewed it as a gift?

A:  I would assume.  How else would you view it?

Q:  Okay.  Do you think that Mr. Bardwell had any reason to view it as anything other than a gift?

A:  I mean, other than the fact that he was the only one that had another commitment on the table, which was that he was going to be working for Ron personally, you know.  Where the rest of us – like I said, we didn't really know what we were going to be doing yet.

Q:  Okay.

A:  So –

Q:  So you would say that Mr. Bardwell had been presented with a commitment that he needed to honor it in order to receive that money; is that your testimony?

MR. CONNELLY:  Object to form.

THE WITNESS:  Yes.

Q:  BY MR. COLLINS:  Let me ask you this.  When you said that he had a commitment, what did you mean?

A:  Well, like I said, <u>I don't know the specifics of what their deal was that they discussed</u>.  All I remember is, from that meeting, Bardwell is going to be working for me.

(*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 258:1-259:8)(emphasis added)

75.     Ziparo admitted that much of his understanding of what Pratte may have expected was based upon assumption he and the others had made:

Q: BY MR. CONNELLY:  I understand.  But these are all assumptions, correct?

A: Yes.

Q: Even on your part?

A: Yes.

Q: I'm going to ask one last question.  We've talked a lot about, you know, how Ron was talking, what he wanted.  Did you ever hear Jeff say anything back to Ron at the North Las Vegas meeting about these assumptions or these things that were kind of floating around there by implication?

A: I don't remember that.  I don't remember any of the – like, specific conversations that anyone else had at that meeting.

Q: So what about the subsequent meeting at Ron's house?  I mean, as best you remember, it happened at Ron's house, I get it.  But do you remember any specific promise Jeff made there?

A: No.

Q: So your recollection is that whatever Ron said and whatever assumptions you and the other parties might have left with, you don't recall any commitment back from Jeff Bardwell at either of those meetings back to Ron?

A: The only – no.

(*Exhibit 12, Depo. J. Ziparo, 12/04/19,* 264:16-265:15)

    Todd Carriere testimony:

76.     When they gathered at the North Las Vegas airport they were standing in a circle within a few feet of each other. (*Exhibit 13, Depo. T. Carriere, 12/05/19,* 22:3-15)

77.    Mr. Carriere confirmed that everyone was surprised when they received the checks at the airport meeting in December 2005. (*Exhibit 13, Depo. T. Carriere, 12/05/19,* 21:16:22; 16-23:5).

78.    Mr. Carriere was asked what Mr. Pratte said when he handed out the checks.  "He didn't say much.  He just handed us the checks and we just looked at it and he was just looking at our faces." (*Exhibit 13, Depo. T. Carriere, 12/05/19,* 21:23-2).

79.    When questioned if he remembered anything specific Plaintiff said to any of the other persons at the airport meeting Carriere responded: "He's a man of few words.  He handed them out."  (*Exhibit 13, Depo. T. Carriere, 12/05/19,* 28:12-15)

80.    Mr. Carriere stated that the check he received was a gift to he and his wife and that it was also a gift to the other four men as well.  (*Exhibit 13, Depo. T. Carriere, 12/05/19,* 72:16-25).

81.    Carriere also received an email from Ron Pratte in late 2018 asking him to write down his recollection of events and that Pratte later asked him to expand on his single paragraph statement which he did. (*Exhibit 13, Depo. T. Carriere, 12/05/19,* 182:3-18).

Q:  Well, and I'm trying to understand what you know about the deal from personal firsthand knowledge, not implications, not what you thought, not what you can guess.

A:  I can tell you what Jeff told me.

Q:  I want to know what Ron said and what Jeff said back to him, if anything.

A:  Their conversations were their conversations.

Q:  So you don't know – you weren't privy to any of those conversations?

A:  Other than the ones that Jeff strictly works for Ron.

Q:  I'm asking about conversations when Ron was speaking to Jeff –

A:  No.

Q:  -- or Jeff speaking to Ron.

A:  Just Jeff speaking to me and Ron speaking to me.

(*Exhibit 13, Depo. T. Carriere, 12/05/19,* 190:17-191:8)

82.     Carriere testified that although he recalled Pratte used the word "gone" and the word "done," he acknowledged it could have meant something other than Pratte's death. (*Exhibit 13, Depo. T. Carriere, 12/05/19,* 196:11-19)

83.     Carriere specifically stated that he didn't hear Pratte say until he was dead. (*Exhibit 13, Depo. T. Carriere, 12/05/19,* 197:17-24)

84.     Carriere acknowledged that Jeff's role in the company was to keep Ron occupied.  (*Exhibit 13, Depo. T. Carriere, 12/05/19,* 209:14-22)

85.     Carriere admitted that at no meeting did he ever hear Jeff commit to Ron to work for him for life (*Exhibit 13, Depo. T. Carriere, 12/05/19,* 248:1-10).

