*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Ronald H. Pratte,                            )
                                             )
        Plaintiff,                           )
                                             )
vs.                                          )  No.
                                             )  2:19-cv-00239-
Jeffrey Bardwell and Fanny F.                )  PHX-GMS
Bardwell, husband and wife,                  )
                                             )
        Defendants.                          )
                                             )



VIDEOTAPED DEPOSITION OF RONALD PRATTE

Scottsdale, Arizona
February 27, 2020
9:30 a.m.




REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1  asked them if they were interested, and they all said

2  absolutely.

3     Q.   Okay.  And this is the same meeting where you

4  gave each of them a check for $2 million, correct?

5     A.   Yes, sir.

6     Q.   Okay.  So prior to giving them that check, you

7  were speaking to all of them as a group, correct?

8     A.   Yes, sir.

9     Q.   Okay.  And if you could -- and, look, I know

10  we're going back a ways.  I mean, this is '05.  It's 15

11  years ago.  I get it -- or 14.

12     A.   I was a lot younger then.

13     Q.   Weren't we all?

14          You know, leading up to that point with the

15  checks, do you remember anything you said to them as you

16  handed out the checks or how that happened?

17          That's a little awkward and let me, if I

18  could, rephrase.  Did you give each of the five fellows

19  their checks and then say something to them, or did you

20  hand them to them individually and make a particular

21  comment to each one as you were going around the group?

22  Or, if you recall, what happened?

23     A.   I don't recall how -- what the sequence was.

24     Q.   Okay.  Did the five fellows appear surprised --

25  happily surprised when they opened these envelopes?

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    A.    I would say that would be an honest statement,

2  yes, sir.

3    Q.    Sure.

4          Because -- and you were looking for whatever

5  their reaction was going to be, correct?

6    A.    Not really.

7    Q.    Well, did they -- did the five fellows know that

8  you were going to be giving them a $2 million check?

9    A.    They did not.

10    Q.    So it was a surprise -- it would be a surprise

11  for them.  All right.

12          So you -- are there any -- if you recall,

13  did you make any comments that you wanted to make before

14  you handed out the checks to them about what it

15  represented or why you were giving them each $2 million?

16    A.    I told them that -- I said -- they didn't -- I

17  was giving them the money to start this perceived company

18  that we were talking about and that they should decide

19  amongst themselves what amount each person should put in

20  to start the company and that was basically it.

21    Q.    Did you leave that up to them?

22    A.    Absolutely.

23    Q.    So, at some point, you were contemplating or

24  hoped that the five of them would get together and form a

25  company to work together?

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    be a gift to each of them, didn't you?

2                MR. COLLINS:  Objection, compound.

3                Go ahead.

4                THE WITNESS:  To my family, not to Jeff

5    Bardwell.

6        Q.   BY MR. CONNELLY:  Okay.  So -- and when you say

7    your family, who are referring to?

8        A.   Trevor, Justin, Jaime and Todd.

9        Q.   So to those that you considered family, it was a

10   gift?

11       A.   Yeah, I would say that.

12       Q.   An unconditional gift?

13       A.   Absolutely.

14       Q.   And what was it -- what was your understanding

15   with respect to the $2 million you gave Jeff Bardwell?

16       A.   It was a verbal contract that Jeff Bardwell would

17   work for me until I died.

18       Q.   And --

19       A.   That's --

20       Q.   Go ahead.

21       A.   -- exactly the way it was stated to Jeff

22   Bardwell.

23       Q.   And who stated that to him?

24       A.   I did.

25       Q.   And where did that occur?

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    A.    Well, like I said earlier, it had to have

2  occurred, although I don't remember it, prior to him going

3  to Las Vegas, or I can't imagine that he would have been

4  on the plane and in the meeting.

5    Q.    Why do you say it had to have occurred prior to

6  Las Vegas?

7    A.    Well, I just -- I just -- I don't remember having

8  a meeting with him about it prior to that.  But common

9  sense tells me that he wouldn't have been at the Las Vegas

10  meeting if there had not been some kind of prior agreement

11  to going to Las Vegas.

12    Q.    But, as you sit here today, you don't recall any

13  such meeting between and you Jeff?

14    A.    I do not.

15    Q.    And, as you sit here today, you don't recall any

16  such oral promise at the Las Vegas airport from Jeff to

17  you or you to Jeff?

18    A.    Him saying:  Yes, I agree to do that?

19    Q.    Well, you'd have to say something to him first so

20  he knew what he was agreeing to.

21    A.    Exactly.

22    Q.    Do you recall talking to Jeff in front of the

23  others at the Las Vegas airport about a promise to work

24  for you for life?

25    A.    I told the whole group:  Everybody needs to

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1   understand that Bardwell's going to work for me.  He's not

2   going to be working as part of this company that you guys

3   are going to form.

4           And everybody agreed to that, including

5   Bardwell.

6       Q.   Okay.  Is that exactly how you remember it?

7       A.   Yes, sir.

8       Q.   And, at that point, this -- the company or

9   companies that you were hoping or contemplating that the

10  five of them might form, nothing had actually been done

11  yet to form any such entity or entities, had it?

12      A.   Nothing at all.

13      Q.   So this was all -- well, maybe more of

14  conjecture, but it was just contemplated.  There wasn't --

15  nobody had taken any substantive action to form those

16  companies?

17      A.   No, sir.

18      Q.   In fact, weren't -- weren't the first of those

19  companies formed some several months or more later in the

20  spring of '06?

21      A.   I don't know exactly when they were formed,

22  because I didn't have anything to do with it.

23      Q.   Okay.  Do you know -- well, do you know who did

24  form those companies?

25      A.   I think Bill Shisler did, but I'm not for sure on

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    Systems?

2        A.    I did.

3        Q.    So would it be fair to say the Pratte Building

4    Systems, as the name would suggests, was more involved in

5    building residential and -- well, was it limited to

6    residential?  Did you do residential and commercial?

7        A.    Pratte Development did commercial -- or

8    commercial early on in the early '70s, but after that ...

9        Q.    You were -- it was more focused on residential?

10       A.    Yes, sir.

11       Q.    Okay.  And the Pratte Development Company was

12   another entity, but it kind of backed up that building

13   company.  They worked together, didn't they?

14       A.    No.  Pratte Building Systems came to be when

15   Pulte became a partner.

16       Q.    Ah, okay.  And that was, what, in the early

17   2000s?

18       A.    It was 2002 or somewhere in there.

19       Q.    Okay.  And they actually ended up -- Pulte

20   actually ended up buying your company, correct, or

21   companies?

22       A.    That was the deal going in, yes, sir.

23       Q.    All right.  And do you remember when that

24   occurred, when they actually acquired you?

25       A.    December of '05.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1   public company.  My half was private.

2        Q.   That's a good point.

3             And your position in the company was

4   private.  Pulte, of course, is a public -- was a

5   publicly-traded company at the time.

6        A.   Still is.

7        Q.   Still are, right?

8        A.   Still is.

9        Q.   Okay.  So all they did was, when they acquired

10  you, they just increased their position in that industry

11  by adding your half of the, you know, your interests in a

12  joint venture-type position to theirs, right?

13       A.   Yes, sir.

14       Q.   Okay.  Referencing Pratte Building Systems, if

15  you recall, and let's call it -- at its peak, how many

16  employees do you think Pratte Building Systems had at any

17  given time at its height?

18       A.   The number I've been told was between 4,800 and

19  5,200, somewhere in that range.

20       Q.   All right.  And that number would fluctuate over

21  time, but is that a number that was fairly commensurate

22  over time until you sold the company?

23       A.   Well, define "over time."

24       Q.   Sure.

25             I mean, you wouldn't be 4,800 to 5,200 for

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    Q.   Well, a part of it.  And thanks for answering it

2  that way.  That's helpful too, because it kind of defines

3  it a little bit better.  But there were employees on

4  Pulte's side and this is when you were join -- you joined

5  with them.  And -- but you're still running your own

6  company as -- with Pulte.  You're kind of in a JV.  Is

7  that a fair way to describe it?

8    A.   Yes, sir.

9    Q.   But there were employees on your side, too.

10    A.   They're all on my side.  They only had one person

11  come into my company.

12    Q.   Okay.  How many employees, you know, did Pratte

13  Industries employ at that time, before you sold?  Just

14  best guess.

15    A.   3,000 maybe.

16    Q.   Okay.  Do you remember -- again, you have --

17  again, I may have asked this before and I think you said

18  it occurred in increments, but do you remember the range

19  that Pulte acquired you for at -- back in '05 or what

20  generally was the deal?  What were they to pay you for the

21  other -- we'll call it the other half of the company where

22  Pulte subsumed Pratte Industry?

23    A.   It was a complicated formula based on earnings,

24  their projections and -- I couldn't tell you a specific

25  number.  It was never defined specifically.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    expecting to be able to come to you for advice.

2              And I use the term mentorship and I use that

3    in terms of both your professionalism and affection for

4    these guys and that you wanted them to be successful.  Is

5    that also fair?

6         A.   Uh-huh.

7         Q.   I'm sorry?

8         A.   Yes.

9         Q.   And that was your plan.  You were going -- you

10   were going to help them.  I mean, you were going to do

11   these things -- if they came to you and asked for your

12   help, you were there to help them.

13        A.   That was my dream, that they would become a

14   premier homebuilder, because they certainly had the ...

15        Q.   And who had better knowledge about how to get

16   there, quite frankly, than somebody like you that had been

17   there in good times and bad times and survived and still

18   grew?

19        A.   Or them.  They were all very --

20        Q.   Understood.

21        A.   -- very knowledgeable.

22        Q.   You know what, and that's certainly a nice way to

23   frame it.  They helped you get there.  Is that also fair?

24        A.   Everybody helped me.

25        Q.   Okay.  And very, you know, nice of you to say.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1            And Jeff, at that time, as we understand it

2    from prior depositions, had been brought in, trained in

3    Nevada, and then -- for six or eight weeks or whatever it

4    was, and then -- when I say "trained," I think he already

5    had familiarity with the lumberyards.  But you had certain

6    programs and things.  I mean, you kind of mentioned those

7    earlier -- you did or Pratte Industries.

8            Jeff got brought in to develop or improve or

9    enhance, or however you want to view it, the Phoenix

10   lumberyard, which was his responsibility in Phoenix as --

11   correct?

12       A.   I don't know about improve or enhance or

13   programs, but he was hired to run the Phoenix lumberyard.

14       Q.   Yeah.  Well, if I told you that Jaime Ziparo told

15   us that -- you know, I don't want to say the lumberyard

16   was nonexistent, but they wanted to build a new lumberyard

17   in Phoenix to support the tremendous growth that was

18   happening.  Would you disagree with that?

19       A.   Not at all.

20       Q.   Okay.  So that's what I'm telling you he did.

21       A.   Okay.

22       Q.   And I'm telling you others said that's what he

23   did.

24       A.   Okay.

25       Q.   But I want to know what you remember, obviously.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    A.    If he said it did, I'm sure it did.

2    Q.    Okay.  But wasn't it during those times together

3  that you guys -- that you and Jeff Bardwell actually got

4  to know each other better and actually became friends?

5    A.    There was a time period where Jeff and I were

6  very close and we became friends.

7    Q.    Okay.

8    A.    But I don't know exactly when that was.

9    Q.    Oh, all right.  That's fine.  That's a good way

10  to describe it.

11          How -- how did you guys become close and

12  become good friends?

13    A.    I just gained a lot of respect for the guy,

14  because he was just an excellent worker.  He did what -- a

15  man of his word.  Said -- did what he said he was going to

16  do.  That's kind of what --

17    Q.    Honest guy?

18    A.    Very honest, very honest.

19    Q.    And I think you just said it, but hard worker?

20    A.    Absolutely.

21    Q.    Not against putting in whatever the hours were

22  required?

23    A.    Absolutely.

24    Q.    So he would appear -- and I'm speaking from your

25  perspective now -- to be a good choice to line up with

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1          (Mr. Marlowe returned to the proceedings.)

2     Q.   BY MR. CONNELLY:  And that's what everybody

3  received at the airport, right?

4     A.   Yes, sir.

5     Q.   Okay.  And it's your testimony that Jeff must

6  have made a promise to you prior to that; you just don't

7  remember when or what was said specifically in that

8  promise, correct?

9     A.   That's correct.

10     Q.   But you've also testified that you remember

11  saying in front of the five of them that Jeff was going to

12  continue working for you and he was doing it because you

13  were giving him a $2 million cashier's check?

14     A.   Yes, sir.

15     Q.   And you're confident that the other -- well, not

16  only Jeff, but the other four individuals would have heard

17  this, where you were all situated and talking, correct?

18     A.   Yes, sir.

19     Q.   Because you wanted them to all hear it?

20     A.   Yes, sir.

21     Q.   So if several of those people testified that they

22  never heard such a request from you or a promise from

23  Jeff, how would you explain that?

24     A.   I wouldn't know how to explain it.  How would you

25  explain it?

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1  A.    -- and keep going?

2         That was my hope and dream in this thing.

3  And they were all very bright and very -- you know, not

4  afraid of work.  And that's what it takes.

5  Q.    Okay.  And if for whatever reason one or more of

6  them decided, that's not what I'm going to do, they could

7  just keep the 2 million and be gone, except for Jeff?

8  A.    Yes, sir.

9  Q.    Because for the $2 million, it's your testimony

10  that you gave that to him to guarantee his working for you

11  for the rest of your life?

12  A.    I gave him that and much more than the 2 million.

13  Q.    Well, we're at the airport now.

14  A.    Right.

15  Q.    What did you give them at the airport --

16  A.    I gave them 2 --

17  Q.    -- besides the 2 million?

18  A.    I gave them $2 million at the airport.

19  Q.    That's all you gave them.

20  A.    Well, I gave them a commitment that the rest of

21  the stuff would come, if that's what you're asking.

22  Q.    Did you describe what that was going to be?

23  A.    I told them I was going to give them the

24  properties that I -- the Pulte properties.

25  Q.    And did you describe specifically what those were

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1   and when you were going to transfer them?

2       A.   They knew what they were, the yards that Pulte

3   occupied and --

4       Q.   But you didn't specifically state what they were?

5       A.   I don't remember if I stated it.

6       Q.   So at the airport the one thing that Jeff

7   Bardwell had in his hand from you was the $2 million?

8       A.   That's correct.

9       Q.   There was no writing from you committing any

10  other properties or assets at that time, were there?

11      A.   There was not.

12      Q.   And if you decided not to transfer those

13  properties, not one of the five fellows at that meeting

14  could have said:  Well, you failed to give us the rest of

15  what you promised us?

16      A.   That would be my understanding.

17      Q.   So, if that's the case, as you've just stated it

18  is, Jeff was promising to work for you for the rest of

19  your life for the $2 million, because that's all he had in

20  his hand at that time, correct?

21      A.   I don't know how to answer your question.

22      Q.   Well --

23      A.   You're going to have to ask it.

24      Q.   -- that's your complaint.

25               So I'm asking what was your intent at the

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1            I suppose they could have.   I don't know.

