*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Ronald H. Pratte,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  ) No.
                                     ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.        ) PHX-GMS
Bardwell, husband and wife,          )
                                     )
        Defendants.                  )
                                     )


DEPOSITION OF JEFF ABENDSCHEIN

Scottsdale, Arizona
February 13, 2020
3:30 p.m.


REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1                    I N D E X

2

3    WITNESS                                    PAGE

4    JEFF ABENDSCHEIN

5         Examination by Mr. Connelly          4, 85

6         Examination by Mr. Collins            75

7

8

9              MR. CONNELLY'S REQUEST

10                 Page   Line
                    41     15
11

12

13

14              E X H I B I T S

15   Deposition
     Exhibits      Description                  PAGE

16              (No exhibits marked.)

17

18

19

20

21

22

23

24

25

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1     A.    Yep.   We used to go to Buttercup.   That was the

2   area that we originally went and it was just a

3   recreational area.

4     Q.    Is that where you first met Ron Pratte, was up at

5   the dunes?

6     A.    Yes.

7     Q.    And how did you end up going up there?

8     A.    We all just drove separately and just met up.

9     Q.    That was a bad question.

10    A.    I got invited through Jeff.

11    Q.    Thank you.

12          So Jeff Bardwell invited you up there?

13    A.    Yes.

14    Q.    And through that invitation you went up and

15   that's where you met Ron Pratte?

16    A.    Yes.

17    Q.    Okay.   And what time frame are we talking about,

18   roughly?

19    A.    Maybe 2005, 2006.

20    Q.    Okay.   And did you get to know Ron Pratte?

21    A.    Uh-huh, yes.

22    Q.    What was your relationship like back in the day?

23    A.    I don't know.   Just sharing a common hobby.

24   Everybody out there, you know, racing around the desert.

25    Q.    I mean, did you get to know him well enough that

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1  you would call him a friend?

2      A.   I wouldn't say, like, personally close to him.

3  More like an acquaintance through other friends.

4      Q.   All right.  So you had other close friends that

5  knew him and you would associate with that group.

6      A.   Yes.

7      Q.   Is that a fair way to put it?

8      A.   Uh-huh, yes.

9      Q.   Do you stay in touch with him now?

10     A.   I've seen him -- the last time I seen him was

11 November 2nd weekend.  It was like the weekend after

12 Halloween.

13     Q.   So this past year, '19?

14     A.   Uh-huh, yes.

15     Q.   Okay.  Is that the last time you've talked to

16 him?

17     A.   Yes.  Yeah, he invited me out to the dunes that

18 weekend.

19     Q.   Did you go?

20     A.   Yeah.

21     Q.   All right.  How did you get out there?

22     A.   I drove.

23     Q.   Alone?

24     A.   With my son.

25     Q.   Do you know how old Ron is?

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1    A.    No.

2    Q.    Was his memory still pretty good?

3    A.    Yeah, he seems actually better.

4    Q.    Better how?

5    A.    His health seemed better to me.  He used to

6  smoke.

7    Q.    You must be reading my questions.  My next

8  questions is:  How is Ron's health overall?

9    A.    Yeah, he seems better.

10    Q.    He quit smoking?

11    A.    Yeah.  From, like, when I used to go to the sand

12  dunes like 2005 maybe to -- I sold my sand rail in 2012 or

13  somewhere around there.  So I hadn't gone in years.  But

14  he used to smoke back then and just wasn't as healthy.

15    Q.    But overall he seemed in pretty good shape?

16    A.    Yeah.

17    Q.    Okay.  So last time you remember seeing him was

18  November 2019.  And then prior to that -- and I know this

19  is the best that you can recall -- was roughly the late

20  fall, October -- of that time frame -- of '18?

21    A.    Yes.

22    Q.    Okay.  Have you talked -- besides seeing him back

23  in November, have you talked to Ron telephonically in the

24  last two years?

25    A.    No.  A text to meet for dinner in October, I

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1  think, of '18.  And that's when he was asking me about how

2  I knew Jeff and how it came to him getting a job with Ron,

3  so ...

4      Q.    Jeff getting a job?

5      A.    Yeah.

6      Q.    And who was asking you these questions?

7      A.    Ron.

8      Q.    Let me understand.  This was a conversation

9  you're recalling that occurred back in late '19 -- late

10  '18?

11      A.    Yes.

12      Q.    And you're talking to Ron Pratte?

13      A.    Yes.

14      Q.    And Ron Pratte is asking you what?

15      A.    How, in my way, how did I know how he got a job.

16  Like, how did Ron offer Jeff a job?  I was neighbors with

17  Jeff.

18      Q.    Why would Ron Pratte be asking you how Ron hired

19  Jeff?

20      A.    He wanted to know what I knew.  Like, he got a

21  check.  So I was, like, one of the first people that seen

22  a sign-on bonus, what you would call it, I guess, or --

23  for him to come work for him.

24      Q.    Okay.  Let's talk about that.  What do you recall

25  about Jeff receiving any monies or any assets?

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1    A.    Yeah.

2    Q.    I want you to focus on that.

3    A.    We met out to dinner.  And he just wanted to

4  know, like, what I knew about Jeff, as far as where he

5  went.  Like, I don't know.  I heard through Larry that he

6  went to Mexico.  I don't even think at that point anybody

7  knew where he was.

8              He took off with an ATV of his that Ron had

9  to report stolen and I think he brought it back.  It took

10  a while, but he brought it back.  But as far as like the

11  business stuff, he --

12    Q.    Who brought the ATV back?

13    A.    I think Jeff.  I don't know.  I just know Ron got

14  it back, which is good.

15    Q.    The ATV was returned, but do you know who brought

16  it back?

17    A.    Yeah, I don't know.  I have no idea.

18    Q.    It wasn't Jeff?

19    A.    I don't know.

20    Q.    Okay.  Well, we have information on that.  We'll

21  maybe talk about that later.  So you went out to dinner.

22  Where did you go?

23    A.    Serrano's.

24    Q.    And who was there?

25    A.    Me, Larry and Jeff -- or Ron.  Sorry.

1    Q.    So Larry Yonker was with you at this grub?

2    A.    Yes.

3    Q.    And this was approximately when?

4    A.    October of 2018.  He wanted to see if I could

5  write a letter.

6              What was that letter that I had to write?

7  Like a deposition letter, I guess.

8              MR. COLLINS:  We'll see if he asks.

9    Q.    BY MR. CONNELLY:  Did he ask you to write a

10  letter and write down what you remember about -- what?

11  What was he asking you to write a letter about?

12    A.    Just what I knew of Jeff and their business.

13    Q.    Jeff and what business?  Jeff and Ron's business?

14    A.    Jeff and Ron's business, yes.

15    Q.    How would you know anything about Jeff and Ron

16  Pratte's business?

17    A.    That's what he was asking me.  And he said, would

18  I write a letter.  And I said:  Sure.  I'll write what I

19  remember.

20    Q.    And when you went out to dinner, I assume that it

21  was the three of you sitting at the table?

22    A.    Yes.

23    Q.    So was Ron making the same inquiries of Larry as

24  he was making of you at that dinner?

25    A.    No, just me.

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1    Q.   What was Larry doing there?

2    A.   We're friends, so ...

3    Q.   And he just sat there and listened?

4    A.   Yeah.

5    Q.   He never participated in the conversation?

6    A.   Him and Ron go out all of the time, so that was,

7    like, I guess, normal.

8    Q.   All right.  So you're at dinner at Serrano's.

9    Larry Yonker is there and Ron wants to talk to you about

10   what you know about Jeff and his, meaning Ron's,

11   relationship?

12   A.   Yes.

13   Q.   And that's how the conversation started?

14   A.   Ron wanted to know what I knew as far as him

15   going to business -- to work for Ron.  And I just said

16   that I remember --

17   Q.   Okay.

18   A.   -- '04, '05.

19   Q.   Sorry.

20        So Ron wanted to know what you knew about

21   Jeff Bardwell coming to work for Ron.  And this was Ron

22   asking you this?

23   A.   Yes.

24   Q.   Well, did you say; what do you mean?

25   A.   Kind of.  I don't know.  I don't have a whole lot

1  of information like that.  All I knew is that, like, I'm a

2  workout partner with Jeff.  I kind of mentored him into --

3  you know, not mentored him.  But talked to him about

4  securing a job with Ron and then he did.  So that's ...

5     Q.   All right.  And then I assume Ron went on to

6  explain the nature of this lawsuit he brought and what he

7  was claiming and wanted to know if you knew anything about

8  these things that he was claiming, if you had ever heard

9  any of this before or were familiar with it?

10    A.   Not any of the partners in business.

11    Q.   I didn't ask you about the partners.

12         You just went through -- I asked you Ron's

13  asking you to tell him, out at dinner with Larry Yonker

14  sitting there, what you knew about the business between

15  him and Jeff Bardwell, correct?

16         And you went on to describe that you were

17  workout friends and in the neighborhood and that was the

18  end of your answer.

19         And what I'm asking you now is:  Did Ron

20  Pratte put some context on this so you knew what he was

21  talking about?  And said:  Well, I brought a lawsuit

22  against Jeff Bardwell.

23         I see you nodding your head.  Did he do

24  that?

25    A.   Yes.

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1   Q.   And did he explain what the nature of the lawsuit

2  was?

3   A.   Yes.  He said he was trying to get some of his

4  money back.

5   Q.   Okay.  So did he explain what he was alleging

6  against Jeff Bardwell so you understood what was going on?

7   A.   He just said Jeff breached his contract.  He took

8  off.  I'm trying to get some of my money back.  The

9  principle of the matter.

10   Q.   And did he explain to you what kind of work Jeff

11  was supposed to be doing for him?

12   A.   As far as I know, all of the work Jeff's ever

13  done is, like -- I don't know everything that he does.

14         MR. COLLINS:  I think he's trying to limit

15  the question just to the conversation at Serrano's.  So --

16         MR. CONNELLY:  I am.

17         MR. COLLINS:  I'm trying to help.

18         THE WITNESS:  Yeah.

19         MR. CONNELLY:  No, that's okay.  That's

20  fine.  Go ahead.

21         THE WITNESS:  So I don't have a whole lot of

22  information.

23         MR. COLLINS:  Right.  But if you break it

24  into two separate chunks, you know, what you knew

25  separately.  And I think right now he's trying to focus on

1  bring Larry?

2      A.   Larry was there.  Everybody drove separately.

3      Q.   So who invited Larry?

4      A.   Ron.

5      Q.   So Ron asked you and Larry to be there.  But how

6  was Ron friends with Larry?

7      A.   Through -- I introduced Larry to Jeff.  And then

8  Jeff introduced -- well, we all did.  Larry's a buddy.  So

9  going to the dunes.

10     Q.   So Larry's relationship with Ron Pratte would

11 have been similar to yours?

12     A.   Yes.  But Larry worked on some of his car museum.

13     Q.   But both of you met Ron through Jeff?

14     A.   Yes.

15     Q.   And you're going up to the dunes and things would

16 have been if Jeff invited you, you'd go.  And did you

17 indicate that Ron would call you sometimes separately and

18 invite you?

19     A.   Just this past November.

20     Q.   Is that the first time that he called you, in

21 November of '18 to go up, himself?

22     A.   Yes.

23     Q.   And was the same true with Larry?  Larry was kind

24 of invited through Jeff, and if Jeff invited Larry, he'd

25 go, when he could?

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1      Q.   How many times has Ron Pratte invited you to

2   dinner?

3      A.   Just here in town, just once.

4      Q.   That was it, wasn't it?

5      A.   Yeah.

6      Q.   He had never invited you to dinner prior to that,

7   had he?

8      A.   No, just at the dunes.

9      Q.   Has he ever -- at the dunes, you were eating kind

10  of on the run, outside, et cetera, right?

11     A.   No.  Sometimes we'd get together.  But you kind

12  of got to be invited.

13     Q.   Well, these are large groups?

14     A.   Yeah.

15     Q.   Eight, 10, 20 people?

16     A.   Yep.

17     Q.   I'm talking about one on one or three people at

18  dinner.

19     A.   Sure.

20     Q.   That was the only time that Ron Pratte ever

21  invited you to dinner?