Jeffrey Bardwell testimony:

86.     Ron told Bardwell that he wanted him to travel to the December 2005 airport meeting because he wanted to treat him like one of his kids.  (*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 42:1-5)

87.     Bardwell asked him what he meant by telling him he wanted to treat him like one of his kids and he said Pratte appeared irritated at the question and responded that he could do whatever he wanted with his money.  (*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 51:2-12)

88.     Bardwell did not recall telling Abendschein about receiving the check or showing him the check and stated that he was not the kind of guy to show off something like the $2 Million check.  He also specifically denied saying anything like it was a "signing bonus" or a "down payment."  (*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 67:1-68:20)

89.     Bardwell stated this his agreement among he and his partners (not Ron Pratte) was that he would do whatever Ron needed to keep Ron off everyone else's back.  (*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 73:2-18)

90.     Bardwell denied Ron ever stating that Jeff worked only for him.  (*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 73:23-25; 76:4-8)

91.     Bardwell denied making any "deal" with Pratte.  (*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 75:7-9)

92.     Bardwell testified, "I wasn't his employee where you have—you clock in, you have to work, you get---I mean, I was there helping him." (*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 106:10-12)

93.     When questioned about whether he would ask permission to take time off.  Bardwell's response was, "You know, out of respect I would tell him, hey, I'm

going on vacation, you know.  And I was always – you know, I was Ron's employee

with Pratte Building Systems, okay.  So we had that relationship.  And it kind of just –

I kept it like that in the respects of the vacation.  You know, I didn't know what he had

planned, what he was doing.  I was there, you know, helping him.

So, I didn't just want to disappear.  So would I ask him?  I would email him and

say, hey, I'm going on vacation or, hey, how do these days look, is that okay?  You

know, and if he truly, truly needed me, and I didn't have to go on vacation or the

camping trip or whatever it was I was doing, I wouldn't go." (*Exhibit 14, Depo. J.*

*Bardwell, 03/06/20,* 110:15-111:2)

94.	With respect to the series of email cited by Plaintiff wherein Bardwell

was advising Ron of times he wasn't showing up or was planning a "vacation"

Bardwell testified as follows:

> Q:  You would agree with me that in the August 13, 2014 email you were asking
> Mr. Pratte for time off, right?
>
> A:  Well, I'm in a sense asking him if these days are okay with him due to the
> fact that I always asked him.  You know, I didn't-- I wasn't his employee. I
> didn't have a number of vacation days that I was able to take.  But I didn't
> just want to leave, and leave him high and dry.

(*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 134:19-135:1)

Bardwell further explained:

"There is a certain way you have to talk to Mr. Pratte. Okay. You can't-- he's the

boss of everything, and you can't say, hey, I'm taking these days off. If you say, hey,

I'm taking these days off, then he puffs up and says no, you're not. So there's a certain

way you have to ask the man. So if you're trying to read into it that I was his employee and Sir, can I have this number 30 -- you know, my number is -- this day off, this will be my number seventh day, it didn't happen like that." (*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 137:16-25)

95.     Bardwell also testified about their disagreement in early 2018 and Ron's refusal to speak or communicate with Bardwell leading to his eventual cessation of contact with Pratte:

A.  I was trying to get Ron to talk to me when I would go down to the dunes in February.  When I came back – because I think I was gone a week, then I came back.  And Ron would not talk to me.  He wouldn't look at me.  Okay.  That's okay.  But I was still going down there.  The whole month of February I still went down there, because it was important to me that I talk to Ron.

So I even had a conversation with his brother.  I said to Don, you know, Ron needs to talk to me.  He's totally avoiding me.  You know, I would talk to Ron face-to-face just like this.  Ron, we need – and he would go the other way.  It was like an opposite side of a magnet.

So I told Don; Don, I'm just going to leave at the end of the month, never come back.  If he doesn't want to talk to me, then he doesn't want to talk to me.  Okay.  There's nothing I can do.

So I went down, like I told you, that whole month.  So the first week I took off, the next three weeks I continued – I went down there for I don't know how many days

of the week I went down.  I went a few days.  But it was to the point, it's like why am I even coming down here.  This man doesn't even want to talk to me.