2      Q.   But would you have felt the same about two of

3  them trying to go forward as opposed to all five?

4      A.   No.   They all five had their separate talents

5  that gelled well together in my mind.

6      Q.   So that made sense to you, that if all five

7  formed the company, that it made sense then that you would

8  have transferred the assets as you did?

9      A.   That's correct.

10     Q.   So is it probable that if you couldn't get those

11 five to agree going forward with these later-formed

12 entities and you only ended up with Jeff, Trevor and

13 Justin, would you still have transferred the money just to

14 those three to form this building company and these other

15 entities?

16            MR. COLLINS:   Objection, speculation.

17            Go ahead and answer.

18            THE WITNESS:   They all agreed, so that

19 wasn't an option.   They all agreed at our first meeting,

20 so it wasn't a consideration.

21     Q.   BY MR. CONNELLY:   So what was the first meeting?

22     A.   The Las Vegas airport.

23     Q.   Okay.   Well, now you're saying they all agreed to

24 do what?

25     A.   They all agreed that they were going to get

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1  '05?

2       A.    Yeah.

3       Q.    Okay.  But you didn't invite any of these other

4  people who at the time you considered to be your key

5  people in the company when things were still -- when you

6  were running things, you didn't invite them.  You invited

7  who you invited.

8       A.    I didn't want a company.  I wanted a family

9  business.

10      Q.    All right.  And you thought of Jeff as family at

11 the time; didn't you?

12      A.    Absolutely, absolutely.

13      Q.    Because my question is, you know:  Why Jeff?  Why

14 did you -- out of all of these people you had access to,

15 that helped you build this company, how did Jeff get

16 included with your two sons and the other two family

17 members to get invited?

18      A.    He's just -- he was an honest, hard-working,

19 good, family man.  And that's probably how he got invited.

20      Q.    And you were able to make that judgment call on

21 him in that time period we've been -- I've been asking you

22 about, '02, '03 '04?

23      A.    I don't remember the exact dates and you keep

24 asking me that, okay.  That actually happened.  Okay.

25 Because he was part of the five guys.  Exactly when that

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1  evolved, I don't know the answer to that.

2      Q.   We've had some people that have indicated, in

3  line with what you're telling us now, that you considered

4  Jeff kind of a surrogate son, to an extent.

5      A.   He was a good kid.

6      Q.   And, actually, from time to time would call him

7  son in front of other people, other employees?

8      A.   I'd say:  This is my adopted son.

9      Q.   And is it fair to say that that was -- well,

10  based upon your view of his work ethic and his efforts on

11  your behalf, is that why you would refer to him that way?

12      A.   His work ethic was excellent.  He was very

13  respectful, okay.  That's big with me.  Didn't lie to me,

14  okay.  If he made a mistake -- hey, I screwed up.  It was

15  all that; all of that's huge.

16      Q.   Okay.  In that vein -- and I'm kind of going off

17  point here -- do you remember an incident with an engine

18  that was missing from the company?

19      A.   I do.

20      Q.   Did you come to determine who actually took that

21  engine out of the company?

22      A.   I didn't know.

23      Q.   Did it come back?

24      A.   It came back.

25      Q.   How long was that engine missing?

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1     A.    Well --

2     Q.    Yes.

3     A.    -- that's what you asked me for, was my view of

4  things.

5     Q.    So you're saying that these things that you gave,

6  the $2 million and then the later assets -- let me

7  rephrase.

8           The promise -- what you said today and how

9  you remembered it, the promise from Jeff was made to work

10 for you for life at the December 5th meeting or prior; is

11 that accurate?

12    A.    I would -- that would be my recollection, yes.

13    Q.    Okay.  Well, do you remember him saying that in

14 front of anybody else after December of '05?

15    A.    I think he said it to lots of people after

16 December '05.

17    Q.    With you there?

18    A.    Not with me there, no, sir.

19    Q.    I see.  So the time that he said it to you in

20 front of anybody else just happened to be all family

21 members.  If it occurred, would have been at certainly at

22 the airport in December of '05, correct?

23    A.    I think he would have said it to me personally

24 prior to that, or I would not have invited him to go on

25 the trip.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1   Q.   And, well, didn't you testify earlier -- if he

2   did that, then he would have known that you were giving

3   everybody a $2 million check, right?

4   A.   No, no.

5   Q.   Well, then why would he work for you for life if

6   he didn't even know what you were going to give him?

7   A.   'Cause I told him he would be taken care of.

8   Q.   That's it?  You said:  You'll be taken care of?

9   A.   That's what I recall having said.

10   Q.   Well, it seems like you were already taking

11   pretty good care of -- was he making over 100,000 a year?

12   A.   Yeah, but there's a big difference between

13   100,000 and what he got out of this deal.

14   Q.   There sure is.

15        But you're claiming that he promised you to

16   work for life?

17   A.   That's correct.

18   Q.   But he didn't know what you were willing to give

19   him to get that commitment back until the airport,

20   correct?

21   A.   I would say if he was promised $100,000 a year,

22   plus, you know, incremental raises, it's as good as what

23   he had.  So I don't know how to answer your question.

24   Q.   Well, because you don't know?

25   A.   Because I don't know.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    Q.   So you didn't tell him prior to December --

2    A.   I didn't say:  Look, Bardwell.  I'm going to give

3 you 10 million bucks.  You need to come to work for me for

4 the rest of your life.

5    Q.   You just said:  I'm going to take care of you.

6 Come work for me for the rest of my life?

7    A.   Right.

8    Q.   Is that what you're saying happened?

9    A.   Pretty much, pretty much.

10    Q.   And then at the airport, that's the first time he

11 became aware what kind of money you were talking about,

12 right?

13    A.   I think so.

14    Q.   And then there was -- and it wasn't just the

15 2 million.  You gave other assets later to a company that

16 he was made a member of, an equal member of, right?

17 $2 million at the airport?

18    A.   The land deals, yes.

19    Q.   And then you transferred over money, four or five

20 months later, to which Jeff became a 20 percent individual

21 owner through a company with the other four guys, correct?

22    A.   I didn't transfer any monies.  I transferred

23 property.

24    Q.   Land assets?

25    A.   Yes.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    do.

2        Q.    And my father passed away this past December at

3    103, literally.  And he was still able to motor on his own

4    volition.

5              Would there come a time when Jeff could

6    retire from this alleged lifelong work engagement with

7    you?  I'll give you an example.

8              What would happen when Jeff turned 65, an

9    age when a lot of people look to retire and so forth?

10   Could he have retired, at that point, or if you were still

11   going strong, you could have required him to continue on?

12       A.    How old -- how old is Bardwell now?  I don't

13   know.

14       Q.    I'll ask the questions here, if it's okay with

15   you.

16       A.    I'm trying to answer your question by asking a

17   question.

18       Q.    No, you asked a question.

19              How long did Jeff have to work for you?

20       A.    I would think he would be done by 65.

21       Q.    Why do you think that?

22       A.    I just think that's -- he would have fulfilled

23   his obligation by then.

24       Q.    All right.  Fair enough.

25              And you had kind of picked that as a --

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    Q.    And do you know why?  When somebody makes a gift

2  like this, significant as it was -- why did you decide to

3  pay the gift tax return?  I mean, was that a decision you

4  made or did somebody else make that for you?

5    A.    I made that decision.

6    Q.    Okay.  Why did you make that decision?

7    A.    Because they wouldn't -- the number would be

8  defined -- you know, if I had given them $2 million cash

9  and they had to pay taxes on it -- I don't know what the

10  number was.  Let's say, it's 800 grand or whatever.

11    Q.    Okay.

12    A.    Okay.  I'm not sure that would have been enough

13  for them to do what I wanted them -- what my vision of

14  them to do with that company was.

15    Q.    All right.  Fair enough.

16        You wanted them to actually realize the

17  amount of money that you were giving -- that you were

18  giving so that they would actually realize that and

19  wouldn't have to pay a pretty good portion of it over to

20  the government?

21    A.    Correct.

22    Q.    So you had kind of calculated, in your own mind,

23  about what it might take to start these things up that you

24  were hopeful they would do, and you wanted them to

25  actually receive -- keep that and be able to retain that

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1     Q.   I understand.

2          I'm talking about --

3     A.   This says December --

4     Q.   -- the meeting before December '05.

5     A.   This -- well, this response relates to

6 December '05, so ...

7     Q.   It does.

8     A.   Okay.

9     Q.   But did you say this to him before December '05?

10    A.   I don't know -- remember what I said to him, but

11 I had to say:  I'm going to take care of your salary or

12 you will be okay or whatever.

13         I don't specifically remember --

14    Q.   Okay.

15    A.   -- what was promised to Jeff Bardwell.

16    Q.   And there isn't any reason to say offering him a

17 sizeable cash payment and million of dollars.  You knew

18 what the cash payment was.  It was 2 million.

19    A.   I don't know that I knew that prior to.

20    Q.   This is December '05.

21    A.   December '05 I knew it.  Yes, sir.

22    Q.   Right.

23         He didn't know it until he opened the

24 envelope?

25    A.   That's correct.

VIDEOTAPED DEPOSITION OF RONALD PRATTE
February 27, 2020

1    Q.   And, at that point, what if Jeff had looked over

2   to you and said -- $2 million check in hand:  Nahhh.  I'm

3   not going to do that?

4    A.   I would have said:  Give me the money back.

5    Q.   Okay.  So it's your testimony that Jeff didn't

6   say that.  That said Jeff what?

7    A.   Didn't say what?

8    Q.   Jeff didn't say:  I'm not going to work for you

9   for life.

10            What specifically did he say?

11    A.   He said:  I am going to work for him for life,

12   okay.

13    Q.   He said that directly to you, or was he

14   commenting to somebody around him?

15    A.   He said it to the group and he said it on many

16   occasions to many people for many years since that time.

17    Q.   Is it possible that what Jeff said is:  For this

18   kind of gratuity -- for this kind of money, I'm going to

19   work for this man for the rest of my life?

20            Is it possible that's what you heard?

21    A.   I don't know what his exact verbiage was.

22    Q.   You mean at the airport on 2005?

23    A.   I don't remember the words he used.

24    Q.   Okay.  I just wanted to ask you one other -- have

25   you met with anybody in the last four months or so

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Ronald H. Pratte,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )  No.
                                     )  2:19-cv-00239-
Jeffrey Bardwell and Fanny F.        )  PHX-GMS
Bardwell, husband and wife,          )
                                     )
        Defendants.                  )
                                     )


DEPOSITION OF RONALD PRATTE

(Volume II   Pages 1 through 83)


Scottsdale, Arizona
August 10, 2020
1:00 p.m.


REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

1      A.    Controller.

2      Q.    Controller.

3            And how many people did you employ at that

4   time when you first hired Bill, roughly?  I mean, 100?

5   1,000 or --

6      A.    Three or 400.

7      Q.    Okay.  And tell me about Bill?  Do you think that

8   he's professional, knowledgeable, knows what he's doing?

9      A.    Very knowledgeable.

10     Q.    Okay.  And did you trust him implicitly?

11     A.    Absolutely.

12     Q.    You've given him a power of attorney in the past

13  to handle your financial matters?

14     A.    I have.

15     Q.    Both with the IRS and in other respects?

16     A.    I don't remember specifically what they were for.

17     Q.    Okay.  But you had enough trust that you'd given

18  him the power of attorney to handle things?

19     A.    That's correct.

20     Q.    If you gave him that power of attorney, he still

21  kept in touch with you, informed you, and discussed things

22  with you, did he not?

23     A.    Most of the time.

24     Q.    Okay.  And when he worked for you, where was his

25  office primarily?  And let's say in the first decade that

1    he worked for you.

2        A.    It was in my office.

3        Q.    Which was where?  I know that you traveled all of

4    the time.  Obviously, he probably didn't.

5        A.    3207 South 51st Avenue.

6        Q.    Okay.  So he was at the lumberyard or the

7    building construction office?

8        A.    Yes.

9        Q.    Okay.  Did he ever work out of Las Vegas or out

10   of Nevada, let me put it that way?

11       A.    He went there from time to time.

12       Q.    Okay.  Was he the CFO -- as your business grew,

13   was he the overall CFO for all locations and offices?

14       A.    He was.

15       Q.    And at some point you entered a partnership with

16   Pulte Homes, correct?

17       A.    That's correct.

18       Q.    About what year was that, roughly?

19       A.    I think it was 2002.

20       Q.    Okay.  Did he remain CFO over the joint venture?

21       A.    I think he did.

22       Q.    Okay.  So he was knowledgeable about that

23   partnership and the transaction between you and Pulte

24   Homes?

25       A.    Yes, he was.

1    A.    If I did, I don't remember.  I don't know why I

2  would have reason to discuss this with him.

3    Q.    Fair enough.

4          So you didn't discuss your intent, the tax

5  return or anything with Earl Secore since your deposition

6  at the end of February?

7    A.    Only to ask him if he had a copy of the tax

8  return that you guys were looking for.

9    Q.    Okay.  All right.  Have you discussed your prior

10  testimony or the gift tax return and some of the questions

11  with Todd Carriere since your last deposition?

12    A.    No.

13    Q.    Okay.  Have you spoke or otherwise communicated

14  with Mr. Shisler at any time in the past year?

15    A.    No.

16    Q.    Other than your counsel, have you asked anybody

17  else to relay a message or communicate with Mr. Shisler on

18  your behalf?

19    A.    Absolutely not.

20    Q.    Has Mr. Shisler tried to contact you?

21    A.    Absolutely not.

22    Q.    Okay.  After this deposition, do you intend to

23  reach out to him for any reason?

24    A.    Absolutely not.

25    Q.    Okay.  Okay.  So let me ask you, what did you

1   tell Mr. Shisler about your decision to give away some of

2   these monies and property?

3      A.   I don't remember what I told him.   That was

4   15 years ago.

5      Q.   Well, well, okay.

6           Okay.   At some point, you decided that you

7   were going to give monies and properties to five

8   individuals and their spouses, correct?

9      A.   That's correct.

10     Q.   And that would have been the gifting ceremony, as

11  I'll call it, was at the end of December of 2005, correct?

12     A.   Correct.

13     Q.   That was at the North Las Vegas airport?

14     A.   Right.

15     Q.   You called the meeting?

16     A.   Right.

17     Q.   You actually flew your own plane or had somebody

18  fly your own plane up there with Justin, Jeff and

19  yourself.   And the other three met you at the airport

20  because they lived in Vegas; is that correct?

21     A.   That is correct.

22     Q.   Okay.   And before you went to that meeting, you

23  had five separate cashier's checks issued, right?

24     A.   That's correct.

25     Q.   And what was the amount of each check?

1   about this, okay.  But I do remember telling Shisler that

2   Bardwell was going to work for me until I die.

3       Q.    BY MR. MARLOWE:   Okay.

4       A.    That was the only reason that he was included in

5   the group.

6       Q.    And that's the only reason?

7       A.    Yes, sir.

8       Q.    Let me ask you a question here.  Why didn't you

9   just pay Bardwell whatever, half a million, a million a

10  year to work for you the rest of your life?