22     A.   Yes.

23     Q.   Larry the same, correct?

24     A.   No.  I think they had frequented more --

25     Q.   So --

1    A.   They'd go to breakfast and so ...

2    Q.   And how many times has Ron invited you to dinner

3 since November of 2018?

4    A.   Just that one time.

5    Q.   So would it be fair to say Ron invited you to

6 dinner because he wanted to talk about this lawsuit that

7 he had brought?

8    A.   Yes.

9    Q.   Not about the dunes, but about the lawsuit?

10    A.   Yes.

11    Q.   So when you got to dinner, you didn't know

12 anything about the lawsuit at that point when you walked

13 into the restaurant, did you?

14    A.   I didn't.

15    Q.   How did you become aware of the -- strike that.

16            Let me ask it a different way.  Not knowing

17 anything about the lawsuit walking in and sitting down at

18 dinner, Ron would have explained what the lawsuit was

19 about and what he was alleging, did he not?

20    A.   Yeah.  He explained that he was going to sue Jeff

21 to get some money back and he wanted to know what I knew

22 about their relationship.

23    Q.   Okay.  So Ron explained the nature of his

24 lawsuit?

25    A.   Yes.

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1    Q.   And this would have been, you know, at least a

2  couple of years ago.  And I understand that you're trying

3  to remember now.  But, generally, that's your

4  recollection?

5    A.   Yes.

6    Q.   And not to belabor the point, but just to be

7  clear, because I think we've kind of gone back and forth

8  with you trying to be helpful and your call -- and I

9  recognize time is an issue here -- you get invited to

10  dinner, which is a little unusual.  First and last time

11  you're ever invited to dinner by Ron Pratte, correct?

12    A.   Yes.

13    Q.   You don't know what it's about until you get to

14  the Serrano's, the restaurant, correct?

15    A.   Correct.

16    Q.   And, at some point, Ron says:  Look, the reason I

17  asked you both here -- I assume he said both, because he

18  invited Larry -- was to let you know that I filed a

19  lawsuit against Jeff Bardwell.  And I want to explain it

20  to you and ask for your help as to what you might recall.

21    A.   Yes.

22    Q.   Is that an accurate statement?

23    A.   Fair.

24    Q.   Okay.  Did Ron ask you at that meeting to be a

25  witness for him at the end of the dinner?

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1     A.   He asked if I could write that letter.  I don't

2  know what that letter is called.  A deposition letter?

3     Q.   Was he asking for something like a declaration?

4     A.   Yeah.  I think that's what it's called.

5     Q.   I don't want to put words in your mouth.

6     A.   Yes.

7     Q.   Write up something that says this is what I know?

8     A.   Yes.

9     Q.   Did you do that?

10    A.   That's what I did within, like, a week of

11  October.

12    Q.   So you did a draft?

13    A.   Yes.

14    Q.   And then what did you do with that?

15    A.   I e-mailed it to -- I'm not sure where it went.

16  I'd have to look at the e-mail.

17    Q.   Do you still have it?

18    A.   Yes.

19    Q.   The letter?

20    A.   Yes.

21    Q.   Could we get a copy of that?

22    A.   I can e-mail it to Greg.

23         MR. COLLINS:  Once the e-mail's here, I'll

24  mail to you.

25         MR. CONNELLY:  I don't have that.

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1    Q.    You talked to no one?

2    A.    Nobody.

3    Q.    Larry Yonker?

4    A.    No.

5    Q.    Anybody suggest to you what kind of questions you

6  might be asked?

7    A.    No.

8    Q.    You weren't subpoenaed to come here, were you?

9    A.    No.

10   Q.    So did Mr. Collins ask you to come voluntarily?

11   A.    Yes.

12   Q.    And you came here to see if you could help

13  Mr. Pratte in this matter, correct?

14   A.    Yes.

15   Q.    And that's an accurate statement?

16   A.    Yes.

17   Q.    You're not here to help Jeff Bardwell?

18   A.    No.

19   Q.    You don't like Jeff Bardwell, do you?

20   A.    I don't really know him anymore.  I haven't hung

21  out with him in maybe seven years.

22   Q.    But you used to be close friends and neighbors?

23   A.    Yes.

24   Q.    You had a falling out with Jeff Bardwell?

25   A.    Yes.

DEPOSITION OF JEFF ABENDSCHEIN
February 13, 2020

1    Q.    What did that involve?

2    A.    He had an affair with my wife.

3    Q.    With your wife or fiancee?

4    A.    Fiancee.

5    Q.    Which was she?

6    A.    What's that?

7    Q.    Which was she, wife or fiancee?

8    A.    We have never been married, so fiancee.

9    Q.    So you just misspoke.  She wasn't your wife.  She

10   was your fiancee?

11   A.    I didn't call her my wife.  She was my fiancee.

12   Q.    Okay.  I understand what you mean.  When did this

13   occur?

14   A.    I think September of '17.

15   Q.    So within less than a year of this lawsuit being

16   brought?

17   A.    Yeah.  Maybe a year, year later.

18   Q.    And did you end up -- are you still with this

19   same young lady?

20   A.    Yes.

21   Q.    So that didn't break up your relationship?

22   A.    No.

23   Q.    Have you ever borrowed money from Ron Pratte?

24   A.    No.

25   Q.    Tell us about the ATV you mentioned earlier.

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Ronald H. Pratte,       )
             )
  Plaintiff,      )
             )
vs.           ) No.
            ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.  ) PHX-GMS
Bardwell, husband and wife,   )
             )
  Defendants.      )
             )


DEPOSITION OF DARYL WOLFSWINKEL

Scottsdale, Arizona
February 13, 2020
11:00 a.m.


REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

I N D E X

WITNESS                                      PAGE

DARYL WOLFSWINKEL

        Examination by Mr. Connelly               4

E X H I B I T S

Deposition
Exhibits        Description                   PAGE

            (No exhibits marked.)

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    A.    Yes.

2    Q.    Are you currently involved in any litigation?

3    A.    No.

4    Q.    You're not part of the most recent filing made in

5  that 10K matter?

6    A.    No.

7    Q.    Okay.  I want to talk about Ron Pratte a little

8  bit.  When did you first meet Ron?

9    A.    I would guess mid '80s.

10    Q.    And how did you guys meet?

11    A.    I don't recall.  We used to go to ASU football

12  games and different things.

13    Q.    So kind of met initially socially?

14    A.    It was all social.

15    Q.    Did you ever end up doing any work -- any

16  business with Ron?  I said work, but let me rephrase.

17          Did you end up doing business with Ron

18  Pratte in any way?

19    A.    Yes.

20    Q.    Can you explain what that was?

21    A.    I've done some loans with him.

22    Q.    Okay.  From you to Ron?

23    A.    From Ron to me.

24    Q.    Okay.  How would you describe your relationship

25  with Ron now?

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    A.    It's fine.

2    Q.    Are you guys friends?

3    A.    Yes.

4    Q.    Close friends?

5    A.    I would say he's a close friend, yes.

6    Q.    Can you describe, from your perspective, Ron's

7 character?

8    A.    He's a very generous-type person when it comes to

9 kids, whatever.  I mean, he's always donated to

10 Barrett-Jackson.  Anything oriented with kids, he's always

11 involved.  He's -- to me, he's always been a great person,

12 so I've never had any issues with Ron.

13    Q.    Would you describe him in his business life as a

14 workaholic?

15    A.    Definitely.

16    Q.    And why would you say "definitely" to that?

17    A.    That's how he got started and that's how he built

18 his business, by putting in the hours.

19    Q.    And does he require the same level of intensity

20 in work-related matters of others as he does himself,

21 meaning of his employees?

22    A.    I don't know as far as the hours in a day that's

23 put in, but he expected you to give him an honest dollar's

24 worth.

25    Q.    And he had a number of family members working for

1  construction-type, generally speaking?

2      A.    Yes.

3      Q.    Okay.  Do you know if he still owns a

4  construction-type company?

5      A.    I have no idea.

6      Q.    Do you know what he's doing at all now?

7      A.    Business-wise?

8      Q.    Business-wise.

9      A.    No, I don't.

10      Q.    So, as far as you know, he could still be working

11  in that industry or he could be retired; you just don't

12  know?

13      A.    My guess is that he's retired, but, to say the

14  guy is retired is -- he's still a workaholic.

15      Q.    Okay.  When's the last time you spoke to Ron?

16      A.    Yesterday.

17      Q.    And did you call him or did he call you?

18      A.    He called me.

19      Q.    And why did he call you?

20      A.    I've got a grandson that was operated on

21  yesterday.

22      Q.    Okay.

23      A.    He wanted to know how he was doing.

24      Q.    Okay.  So he called you to inquire about your

25  grandson, all right.

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    A.    Correct.

2    Q.    And then he has a son-in-law Jaime who is married

3  to Ron's daughter, also named Jamie?

4    A.    Correct.

5    Q.    And they pronounce his name Jaime.   It's kind of

6  interchangeably as we have been going through this.   And

7  then there's another gentleman, Todd Carriere.   And that's

8  his nephew.   Is that the way you understand kind of who

9  the family is?

10    A.    Yes.

11    Q.    In case I mention one of the names you know by

12  first name, Trevor, Justin, Todd or Jaime -- which is kind

13  of how we have been handling it, because a number of them

14  have the same last name, Pratte.   If I do it and you don't

15  know who I'm talking about, just say:   I don't know who

16  you mean.

17    A.    Fine.

18    Q.    Having met Ron -- pardon, Jeff Bardwell out at

19  Stellar, you would interact with him occasionally out

20  there?

21    A.    I would see him out there, yes.

22    Q.    But would you talk to him?

23    A.    Yes.

24    Q.    About business things or personal matters?

25    A.    Just shooting the shit.

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    Q.   Okay.   Then why did you agree to come in?

2    A.   He asked me if I could come in and what day would

3 work the best for me.   And I told him that -- I said that

4 I could probably come Thursday; it might be subject to me

5 canceling because of my grandson.   And that was the extent

6 of the conversation.

7    Q.   Okay.   So did you know why you were being asked

8 to come in and be deposed?

9    A.   He said Bardwell.

10    Q.   Okay.   In the context of what?   I mean, I just

11 want to talk to you about Bardwell?

12    A.   You guys wanted to talk to me about the lawsuit,

13 I guess, with Bardwell and Ron Pratte.

14    Q.   Okay.   Did Mr. Collins explain to you what the

15 lawsuit was about?

16    A.   No.

17    Q.   Did he ask you if you had any recollection of the

18 relationship with Jeff Bardwell and Ron Pratte?

19    A.   No.

20    Q.   Did he ask you if you were familiar with any

21 agreement allegedly between Ron Pratte and Jeff Bardwell?

22    A.   We had a short conversation.   I told him I don't

23 know why they'd want to talk to me, because I don't know a

24 damn thing about it.

25    Q.   Well, either about the lawsuit --

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    A.    About the agreement that was made whenever.

2    Q.    All right.  So you don't know anything about any

3  agreement -- an alleged agreement between Ron Pratte and

4  Jeff Bardwell?

5    A.    I know that there's an alleged agreement.  I have

6  no idea of what the numbers were, what each person was

7  paid or any of that.  I have no idea.

8    Q.    Or what the terms were of any such agreement?

9    A.    The only thing I know is what Bardwell had told

10  me, that he was to work for Ron until Ron died.  And

11  that's how he got his piece of the deal.  He was treated

12  like the rest of the individuals.

13    Q.    Like the other -- the two sons and the nephew and

14  the son-in-law?

15    A.    Yes.

16    Q.    Okay.  Do you know if Ron's been deposed in this

17  case?

18    A.    I have no idea.

19    Q.    So you don't know whether he has or whether

20  that's still pending?

21    A.    I don't know.

22    Q.    And I may have asked you this, but you don't have

23  any personal knowledge of what Ron's doing this week, do

24  you?

25    A.    No.

1   request?

2       A.   I don't recall that.

3       Q.   Now, I'm testing your memory to that old show.

4       A.   Yeah, I don't recall that one.

5       Q.   Well, I guess then in some ways did it appear to

6   you that Ron treated Jeff almost like a son?

7       A.   Yes.

8       Q.   Did you see much interaction between Ron and

9   either one of his natural sons, Justin or Trevor Pratte?

10      A.   No.

11      Q.   And was that because you just didn't see them out

12  there at the offices that much?