So I loaded up on the last week that I made my decision, I loaded up everything that I had down there.  My sand rail, my RZR, my parts.  I went home.  And as I went home, I can't remember if it was a Wednesday or Thursday, one of those two days, went home.  And Ron called me the next day.

Okay.  And I answered the telephone.  Hello.  And he said, hey, Jeffy, we need to talk.  I said, yeah, we need to talk.  I go, do you want me to go to your house?  Do you want me to go to the hangar?  Would you like me to go to the office?  Let's just meet at the office tomorrow at 8:00.  Okay.  No problem.  I'll see you then.

Okay.  I go to the office at 8:00 in the morning.  Ron doesn't show up.  9:00, Ron doesn't show up.  10:00, Ron doesn't show up.  10:30 I leave.  And at that point when I left I was – I was done.  I was totally done.  (*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 167:14-169:9)

96.     Bardwell Specifically denied telling Yonker he made a deal or had a verbal contract with Pratte:

Q.  Do you ever remember telling Mr. Yonker that you – you were going to work with – Mr. Pratte for the rest of your life – rest of his life?  I'm sorry.

A.  I do not.

Q.  Do you ever remember telling Mr. Yonker that you had a contract or a deal with Mr. Pratte?

A.  I do not.

(*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 180:3-9)

97.     Bardwell also denied making any such statements to Abendschein:

Q.  Do you ever remember telling Mr. Abendschein that you had a contract or
deal with Mr. Pratte?

A.  No.

(*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 180:10-12)

98.     Bardwell further clarified:

THE WITNESS:  You know, it's – could I have said, hey, I'm so thankful and

I'll do whatever this man needs, probably.  But did I have a contract with him to work

for Ron his whole life, I did not. (*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 181:11-14)

99.     Bardwell does not recall discussing his activities with Pratte with Yonker:

Q.  Do you remember complaining to Larry Yonker about work that Ron was

having you do?

A.  I do not.

(*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 187:22-24)

100.     Bardwell specifically refuted Pratte's testimony of what occurred at the

2005 airport meeting:

Q.  Is it your testimony that at the airport, Ron Pratte didn't tell everyone that
you were just to work for him?

A.  He did not.

Q.  Do you just not remember, or do you remember that that didn't happen?

A.  No, that did not happen.

(*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 190:18-24)

101.   Bardwell also denied ever having a deal to work for Pratte for the rest of

Pratte's life:

> Q.  Okay.  All four of them testified at various times that you had a deal with
>      Mr. Pratte to work for him for the rest of his life?
>
>      MR. MARLOWE:  Objection, misstates.
>
> BY MR. COLLINS:
>
> Q.  Are they wrong?
>
> A.  I did not have a deal, a lifetime deal.
>
> Q.  Okay.  So they're wrong, right?
>
> A.  They're wrong.
>
> Q.  Okay.  What reason do they have to lie?
>
> A.  I don't know.  You know, they are his family.

(*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 232:1-11)

102.   Bardwell stated that he was not operating under a contract when he

ceased affiliating with Pratte in 2018:

> Q.  Okay.  Your testimony is in January 2018 you didn't have a contract to work
>      with Mr. Pratte, right?
>
> A.  Right.

(*Exhibit 14, Depo. J. Bardwell, 03/06/20,* 232: 23-25)

103.  In September 2015, long before there was any dispute between Pratte and

Bardwell, Bardwell wrote an email to Pratte, the subject matter of which reads "Happy

Birthday." Bardwell's email reads as follows:

> Ron,
>
> I hope this day finds you well. I want to wish you a Happy Birthday. There is nothing in this world that I could buy for you that you can't buy yourself. As we all know. What I can give you is my loyalty, my trust and my dedication which we all know you can't buy. You are a man that has changed my life forever. I will be forever grateful. Please enjoy your day as life is too short. I love you.
>
> Jeff

Pratte responded the following day:

> Thank you Jeff that means a great deal to me.  Love you too.

(Attached hereto as Exhibit 15.)

> Dated this 16th day of February, 2021.

By: /s/ Thomas J. Marlowe
LAW OFFICES OF THOMAS J.  MARLOWE
Thomas J. Marlowe
6720 North Scottsdale Road, Suite 305
Scottsdale, Arizona  85253
Phone: (602) 957-1993
Tmarlowe2425@outlook.com

## CERTIFICATE OF SERVICE

I, Thomas J. Marlowe, hereby certify that on February 16, 2021, I electronically transmitted the foregoing document with the Clerk's Office using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant(s) in this case and emailed a copy of this document to the following:

Gregory B. Collins
Eric B. Hull
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
gbc@kflawaz.com
ebh@kflawaz.com