11      A.    I ask my -- question that every day.

12      Q.    Well, how about you answer it?  Why didn't you

13  just do it that way?

14      A.    I wish I would have.

15      Q.    Okay.  Why did you decide to include Bardwell

16  with the other four people?

17      A.    Because I was trying to treat him like the other

18  four people.

19      Q.    Like one of your family?

20      A.    Like the other four people and this is what I get

21  for it.

22      Q.    You treated the other four people as your family,

23  right?

24      A.    They are my family.

25      Q.    And you treated Jeff the same as your family,

DEPOSITION OF RONALD PRATTE                    VOLUME II
August 10, 2020

1   would take care of whatever was involved in getting that

2   done.

3        Q.   You're the donor, correct?

4        A.   "The donor"?

5        Q.   Yes.  You're the person giving the gift,

6   completing the gift, signing the gift tax return.  You're

7   the donor, right?

8        A.   That's correct.

9        Q.   Okay.  This is your answer, which I'll tell

10  you -- or I will represent to you is verified and under

11  oath when you do these.  It's the same as your testimony

12  here today.

13            It says:  William Shisler to carry out your

14  wishes with respect to the conveyances.  And my question

15  is very simple.  That's saying that you conveyed your

16  wishes to Shisler.  I'm asking you what did you

17  specifically tell Shisler?

18            MR. COLLINS:  Objection, form.

19            The question is:  What did you tell Shisler?

20  Answer that question.

21            THE WITNESS:  I think I already answered it.

22  I told Shisler that I was giving each guy -- the five guys

23  $2 million and I was giving them the commercial properties

24  that I owned and they were going to go set up a business

25  and build houses and commercial buildings, et cetera.

1    Q.    BY MR. MARLOWE:  And it's your testimony that you

2  told him Bardwell was different?

3    A.    I think I told him that Bardwell had agreed to

4  work for me for the rest of my life.

5    Q.    Are you sure?

6    A.    I'm as sure as I can be after 15 years.

7    Q.    Well, this answer was done nine months ago.

8    A.    Okay.  But it still happened 15 years ago.

9    Q.    So you might not remember accurately; is that

10  fair?

11    A.    That's very fair.

12    Q.    Okay.  If you go down on that same page, Page 3.

13    A.    Okay.

14    Q.    It starts on Line 13, at the end, "Rather."

15  First word in the sentence on Line 13 is "Rather."

16    A.    Okay.

17    Q.    Read that sentence to me.

18    A.    Rather, Mr. Pratte acknowledges that his

19  accountant provided privileged advice with respect to the

20  tax matters referenced (sic) to herein but does not intend

21  to divulge the substance of any advice.

22    Q.    Okay.  Earlier today you acknowledged that you're

23  waiving that privilege.  So my question is:  What is the

24  privileged advice Mr. Shisler provided you?

25    A.    I have no idea.  I have no memory of that.

1   Q.   Okay.  Ever?

2   A.   I would assume that he would have, but I don't

3   remember specifically if he did.

4   Q.   Okay.  And you have nothing -- no reason to

5   believe that your memory was particularly better in

6   November of 2019 than it is today?

7   A.   I do not.

8   Q.   Okay.  Did you discuss payment of the gift tax to

9   the Internal Revenue Service with the five guys?

10   A.   I think I recall telling them that I was paying

11   the tax on the gift on the monies that they were getting.

12   Q.   Okay.  So you didn't negotiate with them or

13   bargain with them; you just told them:  I'm transferring

14   these properties and I'm paying the gift tax; is that

15   correct?

16   A.   That's correct.

17        MR. MARLOWE:  If you can hand him back

18   Exhibit 4 real quick, Greg.

19        MR. COLLINS:  Yes.

20   Q.   BY MR. MARLOWE:  And, Mr. Pratte, I'm just asking

21   you beginning on RHP12, and that would be the number on

22   the bottom right-hand corner.  Let me know when you're

23   there.

24   A.   I'm there.

25   Q.   Okay.  Just take a quick minute, if you will, to

1   A.   What?

2   Q.   If you know?

3   A.   I don't know.

4   Q.   Okay.  If you go down a couple of lines, does it

5   tell you what the total tax was on Line 17?

6   A.   16,544,660.

7   Q.   Do you remember paying the gift tax or the amount

8   of the gift tax, having that discussion with Mr. Shisler?

9   A.   I don't remember.

10   Q.   Have you routinely issued checks to the IRS that

11   were in excess of $8 or 10 million?

12   A.   Every year.

13   Q.   Okay.  Have you, at any time, provided any

14   amendments or notice to the IRS that Jeff Bardwell was

15   somehow different than the other four?

16   A.   Not to my knowledge.

17   Q.   Anyone suggest to you that you should inform the

18   IRS that Bardwell was somehow to be treated differently?

19   A.   Not to my knowledge.

20   Q.   So let me try to sum up some bullet point facts

21   and try to wrap this up.

22        You chose to pay the gift tax to the IRS.

23   You didn't have any discussions with anyone, including the

24   recipients; you made the decision to pay it, correct?

25   A.   I did.

DEPOSITION OF RONALD PRATTE
August 10, 2020

1   the speaker.  Hold on.  All right.  Go ask it again.

2       Q.   BY MR. MARLOWE:  In Exhibit 5 you indicated that

3   Mr. Shisler was completing the returns in fulfillment of

4   your wishes, right?

5               MR. COLLINS:  Object to the form.

6               Go ahead.

7               THE WITNESS:  I didn't say:  Bill, you need

8   to fill out a gift tax return.

9               All I did is tell him what the deal was.

10  How he got the paperwork there, that's his thing.  I had

11  nothing to do with any of that.

12      Q.   BY MR. MARLOWE:  So when he handed it to you, did

13  you say:  Bill, why is Bardwell being gifted like the

14  other four?

15      A.   I did not.

16      Q.   Okay.  And you're positive that you told Shisler

17  that Bardwell was different?

18      A.   Absolutely.

19      Q.   Why do you remember that as opposed to everything

20  else that happened that you don't seem to recall?

21      A.   Because it's the truth and that's how the whole

22  thing was put together.  And I know that, and you know

23  that, and Bardwell knows that.

24      Q.   Okay.  Let's go back to what I'm asking, which

25  is, you told Shisler that Bardwell was different before he

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 3

**Ron Pratte**

As you all Wed, Sep 12, 2018, 6:08 PM
know I
am
pursuing a
judgement
against
Bardwell
for his
Breach of
Contract.
What I am
asking
each of
you is for
you to sit
down and
think
through
you

As you all know I am pursuing a judgement against Bardwell for his Breach of Contract. What I am asking each of you is for you to sit down and think through you

**Ron Pratte <prattepx1@gmail.com>**                    Wed, Sep 12, 2018, 6:08 PM



Justin
me
Todd
Todd

As you all know I am pursuing a Judgement against Bardwell for his Breach of Contract.  What I am asking each of you is for you to sit down and think through your recollections, conversations, statements made etc concerning Bardwell's initial commitment to work for me until my demise.  I remember our meeting at the Las Vegas Airport in 2006 and it was my understanding that I had an agreement and a commitment from him at that time and also on subsequent occasions.

The lawyers will issue subpoenas for you guys soon to take your statements regarding what your memories are of how the deal went down.  In order to save legal fees I would appreciate it if each of you could sit down and write out your recollections of the event and email them to me in a PDF file format.  My position is that I agreed to take Bardwell into the group with you guys and his responsibility was to work for me how ever long it took until I died.  Plain and simple.  He is saying that never happened and even if it did it was not written down so it is not

enforceable.  My attorneys say verbal contracts are the same as written contracts if there were witnesses to the event.

So help me out here if you will please and send me your thoughts.  Thanks for your help.
RP



Reply Reply Forward
all

**Justin Pratte**                    Justin M. Pratte602-  Mon, Sep 17, 2018, 1:52 PM
                                     617-8765
                                     DISCLAIMER:This
                                     communication is
                                     intended only for
                                     the personal use of
                                     the recipient(s)
                                     named above and
                                     may contain
                                     information and

Justin M. Pratte602-617-8765 DISCLAIMER:This communication is intended only for the personal use of the recipient(s) named above and may contain information and

**Justin Pratte <justinpratte@gmail.com>**          Mon, Sep 17, 2018, 1:52 PM


Ron
Todd
me

Justin M. Pratte
602-617-8765

DISCLAIMER:

This communication is intended only for the personal use of the recipient(s) named above and may contain information and/or attachments that are privileged, confidential, proprietary and protected from disclosure. If you are not the intended recipient of this message, you are hereby notified that any dissemination, distribution or copying of this message, and any attachments thereto, is strictly prohibited. If you receive this message in error, please promptly delete it without further distribution and reply to the sender that you have received the message in error

This communication or any attachment thereto is not intended, and should not be construed, as a investment advice or and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. This communication or any attachment thereto is not intended, and should not be construed, as legal, tax, public accounting or auditing advice or opinions. You should consult your legal counsel, accountants and/or tax advisors prior to making any decisions or taking any action concerning the matters in this communication. Attachments hereto may have additional important disclosures and disclaimers, which you should read.

IRS CIRCULAR 230 NOTICE: To the extent that this communication or any attachment thereto concerns tax matters, it is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or promoting, marketing or recommending to another party any tax-related matters.

On Sep 15, 2018, at 11:52 AM, Ron Pratte <prattepx1@gmail.com> wrote:

I am trying to keep from having you guys deposed by the lawyers. If you could be more descriptive on everything that happened during the transition from Pulte to your own company that would be helpful. I gifted the money to you guys but the money for Bardwell was a contract for him to work for me which is why I gave him the same amount as the rest of you.

On Sep 14, 2018, at 1:03 PM, Todd Carriere <TCarriere@stellardevelopment.net> wrote:

Hello all,
Attached is my initial draft I am still looking for cancelled checks, bank statements, etc.

Todd Carriere
Stellar Development, L.L.C.
(602)370-5742

From: Ron Pratte [mailto:prattepx1@gmail.com]
Sent: Wednesday, September 12, 2018 3:08 PM
To: Justin Pratte; jaime ziparo; Todd Carriere; Todd Carriere
Subject: Bardwell

As you all know I am pursuing a judgement against Bardwell for his Breach of Contract. What I am asking each of you is for you to sit down and think through

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Ronald H. Pratte,                    )
                                     )
      Plaintiff,                     )
                                     )
vs.                                  ) No.
                                     ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.        ) PHX-GMS
Bardwell, husband and wife,          )
                                     )
      Defendants.                    )
                                     )


DEPOSITION OF WILLIAM SHISLER



Phoenix, Arizona
August 14, 2020
11:00 a.m.



REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1   witnesses have indicated that Ron Pratte was a really

2   hardworking guy.  Would you agree with that?

3       A.   One of the hardest working I know.

4       Q.   Pardon?

5       A.   One of the hardest working I know, yes.

6       Q.   Okay.  Thanks.

7                And would you say that in that vein that Ron

8   was not a great delegator, that he took a lot things on

9   himself or micromanaged matters?

10      A.   Yes.

11      Q.   Did you think he did that sometimes to a fault?

12      A.   I would have preferred that he did not do it to

13  the level that he did.  Whether or not that's a fault, I

14  don't know.

15      Q.   But I suppose in the same vein, his

16  involvement in his companies could sometimes be helpful,

17  because you knew that he was always well informed of what

18  was happening at any given time on any project or other

19  matter, correct?

20      A.   He surprised me often by the knowledge that he

21  had, particularly the accounting knowledge.  But, again, I

22  think that was because of the close relationship with Todd

23  Carriere.

24      Q.   Did you interact regularly with Mr. Pratte over

25  the years regarding your accountancy work, such that it

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1  was your opinion that maybe you actually served as a

2  teacher over the years -- you were there that long --

3  regarding accounting matters?

4      A.   No, I would not say that.

5      Q.   But did you feel comfortable discussing more than

6  just mundane accounting matters with him?  In other words,

7  more complex matters, did you feel like he grasped what

8  you were explaining to him and was able to make decisions

9  based upon your advice or information?

10     A.   He was able to make decisions.  And in the times

11 that he sought my advice, he understood what I was saying

12 or I would have made sure that he did.

13     Q.   Did Ron seek your advice on most matters before

14 he made up his mind to proceed on any given project or

15 venture?

16     A.   No.

17     Q.   You say "no."  You mean he would make up his own

18 mind and then come and give you a directive on how to

19 carry it out?

20          MR. COFFMAN:  I'm going to object to the

21 form.  Excuse me.

22     Q.   BY MR. CONNELLY:  You can answer.

23     A.   I'm sorry.  Repeat the question again.

24     Q.   Sure.  Was it more in line that Ron would decide

25 on his own whatever it was that he wanted done -- and I'm

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1    A.    Yes.

2    Q.    And when did you see -- again, I'm mindful of the

3    time frames here, but when do you think you kind of

4    perceived that there was something more than just an

5    employer-employee relationship going on between Ron Pratte

6    and Jeff Bardwell?

7    A.    I'm not sure I ever knew there was an

8    employee-employer relationship between the two of them.

9    Q.    Okay.  Let's just talk about their personal

10   relationship.

11   A.    Yes, I was aware that there was a close personal

12   relationship between them.  I'm not sure when I came to

13   that conclusion, but it certainly solidified the gift.

14   Q.    Would it be fair to say that sometime in the

15   early 2000s -- let me rephrase.

16        Actually, I'll ask you a different question.

17   There's been other testimony in this case that on occasion

18   Ron Pratte would refer to Jeff Bardwell as his quote,

19   adopted son, end quote, to others if they were talking or

20   visiting, both at the workplace and outside of it.

21        Do you ever recall hearing that or

22   understanding that?

23   A.    No.

24   Q.    So you never heard him refer to Jeff as my

25   adopted son?

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1     A.    No, no.

2     Q.    Are you talking about January 6th, 2006?

3     A.    I'm sorry.  January of 2006 he handed out checks.

4     Q.    I'm sorry.  I talked over you.  Go ahead and

5  finish your thought.

6     A.    The conversation that I had with Ron regarding

7  making gifts to his children was six months, possibly even

8  a year or more before Ron decided to make those

9  disbursements.

10    Q.    And then you don't remember meeting with him or

11 discussing it with him again until early '06?

12    A.    That's correct.

13    Q.    Last question I'll ask you before we take a

14 break.

15          Do you remember -- well, Ron gave checks to

16 each of the five guys.  You're aware of that, correct?

17    A.    Well, he gave checks to the five people, those

18 five people and their spouses, where applicable.

19    Q.    Thank you for the clarification.  And do you

20 remember the amounts of those checks?

21    A.    Generally, it was a total of 2,000 -- I'm sorry.

22 $2 million per family.

23    Q.    Okay.  And did you direct those checks to be cut

24 yourself or did Ron handle that?

25    A.    Ron directed me to cut the checks, which I did.

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1   December of '05, and those checks may have been postdated

2   so that Ron could give them out before the holiday, but

3   the checks may have been dated in January       of '06.