13      A.   Correct.

14      Q.   What about his interaction with Todd Carriere and

15  Ron?

16      A.   I never saw much.

17      Q.   Okay.

18      A.   I wasn't there on a daily basis.

19      Q.   No, I understand.  And I'm just talking about the

20  times that you were over there.  I assume when you went

21  out to Stellar Airpark, you were out there running your

22  business?

23      A.   Right.

24      Q.   You weren't walking around getting coffee and

25  asking others how they were doing with their business?

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1      A.   I thought I knew him fairly well.  I can't say

2  that he's my best friend or anything, but I thought we

3  were always friendly.

4      Q.   Okay.  So you considered him a friend and you

5  would talk to him?

6      A.   Yes.

7      Q.   Okay.  Did you ever talk to him about business,

8  you know, his business or your business?

9      A.   No.

10     Q.   Are you familiar with Jeff's educational

11 background?

12     A.   No.

13     Q.   Would you describe Jeff as an honest person?

14     A.   Definitely.

15     Q.   Credible?

16     A.   I always thought he was.  You could go to the

17 bank on his word.

18     Q.   Were you aware that Jeff was married?

19     A.   Yes.

20     Q.   Did you ever meet his family?

21     A.   Yes.

22     Q.   What was his wife's name?

23     A.   Current wife?

24     Q.   Former, ex.

25     A.   Maria.

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    A.    Bardwell told me that was the deal that he had

2  with Ron.

3    Q.    And where did that happen?

4    A.    I got no idea.  Over the course of ten years or

5  whatever.

6    Q.    Over the course of ten years?

7    A.    From the time I met him until the time he hasn't

8  been around, so what is that?  12 years?

9    Q.    So you're saying that Jeff Bardwell would have

10 told you this before the lawsuit?

11   A.    Yeah.

12   Q.    And in what context would that have come up?

13   A.    We were just talking.  He brought up that he was

14 fortunate to have gotten what he got from Ron and that he

15 agreed to be with Ron until Ron died.

16   Q.    And so is it -- do you remember the specifics,

17 exactly what he told you?

18   A.    No.

19   Q.    So you're trying to summarize what you recall of

20 that conversation?

21   A.    Yes.

22   Q.    Would it be fair to say that you were socializing

23 at that point?  This wasn't a business conversation is

24 what I mean.

25   A.    No.

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    Q.   So you're just having a social conversation with
2    him?
3    A.   Yes.
4    Q.   And you don't remember whether that was at
5    Stellar Airpark or the dunes or somewhere else?
6    A.   I have no idea.
7    Q.   Do you remember who else was there when he
8    mentioned this to you?
9    A.   No.
10   Q.   But, as you recall this generally, at that point,
11   you were aware that Jeff and others had come into monies
12   from Ron Pratte, correct?
13   A.   Correct.
14   Q.   And how were you aware of that?
15   A.   I don't recall exactly if Jeff told me that
16   everybody -- I was told that Jeff is treated like the
17   other members of the family for taking care of Ron.  And
18   that's the extent of my knowledge.  How much money,
19   whatever, I have no idea.
20   Q.   Right.  But you were told generally things.  And
21   it seems reasonable that Ron would have told you that,
22   explaining that I gave money to everybody?
23   A.   That's not like Ron.  That's not like Ron.  He
24   doesn't tell you.  He doesn't tell you shit.
25   Q.   So he's pretty closed-mouth?

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    A.    I would guess it came from Ron at some point.

2    Q.    But you don't recall any of the specifics?

3    A.    It could have came from somebody at the dunes.

4    Q.    Was this a subject of some conversation at the

5  dunes, this lawsuit?

6    A.    I don't recall.

7    Q.    But it wouldn't be unusual -- according at least

8  to you -- that this would have been discussed at the

9  dunes?

10   A.    It could have been.

11   Q.    So you're not aware of any monies or anything

12 else that was exchanged between Ron Pratte and Jeff

13 Bardwell, at this point?

14   A.    No.

15   Q.    Or with his two sons, meaning Ron's sons, or with

16 his son-in-law or nephew?

17   A.    No.

18   Q.    So you're not aware of amounts of money?

19   A.    No.

20   Q.    Or any property that was transferred?

21   A.    I've heard rumors over the years.

22   Q.    I'm asking you if you know.

23   A.    I don't know.

24   Q.    So you don't know, based upon what you're

25 testifying to today, whether Ron Pratte -- pardon me --

1   whether Jeff Bardwell allegedly agreed to work for Ron

2   Pratte for life for a car?  Or a million dollars?  Or the

3   ability to go to the dunes for the next ten years?  You

4   just don't know?

5       A.   I don't know.  Other than he got treated the same

6   as the children got treated.

7       Q.   Okay.  Let's talk about that.

8                The children received the same thing as Jeff

9   Bardwell, correct?

10      A.   That's what I heard.

11      Q.   And are you aware that the children received --

12   well, his children and his son-in-law and nephew received

13   monies and properties as gifts.  Were you aware of that?

14      A.   No.  I know they were treated as equals.  That's

15   all I know.

16      Q.   The five of them were treated equal, meaning Jeff

17   and the other four?

18      A.   Jeff had to perform his duties to get his share.

19      Q.   Okay.  Well, now you have added something

20   different.  You first said that they were all treated

21   equal.  But now you're saying they weren't --

22      A.   They were equal as far as the disbursement of

23   whatever was disbursed.

24      Q.   Okay.  And that's what I want to clarify with

25   you.  So they weren't treated equal is what you're now

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    Q.    So --

2    A.    -- working for Ron, and that's where I heard it.

3    Q.    So somebody else would have approached Ron with

4    this request, based on what you just stated?  Somebody

5    else approached Ron to treat Jeff the same?

6    A.    I have no idea.

7    Q.    Well, you just indicated that somebody asked that

8    Jeff be treated the same.  Do you know who that somebody

9    was?

10   A.    No.  I would assume it's Ron, but I don't know.

11   Q.    So are a lot of the things you're testifying to,

12   Mr. Wolfswinkel, assumptions as opposed to facts that you

13   have direct knowledge of?

14   A.    Yes.

15   Q.    Okay.  I have asked you if you're familiar with a

16   meeting that occurred in December '05 when these checks

17   were handed out to the each of the five individuals, all

18   of equal amounts, $2 million.  And you don't recall that?

19   And you weren't aware of that, correct?

20   A.    If you remember my testimony, I wasn't really

21   interacting with Ron, Bardwell or anybody until about '07.

22   So, no, I have no knowledge.

23   Q.    And you didn't become aware of that meeting --

24   when I asked you, you said:  I have no knowledge of it.

25               I didn't ask if you were there.  I'd asked

1  exact wording, I'm asking you -- there's a number of way

2  things can be said or phrased to have different meanings,

3  potentially, legally, you're aware of that.

4         And because you don't specifically recall

5  the words, is it equally plausible or likely that when

6  Jeff was explaining this to you, he was telling you how

7  grateful he was for having received such a magnanimous

8  gift from Mr. Pratte, along with the other four, and would

9  work for him for the rest of his life, if need be?

10  A.   I think you're putting words in my mouth by

11  saying it was a gift.  I don't know that he would have

12  said that it was a gift.

13         He said:  This is the deal I made with Ron,

14  that I get treated the same as the rest of the boys, but I

15  have to work for Ron for the rest of my life.

16  Q.   He said -- he used the term:  "This is the deal"?

17  A.   To the best of my knowledge, that's the way it

18  was related to me.

19  Q.   By Jeff Bardwell?

20  A.   Yes.

21  Q.   And where did that occur?

22  A.   I don't recall.

23  Q.   And when you say the best that I recall, you

24  don't recall, as you sit here today, under oath, whether

25  those were the words that he used or not, do you?

DEPOSITION OF DARYL WOLFSWINKEL
February 13, 2020

1    A.    Not exactly, no.  So I don't recall.

2    Q.    They do lend themselves to interpretation.

3    A.    There you go.

4              MR. CONNELLY:  Go ahead.  Do you want to

5    object to that?

6              MR. COLLINS:  Put an objection for me.

7    Thank you.

8    Q.    BY MR. CONNELLY:  You haven't reviewed any

9    documents for this deposition, have you?

10   A.    No.

11   Q.    When was the last time you spoke with Jeff

12   Bardwell?

13   A.    I would say it's got to be approximately two

14   years ago.

15   Q.    So about the time this suit was filed, you guys

16   kind of fell apart?  I mean, in terms of contact?

17   A.    Yes.

18   Q.    You had Ron's -- pardon me -- you had Jeff's

19   phone number, right?

20   A.    Yes.

21   Q.    When you hadn't seen him for a while, did you

22   think about picking up the phone and calling and saying:

23   How are you doing?

24   A.    The last time I saw him I gave him a piece of

25   furniture and I saw him and his wife.  We loaded it onto a

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Ronald H. Pratte,               )
                                )
        Plaintiff,              )
                                )
vs.                             ) No.
                                ) 2:19-cv-00239-
Jeffrey Bardwell and Fanny F.   ) PHX-GMS
Bardwell, husband and wife,     )
                                )
        Defendants.             )
                                )


DEPOSITION OF TREVOR PRATTE

Phoenix, Arizona
January 22, 2020
10:00 a.m.


REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF TREVOR PRATTE
January 22, 2020

```
 1                    I N D E X

 2

 3   WITNESS                                  PAGE

 4   TREVOR PRATTE

 5        Examination by Mr. Connelly      5, 110

 6        Examination by Mr. Collins          92

 7

 8

 9                  E X H I B I T S

10   Deposition
     Exhibits        Description            PAGE
11
     1            E-mail chain (Bates JB011036    70
12                through 11040) (5 pages)

13
     2            E-mail chain (Bates JB010288    81
14                through 10296)(9 pages)

15

16

17

18

19

20

21

22

23

24

25
```

ANITA LANDEROS REPORTING, INC.
(602) 230-8793

DEPOSITION OF TREVOR PRATTE
January 22, 2020

1    Q.    Fair enough.

2    A.    -- not mailed.

3    Q.    What was your understanding upon receiving the

4    check, you personally?  Did you consider it a gift, the

5    check?

6    A.    Yes, it was a gift.

7    Q.    And there were other properties transferred to

8    the five -- when I refer to the group of five, I'm

9    referring to Todd -- Todd Carriere, Jaime Ziparo,

10   yourself, Jeff Bardwell and Justin Pratte.  That's who I'm

11   referring to if that were to come up.

12   A.    That's fine.

13   Q.    If you don't understand, just ask me.  I'm not

14   trying to confuse you with names.  Again, we have a lot

15   names.

16             So, based on your recollection, did you have

17   an opinion as to what that $2 million that you believed

18   everybody else got as well, what did it represent to them?

19   Also a gift?

20   A.    A gift.

21   Q.    And, at that time, were you aware that there were

22   any conditions tied to this $2 million that each of the

23   five individuals received?  If it's a gift, there's no

24   conditions attached to it?  I guess I'm asking were there

25   any conditions that you recall that were tied to the

DEPOSITION OF TREVOR PRATTE
January 22, 2020

1    Q.    And do you know who those properties were

2   transferred to?

3    A.    I don't understand the question.

4    Q.    Let me rephrase.

5          Were those properties transferred to you

6   personally?

7    A.    No, they were not.

8    Q.    Do you know if they were transferred to any of

9   the other four individuals personally?

10   A.    No, they were not.

11   Q.    Do you remember recalling how they were

12  transferred, to whom or to what entity?

13   A.    They were -- to an entity.

14   Q.    Do you remember the entity that received those

15  properties?

16   A.    They were separate entities.

17   Q.    So they were spread out amongst two or more

18  entities?

19   A.    Yes.

20   Q.    Okay.  Do you recall, did you have an individual

21  right after that transfer to withdraw your position from

22  those entities and just cash out to your percentage?

23   A.    We did not.

24   Q.    I should have probably asked before that, did you

25  each get an equal percentage in the entities?

1   A.   Yes.

2   Q.   And there were five of you.  Do you recall what

3   the percentages were?

4   A.   Well, yes.

5   Q.   Well, I mean, somebody could have gotten a little

6   bit more than the other.  But they were all an equal 20

7   percent?

8   A.   Right.

9   Q.   I don't want to put words in your mouth and that

10  was an awkward question, but none of you had -- to your

11  knowledge, none of the five individuals had the ability to

12  convert that into cash or any other asset and take that as

13  well personally?