4   Does that refresh your memory at all?

5       A.    Not at all.

6       Q.    Okay.  But you remember the checks were

7   $2 million each and in some instance made out to the

8   individual and their spouse; you recall that?

9       A.    Whenever's there a spouse, yes, it was made out

10  jointly.

11      Q.    Okay.  And other than that conversation you said

12  you had had with Ron some six months or longer prior, he

13  didn't have any more conversations with you until he asked

14  you to cut those checks?

15      A.    That is correct.

16      Q.    Did he explain what his plan was?  I want you to

17  cut these checks to these five guys and some spouses.  Did

18  he explain what he was going to do?

19      A.    All he said was -- he gave me the list, the

20  handwritten list, and there were a couple names on there.

21  Obviously, one in particular, Mr. Bardwell, that I was

22  surprised by.  And Mr. Pratte basically said, just do it.

23  These are the gifts to everybody.

24            And then went on to surprise me even more by

25  including the real estate that was ultimately transferred

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1   too.

2      Q.    There was also some real estate that was

3   transferred to each of the five guys some few months after

4   that -- the checks were given out, correct?

5      A.    Correct.

6      Q.    There was --

7      A.    I'm sorry.  Let me interrupt you.

8      Q.    Go ahead.

9      A.    I misstated that.

10            Your question was real estate was

11   transferred to the five guys.  The correct answer it was

12   transferred to the five guys and their spouses.

13      Q.    Yes, thank you for that.  I was going to clean

14   that up.  And I was going to say -- when I refer to the

15   five guys, I'm not trying to exclude the spouses.

16            If the check was made out to them, on a

17   couple of them, it was also made out to the spouse?

18      A.    Correct.

19      Q.    In Jeff's case, it wasn't made out to the spouse.

20   It was just made out to Jeff?

21      A.    I would think that's wrong.

22      Q.    Was it supposed to have been made out to Jeff and

23   his spouse?

24      A.    Yes.

25      Q.    Okay.  So if it wasn't, that wouldn't be your

1    A.    That's my recollection.

2    Q.    You didn't have anything to do with setting those

3  up, did you?

4    A.    No, I did not.

5    Q.    Were you aware that Ron was going to have this

6  meeting in the North Las Vegas airport with his sons and

7  these other fellows?

8    A.    My recollection is that Ron, whenever it was, was

9  going to take checks and distribute them personally.  I

10  don't know of any meetings.

11    Q.    And, again, you hadn't talked to Ron since at

12  least some six months prior, until he came to you and

13  wanted these checks cut, correct?

14    A.    I did not speak to him about gifts during that

15  intervening period.

16    Q.    But he did tell you what the nature of the checks

17  were, did he not?

18    A.    He did.

19    Q.    And what did he tell you?

20    A.    He told me they were gifts as was the real

21  estate.

22    Q.    So he mentioned the real estate as well, at that

23  point?

24    A.    Yes.

25    Q.    With respect to these, did he ask you at that

1  time to perform any accountancy work or tax work or

2  memorialization of these gifts to the five guys?

3      A.   He told me simply to transfer them.

4      Q.   Well, can you explain what you mean "transfer

5  them"?

6      A.   Transfer ownership of the real estate to the five

7  guys.

8      Q.   And in what capacity?  As gifts?

9      A.   As gifts.

10     Q.   Do you have any personal belief or knowledge as

11 to why Todd Carriere and Jaime Ziparo and Jeff Bardwell

12 were added about a month and a half later to this JTJ?

13     A.   My recollection is that Mr. Carriere was creating

14 entities to hold -- separate entities to hold each of the

15 parcels of real estate.

16          JTJ Development already existed, so rather

17 than creating a new entity for that, I was instructed to

18 simply use that existing entity and arrange to transfer it

19 over.

20     Q.   Thanks.

21          Since you mentioned this, this was kind of

22 the formation company.  Let me ask you about these other

23 companies and if you're familiar with them or not.

24 Stellar Development, L.L.C.?

25     A.   No.

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1  Q.   All right.  Other than you, are you aware if Ron

2  Pratte discussed these transfers with any other

3  professionals, such as lawyers or other CPAs?

4  A.   I believe he transferred -- not transferred --

5  I'm sorry.

6       I believe he discussed it with Todd

7  Carriere.

8  Q.   But he didn't have Todd Carriere prepare the gift

9  tax return?

10  A.   No.

11  Q.   So I assume at some point when that return had to

12  be filed, you needed to have a conversation with Ron, as

13  the donor, about how he wanted these transferred and those

14  monies to be treated, correct?

15  A.   I think it was black and white.  I don't think

16  that there was a conversation either, no.  They were

17  donations or gifts made.  It requires a gift tax return.

18  And the only gray area there would be the valuation of the

19  properties, which we did have appraisals for, so ...

20  Q.   Okay.  All right.  Thanks.

21       When you say it was black and white, is that

22  because Ron Pratte made it clear to you how he wanted

23  these transfers, these monies and properties to be

24  treated?

25  A.   He made it clear to me that they were gifts.

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1    A.    Well, the only real -- the prior discussion that

2  he and I had was when he instructed me to make gifts --

3  the checks and transfer the properties.

4                And after I got out of my shock, I said:

5  Well, that's all well and good, but you got to pay the tax

6  of about -- approximately half of this.  So you're

7  probably in the range of 15 to $20 million of tax.

8                And he said:  I know.

9    Q.    Okay.  So, you know, and basically what you're

10  telling us is that Ron Pratte had a working knowledge.  It

11  wouldn't have been anywhere near as detailed or specific

12  as yours, as a licensed professional, but he had a working

13  knowledge of tax and how tax works with respect to both

14  his business and with respect to gifts in this case?

15    A.    Yes, yes.

16    Q.    But you didn't decide of your own volition to

17  treat any of these transfers, the money or the properties,

18  as gifts, correct?

19    A.    That is correct.

20    Q.    I mean, that would have specifically come from

21  Ron Pratte?

22    A.    Yes, sir.

23    Q.    Do you remember when Jeff Bardwell was involved

24  in a divorce back around 2010?

25    A.    I do recall that.

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1    Q.    Okay.  Thanks.

2         And you prepared this gift tax return based

3    solely upon information conveyed to you from Mr. Pratte,

4    correct?

5    A.    That is correct.

6    Q.    And in the return it identifies the properties

7    and the monies and so forth that Ron Pratte was gifting

8    away, correct?

9    A.    Yes, sir.

10   Q.    And I will avow to you that Mr. Pratte has

11   testified that the properties and monies are properly

12   identified on the schedules appended to this return.  And

13   you would have received that information from Mr. Pratte

14   in order to finish this return, correct?

15   A.    Mr. Pratte would have told me what the gifts were

16   and then it would have been up to me to gather the

17   appraisals and whatnot to -- the appraisals and other

18   documentation to support the return.

19   Q.    Mr. Shisler, when you were discussing the

20   preparation of this return with Mr. Pratte, did he

21   indicate to you in any way that the transfers to Jeff

22   Bardwell and his spouse were somehow different than those

23   that were being made to the other gift recipients?

24   A.    No, sir.

25        MR. COLLINS:  Object to the form.

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1    Go ahead.

2    Q.   BY MR. CONNELLY:  And did Mr. Pratte tell you

3  that he was receiving anything in return for making this

4  gift to Jeff Bardwell?

5    A.   No, sir.

6    Q.   Did Mr. Pratte ever tell you that in exchange for

7  this gift to Mr. Bardwell, that Mr. Bardwell agreed to

8  work for him for his life?

9    A.   No, sir.

10    Q.   Recognizing that you had worked for him for quite

11  a few years prior to this and based upon your familiarity

12  with Mr. Pratte and his companies, would it have been

13  reasonable on your part to have asked Mr. Pratte if he

14  intended that there be any restrictions on these gifts

15  when you did the return?

16          MR. COLLINS:  Object to the form.

17          Go ahead.

18          THE WITNESS:  When Mr. Pratte instructed me

19  to make the gift, I was surprised by two names on the list

20  and I did ask him if he was sure; Mr. Bardwell and

21  Mr. Carriere, if he was sure he wanted to do that.  And

22  his response was:  Yes.  I want to make them -- as you

23  call them, the five guys.

24    Q.   BY MR. CONNELLY:  And you were surprised by the

25  names on the list, because, one, they weren't family?  I

1  mean, direct blood, right?

2      A.    Right.

3      Q.    And, two, he was making these transfers as

4  unconditional gifts to them, and is that really what he

5  intended?  Is that what you were concerned about?

6                  MR. COLLINS:  Object to the form.

7                  Go ahead.

8                  THE WITNESS:  Well, I simply verified that

9  he wanted to make these as gifts and reminded him or

10 pointed out to him that he would be paying the gift tax at

11 roughly half of the amount of the gift or a third amount

12 of the gift and that was a huge number.  To which he

13 responded:  I know.

14     Q.    BY MR. CONNELLY:  And so with that response, what

15 did you do?  Based upon that response you received from

16 your inquiry, what did you do?

17     A.    Facilitated the transfers, drafted the checks for

18 him to sign and when it came around for tax time, drafted

19 the returns -- or prepared the returns.

20     Q.    And so it was your clear understanding and this

21 was based upon your discussion with Mr. Pratte as well as

22 your direct inquiry of Mr. Pratte, that all five of these

23 individuals and/or their spouses were receiving these

24 monies and these later properties as gifts; is that

25 correct?

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1    A.    That is correct.

2    Q.    To your knowledge, without any contingencies on

3  them?

4    A.    Correct.

5    Q.    To your recollection, did you, Mr. Shisler, ever

6  give a copy or provide a copy of the complete gift tax

7  return to any of the gift recipients?

8    A.    I don't recall.

9    Q.    Do you recall if anybody ever asked you for a

10  copy of the gift tax return?

11    A.    Mr. Bardwell asked me at one time during his

12  divorce proceedings for a copy of it and I refused it.

13    Q.    Okay.  Do you know why he was asking for that?

14  Was it him asking or his lawyer, Diana Rader, that wanted

15  it?

16    A.    I believe he was asking, because his wife's

17  attorney -- ex-wife's attorney wanted a copy and I said

18  no.

19    Q.    Okay.  And did Jeff explain -- I didn't mean to

20  interrupt you.

21    A.    I said:  No, Mr. Pratte would have to approve

22  that.

23    Q.    Okay.  Did you ask Mr. Pratte to approve it?

24    A.    It wasn't my place to, so no.

25    Q.    Did Mr. Bardwell explain to you why or what the

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1    Q.    Were you surprised to hear it?  Go ahead.

2    A.    And it may have been simply when I was subpoenaed

3  for the deposition.

4    Q.    Okay.  Sure.

5          Were you surprised to hear that there was a

6  dispute some whatever 12 or 14 years later -- after the

7  fact?

8    A.    Absolutely.

9    Q.    And why were you surprised by that?

10   A.    Well, what was he -- you called Mr. Bardwell

11  Ron's adopted son?

12   Q.    Well, I asked if you had ever heard him referred

13  to that way.

14   A.    But, yeah, it appeared -- I've never heard him

15  referred to that way.  But that seemed to be similar to

16  what their relationship might have been.  So I was shocked

17  that there was a dispute between the two of them.

18   Q.    So you never heard him referred to that way, but

19  he treated him as such?

20   A.    Yes, treated him, what I thought, very well.

21   Q.    Well, almost as good if not as well as his own

22  kids?

23   A.    I don't think he ever quit talking to Jeff for a

24  period of time.  So, yes, probably better than his own

25  kids.

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1    Q.    Oh, meaning there were periods when he went

2    without speaking with his own children, but not Jeff?

3    A.    Right.

4    Q.    Would it be your belief that if Mr. Pratte is now

5    claiming that Jeff Bardwell is still his employee, would

6    it be your belief that that's inconsistent with

7    Mr. Pratte's prior representations to you in how to

8    prepare the 2006 gift tax return?

9                    MR. COLLINS:  Object to the form.

10                    MR. COFFMAN:  Object to the form.

11                    MR. CONNELLY:  We got stereo on that one.

12                    THE WITNESS:  I think it's a question that

13    you have already asked.

14    Q.    BY MR. CONNELLY:  Let me rephrase it.  It's a

15    little bit different.

16                    Ron Pratte's current claim is that Jeff

17    Bardwell is still his employee, or was at least up until

18    through the -- you know, when they parted company.

19                    Wouldn't that be inconsistent with the prior

20    representations that Ron Pratte made to you when he was

21    directing you on how to prepare the gift tax return?

22                    MR. COLLINS:  Object to the form.

23                    Go ahead.

24                    MR. COFFMAN:  Object to form.

25                    THE WITNESS:  The gift tax return in all

1 representations that I know of was that Jeff was not an

2 employee.

3          MR. CONNELLY:  Can we take a break?  Are you

4 okay with a break?

5          THE WITNESS:  That's a good idea.

6          MR. CONNELLY:  How much time would you like?

7          THE WITNESS:  Five, ten minutes, whatever

8 you want.

9          MR. CONNELLY:  I think five or ten is fine.

10 It's a little early, but, you know, there are areas here

11 that I'm not sure that we need to take your time on, and I

12 don't know if anybody is going to argue with that.  So if

13 we're able to take a brief break, we can move on and see

14 if Greg has questions for you.

15          (A recess was taken.)

16     Q.   BY MR. CONNELLY:  We're back on the record.

17          Let me ask this, I guess, more of a question

18 to your professional opinion, but I think that you would

19 clearly be qualified to answer this.

20          The gift tax return was prepared and filed

21 in this case, was it not?

22     A.   Yes, it was.

23     Q.   And that's the 2006 gift tax return and that

24 would constitute a completed gift at that stage, would it

25 not?

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1    A.    Correct.

2    Q.   And so at some point, you testified -- let me

3 back up.

4           After you had this discussion in mid 2005,

5 did you discuss gifts with him again or estate planning

6 with him again until he gave you this list that you talked

7 about?

8    A.    Not that I recall.

9    Q.    Okay.  And I don't really have it in my notes how

10 this played out, but you testified earlier that there was

11 a list that you were given.  And at some point you were

12 also directed to generate checks, right?

13    A.    Oh, it was a combined action, but yes.

14    Q.    Okay.  Walk me through that.  What do you

15 remember about that?

16    A.    Mr. Pratte came into my office, had a list of

17 donees and dollar amounts and said:  Create these checks,

18 make these gifts.

19           And all of the real estate, we probably

20 talked about, which parcels of real estate are also going

21 to go to this group of individuals, arrange for that

22 transfer to happen.

23    Q.    Okay.

24    A.    Which I said:  You're going to incur a huge

25 amount of gift tax.

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1   Q.    That conversation, at this point, is over

2   15 years ago, right?

3   A.    Correct.

4   Q.    Okay.  You understand that whether or not

5   Mr. Pratte intended this to be a gift, that's an important

6   issue in this lawsuit?  You understand that, right?

7   A.    I do understand that.

8   Q.    Okay.  And all memories fade over time.  You'd

9   agree with me there, correct?