14  A.   No.

15  Q.   And why was that; if you recall?

16  A.   That's pretty common.

17  Q.   Because?

18  A.   Because you're partners in an entity.

19  Q.   The plan was to develop these companies, work

20  together and grow the assets; is that a fair statement?

21  A.   It really depends.  Each individual entity was a

22  different story.

23  Q.   Tell us about those.

24  A.   They were leased properties, so they were

25  income-producing properties.  And so they were developed.

1  I mean, that's what a development is.

2      Q.   Well, can you expand upon that a little bit?  Was

3  the plan to grow these properties, expand them, make them

4  more valuable, or were you just collecting rent?

5      A.   No, we were just collecting rent on a couple of

6  them.

7      Q.   Go ahead.  I'm sorry.

8      A.   And the other ones, the raw land, we were going

9  to develop.  So it's not all of the same.

10      Q.   Was there a construction company in these

11  entities?

12      A.   There were two construction companies that were

13  outside of the land holdings that you're speaking of.

14      Q.   And what was the intent with those companies?

15      A.   One was going to concentrate on residential

16  development.  The other was going to concentrate on

17  commercial development and construction.

18      Q.   And how were those companies funded, originally,

19  if you recall?

20      A.   With the million dollars that I said earlier.

21      Q.   So those were the entities where the million

22  dollars went to?

23      A.   Yes.

24      Q.   Okay.  And the goal there was to -- the five of

25  you were to work together -- in addition to the leasehold

DEPOSITION OF TREVOR PRATTE
January 22, 2020

1  interests that you've already described, was to do

2  construction work and grow those companies or profit from

3  those companies, correct?

4       A.   Yes.

5       Q.   What was the direction of the construction?  Was

6  it residential?  Commercial?  A combination?

7       A.   There was one company that was set up to do

8  residential construction, and there was another company

9  that was set up to do commercial construction.

10       Q.   And, to the best of your recollection, these

11  entities were set up when?  Do you have even a

12  recollection of when they might have been formed?

13       A.   Probably the spring of 2006.

14       Q.   Okay.  Do you remember when this lawsuit was

15  filed?

16       A.   I don't.

17       Q.   You have indicated that -- when I asked you, do

18  you remember talking to anybody about it, I think you said

19  Todd called you and Jeff may have contacted you as well.

20            Did Ron -- did your dad ever call you about

21  this?

22       A.   No.

23       Q.   So did he ever write you about it?  When I say

24  contact, I mean call you or --

25       A.   No.

DEPOSITION OF TREVOR PRATTE
January 22, 2020

1    Q.   Do you know what Jeff's educational background
2    is?
3    A.   No.
4    Q.   Did you work around Jeff enough to form an
5    opinion as to his work ethic?
6    A.   Yes.
7    Q.   What is your opinion?
8    A.   Jeff is a great -- has a great work ethic.
9    Q.   Hard worker?
10   A.   Yes.
11   Q.   Honest?
12   A.   Yes.
13   Q.   Would you describe him as reliable?
14   A.   Yes.
15   Q.   Good character?
16   A.   Yes.
17   Q.   Do you know what Jeff's relationship was with
18   Ron, with your dad?
19   A.   No.
20   Q.   Did you ever see them interact?
21   A.   Yes.
22   Q.   Okay.  How did Ron appear to Jeff?
23   A.   I don't know what you mean by that.
24   Q.   Friendly?  Did he treat him respectfully?
25   A.   Just ask me the question from the get-go again.

DEPOSITION OF TREVOR PRATTE
January 22, 2020

1          You've told us that the $2 million you

2    remember receiving, although you don't remember the

3    circumstances of it.  But you are clear that this was a

4    gift to you, correct?

5          A.    Yes, this was a gift.

6          Q.    And it was a gift to each of the other four

7    recipients as well, including Jeff Bardwell?

8          A.    Yes.

9          Q.    And what is your opinion or what was your -- what

10   is your opinion of the monies you received on -- or the

11   land, pardon me, that you received, the lease land and the

12   other properties?  Those assets that went in to form these

13   companies, was that also a gift?

14         A.    Yes.

15         Q.    And why are you of that opinion?

16         A.    Because -- I mean, it was given to the entities.

17   It was transferred into the entities.

18         Q.    And you've said that to us.  And, to be clear,

19   the 2 million was given individually, but the other assets

20   were actually paid over -- or given to an entity, correct?

21         A.    To multiple entities.

22         Q.    Okay.  And you never paid any tax on any of this,

23   did you?

24         A.    No.

25         Q.    Do you know who paid the tax?

1    A.    I believe my dad did.

2    Q.    Did you ever see a federal tax return with regard

3    to this matter, the monies or the other assets?

4    A.    No.

5    Q.    Did you ever ask about it?

6    A.    No.

7    Q.    What you knew though is that you had received

8    these assets, the $2 million, and these other property

9    assets and you didn't owe any tax on it, as far as you

10   knew?

11   A.    I did not.

12   Q.    And that was the same position for the other four

13   members of the five-member group, as far as you knew?

14   A.    Yes.

15   Q.    I know that you've told us that you don't have

16   any independent recollection of the meeting or how you

17   received the check, but whether it was there or at any

18   other time, did you ever hear Jeff Bardwell make any type

19   of promise to Ron?

20   A.    No.

21   Q.    And it was your understanding -- and I'm putting

22   this in the context of those meetings you had prior to

23   receiving any monies, the 2 million.  Let's start with

24   that, because that's the first thing that you received was

25   the two million.

DEPOSITION OF TREVOR PRATTE
January 22, 2020

1     Q.    Which later became, you know, Stellar, correct,

2  or do you know that?

3     A.    I know it became Stellar, but I was not part of

4  that company --

5     Q.    Okay.

6     A.    -- when that change happened.

7     Q.    Okay.  I understand you were gone.

8     A.    I was gone.

9     Q.    So Jeff Bardwell was doing some work for these

10 entities that were formed, and at the same time he was

11 working with Ron Pratte; is that correct?

12    A.    Yes.

13    Q.    And that's because, if I understand your answer

14 correctly, that's how the other principals, that is, you

15 and Jaime, Todd and Justin, wanted it.  You wanted him

16 working with Dad on things and then working with the

17 companies.  And that was kind of a split of obligations on

18 his part?

19    A.    Uh-huh, yes.

20    Q.    Because I was using the first name when I was

21 referring to Stellar.  I'm referring to Stellar

22 Development, not the airpark, okay?

23    A.    Correct.  Yeah.

24    Q.    And that was kind of the plan, the five of you

25 got together, you divided up responsibilities in the

DEPOSITION OF TREVOR PRATTE
January 22, 2020

1      A.    He was the one working with Ron on other matters.

2      Q.    And that's because that's the way that the other

3   four partners and he wanted it, correct?

4                MR. QUIGLEY:   Objection, asked and answered.

5                MR. COLLINS:   Join.

6      Q.    BY MR. CONNELLY:   That's the way that the

7   principals in the companies wanted the responsibilities

8   set up, correct?

9      A.    Yes.

10     Q.    Okay.  You don't have a very high opinion of

11  Jaime Ziparo, do you?

12     A.    I don't think about Jaime Ziparo.

13     Q.    Okay.  Well, let me ask.  Was it your belief that

14  Jaime was in these things solely for the money?

15     A.    I can't speculate as to -- you know, here's what

16  you need to understand is that this was a very, very, very

17  painful time in my life that I have spent years getting

18  over and not revisiting this.

19            And so when you're asking me these questions

20  as it relates to my family, I have spent time specifically

21  forgetting this.

22     Q.    Okay.  And I'll move on.  I wasn't trying to

23  address things directly with the family, but I understand

24  that Jaime Ziparo is tangentially part of the family

25  because he's married to --

DEPOSITION OF TREVOR PRATTE
January 22, 2020

1   A.   Jeff spent time taking care of my dad's things.

2   Q.   Okay.  And this is after Mr. Bardwell would have

3   received the $2 million check and additional compensation,

4   the same type of compensation that you received, correct?

5               MR. CONNELLY:  Object to form.

6   Q.   BY MR. COLLINS:  It's after 2005?

7   A.   Yes.

8   Q.   And that's what you're referring to here?

9   A.   Yes.

10   Q.   That Mr. Bardwell was working alongside your dad

11   after late 2005 when you received that gift, right?

12   A.   That's the timeline, yes.

13   Q.   Okay.  And do you know why Mr. Bardwell was

14   working alongside your dad after the 2005 gift was made to

15   you during that time frame?

16   A.   I'm sorry?

17   Q.   Why was Mr. Bardwell working alongside your dad

18   after December 2005?

19   A.   Because we formed those entities and put Jeff in

20   the entities for us and we decided that he would be the

21   one that took care of my dad's stuff.

22   Q.   Okay.  And so we talked about the entities

23   earlier.  Those entities include Lone Mountain that owned

24   property that was leased by, then, I think, Pulte?

25   A.   Yeah.

DEPOSITION OF TREVOR PRATTE
January 22, 2020

1    A.    A lot of times.

2    Q.    Okay.  And last question.  You were asked if Ron

3    called Jeff and was asked to do something, he would do it,

4    right?

5    A.    Yes.

6    Q.    If Ron called you and asked you to do something,

7    and it was related to the companies or even his personal

8    stuff, you would do it, too, wouldn't you?

9    A.    Yes.

10   Q.    And wouldn't you expect that Todd or Jaime or

11   Justin would do the same thing, that if Dad -- if Ron

12   picked up the phone and called them and said:  Hey, I need

13   something picked up or something delivered over here, that

14   if they were the one available and if he called them, that

15   they would do it as well?

16   A.    Yes.

17            MR. CONNELLY:  Thank you.

18            MR. QUIGLEY:  All right.  Thank you

19   everybody.  We'll read and sign.

20            (The deposition concluded at 1:10 p.m.)

21

22

23

24

25

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


RONALD H. PRATTE,              )
                              )
         Plaintiff,            )
                              )
                              )
         vs.                  ) No.
                              ) 2:19-cv-00239-PHX-GMS
                              )
JEFFREY BARDWELL and           )
FANNY F. BARDWELL,             )
husband and wife,             )
                              )
         Defendant.           )
_____)



DEPOSITION OF DIANA I. RADER


(CONFIDENTIAL DESIGNATIONS - PAGES 56-121)

Phoenix, Arizona
January 24, 2020
11:21 a.m.




Prepared by:                   CARRIE REPORTING, LLC
MICHAELA H. DAVIS              Certified Reporters
Registered Professional Reporter   2415 E. Camelback Road
Certified Realtime Reporter    Suite 700
Certified Realtime Captioner   Phoenix, AZ 85016
Certified LiveNote Reporter    (480) 429-7573
AZ CR No.  #50574
carrie@carriereporting.com

(COPY)

Page 11

1    found some drafts and some documents within the electronic

2    file that I brought from Sacks Tierney, and those are what

3    I provided.

4        Q.    Okay.  I want to unpack your testimony a little

5    bit.

6        A.    Uh-huh.

7        Q.    I know a lot of background here.  Some of it I'm

8    just going to ask questions --

9        A.    Sure.

10       Q.    -- related to -- so we can get it on the record.

11       A.    Sure.

12       Q.    You indicated that -- Jeff Bardwell was your

13   client when you were at Sacks Tierney; correct?

14       A.    Correct.

15       Q.    And you handled the divorce for him from his

16   wife Maria; correct?

17       A.    If that was his wife's name at the time, yes.  I

18   just don't have it mem- -- -- I don't mem- -- -- I don't

19   remember her name.

20       Q.    Yeah.  As you sit here, you remember that you

21   handled the --

22       A.    Oh, absolutely.

23       Q.    -- divorce?

24       A.    No, I remember the divorce; I just don't

25   remember the exact -- her exact name.

Page 20

1   needed in order for two people to get divorced.   I

2   personally do not include every contested legal issue in

3   the petition.   And some people do that; I don't do it

4   because it just adds to an already difficult situation for

5   two people that are going to divide the most important

6   things in their life.

7             And so when I file petitions, I file them very

8   statutory in nature and basically notice the most -- the

9   basic information that needs to be filed to get a divorce

10  started.