10  A.    Yes.

11  Q.    Okay.  And at least for my memory, sometimes I

12  remember the broad strokes of what happened, but I don't

13  necessarily remember quotes, I don't necessarily remember

14  exactly what was said.  The same for you?

15  A.    In many conversations, that's true.

16  Q.    Okay.  In this conversation you just testified

17  that Mr. Pratte came in and said:  Make these gifts?

18  A.    Correct.

19  Q.    Is it possible that Mr. Pratte said something

20  along the lines of:  Make these payments?

21        And he never used the word "gift" at all

22  during that conversation?

23  A.    No, I don't believe that could be.

24  Q.    Why do you say that?

25  A.    Because I was actually surprised by the magnitude

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1  of the gifts, and why he wanted to do them, and why he was

2  willing to pay an extra $16 million or so to make gifts.

3        And, again, I mentioned to him, the

4  magnitude of the taxes and he was fine with that.

5     Q.   Okay.

6     A.   So, in my mind and my recollection, there's no

7  question he intended to do that.

8     Q.   I understand that.

9        My question to you is whether or not he used

10  the word "gift" when he told you to make these payments

11  and asset transfers?  And do you have a specific

12  recollection, as you sit here today, that 15 years ago,

13  Mr. Pratte used the word "gift" when he said:  To make

14  these asset transfers and draw up these checks?

15     A.   Yes, he would have used the word "gifts."

16     Q.   When he said that, did you ask him whether he

17  wanted to make a gift to all of these individuals on the

18  list?

19     A.   Yes, I did.

20     Q.   What did you ask him?

21     A.   I said:  Gifts to all of these people?

22        Basically, I didn't even know who Jeff

23  Bardwell was at that point, I don't think.

24     Q.   Okay.

25     A.   And I was a little surprised by Todd Carriere,

1  too.

2     Q.    And what did he say?

3     A.    He said:  Yes.

4     Q.    Okay.  Did you explain to Mr. Pratte at that time

5  the difference between making a gift to someone versus

6  paying them compensation for future services?

7     A.    The only person that would have qualified to be

8  an employee of that group would have been Mr. Bardwell.

9          And I'm positive that I told Mr. Pratte that

10  he would owe less tax if he could pay Mr. Bardwell's, and

11  Mr. Carriere's too, actually, amounts as payroll.  That

12  would shift the tax liability to the individuals from

13  Mr. Pratte.

14     Q.    When you say that you're positive that you told

15  him that, that would have been good advice to give to one

16  of your clients, but you're actually positive, as you sit

17  here today, that you had that discussion with him 15 years

18  ago?

19     A.    Yes.  I mean, that was a very memorable event.

20     Q.    Okay.  The people on the list, do you remember

21  who was on the list?

22     A.    I do.  The three children and their spouses,

23  Mr. and Mrs. Todd Carriere, and Mr. and Mrs. Jeff

24  Bardwell.

25     Q.    So you remember that Mr. Pratte had on the list

DEPOSITION OF WILLIAM SHISLER
August 14, 2020

1    A.    Correct.

2    Q.    But it was not included, as I understand your

3    testimony, because it was clear to you, based upon

4    Mr. Pratte's intentions, that these were to be outright

5    unconditional gifts to the five individuals, correct?

6    A.    Yes.

7          MR. CONNELLY:  I don't have any -- do you

8    want to ask follow-up on that?

9          MR. COLLINS:  No, we're good.

10         MR. CONNELLY:  I'm going to call you, Bill.

11   I feel like we should go to dinner.  You've been very

12   gracious, very patient.  You too, Sam.  And thanks for

13   bearing with us.

14         When you're not the one trying to correct an

15   audio or video issue, it feels like, you know, hey, if I

16   was there, I could fix this pretty quick.  You guys were

17   very patient with us.

18         We actually finished this thing honestly a

19   couple hours sooner than we thought and we're all happy

20   about that.  Especially for you, but we certainly

21   appreciate it as well.

22         THE WITNESS:  It's been a challenge for

23   Anita as well.

24         MR. CONNELLY:  You know what, it has.

25   That's very nice of you to remember her.

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 5



Brian M. Flaherty, #023207
Brian.Flaherty@sackstierney.com
SACKS TIERNEY P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone: 480.425.2600

Attorneys for Plaintiff Ronald H. Pratte

**SUPERIOR COURT OF ARIZONA**

**MARICOPA COUNTY**

| RONALD H. PRATTE, | |
|---|---|
| Plaintiff, | No. CV 2018-015092 |
| v. | COMPLAINT |
| JEFFREY BARDWELL and FANNY F. BARDWELL, husband and wife, AFFILIATES I-X, | |
| Defendants. | |

For his Complaint, Ronald H. Pratte ("Pratte") alleges as follows:

1.      Plaintiff is an individual who resides in Maricopa County, Arizona.

2.      Defendant Jeffrey Bardwell is a married man who resides in Arizona and California and does business in Arizona. All acts by Defendant Jeffrey Bardwell alleged herein are done on behalf of the marital community existing between him and Fanny F. Bardwell.

3.      Fanny F. Bardwell is the wife of Jeffrey Bardwell and also resides in Arizona and California.

4.      Defendant Affiliates I-X are presently unknown to Plaintiff and are therefore identified by such fictitious names, to be more specifically identified upon amendment of this Complaint when their true names and capacities have been ascertained.

5.      Defendant Jeffrey Bardwell caused events to occur in Maricopa County, Arizona which form the basis of this Complaint.

2116776.v1

6.      This Court has jurisdiction over this matter and venue is proper before this Court.

**GENERAL ALLEGATIONS**

7.      In December 2005, Plaintiff and Jeffrey Bardwell entered into an agreement wherein Plaintiff would pay Jeffrey Bardwell cash and real property in consideration for Jeffrey Bardwell agreeing to work for the Plaintiff until either man died.

8.      Jeffrey Bardwell promised the Plaintiff that he would continue providing services to the Plaintiff until one of them died and Plaintiff relied on this promise when he paid Jeffrey Bardwell.

9.      Jeffrey Bardwell intended Plaintiff to rely on his promise.

10.     Plaintiff reasonably relied on Jeffrey Bardwell's promise.

11.     Plaintiff initially paid Jeffrey Bardwell and his wife $2.0 million in cash.

12.     Plaintiff also transferred to Jeffrey Bardwell and his wife an interest in three real estate parcels located in Nevada and Arizona on April 1, 2006.

13.     Plaintiff also paid taxes on behalf of Jeffrey Bardwell and his wife.

14.     Plaintiff enriched Jeffrey Bardwell and his wife in the total amount of $10,624,200.

15.     From 2006 until March 2018, Jeffrey Bardwell managed the Plaintiff's properties, handled insurance issues for Plaintiff's vehicles and provided labor on Plaintiff's properties.

16.     In March 2018, Jeffrey Bardwell ceased communicating with the Plaintiff and stopped working for Plaintiff.

17.     Prior to filing this action, Plaintiff demanded Jeffrey Bardwell return the value of the property he received from the Plaintiff. Jeffrey Bardwell rejected the offer.

**COUNT ONE**

**(Breach of Contract)**

18.     The allegations contained in paragraphs 1-17 are incorporated herein as if fully restated.

2116776.v1

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

19.     Under the oral agreement, Jeffrey Bardwell was contractually obligated to the Plaintiff.

20.     Defendant performed his obligations in accordance with the contract from 2006 until March 2018.

21.     Defendant Jeffrey Bardwell has breached his obligations under the contract.

22.     As a result of Defendant's breach, Plaintiff has been damaged.

## COUNT TWO

### (Promissory Estoppel)

23.     The allegations contained in paragraphs 1-22 are incorporated herein as if fully restated.

24.     Jeffrey Bardwell promised to continue providing services to the Plaintiff until one of them was dead.

25.     It was reasonably foreseeable to Jeffrey Bardwell that Plaintiff would rely on that promise.

26.     Plaintiff justifiably relied upon the promise.

27.     Plaintiff incurred loss as the result of his reliance on Jeffrey Bardwell's promise.

## COUNT THREE

### (Unjust Enrichment)

28.     The allegations contained in paragraphs 1-27 are incorporated herein as if fully restated.

29.     Defendants' acts alleged herein caused Defendants to be unjustly enriched and Plaintiff to be unjustly impoverished.

30.     Defendants' unjust enrichment and Plaintiff's unjust impoverishment are connected and are the direct result of Defendant Jeffery Bardwell's wrongful acts described herein.

31.     There is no justification for the enrichment of Defendants and the impoverishment of Plaintiff.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

3

32.     The acceptance and retention by Defendants of the funds paid by Plaintiff is inequitable without Defendants repaying Plaintiff the amounts of principal and interest Plaintiff previously paid Jeffrey Bardwell.

33.     If Plaintiff is not successful on his other claims for relief, Plaintiff will have no other remedy at law.

34.     As a result of the unjust enrichment, Plaintiff has been injured and is entitled to an award of damages and/or other relief as determined in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     For contractual damages in an amount to be proven at trial, plus interest at the statutory rate;

B.     In the alternative to A, compensation to Plaintiff for the reasonable value of any benefits conferred upon Defendants as a result of Plaintiff's justifiable reliance;

C.     For reasonable costs and attorneys' fees incurred herein in accordance with A.R.S. §12-341.01;

D.     For such further relief as the Court deems just and proper;

E.     A jury trial is requested.

DATED this 10th day of December, 2018.

SACKS TIERNEY P.A.

By: _____
Brian M. Flaherty
Attorneys for Plaintiff Ronald H. Pratte

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

4

2116776.v1

Brian M. Flaherty, #023207
Brian.Flaherty@sackstierney.com
SACKS TIERNEY P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone: 480.425.2600

Attorneys for Plaintiff Ronald H. Pratte

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

RONALD H. PRATTE,

          Plaintiff,

v.

JEFFREY BARDWELL and FANNY F.
BARDWELL, husband and wife,
AFFILIATES I-X,

          Defendants.

No.   CV2018-015092

SUMMONS

If you would like legal advice from a lawyer,
contact the Lawyer Referral Service at
602-257-4434
or
www.maricopalawyers.org
Sponsored by the
Maricopa County Bar Association

> **WARNING: This is an official document from the court that affects
> your rights.  Read this carefully. If you do not understand it, contact
> a lawyer for help.**

THE STATE OF ARIZONA TO DEFENDANTS:

        **Jeffrey Bardwell and Fanny F. Bardwell**

      A lawsuit has been filed against you.  A copy of the lawsuit and other court papers
are served on you with this "Summons".

      YOU ARE HEREBY SUMMONED and required to appear and defend, within the
time applicable, in this action in this Court. If served within Arizona, you shall appear and
defend within 20 days after the service of the Summons and Complaint upon you, exclusive
of the day of service.  If served out of the State of Arizona--whether by direct service, by
registered or certified mail, or by publication--you shall appear and defend within 30 days
after the service of the summons and complaint upon you is complete, exclusive of the day
of service.  Where process is served upon the Arizona Director of Insurance as an insurer's
attorney to receive service of legal process against it in this state, the insurer shall not be
required to appear, answer or plead until expiration of 40 days after date of such service
upon the Director.  Service by registered or certified mail without the State of Arizona is
complete 30 days after the date of receipt by the party being served.  Service by publication

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

2256989.v1

1   is complete 30 days after the date of first publication.  Direct service is complete when
made.  Service upon the Arizona Motor Vehicle Superintendent is complete 30 days after
2   filing the affidavit of compliance and return receipt or officer's return.  A.R.C.P. 4; A.R.S.
§§ 20-222, 28-502, 28-503.

3

4       YOU ARE HEREBY NOTIFIED that in case of your failure to appear and defend
within the time applicable, judgment by default may be rendered against you for the relief
demanded in the complaint.

5

6       YOU ARE CAUTIONED that in order to appear and defend, you must file an
answer or proper response in writing with the clerk of this court, located at **Office of Clerk
of the Superior Court, 201 West Jefferson Street, Phoenix, AZ   85003-2205,**
accompanied by the necessary filing fee, within the time required, and you are required to
serve a copy of any answer or response upon the Plaintiff's attorney.  A.R.C.P. 10(d);
A.R.S. §12-311; A.R.C.P. 5.

7

8

9       The name and address of Plaintiff's attorney is:

10                   Brian M. Flaherty, Esq.
                Sacks Tierney P.A.

11           4250 N. Drinkwater Blvd., Fourth Floor
             Scottsdale, AZ 85251

12

13       Requests for reasonable accommodation for persons with disabilities must be made
to the office of the judge or commissioner assigned to the case, at least ten (10) judicial
days before your scheduled court date

14

15       Requests for an interpreter for persons with limited-English-proficiency must be
made to the office of the judge or commissioner assigned to the case at least ten (10)
judicial days in advance of your scheduled court date

16

17       SIGNED AND SEALED this date:

18                   CHRIS DEROSE
                CLERK OF THE SUPERIOR COURT

19   

20               By: _____   DEC 1 0 2018
                Deputy Clerk

21                          CHRIS DEROSE, CLERK
                       A. HATCH
                       DEPUTY CLERK

22

23

24

25

26

27

28

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-0695

2256989.v1

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 6

Gregory B. Collins (#023158)
Zach R. Fort (#031643)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kflawaz.com
zrf@kflawaz.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald H. Pratte, | Case No. 2:19-cv-00239-PHX-GMS |
| Plaintiff, | **PLAINTIFF'S THIRD AMENDED MANDATORY INITIAL DISCOVERY RESPONSES** |
| vs. | |
| Jeffrey Bardwell and Fanny F. Bardwell, husband and wife, | |
| Defendants. | |

Pursuant to the Mandatory Initial Discovery Pilot project approved by the Judicial Conference of the United States, Plaintiff, Ronald H. Pratte ("Pratte"), hereby submits his *third amended* responses to the Court-issued discovery requests. These responses are made based on the information reasonably available to Pratte as of the date hereof. At this stage in the litigation, Pratte has not identified all individuals and documents possibly relevant to this lawsuit. Pratte reserves the right to supplement these responses and to rely on information not identified herein but subsequently produced in discovery. In addition, Pratte does not waive his right to object to the production of material disclosed herein on the basis of any privilege, the work-product doctrine, or any other valid objection.

1

**I.**    **Name, Address, and Telephone Number of Persons Likely to Have Discoverable Information Relevant to Any Party's Claims or Defenses**

1.    Ronald H. Pratte (Ron Pratte or Plaintiff)
c/o Gregory B. Collins
Kercsmar & Feltus PLLC
4250 N. Drinkwater Blvd., Fourth Floor
Scottsdale, AZ 85251

Ronald H. Pratte is the Plaintiff in this case and is aware of the offer he made to Jeffery Bardwell, Bardwell's acceptance of the offer and the consideration Plaintiff paid to Bardwell. Plaintiff also has information regarding Bardwell's breach of contract and the amount of time Bardwell actually spent working in accordance with his agreement with Plaintiff.