11      Q.    Okay.   Thank you.

12            And there's a date on this, the date it was

13  filed.   Does that refresh your recollection as to the time

14  period that you would have met and worked with

15  Mr. Bardwell?

16      A.    Yes.

17      Q.    What is that date?

18      A.    September 9, 2009.

19      Q.    Okay.   And would you have met with Mr. Bardwell

20  prior to filing this petition?

21      A.    Yes.

22      Q.    Okay.   What do you remember about that meeting?

23            MR. MARLOWE:   Well, privilege as to

24  communications or statements made by Jeff, but to the

25  extent you have any other answers, feel free.

1    on unreasonableness during the litigation.  And so,

2    actually, I've yet to see a divorce where they don't say

3    the other one's been unreasonable, so they always say

4    one's been unreasonable.  And then sometimes you have to

5    pay just based on income alone.

6         Q.    Right.  If you --

7         A.    So we always request it, like you'll see it in

8    my petition, even though -- well, you'll see it in my

9    petitions.  Just about all of them.

10        Q.    Okay.  And you seek it in the petition because

11   you might later request it; right?

12        A.    Yes.  Because the likelihood is that the --

13   your -- your client will think the other side is

14   unreasonable, and so you'll have -- if you don't put it in

15   the petition, then you can't make the claim later.

16        Q.    Do you remember if Ms. Bardwell's wife asserted

17   that --

18              MR. MARLOWE:  Ms.?

19              MR. COLLINS:  Sorry.

20   BY MR. COLLINS:

21        Q.    Do you remember if Mr. Bardwell's then-wife

22   asserted that Mr. Bardwell should pay the attorney's fees?

23        A.    I know she did.

24        Q.    Okay.

25        A.    For $100,000.  I'll never forget that one.

Page 33

1       Q.    Okay.  Do you remember if you took any efforts

2    to try and obtain that document?

3       A.    Yes.  I re- --

4       Q.    What did you do?

5       A.    I remember speaking with an accountant, and I

6    can't remember his name, who had confirmed with -- to me

7    that it was declared as a gift, which is the only reason I

8    would have been able to turn around and tell the other

9    lawyer that because I had inde- -- confirmed it

10   independently through the accountant.  Because I -- I do

11   recall insisting to the other lawyer that it was -- it was

12   declared as a gift in tax documents of some sort.

13      Q.    Okay.  And you remember relying on more than

14   Mr. Bardwell's word?

15      A.    Oh, yes.  Yes.

16      Q.    Okay.  And as you sit here today, you recall a

17   conversation with accountant --

18      A.    Correct.

19      Q.    -- about that; right?

20            Do you remember whose accountant that would have

21   been?

22      A.    I don't know for sure, but I'm pretty sure it

23   was Mr. Pratte's.  I don't think it was my client's

24   accountant.

25      Q.    Okay.  Does the name Shisler -- Mr. Shisler ring

Page 34

1    a bell?

2         A.    Yes, it does.

3         Q.    Is that the accountant that you spoke --

4         A.    Bill.

5         Q.    Bill?

6         A.    Bill.  Okay.

7         Q.    Yes.  Is that the accountant you spoke with?

8         A.    I believe so.

9         Q.    Okay.  I don't know if Mr. Bardwell's attorneys

10   will assert a privilege of any kind related to this, but

11   what do you remember about those communications?

12        A.    I remember asking if it was a gift or payment.

13   So I would have been far more concerned about whether it

14   was payment for services or just a gift because at that

15   time, I'm only thinking about the wife; right?

16        Q.    Right.

17        A.    So I remember asking a lot of questions about

18   whether there was payment for working versus just a gift.

19   And I recall walking away from that conversation very

20   happy and comfortable that it wasn't payment for services

21   but, rather, a gift so that I could make that -- those

22   statements within the divorce case.

23        Q.    Okay.  Do you remember any specific statement

24   from that conversation that Mr. Shisler made?

25        A.    Specifics?  Like words that he said --

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS.

EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Ronald H. Pratte,                          )
                                           )
        Plaintiff,                         )
                                           )
vs.                                        )  No.
                                           )  2:19-cv-00239-
Jeffrey Bardwell and Fanny F.              )  PHX-GMS
Bardwell, husband and wife,                )
                                           )
        Defendants.                        )
                                           )

DEPOSITION OF JAIME ZIPARO

Scottsdale, Arizona
December 4, 2019
10:00 a.m.

REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    A.    Correct.

2    Q.    And, again, if you went two to two on a vote and

3 Jeff was the deciding vote and he cast the vote one way or

4 the other, that's the way that it was going to go?

5    A.    Correct.

6    Q.    And I will assume as part of that, he would have

7 had to have been knowledgeable about whatever it was that

8 the group was voting on, correct?

9    A.    Yes.

10   Q.    Are you familiar with the law firm Sacks Tierney?

11   A.    Yes.

12   Q.    Did they ever represent any of the companies, to

13 your knowledge?

14   A.    Yes.

15   Q.    Do you know which ones?

16   A.    I know they represented Stellar Development and I

17 believe -- I can't remember for sure if it -- you know, we

18 were involved in a couple of other insurance claims for

19 some theft.  But, to be honest with you, I can't remember

20 if Sacks Tierney represented us or the other attorney that

21 we hired in North Scottsdale.

22         I know one of them represented us for one

23 and one represented us for the other, but I can't

24 remember.

25   Q.    Do you remember if Sacks Tierney was the firm

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1   that ended up forming the entities that we're discussing?

2       A.   I'm pretty sure, yeah.

3       Q.   Do you remember if the companies had a form

4   operating agreement?

5       A.   We had an operating agreement that we all signed.

6       Q.   Let me then -- that was awkward.

7               Do you remember if the companies had an

8   operating agreement that was essentially the same for the

9   four companies?

10      A.   I can't remember if it was the same.

11      Q.   Okay.

12              (Deposition Exhibit Number 1 was marked for

13   identification.)

14      Q.   BY MR. CONNELLY:  We're back on the record.

15   You've been handed what's been marked as Exhibit 1.  Do

16   you remember seeing this document?

17      A.   I remember -- yeah, I remember when we formed the

18   companies signing some paperwork.  Not this specific

19   document, though.

20      Q.   Do you see that the companies that we have been

21   talking about are all referenced there?

22      A.   Yeah, for the most part with a little bit

23   different names.

24      Q.   Right.  Well, it's --

25      A.   Pratte Construction.

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    Development, you know, the company before.

2        Q.    Right.   Okay.

3                Well, like with the name change, if Ron

4    decided or thought:  Hey, you know what, I kind of would

5    like to have that name back, I assume that he picked up

6    the phone and called somebody.

7                Nobody would have reached out to him and

8    said:  Hey, do you want the name back?

9        A.    No.  He would have just said:  Hey, that's my

10   name.  Change your name.  And we would have went and

11   changed it.

12       Q.    So, to your recollection, you didn't vet the name

13   by him before you used it?

14       A.    No.

15       Q.    Oh, and then when he became aware of it, he

16   said --

17       A.    I want that name.

18       Q.    -- Hey, what are you doing?

19       A.    That's just something in the back of my mind.

20       Q.    Did you sell it back to him?

21       A.    No, I should have.  I could have made a little

22   bit of money.

23       Q.    Because it wasn't already taken, was it?

24       A.    No.

25                MR. COLLINS:  Tom, do you mind if we take a

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    Q.    You hired Jeff?

2    A.    Yes.

3    Q.    Is that how he met Ron?

4    A.    Yes.

5    Q.    So he had not met Ron before you engaged him?

6    A.    No.

7    Q.    And how did you meet Jeff?  How did that come

8    about?

9    A.    I believe it was through a locating agency.

10   Q.    And he came out to the shop and interviewed with

11   you?

12   A.    Yes.

13   Q.    What did you think of Jeff?  You liked him?  You

14   hired him?

15   A.    Yeah, he was a hard-working kid, smart, you know.

16   Q.    Decent guy?

17   A.    Decent guy.

18   Q.    Trustworthy?

19   A.    Yes.

20   Q.    If you gave him a job to do, would he do it?

21   A.    Whatever it took to get it done.

22   Q.    Did he ever fudge on a job, to your recollection?

23   A.    No, not to mind.

24   Q.    Or make up a story to avoid work or not getting

25   something done?

1    A.    No.

2    Q.    So you say that he was honest?

3    A.    Yes.

4    Q.    You two had somewhat of a personal relationship

5 during that time and after for a while, didn't you?

6    A.    Not -- I mean, not -- we did things other than

7 work, but not much.

8    Q.    Well, okay.  Let me put it in this context.  And

9 that contact may have occurred because there was kind of

10 an oversight to everything, being Ron; the companies and

11 working and Pulte and just kind of everybody being around

12 each other.  Is that also fair?  Was Ron kind of

13 the -- let me rephrase.

14           Was Ron the one that kind of brought this

15 group together?

16    A.    Oh, yes.

17    Q.    Okay.  You've just told us that you met Jeff

18 first, hired him?

19    A.    Yes.

20    Q.    That's how he met Ron?

21    A.    Yes.

22    Q.    And, obviously, Ron took a liking to him?

23    A.    Yes.

24    Q.    How long did you work with Jeff before he met

25 Ron, if you recall?

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1   the summer?

2       A.    Yeah.   That's the average, but not in the -- in

3   the wintertime, it's $1,200.

4       Q.    And what was the term?   What was the term of that

5   agreement?

6       A.    The term?

7       Q.    Yes.

8       A.    The same as any other agreement that was made

9   that day.   You're going to pay -- I'm going to give you --

10  he basically gave us a check and he gifted us the

11  properties, Pratte Buckeye -- well, what we call

12  Buckeye -- and Lone Mountain, LLC.   And in turn we were

13  able to have our offices at Stellar Airpark.   And the deal

14  that we made was that we would pay the utilities on the

15  building.

16      Q.    And all of the members were okay with that?

17      A.    Yes.

18      Q.    So some of the things that were decided on that

19  day sometime in late December of '05 and they carried

20  forward were kind of understood between the members and

21  Ron and some were documented and some weren't; is that a

22  fair statement?

23      A.    Meaning there were -- there wasn't anything

24  documented in those meetings.   I didn't take any notes.

25  We didn't sign anything.   We were handed checks and Ron

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    gave us -- laid out a plan for us.  And, you know, that's

2    what we -- we all moved here under the assumption that's

3    how life was going to be.

4        Q.    Well, some of you had to move here; some were

5    already here?

6        A.    Yeah, Todd and I had to move here.

7        Q.    Correct.

8        A.    Yes, and Trevor.

9        Q.    And, you know, this was not an opportunity that

10   most people with any brains would turn down?

11       A.    Absolutely.

12       Q.    I mean, you were already in the industry?

13       A.    Yes.

14       Q.    You were getting an offer from -- you were

15   married at the time too?

16       A.    Yes.

17       Q.    To Jamie?

18       A.    Yes.

19       Q.    His daughter?

20       A.    Yes.

21       Q.    He was already a giant in the industry here.  I

22   mean, well-known, successful.  And so what he was offering

23   you was not some kind of apprenticeship but your own

24   setup; is that accurate?

25       A.    Initially, he -- it was laid out to us that we

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    were going to build homes together and he was going to be

2    involved in it, you know.  Fast forward a year later and

3    he was retired and had other interests and he basically

4    took me to meet -- to my -- you know, I had been doing

5    work, but he got me my first big contract, a marquise

6    contract, from an associate of his.

7                    And after that, you know, we were pretty

8    much on our own.  He wasn't involved in the process.

9        Q.    Well, he didn't -- from him originally planning

10   and being involved to not being involved, was that as a

11   result of the Pulte sale or just because things changed

12   for Ron?

13       A.    Things --

14       Q.    I mean, personal things changed for Ron?

15       A.    Yeah, personal things changed for him.

16       Q.    Because the Pulte deal, that was going through --

17       A.    That was done.

18       Q.    -- in any event, and the thought was that the

19   five of you would proceed -- and I'm trying to paraphrase

20   or re-comment.  So -- and Ron was going to be involved

21   from an advisory position with respect to the companies.

22                   It just didn't end up working out that way

23   after a year or so; is that accurate?

24       A.    Yes.

25       Q.    You could still call Ron?  I mean -- and I assume

1  got to go.

2                    Did he fight you on that?

3      A.   No, he understood it.

4      Q.   So -- but you indicated earlier that he wasn't

5  doing anything for the company anyways?