*Plaintiff has information regarding Bardwell's acknowledgment of their agreement, Bardwell's communications with others acknowledging the agreement, and Plaintiff's damages in this case.*

*He is expected to testify consistent with his deposition in this matter.*

2.    Jeffery Bardwell
c/o Thomas J. Marlowe, Esq.
Law Offices of Thomas J. Marlowe
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016

Jeffrey Bardwell is a Defendant in this case and is expected to provide testimony consistent with his Answer and his disclosures to-date.

*He is expected to testify consistent with his deposition in this matter.*

3.    Fabiola Bardwell
c/o Thomas J. Marlowe, Esq.
Law Offices of Thomas J. Marlowe
2425 East Camelback Road, Suite 880
Phoenix, Arizona 85016

Fabiola Bardwell is a Defendant in this case and Jeffery Bardwell's spouse. Mrs. Bardwell is expected to testify regarding her understanding of the agreement between Mr. Pratte and Mr. Bardwell.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

2

4.      Justin Pratte
        5310 East Calle Ventura
        Phoenix, AZ 85018
        602-617-8765

Justin Pratte has information regarding the agreement Bardwell made with the Plaintiff to work for Plaintiff for life. He is expected to testify consistently with his written statement.

In addition, he has information related to Mr. Bardwell's initial hiring in approximately 2002 and his working relationship with Mr. Bardwell at the Pratte Building Systems lumber yard in Phoenix.

Justin Pratte has information regarding conversations he had with Mr. Bardwell after Ron Pratte made his offer of lifetime employment to Mr. Bardwell in exchange for the compensation that is the subject of the Complaint. In those conversations, Justin Pratte cautioned Mr. Bardwell to consider the extent of the commitment before he accepted.

Justin Pratte has information regarding Mr. Bardwell's work description for Ron Pratte after accepting the offer for lifetime employment.

Justin Pratte also has information regarding a phone conversation he had with Mr. Bardwell immediately following Mr. Bardwell's decision to quit his employment with Ron Pratte and his reasons for quitting.

***He is expected to testify consistent with his deposition in this matter.***

5.      Todd Carriere
        541 East Spur Avenue
        Gilbert, AZ 85296
        602-370-5742

Todd Carriere has information regarding the agreement Bardwell made with Plaintiff to work for Plaintiff for life. He is expected to testify consistently with his written statement.

In addition, he has information regarding working with Mr. Bardwell while Mr. Carriere worked at the Pratte Building Systems lumber yard in Las Vegas,

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1    Nevada.

2         Mr. Carriere has information regarding Stellar Development and Mr.

3    Bardwell's involvement with Stellar Development.

4         Mr. Carriere also has information about a hunting trip on which Mr. Bardwell

5    discussed his working relationship with Ron Pratte and Mr. Bardwell's belief that

6    Ron Pratte expected Mr. Bardwell to work for him for the rest of Ron Pratte's life.

7         Mr. Carriere is a certified public accountant. Relying on his knowledge and

8    experience as a CPA, it is also expected that Mr. Carriere will testify about certain

9    tax issues that have come up in this matter, including the tax treatment of Ron

10   Pratte's payment to Mr. Bardwell.

11        ***He is expected to testify consistent with his deposition in this matter.***

12        6.    Jaime Ziparo
             7 Meadow Drive
13           Fayetteville, NY 13066
             602-615-8752
14

15   Jaime Ziparo has information regarding the agreement Bardwell made with

16   Plaintiff to work for Plaintiff for life. He is expected to testify consistently with his

17   written statement.

18        In addition, Mr. Ziparo has information regarding his own experiences

19   working for Ron Pratte in a role similar to the one undertaken by Mr. Bardwell. He

20   also has information regarding Mr. Bardwell's work responsibilities during the time

21   he worked for Ron Pratte following entering the employment contract for life.

22        Mr. Ziparo has information regarding conversations with Mr. Bardwell at and

23   around the time Ron Pratte distributed checks following Mr. Bardwell's acceptance

24   of the contract that is the subject of this lawsuit.

25        Mr. Ziparo has information regarding conversations he had with Mr. Bardwell

26   after Ron Pratte made his offer of lifetime employment to Mr. Bardwell in exchange

27   for the compensation that is the subject of the Complaint. In those conversations, he

28   advised Mr. Bardwell to carefully consider the ramifications of accepting the offer.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

*He is expected to testify consistent with his deposition in this matter.*

7.   Maria Jennifer Recendez
      1901 E. Tulsa St.
      Chandler, AZ 85225
      480-415-4018

Ms. Recendez was formerly married to Bardwell and is expected to have knowledge regarding the agreement between Bardwell and Plaintiff.

*She is expected to testify consistent with his deposition in this matter.*

8.   Daryl Wolfswinkle
      9180 South Kyrene Rd., Suite 112
      Tempe, AZ 85284
      480-226-9361

Daryl Wolfswinkle spoke to Bardwell regularly for many years and Bardwell explained to him the deal between him and Plaintiff. He is expected to testify that Bardwell told him that he expected to work for Pratte for the rest of Pratte's life.

*He is expected to testify consistent with his deposition in this matter.*

9.   Larry Yonker
      706 North Evergreen St.
      Gilbert, AZ 85233
      480-226-9361

Larry Yonker was a friend and neighbor of Bardwell for many years and is expected to testify that Bardwell told him on several occasions what his agreement was with the Plaintiff. *Mr. Yonker spent time at both Stellar Airpark and the Dunes with both Ron Pratte and Bardwell. He and Bardwell had a close friendship through their time spent together at those locations. Bardwell repeatedly told Mr. Yonker that his agreement with Ron Pratte is that Bardwell would work for Ron Pratte "for life." In March 2018, when Bardwell left his employment with Ron Pratte, Ron Pratte sent several emails to Bardwell trying to clarify the matter and seemingly to reconcile. Bardwell forwarded these emails to Mr. Yonker, suggesting Mr. Yonker's understanding of the contract between Bardwell and Ron Pratte.*

*Mr. Yonker is expected to testify consistent with his deposition in this*

Keromsar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

*matter.*

10.    Jeff Abendschein
       Address currently unknown
       602-315-2060

Jeff Abendschein was a friend and neighbor of Bardwell. Bardwell previously spoke to Abendschein about his agreement with the Plaintiff.

*Mr. Abendschein is expected to testify consistent with his deposition in this matter.*

**II.  Name, Address and Telephone Number of Persons Who Have Given Written or Recorded Statements Relevant to Any Party's Claims or Defenses.**

1.  Justin Pratte
    5310 East Calle Ventura
    Phoenix, AZ 85018
    602-617-8765

2.  Todd Carriere
    541 East Spur Avenue
    Gilbert, AZ 85296
    602-370-5742

3.  Jaime Ziparo
    7 Meadow Drive
    Fayetteville, NY 13066
    602-615-8752

**III.  Documents, ESI, Tangible Things, Land, or Other Property Known to Exist that may be Relevant to Any Party's Claims or Defenses**

1.    Written statement by Justin Pratte

2.    Written statement by Todd Carriere

3.    Written statement by Jaime Ziparo

4.    Redacted 2006 tax return from Ronald Pratte with appraisal information and distribution information.

5.    Defendants' Wells Fargo Account Portfolio Documents

6.    Plaintiff is unaware of any ESI that would be relevant to any claims or

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

defenses.

       7.     *Every document disclosed by any party in this litigation.*

       8.     *Every document disclosed by third parties in response to a subpoena or voluntarily provided.*

       9.     *Jeffrey Bardwell's emails disclosed in this case.*

**IV.    Statement of Facts Relevant to Claims and Defenses, and the Legal Theories upon which They are Based**

    **1.    Factual Basis for Claims**

The origin of the parties' unequivocal agreement dates back to December 2005, when Mr. Pratte gathered Mr. Bardwell, *Jaime Ziparo,* Justin Pratte, Todd Carriere, and Trevor Pratte for a meeting at a North Las Vegas airport. There, Mr. Pratte told the attendees that he was planning to sell his company, and that he wanted his family members in attendance to join in a new venture that would develop land and build homes in Arizona. Mr. Bardwell was the only attendee who was not connected to Mr. Pratte by family relation, and Mr. Pratte made clear to each attendee, including Mr. Bardwell, that Mr. Bardwell's role would be different: in exchange for the exorbitant payment Mr. Pratte was offering, Mr. Bardwell would agree to work for Mr. Pratte so long as Mr. Pratte was alive. At that time, Mr. Pratte handed each attendee, including Mr. Bardwell, a sizable check. Mr. Bardwell accepted the check with full knowledge of Mr. Pratte's expectations.

To the extent there was any misunderstanding or confusion, Mr. Pratte gathered the same group for a meeting around on or around January 2006, where he reiterated his intentions for each of them going forward. Again, Mr. Pratte reiterated that Mr. Bardwell would not be affiliated with the new venture to be pursued by Mr. Pratte's family members. Instead, Mr. Pratte made clear, once again, that Mr. Bardwell's exorbitant compensation was in exchange for Mr. Bardwell's promise to work for Mr. Pratte until Mr. Pratte passed away. The family members discussed certain expenses that they would cover for Mr. Bardwell, and the location of his

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

office was even discussed. Mr. Bardwell knew precisely the terms of his agreement with Mr. Pratte, and he even went so far as to affirm his commitment to performing under the agreement in a conversation with Justin Pratte shortly thereafter.

Mr. Bardwell commenced performance, and he worked for Mr. Pratte under the terms of their explicit agreement for twelve years. During that time, Mr. Bardwell never received a paycheck – he understood that he had received an up-front payment in excess of $10,000,000 that was far greater than any amount he could earn with traditional employment. After all, this was not an employment agreement; it was a well-defined contract between two sophisticated, well-informed parties: Mr. Pratte would pay Mr. Bardwell more than $10,000,000, and in return, Mr. Bardwell would work for Mr. Pratte until Mr. Pratte died. Mr. Bardwell never asked Mr. Pratte for a paycheck. The terms of his employment were non-traditional, and he affirmed his understanding of that agreement every day he showed up to work for Mr. Pratte without demanding any additional compensation.

*Specifically, Ron Pratte gave Mr. Bardwell a $2,000,000 check at a meeting in late December 2005. Mr. Bardwell described this check as a "signing bonus" when showing the check to his friend and neighbor, Jeff Abendschein. Mr. Pratte also transferred several properties to a group consisting of Mr. Bardwell, Jaime Ziparo, Justin Pratte, Todd Carriere, and Trevor Pratte. This group set up various companies to receive each of several properties. Ron Pratte had no input into how the companies were set up or which property went to which company. Instead, either William Shisler and/or the law firm Sacks Tierney set up the companies Pratte Companies, LLC, Pratte Construction, LLC, Pratte Residential, LLC (later Stellar Residential, LLC), BCPPZ Land Holdings, LLC, Pratte Lone Mountain Property, L.L.C., and Pratte Buckeye Property, LLC.*

*Ron Pratte transferred properties into the various entities. He transferred via quit claim deed a property located at 600 N. 94th Ave, Tolleson, Arizona. This property was appraised on July 27, 2006 for $14,790,000 and was transferred to a*

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

*Pratte Land Holdings, LLC, a company in which Mr. Bardwell owned 20%. Mr. Pratte also transferred via quit claim deed a property located in Buckeye, Arizona. This property was appraised on October 12, 2006 for $3,798,000 and was transfer to Pratte Buckeye Property, LLC, a company in which Mr. Bardwell owned 20%. Mr. Pratte also transferred via quit claim deed a property located at 2900 E. Lone Mountain Road, North Las Vegas, Nevada. This property was appraised on May 1, 2006 for $8,100,000.00 and was transferred to a Pratte Loan Mountain, LLC, a company in which Mr. Bardwell owned 20%.*

*In addition to these transfers, Ron Pratte paid the taxes on all of the assets he paid to Mr. Bardwell. The taxes for just Mr. Bardwell's payment was $3,378,092.00.*

At times, Mr. Bardwell complained about aspects of his ongoing obligations to Mr. Pratte. Mr. Bardwell complained about working at the dunes, he expressed dissatisfaction about the time spent working away from home, and various complaints to employees and associates of Mr. Pratte related to his responsibilities at the dunes. But, he kept working, without collecting traditional compensation, day after day, month after month, year after year.

In 2018, Mr. Bardwell told Justin Pratte that he'd had enough. "I can't do this anymore," Mr. Bardwell said. "Ron can come after me in Court." Then, Mr. Bardwell went dark. He stopped answering calls and text messages. He refused to meet with Mr. Pratte to discuss whatever issues has caused him to suddenly disappear. But after working for Mr. Pratte under the same agreement that was first proposed in December 2005, reaffirmed in January 2006, and then reaffirmed every day that Mr. Bardwell went to work for Mr. Pratte between 2006-2018 without receiving (or demanding) any additional compensation, Mr. Bardwell opted for a new path: intentionally breach his contractual obligations and dare Mr. Pratte to sue him while enjoying the fruits of his ill-gotten gains.

As it relates to the December 2005 meeting at the North Las Vegas Airport,

the testimony of every individual in attendance (except Mr. Bardwell) corroborates the terms of the offer Mr. Pratte made to Mr. Bardwell. As it relates to the January 2006 meeting in Arizona, the testimony of every individual in attendance (except Mr. Bardwell) corroborates the fact that Mr. Pratte and Mr. Bardwell again discussed the specific terms of their agreement -- millions of dollars in cash and real estate revenues in exchange for working for Mr. Pratte for the rest of Mr. Pratte's life -- and that Mr. Bardwell unequivocally agreed to the terms proposed by Mr. Pratte. There is no dispute that Mr. Bardwell worked for Mr. Pratte, without traditional compensation, for around twelve years. And there is no dispute that Mr. Bardwell took every penny paid to him by Mr. Pratte and then, after twelve years, quit working for Mr. Pratte without so much as a phone call or text message.

## 2.    Causes of Action Asserted by Mr. Pratte

### a.    Breach of Contract

On his claim for breach of contract, Ron Pratte must prove there was a contract with the defendant Bardwell, Bardwell breached the contract and that the breach resulted in damage to Ron Pratte.

In December 2005, Ron Pratte verbally offered to give Bardwell a percentage of Ron Pratte's business holdings if Bardwell agreed to work for Ron Pratte for life. Bardwell accepted the deal and as a result Ron Pratte paid Bardwell and his former wife Maria Recendez $10,624,200 in cash, property and tax benefits. ***Specifically, Ron Pratte paid Bardwell a $2 million check (the 709 Form lists $1 million to Jeff Bardwell and $1 million to Mrs. Jeff Bardwell). Ron Pratte also transferred $26,688,000 million in properties to companies in which Mr. Bardwell held a 20% interest (Mr. Bardwell's interest was worth $5,337,600). And Mr. Pratte paid Mr. Bardwell's taxes on the payments and transfers, totaling $3,378,092.00.*** The offer and acceptance were witnessed by Justin Pratte, Todd Carriere, Jamie Ziparo and Trevor Pratte. On or about March 3, 2018, Bardwell breached the agreement. He stopped speaking with Ron Pratte and ceased working. As a result, Plaintiff has

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

suffered damage.