6      A.   No, he wasn't.

7      Q.   So that went on for eight years before you told

8  him you're not doing anything for us?

9      A.   Well, it wasn't eight.  Well, if it was, it

10  didn't seem like it.  It went by in a blink.

11     Q.   Well, since he was in it originally --

12     A.   In Stellar, in Pratte, yeah.

13     Q.   Yeah.  So while --

14     A.   Here's what it boils down to.  I mean, the deal

15  that we made was -- you know, we talked about paying the

16  rent.  Jeff was going to be part of our business.  We were

17  going to pay for his incidentals and whatever money we

18  made, he got an equal share of.

19                    And Trevor and Justin left and we didn't end

20  up developing real estate in the way that Ron had laid it

21  out in the beginning.  So what was proposed at the

22  beginning and what it evolved into were two different

23  things.

24     Q.   But that happens with companies?

25     A.   Exactly.

1   tracks of land.

2       Q.    Right.  But the five of you meaning -- wasn't

3   that his original desire?

4       A.    The five of us with him included.

5       Q.    That was the original suggestion?

6       A.    Yeah, yes.

7       Q.    And that somehow morphed into he was gone after a

8   year in the company, Ron.  And then within a short time

9   thereafter, Justin and Trevor are gone?

10      A.    Ron was never involved in it.

11      Q.    Well, I thought you said for the first year or so

12  he was involved in it as an advisor --

13      A.    I never said that.

14      Q.    -- and helped you get things set up?

15      A.    I never said that.

16      Q.    So Ron was never involved in any of the entities?

17      A.    No.  I said after he gave us the checks and we

18  had the initial meeting, it was -- that was the last -- it

19  never evolved into anything once we all moved there and

20  got started.

21            I rarely recollect ever going to Ron to talk

22  to him about anything that had to do with any of these

23  businesses.

24      Q.    But talking about the meaning, wasn't -- was it

25  your perception that it was Ron's hope, in giving the

1  checks out and making suggestions, that the five of you

2  would work together and build these companies up?

3  Otherwise, why was he -- what was he doing?

4      A.   He was going to be part -- you know, at the

5  initial meeting he was going to be part of it.

6      Q.   And what happened?

7      A.   I don't know what happened.  He just never got

8  into it.  I never asked him why he didn't.

9      Q.   So the whole direction of this thing certainly

10  changed when he didn't become a part of it?

11      A.   Absolutely.

12      Q.   So whatever was discussed at the Vegas meeting

13  morphed into something different as things went along?

14      A.   Not necessarily.  The only difference is that he

15  didn't get involved.  We all set out with the game plan to

16  start a construction business.

17      Q.   With his money?

18      A.   No, it was our money.  He gave it to us.

19      Q.   Okay.  Prior to that, did you five have the money

20  to open this?

21      A.   I could have.  I was --

22      Q.   But you didn't?

23      A.   No, I didn't.

24      Q.   You moved here because Ron was going to give you

25  all money?

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    A.    Not that I remember.

2    Q.    Anybody leave the meeting prematurely and not

3  come back?

4    A.    Not that I remember.

5    Q.    As best you can tell us, in your own words, how

6  did Ron start out the meeting once he got everybody

7  together?  He said:  Listen up.  And then take us from

8  there.

9    A.    Yeah.  I mean, it happened so long ago, it's hard

10  to -- all I remember for the most part is him giving us a

11  check and talking about the properties being signed over

12  to us, talking about starting a construction company, all

13  of us moving to Phoenix, starting a construction company

14  in Phoenix and we'd be developing land and building houses

15  and maybe doing some commercial development as well.

16              And, you know, we were given the green light

17  to put our notice in at Pulte.

18    Q.    Because a couple of you were still working for

19  Pulte at the time?

20    A.    Yes.  I think most of us were at that point in

21  time.  And, you know, at that point in time, he said --

22  explained why he was bringing Jeff in and what Jeff's role

23  was going to be in the process, that he would be working

24  solely for him.

25              So it would be the five of us and however --

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1  Ron first proposed this and he talked about a construction

2  company, you mentioned earlier and I think that you

3  alluded to it here just a moment ago, that he was thinking

4  about early on, at this meeting, being involved in the

5  companies, correct?

6      A.   Yes.

7      Q.   What was his role going to be or did he define

8  it?

9      A.   There were no -- roles were not defined.  There

10  were no roles defined.  I mean, we all assumed -- you can

11  only assume that Todd is going to do the bookkeeping and

12  take care of that end of it, because that's all that he

13  knows how to do.

14          And that I would be doing whatever needed to

15  be done in the field, because that's what I did.

16          And Ron would be, you know, doing what he

17  normally did, which is making the grand plan.  This is the

18  property we need to buy.  These are the houses that we

19  need to build, you know, and ...

20      Q.   So you're actually expecting that Ron would be

21  intimately or directly involved in any company or

22  companies that were set up?

23      A.   Initially, I think we all expected that.

24      Q.   Okay.

25      A.   And, like I said, that's kind of what led to the

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1  downfall of the Trevor and Justin, you know.

2      Q.    Departures?

3      A.    Yeah.

4            Hey, I thought that we were going to be

5  working for you, Dad.  And you were going to be teaching

6  us all of this stuff.  We don't want to work for Jaime

7  anymore.

8      Q.    What's the first thing that Ron did at the

9  airport?  Hand out the checks?

10     A.    I want to say that that was one of the first

11 things he did, yes, but --

12     Q.    Do you remember that or what he said when he did

13 that?

14     A.    It had something -- I mean, I really don't

15 remember.  It was so long ago.  I -- the one thing I

16 recall when he did is, like:  You guys aren't going to get

17 any more.  This is all I'm giving you.

18            Todd and Jeff, you guys are separate from

19 this.

20            Justin, Trevor and me, because I was married

21 at the time and had his grandchildren, he said:  They're

22 my family.  What I do for them down the road is going to

23 be different than anything I ever do for you guys.  But

24 this is basically all you get.

25     Q.    The 2 million?

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1      A.     No.   The 2 million, plus the properties.

2      Q.     Oh, okay.   All right.   But I'm talking when he

3  first handed over the envelope.   I assume the checks were

4  in envelopes or just the checks?

5      A.     They were the checks.

6      Q.     And you said that he kind of separated out Todd

7  and Jeff from you and Trevor and Justin?

8      A.     Well, yes, because we're -- I mean, Todd's

9  married to his niece.   But, obviously, Trevor and Justin

10  are his sons.   And I was married to his daughter, so ...

11      Q.     Okay.   So what did you perceive the separation to

12  mean; Todd and Jeff, and then the three of you over here?

13      A.     Meaning that eventually one day he's going to

14  pass away and the rest of his kids are going to get more

15  money -- or they may or may not get money.   Who knows?

16      Q.     But Jeff and Todd weren't going to share in that?

17      A.     Yes.

18      Q.     And that's how you took it?

19      A.     Yes.

20      Q.     And so do you remember what he said just to you

21  personally or if you remember what he said, if he said it

22  to the group, you know, when he handed out the checks?

23  Did he hand them out and then address everybody or do you

24  recall?

25      A.     No.   Like I said, I remember we had the

1  conversation about moving to Phoenix, starting -- you

2  know, we're going to start some kind of a construction

3  company.

4          The intent was that he was going to be

5  involved in it.  And Jeff would be working solely for him,

6  so he would not be involved -- like if there was time

7  maybe at that point in time; well, maybe he'll have a free

8  day every once and a while where he can come help us out.

9          But we had no control over anything that he

10  did or shouldn't count on him being part of whatever we

11  were doing.

12     Q.   Well, isn't it certainly equally plausible that

13  at that time, your perception was Ron was going to be

14  involved in the company, that everybody could go to, learn

15  from, he could make referrals, and so forth, and Jeff

16  would be working for him.

17          So he's in these companies, like the other

18  four members, including yourself, and working with Ron.

19  You're expecting Ron to be working in the companies,

20  correct?  And that's what you've told us.

21     A.   To a certain degree, yeah.  Like quarterbacking

22  the decisions more than anything.  Not so much, like,

23  doing the grunt work.

24     Q.   Right.

25          So certainly Jeff's working for Ron could

1  have easily been perceived by you or anybody else that

2  he's going to be working with Ron --

3      A.    No.

4      Q.    Ron's going to be feeding us into the companies?

5      A.    No.   We all understood that he -- Ron had already

6  had so much -- you know, he had car collections and boats

7  and properties in Yuma.   You know, the sand dunes, that

8  whole thing.   He already had enough going on where it

9  was -- a guy could be employed managing that portion of

10 his life.

11     Q.    Well, did you think it odd that he was being --

12 that Jeff was a full member in all of the entities that

13 ended up getting set up, and according to you, didn't have

14 any job responsibility and no duties?

15     A.    Yeah, it was all odd.   It's an odd situation.

16 It's not something that happens -- I mean, how many times

17 do you hear of stuff like this happening?   Have you guys?

18     Q.    This is the first for me.

19     A.    Yeah.   So it was odd, very odd.

20     Q.    So when you got your check, what did you view it

21 as?

22     A.    A gift.

23     Q.    And how do you think that everybody else viewed

24 their checks?

25     A.    The same; how else do you?

1   Q.   And what about the property that -- was the

2   specific property discussed at the airport meeting or was

3   it more talking about the companies and the plant, maybe

4   setting up companies?  Was it more in theory or -- I mean,

5   were there specifics discussed about the companies?

6   A.   There were no specifics discussed about the

7   companies.  The checks, the rent distributions, Jeff

8   working solely for Ron, construction company.

9        I mean, those are the key points that I

10  remember.  It was a long time ago.

11  Q.   Well, let's talk about the leases.  That actually

12  was specifically discussed at the meeting?

13  A.   Yes.

14  Q.   And in what context?

15  A.   You know, the properties would be turned over to

16  us and we would be receiving the rent incomes and whenever

17  the leases ran out, the properties would be ours to do

18  whatever we wanted.

19  Q.   And so -- well, that's fairly specific.

20  A.   Yes.

21  Q.   And was any of this followed up with an e-mail by

22  Ron or from any of you back to Ron subsequent to this

23  meeting, like within a week?

24  A.   He did give us an opportunity to decide what we

25  wanted to do, if we were all going to do it or not.  I

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1  didn't interact with him that much.  I wasn't at the

2  office that much.

3      Q.   You'll get us that other statement?

4      A.   Yeah.  I'm sorry that I didn't put it in here.

5      Q.   Is it fair to -- I think you've already indicated

6  this, but is it fair to say that you did this -- would

7  this be -- do you know if this is the second statement?

8      A.   It is the second, yeah.

9      Q.   Okay.  And would it be fair to say that you

10 drafted this as a result of Ron e-mailing you saying:

11 Hey, I need some more meat on the bone on this statement?

12     A.   Be a little more descriptive in what took place

13 or what I could correct and, you know, I mean ...

14     Q.   And how were you more descriptive in this second

15 statement?

16     A.   Without looking at the other one, I know that I

17 may have had added the part about where -- I mean, I can't

18 tell without looking at the other one.  But it was --

19 they're very similar.  Very little changed in my

20 statement.

21     Q.   But it was enough not to say:  No, that's what I

22 remember, Ron.  That's my statement?

23          You still made an effort to change it,

24 however little it was.

25     A.   Well, yeah.

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    Q.    Because Ron asked you to?

2    A.    Yeah, yes.

3    Q.    Did you exchange your first second or statement

4    or any of your statements with Justin or Todd?

5    A.    I did.

6    Q.    And they sent you theirs, didn't they?

7    A.    I know Todd may have sent me his.

8    Q.    You guys exchanged statements for what reason?

9    A.    Because we wanted to make sure that at least --

10   this meeting happened so long ago, we wanted to

11   cross-check some of the points with each other, like did

12   we talk about that?  Were you there?  Was I there?

13   Q.    But you weren't asked to cross-check.  You were

14   asked to recall what you recalled from the meeting.

15         So are these your recollections or are these

16   possible recollections of Todd and Justin as they

17   recalled?

18   A.    No, these are my recollections.

19   Q.    But how can you say that if you just told us that

20   you shared them in order to make sure you cross-referenced

21   and remembered things the same?