### b. Promissory Estoppel

To establish promissory estoppel, Plaintiff must prove: (1) the Defendant made a promise; (2) Defendant should have reasonably foreseen that Plaintiff would rely on that promise; and (3) Plaintiff relied to its detriment on the promise. *See Higginbottom v. State*, 203 Ariz. 139, 144, ¶ 18, 51 P.3d 972, 977 (App. 2002). A party asserting promissory estoppel must also demonstrate that injustice can be avoided only by enforcement of the promise. *Double AA Builders, Ltd. v. Grand State Constr. L.L.C.*, 210 Ariz. 503, 506, ¶ 13, 114 P.3d 835, 838 (App. 2005) "Promissory estoppel provides an equitable remedy that renders a promise enforceable . . . ." *Sholes v. Fernando*, 228 Ariz. 455, 460, ¶ 14, 268 P.3d 1112, 1117 (App. 2011).

Bardwell promised Ron Pratte that he would work for him for life. Bardwell had worked with Ron Pratte for years and knew his work ethic. Bardwell was fully aware of the terms of his agreement with Mr. Pratte. Bardwell should have known that accepting over ten million dollars from Mr. Pratte would lead Mr. Pratte to reasonably expect Bardwell would actually work for him for life. Mr. Pratte would not have paid Bardwell over ten million dollars had he not believed Bardwell would fulfill his promise. It would be unjust for Bardwell to retain the $10,624,200 despite his failure to fulfil the promise.

### c. Unjust Enrichment

Plaintiff's unjust enrichment claim is made in the alternative to his breach of contract claim. Should the Court find that the statute of frauds invalidates the contractual agreement between Pratte and Bardwell, Plaintiff will seek damages in accordance under a theory of unjust enrichment.

In order be able to prevail on a claim of unjust enrichment, a plaintiff must prove each of the following five elements: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) the absence of

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

11

justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law.

Ron Pratte paid Bardwell and his spouse over ten million dollars if Bardwell worked for him for life. Bardwell only performed services for 12 years and the benefit Bardwell and his current spouse enjoy far outweighed the $10,624,200 in cash, property and tax benefits paid by Pratte.

### 3. Legal Theories Related to Defenses Raised or Facts Asserted by Mr. Bardwell

#### a. Lifetime Contract

In his MIDP Disclosure, Bardwell alleges that Plaintiff's claims as asserted in the Complaint would make him an "indentured servant" and that the asserted contract is void as against Arizona public policy. Neither is true. First, Bardwell was anything but an indentured servant. Prior to entering into the contract with Mr. Pratte, Bardwell made approximately *$150,000* a year. The contract provided him with upfront compensation worth over $10 million—or what Bardwell would have made in about *67* years at his previous salary. The fact that this windfall came with strings attached is neither unconscionable nor surprising.

Furthermore, lifetime employment is not against public policy and has been recognized as legitimate under Arizona law. Notably, it is usually the employee that seeks to enforce a lifetime employment contract—Bardwell takes the unusual position that he worked for free with no obligations despite accepting *67* years' worth of compensation upfront.

> The general rule is that in the absence of additional express or implied stipulations as to duration, where the employee furnishes no consideration in addition to the services incidental to his employment, a contract for lifetime employment amounts to an indefinite general hiring terminable at will by either party. . . . However, where, as here, the employee gives up his security of union representation to work in a non-union shop only after he has been assured lifetime employment, the employee, in giving up this valuable security with the knowledge of the employer, furnishes consideration sufficient to support the promise of

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

lifetime employment.

*Gesina v. Gen. Elec. Co.*, 162 Ariz. 35, 36–37, 780 P.2d 1376, 1377–78 (Ct. App. 1989); *see also Koepping v. Tri-Cty. Metro. Transp. Dist. of Oregon*, 120 F.3d 998, 1003 (9th Cir. 1997) ("a promise of permanent employment that was collateral to the sale of plaintiff's Portland, Oregon, bakery and his agreement not to compete for five years, was an enforceable contract"); *Langendorf United Bakeries, Inc. v. Moore*, 327 F.2d 592, 594–95 (9th Cir. 1964) (finding a lifetime contract appropriate "where there are additional circumstances which would render such a promise not unreasonable in the light of that which is bargained for").

Here, Bardwell received an extraordinary windfall and, at the same time, in consideration he gave up his right to a salary going forward. In addition, even by Bardwell's own admissions, that windfall came with expectations related to a continuing relationship and specific purposes for the use of the windfall— expectations that Bardwell failed to meet. He was not an "indentured servant." He was a man offered an opportunity. Now that he no longer wants the opportunity, he also must return the associated windfall.

Nor does Bardwell's citation to Ariz. Rev. Stat. Ann. § 23-1501 allow him to keep his windfall. As an initial matter, that Section is meant to protect employees from unfair termination—not to allow employees to keep upfront compensation despite failing to work. Furthermore, that Section explicitly states a public policy preference for contractual employment relations—not windfall gifts followed by alleged "voluntary" work.

Nor does this Section (or Arizona law in general) prohibit unwritten employment contracts.

> Arizona recognizes that implied-in-fact contract terms may create an exception to employment that is completely at will. . . . While employment contracts without express terms are presumptively at will, an employee can overcome this presumption by establishing a contract term that is either expressed or inferred from the words or conduct of the parties. . . . When so inferred, the implied-in-

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

> fact term is part of the contract. . . . An example of such a term is one that offers the employee job security—one specifying the duration of employment or limiting the reasons for dismissal . . . ."

*Demasse v. ITT Corp.*, 194 Ariz. 500, 505, 984 P.2d 1138, 1143 (1999) (internal citations omitted). It stands to reason that if an employee can enforce such terms, an employer may do the same in the unusual circumstances of this case.

Simply put, "When employment circumstances offer a term of job security to an employee who might otherwise be dischargeable at will and the employee acts in response to that promise, the employment relationship is *no longer at will* but is instead governed by the terms of the contract." *Id.* (emphasis in original). Here, a $10 million upfront windfall created a contract that Bardwell breached.

### b. The Contract between Mr. Pratte and Mr. Bardwell was not an unconditional gift.

In his MIDP Disclosure, Bardwell alleges that the compensation he received was a gift with no strings attached. Bardwell fails to establish the necessary elements to prove that his windfall was a gift. To the extent he can establish any elements to show he received a gift, that gift was clearly conditional based on the undisputed facts. Mr. Bardwell concedes that upon his receipt of the $10 million compensation, Plaintiff stopped paying him a salary or providing tax documents. Bardwell insists that his work for Plaintiff in the subsequent 12 years was little more than a hobby—one at which he worked between 1,800 and 3,000 hours a year.

Bardwell's excuse rings hollow. But more importantly, the change in Bardwell's compensation occurred at the exact moment Mr. Pratte provided him with the $10 million. "A gift inter vivos requires that donor manifest a clear intent to give to party claiming as donee and that latter be given full possession and control of property before death of donor." 11A Ariz. Prac., Real Estate Law A.R.S. § 33-601. The "[b]urden is on alleged donee seeking to establish gift of realty inter vivos, or to make imperfect gift thereof valid, under equitable doctrine of estoppel, to establish

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

14

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1    such gift by evidence which is certain, clear, complete, direct, positive, express and

2    satisfactory." *Id.*

3          Bardwell cannot establish donative intent. *See Ewing v. Hladky Constr., Inc.,*

4    *48 F.3d 1086 (Wy. 2002).* Instead, the compensation provided was clearly a

5    substitute for Bardwell's previous salary.

6          While the underlying situations are different, the most analogous reasoning

7    comes from cases examining donative intent conditioned on a continuing familial

8    relationship. A "'gift may be conditional upon the continuance . . . of a relation, and

9    if conditional the donor is entitled to its return if the relation terminates . . . The

10   condition may be stated in specific words or it may be inferred from the

11   circumstances.'" *Hellyer v. Hellyer*, 119 Ariz. 365, 367, 580 P.2d 1219, 1221 (Ct.

12   App. 1978) (quoting Restatement of Restitution § 58 cmt. b (1937)); *see also Brown*

13   *v. Dooner*, No. 1 CA-CV 12-0582, 2013 WL 6506941, at *2 (Ariz. Ct. App. Dec. 10,

14   2013) ("The donor may expressly or impliedly condition the donee's retention of the

15   gift on the continuation of the parties' relationship").

16         Here, Mr. Bardwell admits, "Plaintiff treated Bardwell not only as a valuable

17   employee, but also came to treat him like a virtual 'son,' or member of his family."

18   (Defendant's MIDP at 11:19-20.) Bardwell concedes that Mr. Pratte provided him

19   money for a specific purpose: "At that meeting Plaintiff advised his family members

20   that he was going to gift them each monies and property to get them started in their

21   own development enterprise." (*Id.* at 12:13-15.) He further concedes "that Plaintiff

22   wanted to have the five [recipients] learn to operate, in a 'hands-on' capacity, a real

23   estate construction and development company. Plaintiff then explained that the

24   second million dollars was so that, between them, the five men could start and

25   operate a construction and development business later known or referred to as Stellar

26   Development ('Stellar')." (*Id.* at 13:5-10.)

27         Even if there is merit to Mr. Bardwell's allegation that Plaintiff's payment

28   was a gift, by his own admissions, that gift was conditioned on a continuing working

15

1    relationship and was earmarked for a specific purpose. By his own theory, Defendant

2    Bardwell failed to abide by those conditions and must return the money.

3                    **c.  Mr. Bardwell's spurious claims of illegal conduct**

4            Throughout his MIDP Disclosure (and in particular in his list of persons likely

5    to have discoverable information), Bardwell alludes to several of Mr. Pratte's actions

6    that Mr. Bardwell claims (without evidence) are "illegal." Bardwell seems to suggest

7    (without ever stating it) that this conduct excuses Bardwell from fulfilling his

8    contract. Even if Bardwell's allegations were truthful (they are not), his allegations

9    do not affect his obligations under the contract or excuse his non-performance.

10           "While a contract closely connected with some unlawful plan or act is not

11   enforceable, if the contract is merely collaterally connected with an unlawful purpose

12   or act, the rule generally adopted is that the contract is valid if it is only remotely

13   connected with an unlawful transaction and rests on an independent and legal

14   consideration, and the plaintiff can establish his or her case without relying on the

15   unlawful transaction." 8 Williston on Contracts § 19:11 (4th ed.); *see also Mountain*

16   *States Bolt, Nut & Screw Co. v. Best-Way Transp.*, 116 Ariz. 123, 124, 568 P.2d 430,

17   431 (Ct. App. 1977) ("Thus if the acts to be performed under the contract are

18   themselves illegal or contrary to public policy, or if the legislature has clearly

19   demonstrated its intent to prohibit maintenance of a cause of action, then recovery

20   should be denied. However, none of these circumstances is present here. The

21   transportation of goods is not in and of itself an illegal purpose or contrary to public

22   policy."); *E & S Insulation Co. of Arizona v. E. L. Jones Const. Co.*, 121 Ariz. 468,

23   470, 591 P.2d 560, 562 (Ct. App. 1979) ("The fact that the contract was performed

24   by a subcontractor who had not paid Arizona taxes for two successive years does not

25   add a public policy reason to bar recovery, since the Legislature allows a General

26   contractor in the same situation both to contract for and perform the public work").

27           Bardwell's allegations of illegal conduct (related to cash payments to workers

28   and FAA regulations for Plaintiff's plane) have nothing to do with the subject of the

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

employment contract between Mr. Pratte and Bardwell—*indeed the allegations are so far attenuated that they are not even relevant.* Instead, Bardwell alludes to these allegations solely to publicly accuse Mr. Pratte of misconduct in an ill-advised attempt to gain leverage in this litigation.

**V.      Computation of Each Category of Damages and Documents Supporting Same**

Plaintiff seeks the return of the $10,624,200 in cash, property and tax benefits he paid to Bardwell and his family. The $10,624,200 is supported by the appraisals and gift tax filings from 2006. *In addition, Plaintiff is entitled to recover his attorneys' fees under A.R.S. 12-341.01.*

*Mr. Pratte will further supplement his damages disclosure here with expert reports and expert testimony on the deadline set by the Court.*

**VI.     Insurance or Other Agreement Under Which an Insurance Business or Other Person or Entity May Be Liable To Satisfy All or Part of a Possible Judgment in the Action or to Indemnify or Reimburse a Party for Payments Made by the Party to Satisfy the Judgment.**

Not applicable.

DATED this 26th day of August, 2020

KERCSMAR & FELTUS PLLC

By: *s/ Gregory Collins*
Gregory B. Collins
Zach R. Fort
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
*Attorneys for Plaintiff*

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1

## CERTIFICATE OF SERVICE

2       I certify that on August 24, 2020, I transmitted the foregoing, via electronic mail and

3   U.S. Mail, to the following:

4
    Thomas M. Connelly
5   **LAW OFFICES OF THOMAS M. CONNELLY**
    2425 East Camelback Road, Suite 880
6   Phoenix, Arizona  85016
    Phone: (602) 957-1993
7   Facsimile: (602) 957-2137
    Tconnelly2425@aol.com
8

9   Thomas J. Marlowe
    **LAW OFFICES OF THOMAS J. MARLOWE**
10  2425 East Camelback Road, Suite 880
    Phoenix, Arizona  85016
11  Phone: (602) 957-1993
    Facsimile: (602) 957-2137
12  Tmarlowe2425@outlook.com

13
    *Attorneys for Defendants*
14

15
    *s/*_____
16

17

18

19

20

21

22

23

24

25

26

27

28

*Kersmar & Feltus PLLC*
*7150 East Camelback Road, Suite 285*
*Scottsdale, Arizona 85251*
*(480) 421-1001*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Ronald H. Pratte,                          )
                                           )
        Plaintiff,                         )
                                           )
vs.                                        )  No.
                                           )  2:19-cv-00239-
Jeffrey Bardwell and Fanny F.              )  PHX-GMS
Bardwell, husband and wife,                )
                                           )
        Defendants.                        )
                                           )

DEPOSITION OF JUSTIN PRATTE

Phoenix, Arizona
November 26, 2019
10:00 a.m.

REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

```
1                        I N D E X

2

3   WITNESS                                    PAGE

4   JUSTIN PRATTE

5         Examination by Mr. Connelly       7, 134

6         Examination by Mr. Marlowe            80

7         Examination by Mr. Collins           129

8

9

10                     E X H I B I T S

11  Deposition
    Exhibits      Description                 PAGE
12
    1        Arizona Corporation Commission      39
13           Application for Reservation of a
             Corporate Name - Stellar
14           Development, L.L.C., Affidavit of
             Publication (2 pages)
15

16  2        E-mail chain between several        58
             parties (Bates Bard_JZ0012 through
17           15; Bard_JZ0018, 19) (6 pages)

18  3        E-mail chain amongst several        63
             parties (4 pages)
19

20  4        E-mail dated 1/19/2015 from Justin  68
21           Pratte to Dad (3 pages)

22  5        Sacks Tierney Interoffice           72
23           Memorandum dated April 13, 2006, to
             Steven Goldstein from Shannon Mason
24           (Bates Bard_TP0665 through 667)
             (3 pages)
25
```

ANITA LANDEROS REPORTING, INC.
(602) 230-8793

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1                         E X H I B I T S

2    Deposition
     Exhibits        Description                      PAGE
3
     6               Operating Agreement of BCPPZ        75
4                    Investment Holdings, L.L.C.
                     (Bates Bard_TP0039 through 73)
5                    (35 pages)

6
     6A              Operating Agreement of BCPPZ        75
7                    Investment Holdings, L.L.C.
                     (Bates_TC0191 through 220)
8                    (30 pages)

9
     7               Arizona Corporation Commission      81
10                   letter dated April 22, 2006, to
                     Todd Carriere from Crystal Begay;
11                   Articles of Organization of BCPPZ
                     Land Holdings, L.L.C.; Acceptance
12                   of Statutory Agent
                     (Bates Bard_TC0233, 235, 236)
13                   (3 pages)

14
     8               Letter dated August 14, 2006, to    81
15                   Todd Carriere from Shannon Mason;
                     Notarized signature of Ronald Pratte;
16                   Quit Claim Deed - Pratte Buckeye
                     Property, L.L.C.; Corrective Quit
17                   Claim Deed (Bates Bard_TC0371, 373,
                     356, 372)  (4 pages)
18

19   9               Letter dated August 22, 2006, to    83
                     Todd Carriere from Keri Tignini;
20                   Lawrence Bloom's Summary Appraisal
                     Report (Bates Bard_TC0386 through
21                   436)  (51 pages)

22
     10              Affidavit of Property Value         87
23                   (Bates Bard_TP0002)  (1 page)

24
     11              Assignment of Lease                 89
25                   (Bates Bard_TC0384, 385)  (2 pages)

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1       E X H I B I T S
   Deposition
2  Exhibits      Description                    PAGE

3  12         Operating Agreement of Pratte          90
              Buckeye Property, L.L.C.
4             (Bates Bard_TP0378 through 410)
              (33 pages)
5

6  13         A Complete Appraisal, Self-Contained    95
              Report - Location - 2900 East
7             Lone Mountain Road, North Las Vegas
              (Bates Bard_TC0437 through 592)
8             (156 pages)

9

10 14         Grant, Bargain, Sale Deed - Pratte      97
              Building Systems, L.L.C., to Pratte
              Development Company, Inc., Exhibit A
11            (Bates Bard_TC0367 through 369)
              (3 pages)
12

13 15         Assignment of Lease                     99
              (Bates Bard_TC0382, 83) (2 pages)
14

15 16         Special Warranty Deed                   100
              (Bates Bard_TP0617) (1 page)
16

17 17         Nevada Title Company - Seller's         104
              Closing Statement (Bates
18            Bard_TC003, through 005; 356)
              (4 pages)
19

20 18         Certificate of Limited Liability        105
              Company Status and Authority of
21            Pratte Lone Mountain Property,
              L.L.C. (Bates Bard_TP0610 through 612)
22            (3 pages)

23

24

25

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1                        E X H I B I T S

2    Deposition
     Exhibits        Description                          PAGE

3    19          Pratte Lone Mountain Property,           107
4                L.L.C., Joint Unanimous Written
                 Consent to Action by All of the
5                Members and the Managers Without
                 a Meeting (Bates_TP0621 through
6                625) (5 pages)

7
8    20          Agreement for Purchase and Sale of       108
                 Real Estate -Pratte Lone Mountain
9                Property, L.L.C.
                 (Bates_TP0513 through 515; 520,
10               516 through 541) (30 pages)

11   21          Grant, Bargain, Sale Deed -              109
12               Pratte Trust Agreement to Pratte
                 Lone Mountain Property, L.L.C.
13               (Bates Bard_TC0357 through 360,
                 362) (5 pages)

14

15

16

17

18

19

20

21

22

23

24

25

1    DEPOSITION OF JUSTIN PRATTE

2  was taken on November 26, 2019, commencing at 10:01 a.m.,

3  at the Law Offices of Thomas M. Connelly, 2425 East

4  Camelback Road, Suite 880, Phoenix, Arizona, before Anita

5  Landeros, a Certified Reporter in the State of Arizona.

6

7  COUNSEL APPEARING:

8  For the plaintiff:

9          By:  MR. GREGORY B. COLLINS
           Kercsmar & Feltus, PLLC
10         7150 East Camelback Road
           Suite 285
11         Scottsdale, Arizona  85251

12

13

   For the defendants:
14
           By:  MR. THOMAS M. CONNELLY
15         Law Offices of Thomas M. Connelly
           2425 East Camelback Road
16         Suite 880
           Phoenix, Arizona  85016

17

18                   AND

19
           By:  MR. THOMAS J. MARLOWE
20         Law Offices of Thomas J. Marlowe
           2425 East Camelback Road
21         Suite 880
           Phoenix, Arizona  85016

22

23

24

25

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1    A.   I was estimating manager for lumber and truss.

2    Q.   Okay.  And, at that time, who were you working

3  with, or did you have an immediate supervisor?

4    A.   I did.

5    Q.   And who was that?

6    A.   Joe Tearhark.

7    Q.   And was Jeff Bardwell involved in that company as

8  well?

9    A.   Yes, he was.

10    Q.   And do you remember what his --

11    A.   He was a lumberyard manager.

12    Q.   Okay.  And you are the youngest son of Ron

13  Pratte?

14    A.   That's correct.

15    Q.   The plaintiff in this case?

16    A.   Yes, sir.

17    Q.   How would you describe your relationship with

18  your dad?

19    A.   Typical father-son relationship.

20    Q.   So a good relationship?

21    A.   Yes.

22    Q.   Okay.  And would have been true both in '05 and

23  '06 through the present?

24    A.   Yes.

25    Q.   So you two were able to communicate and had no

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1  problem in that respect?

2      A.    Largely, yes.

3      Q.    Well, on both a business and social level?

4      A.    Yes.

5      Q.    Okay.  Do you know if your dad, Ron, has many

6  social friends?

7      A.    Absolutely.

8      Q.    Can you name a few of them?

9      A.    Daryl Wolfswinkel, Jim Pollard, Bill Diana, Scott

10  Urschel, Larry Yonker, Richard Goettel.  How far do you

11  want me to go with this?

12      Q.    That's helpful.

13            What is Ron's relationship, as far as you

14  know, with Daryl Wolfswinkel?

15      A.    They're just -- they've been friends for -- I

16  don't know.  As long as I can remember.

17      Q.    How old is Ron?

18      A.    72.

19      Q.    And Daryl?

20      A.    Roughly the same age, I would venture to say.

21      Q.    Do you think that Daryl is in his early 70s?

22      A.    I've never asked him when his birthday is, but by

23  the look of it, sure.

24      Q.    And Bill (sic) Pollard?

25      A.    Jim Pollard.

1  Systems.  We were all aware of that for quite some time.

2            At that point, the offer -- I wouldn't call

3  it an offer.  And it wasn't an opportunity.  It was simply

4  an idea.  If you guys want to do this, great.  Either way

5  you are all going to still get these checks regardless.

6            But he did propose an idea of how the

7  structure would work in which myself, Jaime Ziparo, Todd

8  Carriere and Trevor Pratte would all -- you know, it would

9  be up to us to run day-to-day businesses for this new

10  venture, if we chose to go forward with that.  And part of

11  that situation also was the fact that Jeff would also be a

12  member of this company, and even though he would be on

13  paper a one-fifth owner, he would not be working there.

14  He would be working for Ron directly.

15      Q.    Was it suggested all five of the individuals

16  you've mentioned with the exception of Ron -- Ron was

17  giving the money, the $2 million check.  Was it suggested

18  by Ron what all of the individuals might do with the $2

19  million?

20      A.    No.  It was entirely up to us.  We used that

21  money as seed money to stake the company, to get up and

22  running.  But no, other than that, I don't believe that

23  there was -- really was a suggestion on what to do with

24  it.

25      Q.    How much of the 2 million did you use to seed the

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1          Those assets, which were real estate, were

2   gifted to the five of us.  And we retained the leases

3   and -- well, we retained the property, which was leased to

4   Pulte Homes.

5       Q.   But when Ron was involved with Pulte Homes, had a

6   relationship with them, things didn't change too much with

7   these new entities that the five of you formed.  I mean,

8   you were still home building, correct?  You needed lumber

9   and other materials, correct?

10      A.   We did not use those facilities for our companies

11  moving forward, only Pulte Homes --

12      Q.   What did you mean by that?

13      A.   Only Pulte Homes utilized both of those

14  lumberyards after January 1, 2006.

15      Q.   So how was Stellar building homes?

16      A.   We built custom homes.  It's different -- the

17  manner of construction is completely different.  We

18  don't -- lumber gets delivered directly to the job site --

19  excuse me.

20          All materials regarding building get

21  delivered directly to the job site.

22      Q.   So somebody would have to order the lumber?

23      A.   Yes, sir.

24      Q.   Wasn't it Jeff that was ordering the lumber?

25      A.   No.

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1     A.    Same thing I just told you minutes ago, his

2   responsibility was to do whatever Ron asked him for as

3   long as Ron was alive.

4     Q.    I'm a little confused because looking at your

5   statement, it reads:  "At which time, Ron Pratte revealed

6              to us all that he was selling his company and

7              that he had an offer for all five of us."

8              Do you remember writing that?

9     A.    Yes.

10    Q.    Well, you say he revealed to us all, not to the

11  others.  I already knew about it.

12              So this was the first time you became aware

13  of what Ron was intending to do, correct?

14    A.    That's incorrect.

15    Q.    I'm just reading what you wrote.

16    A.    Understood.

17    Q.    "The offer was very specific in nature and

18              verbiage and clearly audible."

19              I guess you're indicating that everybody

20  would have heard whatever you heard?

21    A.    Yes.

22    Q.    Did anybody leave the meeting at any time?

23    A.    I don't recall.

24    Q.    Did you leave the meeting at any time?

25    A.    I don't recall.

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1    Q.    This was a fairly momentous event, was it not?

2    A.    Yes.

3    Q.    I mean, you get handed a check for $2 million?

4    A.    Yes.

5    Q.    What else can you recall from that meeting

6  besides what you have already related to us?  You said it

7  lasted about an hour?

8    A.    My assumption, yeah, maybe even less.  I mean, it

9  I couldn't -- I can't tell you exactly how long it lasted.

10   Q.    Well, are you saying that it lasted less than an

11  hour now?

12   A.    I'm telling you that I can't tell you

13  specifically how long it was.  Was it 40 minutes?  Was it

14  70 minutes?  Both of those are close to an hour.  I wasn't

15  staring at my watch the entire time.

16   Q.    Well, we've been going here now not quite an

17  hour, so does it seem like your meeting in Las Vegas was

18  about this long?

19   A.    Sure.

20   Q.    And was a good portion of the meeting made up of

21  Ron giving advice about the money he was paying over and

22  how you might all use it?

23   A.    He had made suggestions, as I intimated to you

24  earlier, that we should use some of the money for seed

25  money.  But he didn't specifically tell us what to do with

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1    it.

2        Q.    That was up to each of the five of you?

3        A.    That's correct.

4        Q.    So that money could have been used any way the

5    five of you wanted?  You didn't have to put it into these

6    companies?

7        A.    We didn't have to, but we all did.

8        Q.    You chose to?

9        A.    Of course.

10       Q.    Well, you say "of course."  You chose to because

11   the five of you got together?

12       A.    Yes.

13       Q.    And so while Ron had some suggestions, his

14   suggestions didn't -- wasn't the reason the five of you

15   formed these entities, correct?

16       A.    Ask the question again, please.

17       Q.    Sure.

18              While Ron had some suggestions, it was the

19   five of you, the five members, getting together that ended

20   up in the formation of these entities, these companies

21   I've mentioned to you?

22       A.    Yes.

23       Q.    So Ron had nothing to do with that other than a

24   suggestion?

25       A.    That is correct.

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1    Pratte Buckeye Property didn't need to be funded.  All

2    those were was articles of organization and that transfer

3    of -- deed of trust -- a first deed of trust into all five

4    of us.

5        Q.   And there were already assets in these entities,

6    property assets?

7        A.   They weren't in those -- those entities had not

8    been formed yet.  Ron Pratte owned them up until

9    January 1, 2006.

10       Q.   If Ron Pratte had decided, since he was just

11   making suggestions in North Las Vegas, not to transfer

12   those entities, the five of you would have still gotten to

13   keep your $2 million, correct?

14       A.   Yes.

15       Q.   And not a bad day for a meeting in North Las

16   Vegas if that was the outcome of that meeting?

17       A.   It was not a bad day.

18       Q.   So if I understand this correctly, the five of

19   you got a check for $2 million, and among other things

20   that were discussed, there was a discussion about forming

21   entities between the five of you that each of you had come

22   into this $2 million and possibly going forward as

23   partners in these entities; is that accurate?

24       A.   Yes.

25       Q.   Nothing was signed on that evening; was it?  Was

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1    A.    Yes.

2    Q.    And it's one of those pages.  It's a fairly long

3    e-mail from Trevor.  Can you explain why his recollection

4    of things seem to be very different than yours?

5    A.    No.

6    Q.    You indicated earlier that you had a good

7    relationship with Ron Pratte, your dad, correct?

8    A.    Yes.

9    Q.    Is he somebody whose approval you'll seek with

10   some regularity?

11             MR. COLLINS:  Object to form.

12             THE WITNESS:  Can you ask that question

13   again?

14   Q.    BY MR. CONNELLY:  Do you want me to rephrase?  Do

15   you work at getting your dad's approval?

16   A.    Occasionally.

17   Q.    Okay.  Do you feel like he ignores you?

18   A.    Occasionally.

19   Q.    What does "occasionally" mean?

20   A.    From time to time.

21   Q.    Not with any regularity?

22   A.    I would say that he -- that I feel as if he

23   ignores me from time to time.

24   Q.    Okay.  Does he leave you out of family functions?

25   A.    Can you define what a "family function" is?

DEPOSITION OF JUSTIN PRATTE
November 26, 2019

1    Q.    Going to the dunes.

2    A.    Well, I have an open invitation to go there seven

3    days a week, 365 days a year.

4    Q.    So is your answer:  No, he includes me?

5    A.    My answer is that if I had showed up at the sand

6    dunes any day of the week, he would not be disappointed.

7              (Deposition Exhibit Number 4 was marked for

8    identification.)

9    Q.    BY MR. CONNELLY:  Mr. Pratte, you have been

10   handed what's been marked as Exhibit 4, I believe.  Do you

11   see that e-mail on Page 2?

12   A.    Yes.

13   Q.    Do you remember writing this?

14   A.    Yes.

15   Q.    What is that?

16   A.    It's an e-mail that I had written to my father.

17   Q.    And relating to what?

18   A.    It's pretty self-explanatory that I was upset

19   that I wasn't asked to go on one particular trip to the

20   dunes.

21   Q.    Okay.  Isn't the e-mail a little more expansive

22   than that?  That you're complaining of years of not being

23   able to get close to your dad?

24   A.    Yes, sir.

25   Q.    You wanted your dad's approval, correct?