22   A.    We were all in the same e-mail chain.

23   Q.    I understand that.

24         And you're exchanging this to read each

25   other's statements to try and come up with a statement

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1   meeting at the airport.  That's my statement.

2                   Would you agree that the meeting was

3   somewhat confusing at the airport?

4       A.   Oh, yeah.  I mean, confusing to a certain degree.

5   Ambiguous more than confusing.

6       Q.   As to where things were and where they were going

7   when you all left the airport?

8       A.   Yes.

9       Q.   But all we can get is your opinion as you sit

10  here today.

11                  Your best recollection, was it your

12  understanding that Ron said:  You know, you're going to be

13  in all of these entities, you're going to get paid through

14  all of these entities, but you're going to work for me?

15                  Is that something that you recall?

16      A.   Yes.

17      Q.   And you left that meeting -- and I'm just asking

18  about you now, not any of the other members.

19                  And your understanding was that Ron was

20  going to, in some capacity, whatever that was, advisor,

21  mentor, actual member, at least be involved from either an

22  advisory position or direct position in these companies,

23  once they were formed and up and operating?  You left that

24  meeting with that impression, correct?

25      A.   Initially.

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1   a commitment different than:  Here's your check.

2                You don't remember?

3       A.   No.

4       Q.   And you don't remember what he said to --

5       A.   I remember him saying:  Think about it?

6       Q.   To who?

7       A.   All of us.

8       Q.   Okay.  Great.  Think about what?

9       A.   If you want to make this move and be a part of

10  this.

11      Q.   And do you remember anything else that he said to

12  you or to Jeff?

13      A.   No, not necessarily.

14      Q.   So when he handed Jeff that check, you don't have

15  any independent recollection of what he might have said to

16  him or what Jeff said to him?

17      A.   Other than the -- what he had lined out as far as

18  Jeff's role would be, working solely for Ron.

19      Q.   You remember him saying that to Jeff as he give

20  him the check?

21      A.   He didn't say -- I already said that he didn't

22  say anything specific to any of us when he handed the

23  checks.  It was a general discussion.  You know, pretty

24  much a general discussion.

25      Q.   Let me wind this up.

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1          You said that you -- at one point in

2    response to Mr. Connelly's questions, I have in my notes

3    that you said that you viewed the check as a gift when you

4    received it at the North Vegas airport meeting?

5          A.    Yes.

6          Q.    Do you remember saying that?

7          A.    Yes.

8          Q.    And then you also said that you think everyone

9    else did, too.  Do you remember saying that?

10         A.    Yes.

11         Q.    Is that accurate?  That's your recollection, that

12    you think that everyone else viewed it as a gift?

13         A.    I would assume.  How else would you view it?

14         Q.    Okay.  Do you think that Mr. Bardwell had any

15    reason to view it as anything other than a gift?

16         A.    I mean, other than the fact that he was the only

17    one that had another commitment on the table, which was

18    that he was going to be working for Ron personally, you

19    know.  Where the rest of us -- like I said, we didn't

20    really know what we were going to be doing yet.

21         Q.    Okay.

22         A.    So --

23         Q.    So you would say that Mr. Bardwell had been

24    presented with a commitment that he needed to honor in

25    order to receive that money; is that your testimony?

1          MR. CONNELLY:  Object to form.

2          THE WITNESS:  Yes.

3     Q.   BY MR. COLLINS:  Let me ask you this.  When you

4  said that he had a commitment, what did you mean?

5     A.   Well, like I said, I don't know the specifics of

6  what their deal was that they discussed.  All I remember

7  is, from that meeting, Bardwell is going to be working for

8  me.

9          You know, and if -- we all had to make a

10  decision as to whether we were going to do this or not.

11          And my decision wasn't based on that I'm

12  going to be going to Phoenix and, you know, making sure

13  that Ron has enough people to clean his plane and make

14  sure all of his cars work and can get to Barrett-Jackson.

15          My decision is to go there to still be in

16  some kind of a construction company and do something else

17  to make a living, other than what we have.  Whereas Jeff's

18  was when he took that money he was signing up to work for

19  Ron.

20     Q.   Okay.  And you said you would return the check if

21  you weren't going to move to Phoenix and do what

22  Mr. Pratte outlined -- what Ron outlined at that meeting.

23  Is that what your testimony was earlier?

24     A.   Yes.

25     Q.   Okay.  Do you think that you were obligated to

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1    thought may not have been that he was going to work solely

2    with the four members in the companies that were to be

3    formed, however, they're going to be structured; that he

4    would be working for Ron.  But Ron -- the expectation was,

5    as you've testified, was going to be working with or

6    around or I guess "with" is the best term -- those

7    companies.

8            So certainly whatever he was doing could

9    have included Jeff assisting him and you guys would have

10    been doing the other work, the building, the getting the

11    bids, the setting up the labor, et cetera, correct?

12            MR. COLLINS:  Objection, form.

13            THE WITNESS:  It could have been assumed,

14    but that's not -- that's not the assumption that we all

15    had.  We all walked away --

16    Q.   BY MR. CONNELLY:  I understand.  But these are

17    all assumptions, correct?

18    A.   Yes.

19    Q.   Even on your part?

20    A.   Yes.

21    Q.   I'm going to ask one last question.

22            We've talked a lot about, you know, how Ron

23    was talking, what he wanted.

24            Did you ever hear Jeff say anything back to

25    Ron at the North Las Vegas meeting about these assumptions

DEPOSITION OF JAIME ZIPARO
December 4, 2019

1   or these things that were kind of floating around there by

2   implication?

3       A.   I don't remember that.  I don't remember any of

4   the -- like, specific conversations that anyone else had

5   at that meeting.

6       Q.   So what about at the subsequent meeting at Ron's

7   house?  I mean, as best you remember, it happened at Ron's

8   house, I get it.  But do you remember any specific promise

9   Jeff made there?

10      A.   No.

11      Q.   So your recollection is that whatever Ron said

12  and whatever assumptions you and the other parties might

13  have left with, you don't recall any commitment back from

14  Jeff Bardwell at either of those meetings back to Ron?

15      A.   The only -- no.  I've never seen him say:  Hey,

16  this is -- but he accepted the money.

17      Q.   Sure.

18      A.   That is --

19      Q.   So did you?

20      A.   -- the commitment.

21           And I fulfilled my commitment.  I'm still

22  fulfilling my commitment.

23      Q.   You actually viewed it as a commitment, because

24  one could say you have, you know, strong ethics, and a

25  work ethic as well as moral ethic.  And you're not going

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Ronald H. Pratte,                          )
                                           )
          Plaintiff,                       )
                                           )
vs.                                        )  No.
                                           )  2:19-cv-00239-
Jeffrey Bardwell and Fanny F.              )  PHX-GMS
Bardwell, husband and wife,                )
                                           )
          Defendants.                      )
                                           )

DEPOSITION OF TODD CARRIERE

Phoenix, Arizona
December 5, 2019
10:00 a.m.

REPORTED BY:
ANITA LANDEROS, RPR
Certified Reporter
Certificate No. 50538

PREPARED FOR:

DEPOSITION OF TODD CARRIERE
December 5, 2019

1    Q.    Okay.

2    A.    But my recollection would be around 45 minutes,

3  but ...

4    Q.    So you get to this meeting.  It's Ron's meeting,

5  but you were all working in one capacity or another for

6  Ron at that time weren't you?  When I say "you all," I'm

7  talking about the five of you that were gathered together

8  by Ron in North Las Vegas.

9    A.    Yeah.  By that point in time, Ron had kind of

10  checked out of the -- you know, he wasn't in day-to-day

11  activity or doing anything like that, so, you know, you're

12  really working for the new LLC.

13    Q.    Okay.  At that point you all still were working

14  at your regular positions?

15    A.    That's correct.

16    Q.    Okay.  So you get there, does Ron give you the

17  check shortly after the meeting starts?

18    A.    I think it was probably midway through.

19    Q.    Was that a surprise to you?

20    A.    The check?

21    Q.    Yes.

22    A.    Absolutely.

23    Q.    And when he handed you the check, what did he

24  say; if you recall?

25    A.    He didn't say much.  He just handed us the checks

ANITA LANDEROS REPORTING, INC.
(602) 230-8793

DEPOSITION OF TODD CARRIERE
December 5, 2019

1   and we just looked at it and he was just looking at our

2   faces.

3       Q.   You were in fairly close proximity to the other

4   four individuals that had all gotten checks, right?

5       A.   Yes, we were standing in a circle.

6       Q.   So something about the size of this office or

7   larger?

8       A.   Probably this circle right here would be the

9   size.

10      Q.   Oh, right here at the table?  So you're all

11  within a few feet of each other?

12      A.   Sure.

13      Q.   Okay.  So you saw when they got their checks;

14  they saw when you received your check?

15      A.   Yes.

16      Q.   Did you recall him saying anything to you or

17  saying:  Good job?  Or, you know --

18      A.   No.

19      Q.   -- enjoy it?

20      A.   No.  He just handed out the checks and he said:

21  I think you should all be equal.  So that was -- that led

22  me to believe that everybody's check was for 2 million.

23      Q.   Okay.  And you saw some other surprised faces as

24  well, right?

25      A.   Sure.  I mean, I was just probably looking at my

1  check more than anything.

2      Q.    Okay.  After he gave you the checks, where did

3  the conversation go?

4      A.    I think he got on the plane and took off and we

5  kind of -- I headed home.

6      Q.    Okay.

7      A.    I recall that distinctly because my parents had

8  come into town and I went straight home and it was kind of

9  a weird scenario, because we had just had our child -- or

10 my wife was about to give birth.  It's not like I could

11 show my parents, you know.  So I showed my wife the check.

12 She was on the telephone and she just kind of looked at me

13 funny.  And you had to keep it a secret.  Well, I felt

14 that I had to keep it a secret.  So I know that I got the

15 heck out of there when it happened.

16     Q.    Was there any discussion at any part of this

17 meeting about the five of you forming a company or

18 companies together?

19     A.    I don't know if that took place at that meeting

20 or not.

21     Q.    Okay.  You don't recall if there was any

22 discussion about --

23     A.    I don't know if it was at that meeting.  I recall

24 us meeting -- I had met with Ron before that.  I had met

25 with Ron and Jaime before that.

1   got?  How did you view that?

2       A.   Me personally?

3       Q.   Yeah.

4       A.   For me, it could have been for all of the years

5   of work that I did.  It could have been the -- the check

6   was made out to me and my wife, so it could have been for

7   relocation, you know.  I used it to buy a house in

8   Gilbert.  Funds to start the company.

9       Q.   You weren't obligated to start the company

10  though, were you, with that money?

11      A.   Well, we were obligated to make the entities --

12  well, let me rephrase that.

13           Without the money, it would have been much

14  harder to start the company.

15      Q.   Okay.

16      A.   I mean, I guess you could look at it -- a portion

17  of it as seed money, for all intents and purposes.

18      Q.   Well, did you consider the $2 million basically a

19  gift to you and your wife?

20      A.   Yeah.

21      Q.   Okay.  Is that how the other members viewed their

22  $2 million checks?

23      A.   You'd have to ask them that question.

24      Q.   Well, I only got you here today.  And I

25  understand that you can't -- you don't know necessarily

DEPOSITION OF TODD CARRIERE
December 5, 2019

1  how they perceived it, but when you were there and

2  everybody got their check, did it appear like Ron was

3  giving out the checks to everybody in the same vein -- in

4  the way that he was handing it to you?

5            MR. COLLINS:  Objection, form.

6       Q.   BY MR. CONNELLY:  Let me rephrase, if I may.

7            Ron handed you your check just kind of, you

8  said, watched your expression.  You don't necessarily

9  remember anything specific about anything that he said to

10 you at that time, do you?

11      A.   No.

12      Q.   Okay.  Do you remember anything specific he said

13 to any of the other four members when they got their

14 checks?

15      A.   He's a man of few words.  He handed them out.

16      Q.   Okay.

17      A.   Like I said, he said:  I think you guys should

18 all be equal.

19      Q.   All right.  And you recall a meeting just with

20 you and Ron previous to the December '05 North Las Vegas

21 meeting?

22      A.   Yes, I did have one.

23      Q.   And what did he tell you at that meeting?

24      A.   That he was thinking of having the guys work --

25 the members work together, you know, to work together in

DEPOSITION OF TODD CARRIERE
December 5, 2019

1   Q.   Correct.   So --

2   A.   Jaime had a commitment to work for Pulte for a

3   period of time.

4   Q.   So when all of you -- when the five members left

5   the airport in December of '05 and you each -- you all had

6   your checks, there was some expectation, or there were

7   some suggestions, however you want to frame it, that these

8   future entities -- or these things were still to be

9   discussed going forward?

10   A.   Still to be discussed.

11   Q.   So there was no firm commitment to any of these?

12   A.   Well, there was a commitment to moving, but, I

13   mean, I don't think anybody had the idea that we were

14   going to need to set up seven entities or whatever, you

15   know.   That just didn't occur at that point in time.

16   Q.   And if these things didn't come to pass and Ron

17   didn't make the land transfer and -- that ended up

18   occurring sometime months later, could you keep your

19   $2 million, you personally?

20   A.   Yes.

21   Q.   Because it was a gift?

22   A.   To me and my wife.

23   Q.   And that would have been the same with the other

24   four members, would it not?

25   A.   Yes.

1    A.    What did I put in there?  I think there was an

2  e-mail that asked how much did the property sell for.

3    Q.    When you wrote your -- by the way, how many

4  statements -- I'll call them your statements -- did you

5  write?  You wrote two, didn't you?  Didn't you write one

6  originally and then --

7    A.    I believe I wrote a short one --

8    Q.    -- expanded on it?

9    A.    -- and then I expanded on it.

10    Q.    And I'll show you what I think is the expanded

11  version.  Do you still have both versions?

12    A.    I couldn't find the short version, I think I gave

13  you -- because the short version would have been one

14  paragraph.  I'm not --

15    Q.    But that's basically what you remembered at the

16  time?

17    A.    No.  I'm just not a guy that wants to put things

18  in writing.  I worked at the medical examiners through

19  college and saw all these things that get drug through

20  court through the cases.  And I just learned that if you

21  put your signature on something or you write something --

22  so I've always been one my whole life that lived that if I

23  could -- the least -- I mean, you look at me and I'm the

24  one that signed all of this for all of these groups.

25                    But, believe me, I would have loved to have

1    Q.    And that was Ron telling you that?

2    A.    Yes.  But Jeff Bardwell told me that as well.

3    Q.    Well, did you hear Ron say that in front of Jeff

4  at Jupiter?

5    A.    I think it was just the point that Jeff solely

6  works for Ron.

7    Q.    And who was there for that discussion?

8    A.    All five guys.

9    Q.    And Ron said it to all five of you?

10   A.    That Jeff solely works for him, yes.

11   Q.    Was there any response from Jeff?

12   A.    No.

13   Q.    None?

14   A.    Well, Jeff knew that.

15   Q.    Did you say no?

16   A.    No.  Well, Jeff knows that.  That was the deal.

17   Q.    Well, and I'm trying to understand what you know

18  about the deal from personal firsthand knowledge, not

19  implications, not what you thought, not what you can

20  guess.

21   A.    I can tell you what Jeff told me.

22   Q.    I want to know what Ron said and what Jeff said

23  back to him, if anything.

24   A.    Their conversations were their conversations.

25   Q.    So you don't know -- you weren't privy to any of

1  those conversations?

2      A.   Other than the ones that Jeff strictly works for

3  Ron.

4      Q.   I'm asking about conversations when Ron was

5  speaking to Jeff --

6      A.   No.

7      Q.   -- or Jeff speaking to Ron.

8      A.   Just Jeff speaking to me and Ron speaking to me.

9      Q.   Okay.  So he goes -- Ron goes on in this e-mail

10  and he's telling you:  I remember our meeting at Las Vegas

11  airport.  It was my understanding I had an agreement and

12  commitment from him at that time and also on subsequent

13  occasions.

14          So he's going on to describe -- basically,

15  he's laying out:  This is what I remember.  Yet, he's

16  asking you to give back what you remember, correct?

17      A.   Yes.

18      Q.   That's what's going on here; fair?

19      A.   Sure.

20      Q.   So second paragraph, the lawyers are going to

21  issue subpoenas.  You guys are going to have statements

22  taken regarding your memories about what went down.

23          And he says in order to save legal fees, he

24  wants to you sit down and write out your recollections of

25  the events, as you recall them.

1  recollections that you all had?

2      A.    Yeah.

3      Q.    Okay.  And that's basically what Jaime told us

4  yesterday.  So you exchanged them with each other why?

5  Why did you do that?

6      A.    I have no idea, just to see what everybody else

7  wrote and see if we were forgetting something, to see if

8  something sparked your memory and --

9      Q.    And that's my point.  If you saw something that

10  Justin --

11      A.    Just like right now, you made me recollect

12  something that Ron -- when Ron said:  You're going to work

13  for me, it wasn't until he died.  He used the word gone.

14  Until I'm gone.  And he used the word until I'm done.  So

15  you could -- gone, to me --

16      Q.    That could be gone from the company or done with

17  the company, or it could mean a lot of things, couldn't

18  it?

19      A.    Yes, it could.  But it was --

20      Q.    And that's what you --

21      A.    But to me, it was until I die.  I mean, that's --

22      Q.    That's the way you took it.

23              THE REPORTER:  You guys, one at a time.

24              THE WITNESS:  -- to me, it's dead and gone.

25              And Jeff used those terms with me.  So it's

1   always been when Ron is dead, Jeff is done.

2       Q.   BY MR. CONNELLY:   And that comment came after, as

3   far as -- the first time you heard that was sometime after

4   the North Las Vegas meeting in '05, correct?

5       A.   I heard it at the meeting on Jupiter Way in the

6   office when he said:   He's mine.   He's mine until I'm dead

7   and gone.   You guys do whatever the heck you want.

8       Q.   Well, now you added dead and gone.   That's not

9   what your statement says.   Your statement says until I'm

10  gone.

11      A.   I was saying dead and gone earlier, so it's fresh

12  in my memory.   He used the word gone.

13      Q.   And you're interpreting that to mean until -- the

14  way Ron was using it -- until he was dead and gone?

15      A.   Yes, because Jeff used it that way from that

16  point forward.

17      Q.   But I'm referring to Ron now.   I appreciate you

18  keep interjecting Jeff.   I'm sure Mr. Collins will have

19  some questions about that, but let him ask those, okay?

20           One could equally interpret that "until I'm

21  gone" as until I'm gone from the company, or until I'm

22  done working or any other number of things.   But he didn't

23  say until I'm dead, did he?

24      A.   I didn't hear "dead" --

25      Q.   Okay.

DEPOSITION OF TODD CARRIERE
December 5, 2019

1   to get the lease check out?  I mean --

2       Q.   Is that all that Jeff was good for?

3       A.   No.  Jeff was a hard worker.

4       Q.   Why not --

5                THE REPORTER:  One at a time, please.

6                THE WITNESS:  Pratte Buckeye, Pratte Lone

7   Mountain, that was on me.  It was accounting.  It was

8   collecting a check.  It was making sure insurance is in

9   place.  There was nothing there.  The land was a holding

10  company until we sold it.  Nothing there to do.

11               I mean, there just wasn't -- other than the

12  construction company and those two -- the other two guys

13  were gone then; there just wasn't anything there.

14      Q.   BY MR. CONNELLY:  Wasn't Jeff doing exactly what

15  the companies wanted him to do, which was basically occupy

16  yourself with Ron, deal with Ron, whatever Ron wants you

17  to do, just do it.  You'll collect your money, just as we

18  other four partners collect ours, which became three, you,

19  Jaime, and Jeff.  Just keep Ron occupied or keep yourself

20  occupied with Ron and let us run the companies?  Isn't

21  that what the company was basically agreeing to?

22      A.   Yes.

23      Q.   But the company -- if Stellar, let's say, got

24  really busy in '08 or '09, let's say we didn't have a

25  collapse.  Or '10 or '11, when things are kind of coming

DEPOSITION OF TODD CARRIERE
December 5, 2019

1    Jupiter, the later meeting in May, you never heard Jeff

2    specifically -- Jeff now commit to Ron to work for him for

3    life?  And I mean coming out of Jeff's mouth.

4        A.    No.

5        Q.    All right.  Thanks.

6        A.    But he did tell it to me.

7        Q.    I asked if you ever heard him --

8        A.    Say it to Ron?

9        Q.    -- say it to Ron?

10       A.    Not to my recollection.

11              MR. CONNELLY:  Okay.

12              MR. COLLINS:  Mr. Carriere, it's been a long

13   day.  I'll try and be quick.

14              MR. CONNELLY:  Do you want a break?

15              MR. COLLINS:  No, unless you do.

16              THE WITNESS:  No.

17              MR. COLLINS:  If you need a break,

18   Mr. Carriere, let me know.

19

20                        EXAMINATION

21   BY MR. COLLINS:

22       Q.    Mr. Connelly just asked you if you ever heard

23   Mr. Bardwell commit to Ron -- and I will use Ron as

24   opposed to Mr. Pratte, because there were multiple

25   Mr. Prattes at that meeting -- that he would work for him

1   of debt, joint and several liability.  It's got a

2   modification clause, transfer of the note, severability of

3   provisions, choice of law provision, and it requires a

4   notary.

5             So this short-term note, you know, covers a

6   number of things in it, you know, to make sure that Ron's

7   money is protected and he gets the benefit of his note,

8   correct?

9        A.   Yes.

10       Q.   And Ron saw fit to go to the trouble of having

11   this worked up, but not one sentence, one paragraph, one

12   word, in any of all of the documents that we've gone

13   through today here about Jeff's alleged commitment to work

14   for him for life.  Also a fair statement, correct?  Not

15   fair.  It's true?  If it's not, please point out to me

16   where --

17       A.   It is a true statement.  But this is a pretty

18   simplified note for a $2 million loan.

19       Q.   Yes, it is.

20       A.   And that's why I was chuckling.

21       Q.   And I don't disagree with you.

22             This is obviously a note done between people

23   that trust each other.  Would you say that's true, based

24   on what you just said?  $2 million, a two-page note.  I've

25   never seen one; not for 2 million.

DEPOSITION OF TODD CARRIERE
December 5, 2019

1    A.   Well, nobody instructed me to do anything in more

2 detail, so ...

3    Q.   I understand.  And I'm just going along with your

4 prior statement, fairly simple note.  I mean,

5 straightforward?

6    A.   Yeah.

7    Q.   And between two gentlemen that knew each other,

8 right?

9    A.   Yes.

10    Q.   They knew what the collateral asset was.  They

11 knew what the investment position was going to be.  And

12 Ron loaned him the money expecting it back in due order,

13 asked you to draw something up that documented their

14 agreement, right?

15    A.   Well, I think Jeff initiated me to draw it up and

16 Ron verified it.

17    Q.   Okay.  You think Jeff would have come up with the

18 9 percent and the transaction fee?

19    A.   I don't know how that came to do -- probably a

20 mutual agreement between Jeff and Ron.

21    Q.   Okay.  And on something that was supposed to be

22 handled in months, if not weeks, they did a writing,

23 correct?  There's a writing, correct?  There's the note.

24    A.   Yeah.

25    Q.   And the expectation was this would be paid back

DEPOSITION OF TODD CARRIERE
December 5, 2019

1    when that property funded and Jeff got his distribution?

2    A.    Yes.

3    Q.    Yet on what is alleged by Ron Pratte to be a

4    life-long commitment, there's not a word of it anywhere in

5    any of the entities or anything connected with the

6    $2 million given that day in December at the North Las

7    Vegas airport.  Can you explain that?

8    A.    No, nothing exists to my knowledge.

9              (A brief discussion was held off the

10   record.)

11             (Deposition Exhibit Number 48 was marked for

12   identification.)

13   Q.    BY MR. CONNELLY:  Exhibit 48, is that the

14   Redemption of Membership Interest that we spoke about

15   previously, but we just didn't have any documentation on

16   it in front of us at the time?

17   A.    This is the first reduction for 13.33 percent

18   that we talked about.

19   Q.    And it's a reduction of 13.33 percent in -- well,

20   is this solely limited to Stellar?

21   A.    Stellar Development and BCPPZ Investment.

22   Q.    What did BCPPZ have in it at that time?

23   A.    Some cash.

24   Q.    So he was reducing his percentage in both?

25   A.    Yeah, because when you transfer money in and out,