*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 14

Deposition of Jeffrey Bardwell

3/6/2020

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Ronald H. Pratte,                    )
                                     )
                                     )
          Plaintiff,                 )
                                     )
                                     ) Case No.
             vs.                     ) 2:19-cv-00239-PHX-GMS
                                     )
                                     )
Jeffrey Bardwell and Fanny F.        )
Bardwell, husband and               )
wife,                                )
                                     )
                                     )
          Defendants.                )
_____    )


VIDEOTAPED DEPOSITION OF JEFFREY MICHAEL BARDWELL

Scottsdale, Arizona
March 6, 2020
9:39 a.m.


Prepared for:
COPY

Prepared by:                    CARRIE REPORTING, LLC
SHERYL L. HENKE                 Certified Reporters
Registered Professional Reporter 2415 E. Camelback Road
AZ CR No. #50745                Suite 700
carrie@carriereporting.com      Phoenix, AZ 85016
                                (480) 429-7573

Deposition of Jeffrey Bardwell

3/6/2020

Page 42

1      A.     Ron asked me if I could go to -- if I had time

2    to go to the Boulder City Airport.  And I asked him, yeah,

3    for what?  And he says, oh, it will be good for you.

4    Okay.  What does that mean?  And he told me, well, I want

5    to treat you like one of my kids.

6      Q.     Where did that conversation occur?

7      A.     That was at the -- in Chandler, I believe it

8    was.

9      Q.     And so the lumber yard is in Gilbert, right?

10     A.     The lumber yard's in Gilbert.

11     Q.     Okay.

12     A.     No, no.

13     Q.     Sorry.

14     A.     Lumber yard's in Gilbert?  The lumber yard's in

15   Phoenix.

16     Q.     The one at 91st Avenue and Buckeye?

17     A.     Yes.

18     Q.     That's Phoenix?

19     A.     Yes.

20     Q.     Okay.  Why were you in Chandler?

21     A.     I always stop by.  Chandler was on my way home.

22     Q.     Okay.

23     A.     So when Ron -- you know, Ron purchased that

24   hangar, was remodeling that hangar, and he would always

25   call me, what are you doing.  And I would always stop by

Deposition of Jeffrey Bardwell

3/6/2020

Page 51

1      A.    That's correct.

2      Q.    And he says, hey, I want you to fly with me to

3   Boulder City Airport.  You said that he said it will be

4   good for you.  And that he also told you that he wanted to

5   treat you like one of his kids, right?

6      A.    That's correct.

7      Q.    Okay.  What did you think that meant?

8      A.    Well, I asked him.  I said, treat me like one of

9   your kids?  You know, I'm surprised.  I'm like, well, what

10  does that mean?  And he said, I can do whatever I want to

11  do with my money.  And he kind of like piped off like

12  irritated.  And I didn't ask another question.

13     Q.    Okay.  What happened next?

14     A.    We waited for Justin, because I believe Justin

15  was going.  And I thought at the time Trevor was going,

16  but Trevor lived in -- in Phoenix -- or Vegas, but I

17  thought Trevor was on the plane.  But that's just from my

18  -- that's what I remembered, but I don't think that

19  happened after reading all transcripts.  And we flew up to

20  Boulder City.

21     Q.    Okay.  And so you recall at some point Justin

22  meets you at Stellar Airpark?

23     A.    Yes, to go with us.

24     Q.    Did you have any conversation with Justin before

25  he got on the airplane?

Deposition of Jeffrey Bardwell

3/6/2020

Page 56

1      Q.    Okay.   What happened next?

2      A.    We opened the envelopes.

3      Q.    Okay.   So you opened them right there?

4      A.    Yeah.   Right then and there we all opened the

5  envelopes.

6      Q.    Okay.   What you do remember next?

7      A.    I remember looking at the envelopes.   And it was

8  a check for $2 million, and I've never saw so many zeroes

9  in my life.

10     Q.    You were counting the zeros?

11     A.    I was trying to.   I mean, I was more looking at

12 the commas.   I mean, I was shocked, and so everybody else

13 was shocked.

14     Q.    Okay.

15     A.    I mean, it's kind of strange because nobody said

16 one word.   I mean, we were -- we were shocked.

17     Q.    So everybody opens their envelopes.   Everyone's

18 shocked that there is a $2 million check in this envelope.

19 Do you remember Ron saying anything at that point?

20     A.    You know, it was silence for a good minute,

21 which is a long time, you know.   And Ron's like, what do

22 you guys think, what do you guys think?   You know, and

23 then after that time, everyone's like thank you.   You

24 know, thank you so much.   And he kept looking at me, what

25 do you think?   'Cause he loves to see people's reaction

1  'cause he just loves that. And I said it's like winning

2  the lottery. And he says, no, it's better than winning

3  the lottery 'cause I'm paying the taxes on it.

4      Q.   Say that just to you or say it to everybody? I

5  mean, you made the comment that it's like winning the

6  lottery.

7      A.   Mm-hm.

8      Q.   You know, you said that around everybody, right?

9      A.   I said that around everybody.

10     Q.   So everybody could have heard that, right?

11     A.   That's correct.

12     Q.   Okay. And then Ron says, no, it's better than

13  winning the lottery because I'm paying the taxes on it?

14     A.   That's correct.

15     Q.   Okay. Did he say that loud enough for everybody

16  to hear?

17     A.   Yes.

18     Q.   Okay. What do you remember next?

19     A.   You know, then he says, well, you know, I hope

20  you guys can start your business now.

21     Q.   Okay.

22     A.   You know, hopefully you guys can start up a

23  construction business, you know. And at that point it

24  seemed to me that he was already talking to them about it.

25     Q.   When you say it seemed like he was already

Deposition of Jeffrey Bardwell

3/6/2020

Page 58

1    talking to them about it, "them" is?

2        A.    Somebody in the group.

3        Q.    Okay.  Somebody in the group.  You didn't know

4    exactly what conversations had happened prior to you

5    showing up at this meeting?

6        A.    Yeah, I don't know.

7        Q.    Okay.  So fair to say you got the impression

8    that there were conversations prior to this about starting

9    up a business?

10       A.    That's how I felt.

11       Q.    That's how you felt.  Okay.  What else do you

12   remember Ron saying about starting up your business?

13       A.    That's all I remember.

14       Q.    Okay.  Do you know what business he was talking

15   about?

16       A.    He said construction business.

17       Q.    Do you remember what type of construction

18   business?

19       A.    He didn't give a specific type.

20       Q.    Do you remember him saying anything about home

21   building?

22       A.    That's what we take construction business as.

23       Q.    Okay.  Right.

24       A.    Yeah.

25       Q.    Okay.  Did Pratte building, the Pratte

Deposition of Jeffrey Bardwell

3/6/2020

Page 67

1     Q.    He's your neighbor, right?

2     A.    That's correct.

3     Q.    Okay.  Do you remember calling him and telling

4  him that you got a big check around this time?

5     A.    I do not.

6     Q.    Okay.  Do you remember him coming over and you

7  showing him the check at all?

8     A.    I don't remember that.  I mean, he did live

9  across the street.  We did hang out in our garages.  And

10  that's what --

11     Q.    And you hung out frequently, right?

12     A.    Yeah, once or twice a week.

13     Q.    Once or twice a week?

14     A.    Mm-hm.

15     Q.    Okay.  Is it possible that that happened and you

16  just don't remember it?

17     A.    I don't recall doing that.  I'm not that type

18  to, you know, hey, look what I got.  I'm not that type of

19  guy.

20     Q.    Not the type of guy to show it off?

21     A.    Yeah.

22     Q.    You've read Mr. Abendschein's transcript, right,

23  his deposition transcript?

24     A.    Yes.

25     Q.    Okay.  And you recall that Mr. Abendschein

Deposition of Jeffrey Bardwell

3/6/2020

Page 68

1     testified at deposition that he came over to your house

2     and you showed him the check, right?

3          A.    Okay.

4          Q.    Do you recall that at all or not?

5          A.    I recall in the transcript, yes.

6          Q.    Okay.  You think that didn't happen?

7          A.    I don't -- I don't believe it did.  I don't

8     recall it ever did.

9          Q.    Okay.  Did you ever tell him that this was a

10    signing bonus?

11         A.    A what?

12         Q.    Signing bonus.

13         A.    No.

14         Q.    Ever tell him it was a down payment?

15         A.    No.

16         Q.    What do you remember telling Mr. Abendschein

17    about your -- the payment you received from Ron Pratte?

18         A.    Yes.  I remember talking to Jeff and being so

19    excited that I got this gift from Ron.  That I was going

20    to work for Ron for the rest of my life.

21         Q.    When do you remember telling him that?

22         A.    Next few days.  I mean, I was so excited, you

23    know.  And I said, you know, if I got to work for this man

24    the rest of my life, it is what it is.

25         Q.    Before you deposited the check, did you discuss

Deposition of Jeffrey Bardwell

3/6/2020

Page 73

1   Q.   What do you remember about that?

2   A.   I remember talking to them about starting up a

3   construction company.  You know, and then they -- we all

4   agreed that my role in that company would be to keep Ron

5   off of everyone's back.  Jaime and Todd -- well, Jaime

6   more than anybody, but Jaime and Todd were like, hey, we

7   want to grow this company.  We need you to be on board.

8   You know, we're going to need your help.  But if Ron needs

9   something, you need to be the guy to go to help him.

10   Q.   And you said your role in the company would be

11   to keep Ron off everyone's back; is that right?

12   A.   Yeah.  Ron was very -- he was very demanding

13   upon everybody.  And we all agreed that if he needed

14   something, that I would help him.  So Jaime and Todd and

15   the boys could grow the company.  You know, while I

16   still -- you know, if they needed my help, I would go and

17   do what I needed to do there.  If Ron needed help, I would

18   go and help Ron.

19   Q.   Do you remember what Ron said your role would be

20   in the company?  Do you remember Ron ever dictating what

21   your role would be?

22   A.   Ron never said anything.

23   Q.   Okay.  Ron never said Jeff Bardwell works for

24   me?

25   A.   No, he did not.

Deposition of Jeffrey Bardwell

3/6/2020

Page 74

1      Q.     So it's your testimony that Jaime and Todd

2   decided that, hey, your role in these companies is going

3   to be to keep Ron off everybody's back, right?

4      A.     Not just Jaime and Todd.  All four of us agreed.

5   So it was Justin, Trevor -- all four of us, all four of

6   the boys plus myself agreed that it would be me to help

7   Ron, if Ron needed help.  And if I wasn't available, that

8   they would have to do it.

9      Q.     Okay.  Ron's got a lot of business experience,

10  right?

11     A.     Yes.

12     Q.     You consider him a mentor, at least

13  business-wise?

14     A.     I do.

15     Q.     Okay.  He built a company from, I think we heard

16  during his deposition, of a $15,000 investment to hundreds

17  of millions of dollars in worth.  Why wouldn't the boys

18  want Ron involved in that type of company on a daily

19  basis?

20     A.     Well, from my understanding we could call Ron if

21  we needed help.

22     Q.     But, you know, you testified that, look, your

23  role was to keep Ron off everybody's back, to basically

24  keep him out of the business; is that right?

25     A.     No.  My role was to, instead of Ron calling on

Deposition of Jeffrey Bardwell

3/6/2020

Page 75

1   somebody to go make sure the plane was getting fueled up,

2   that it would be me versus Jaime if he's out in the field.

3       Q.    But again your testimony is that Ron didn't say,

4   hey, I need somebody to be my helper, right?  He didn't

5   tell people that?

6       A.    No.

7       Q.    That wasn't part of the deal when he handed out

8   the checks, right?

9       A.    Well, it was no deal.  I don't remember a deal.

10      Q.    Okay.  But for some reason the boys decided that

11  somebody needed to be there to take care of Ron's -- Ron's

12  needs, fair?

13      A.    We all did.  Yes, that's fair.

14      Q.    Why?

15      A.    Because Ron is very demanding, and Ron owns a

16  lot of stuff and Ron's always busy doing stuff.

17      Q.    Ron gave you all this stuff, though?  Gave you

18  and the boys all this stuff.  You didn't have to take care

19  of what Ron needed any more, right?

20      A.    I did not have to.  But would I?  Absolutely.

21      Q.    And the boys, they didn't have to take care of

22  what Ron needed any more, right, after he gave them all

23  that?

24      A.    No, they did not.

25      Q.    But your testimony is that because of what Ron

Deposition of Jeffrey Bardwell

3/6/2020

Page 83

1   help out Ron?

2       A.      That's correct.

3       Q.      Okay.  And that was a responsibility you had in

4   connection with your membership interest in the

5   residential home building company, right?

6                   MR. MARLOWE:  Objection to form.

7                   THE WITNESS:  Yeah, I don't understand the

8   question.

9   BY MR. COLLINS:

10      Q.      Yeah.  Okay.  Let me break it down.

11      A.      Yeah.

12      Q.      We've got this LLC that eventually becomes

13  Stellar Development, --

14      A.      Yup.

15      Q.      -- right?  I asked you what your

16  responsibilities were to that LLC.  And one of the

17  responsibilities that you listed is helping out Ron,

18  right?

19      A.      Right.

20      Q.      Okay.  How did helping out Ron aid the home

21  building company?

22      A.      It was able to not have Jaime and Todd helping

23  Ron, because Ron loves to bring everybody to help him.

24  Anyone in arm's length of Ron is going to be helping him.

25  And it would enable the company to grow.

Deposition of Jeffrey Bardwell

3/6/2020

Page 104

```
 1              (Recess taken from 11:51 a.m. to 12:29 p.m.)
 2              THE VIDEOGRAPHER:  This begins media 2 in
 3    the deposition of Jeffrey Bardwell.  We're on the record
 4    at 12:29 p.m.
 5    BY MR. COLLINS:
 6      Q.    Mr. Bardwell, I want to talk to you about the
 7    work that you did with Ron Pratte after December 2005.
 8    Okay?  You've testified that one of the reasons you did
 9    that work is because you were a member of these LLCs, and
10    as a member of these LLCs, it was decided with the boys
11    that this was one of your roles, this is one of your
12    responsibilities, right?
13      A.    That's correct.
14      Q.    Okay.  And if you could, walk me through what
15    the work, what doing what Ron needed meant, what it
16    entailed.
17      A.    I mean, whatever he asked me to do, I would help
18    him with.  There wasn't really a set schedule.  You know,
19    there wasn't, okay, do this on Monday, do this on Tuesday.
20    It was Jeff, can you go get my cigarettes?  Okay.  You
21    know, I know there's soda drinks that need to go in the
22    airplanes or in the fridge.  He had a tool room.  I
23    organized the tool room.  We put our tools in there as
24    well from Stellar.  So basically it's what whatever he
25    wanted me to do, if he asked me, I would do it.
```

Deposition of Jeffrey Bardwell

3/6/2020

Page 106

1    sometimes it would require more than 40 hours.

2         Q.    Okay.  Sometimes it might have been 80 hours in

3    a week; is that right?

4         A.    That's correct.

5         Q.    Okay.

6         A.    Not required, but I would do it.  And I would

7    stay.  I could have left at any time, but I stayed.

8         Q.    When you say you "could have left at any time,"

9    what does that mean?

10        A.    Well, I mean, he wasn't -- I wasn't his employee

11   where you have -- you clock in, you have to work, you

12   get -- I mean, I was there helping him.

13        Q.    Okay.  And you were there helping them -- him

14   why, again?

15        A.    Because that was my role in the companies, and

16   all the companies that all of us boys set up.

17        Q.    And so you couldn't leave, right, because that

18   was -- that was one of your responsibilities as a member

19   of those companies, right?

20        A.    I couldn't leave all the companies, or I

21   couldn't leave not helping Ron, or what's the question?

22        Q.    I mean, if your role as a member of these

23   companies was to help Ron, --

24        A.    Mm-hm.

25        Q.    -- if Ron asked you to do something, you did it,

Deposition of Jeffrey Bardwell

3/6/2020

Page 107

1    right?

2        A.    Yeah.  And if I didn't do it or couldn't do it,

3    I would go back to the boys.  And they would send Jaime.

4    I mean, there's times I didn't go to the dunes and Jaime

5    was down at the dunes.

6        Q.    Okay.  So somebody had to do it, right?

7    Somebody had to do what Ron asked?

8        A.    They didn't have to.  But, you know, Ron changed

9    our lives, okay, all of our lives.  So we wanted to help

10   him.  We truly wanted to help him.  That's that.

11       Q.    All of the boys?

12       A.    Yeah, I believe we all felt the same.

13       Q.    Okay.  And so your testimony is, look, if you

14   weren't able to do something that Ron asked, you would go

15   to the boys and ask them to do it; is that right?

16       A.    Yes.

17       Q.    Okay.  Do you ever remember doing that?  You

18   mentioned the one time where Jaime went to the dunes.

19       A.    Yeah.  I mean, there were times where Jaime

20   went, because he knew I wasn't going to go.  I don't

21   really remember going and saying, hey, I'm not doing this

22   and I'm not -- I don't remember going to the boys and

23   saying I can't do it.  I'm a guy that likes to get stuff

24   done, you know, at all costs.  I mean, I'll work 100 hours

25   a week because I want to get things done.

Deposition of Jeffrey Bardwell

3/6/2020

Page 110

1      A.      That's correct.

2      Q.      And generally how much work, how many hours a

3   week?

4      A.      You know, he had somebody working on the cars,

5   the mechanic working on the cars.  You know, the hours I

6   don't -- I don't recall how many hours it was.  You know,

7   I never kept track.

8      Q.      More than 40?

9      A.      I'm sure sometimes, yeah.

10     Q.      And again, you didn't receive a paycheck for any

11   of this work you were doing for Ron, right?

12     A.      That's correct, I never received a paycheck.

13     Q.      If you took time off, did you ask Ron if you

14   could take time off?

15     A.      You know, out of respect I would tell him, hey,

16   I'm going on vacation, you know.  And I was always -- you

17   know, I was Ron's employee with Pratte Building Systems,

18   okay.  So we had that relationship.  And it kind of

19   just -- I kept it like that in the respects of the

20   vacation.  You know, I didn't know what he had planned,

21   what he was doing.  I was there, you know, helping him.

22              So I didn't want to just disappear.  So would I

23   ask him?  I would email him and say, hey, I'm going on

24   vacation or, hey, how do these days look, is that okay?

25   You know, and if he truly, truly needed me, and I didn't

Deposition of Jeffrey Bardwell

3/6/2020

Page 111

1    have to go on vacation or the camping trip or whatever it

2    was I was doing, I wouldn't go.

3        Q.    Okay.  If Ron asked you to do something and you

4    said no -- first of all, do you ever remember Ron asking

5    you to do something and you said no?

6        A.    A few times, yeah.

7        Q.    Can you give me an example?

8        A.    We were working at the dunes.  Ron was digging a

9    hole with the backhoe.  Pipe broke or something.  I don't

10   remember what it was.  Told me to jump in the hole.  Jump

11   in that hole.  And I told him no.  I didn't say that

12   nicely.  I said fuck, no, you jump in the hole.  Because

13   the hole needed to be shored up.  It was too skinny.  And

14   we made the hole bigger.  And that was one instance.

15       Q.    Okay.  So in that instance you thought it was

16   probably dangerous to jump in the hole, right?

17       A.    Yeah.

18       Q.    Okay.  You didn't jump in the hole.  You

19   eventually got the problem fixed another way, right?

20       A.    That's correct.

21       Q.    Okay.  Tell me another time that you told Ron,

22   no, I'm not going to do that.

23       A.    Well, I remember it's Valentine's Day and Ron

24   wanted me to stay.  I think Valentine's Day was on a

25   Thursday maybe.  I'm not sure of the exact date.  And I

Deposition of Jeffrey Bardwell

3/6/2020

Page 116

1      Q.     Okay.  Did he say derogatory things to you?

2      A.     Well, you know, he would -- little comments, you

3   know, about how dumb Mexicans are and comments like that.

4   You know, can you find a Mexican with a brain?  You know,

5   I didn't like that.  You know, my -- my dad is full

6   Mexican, you know, full Hispanic.  He's got adopted and

7   his last name is Bardwell.  So it was a little offensive.

8      Q.     Okay.  Anything else that you remember that he

9   said derogatory towards you?

10     A.     You know, there's -- can I pinpoint all the

11  things that he said?  I mean, there's a lot of things that

12  went on.  There's a lot of things that were said.  A lot

13  of jokes.  You know, but I'm not here to -- I mean, that's

14  not -- I mean, it is what it is.  He said it.  You know,

15  can I remember every single instance?  No.  But there was

16  a lot of them.

17     Q.     Okay.  2008 you stopped -- 2018 you stopped

18  working for Ron.  You stopped doing what Ron told you to

19  do, right?

20     A.     No, not working for him, but yes, I stopped

21  associating with him.

22     Q.     Did you do that because he made derogatory

23  comments about you?

24     A.     I did that -- it was leading up -- there was a

25  lot of things that were leading up to that.  Okay.  And it

Deposition of Jeffrey Bardwell

3/6/2020

Page 121

1              MR. MARLOWE:  Objection, form.

2              THE WITNESS:  Negotiation with how much

3     money I need to get back?

4     BY MR. COLLINS:

5         Q.    Yes.

6         A.    I asked him if I was getting my money back that

7     I had invested in this company.

8         Q.    What did he say?

9         A.    He said yes.

10        Q.    And then if you take a look at section 2 here,

11    section 2 lists separation compensation.  Do you see that?

12    Sorry, page 1.

13        A.    What am I looking at?

14        Q.    Section 2.

15        A.    Yeah.

16        Q.    The bullet point 2.  Separation compensation, do

17    you see that?

18        A.    Yes.

19        Q.    And under --

20        A.    Well, let me just clarify one thing.  When I was

21    talking to Todd Carriere and he said I would get my money

22    that I was invested in the company, that I would get that

23    back, but if -- if I agreed to sign this.  If I didn't

24    agree to sign this, then he said we go to the operating

25    agreement.  Okay.

Deposition of Jeffrey Bardwell

3/6/2020

Page 130

1    Q.    Why?

2    A.    You know, I was -- I was so grateful for what

3    Ron had given me.  You know, I was grateful in 2002, '3,

4    '4 for the work.  I was grateful for what he did.  He

5    changed my life.  You know, I was making $150,000 in '05,

6    which was a lot of money and it's still a lot of money

7    today.  And I was super thankful and loyal for that.  And

8    this man changed my life.  When he gave me that

9    $2 million, he changed my life.  So, you know, I got

10   kicked out of these companies, and I stayed, continued to

11   help him.

12   Q.    And let me ask you this.  From 2006,

13   January 2006 --

14   A.    Yup.

15   Q.    -- to the end of 2014 it's your testimony that

16   you did what Ron asked you to do because you were a member

17   in these companies and that was part of your

18   responsibilities as a member?

19   A.    My role, that is correct.

20   Q.    Okay.  And even when your membership in these

21   companies ended, you continued to do the same thing, you

22   continued to work for Ron Pratte, you continued to do what

23   he asked you to do, right?

24   A.    I continued to help him.  I was so thankful.

25   Okay.  I didn't -- I had enough money to live.  I didn't

Deposition of Jeffrey Bardwell

3/6/2020

Page 131

 1    need to be like Ron and have, 3, 4, $500 million.   I

 2    didn't need it.  I wasn't going to get up, walk away and

 3    go find a job.  You know, I loved that man.  He changed my

 4    life.  That's it.

 5        Q.    Do you ever remember telling Ron, hey, I don't

 6    have to do this any more, I'm doing this 'cause I want to?

 7        A.    I never did.

 8        Q.    Okay.  Do you ever remember telling him, huh,

 9    hey, Ron, my membership interest got bought or repurchased

10    or redeemed?  Do you ever remember having this

11    conversation with him?

12        A.    Yes.

13        Q.    What did he say?

14        A.    I told Ron that the kids, that the boys were

15    kicking me out.

16        Q.    Okay.  What did he say?

17        A.    He turned around and walked away.

18        Q.    He didn't say anything?

19        A.    Not a word.

20        Q.    When did you tell him this?

21        A.    I told him, it had to be in August sometime.   I

22    remember I was at the sand dunes.

23        Q.    Okay.  So you think you told him before you

24    signed the separation agreement or after?

25        A.    I don't recall the exact time.

Deposition of Jeffrey Bardwell

3/6/2020

Page 134

```
 1              THE VIDEOGRAPHER:  We are on the record at
 2    1:13 p.m.
 3    BY MR. COLLINS:
 4       Q.    Mr. Bardwell, the court reporter has just handed
 5    you what's been marked as Exhibit 6.  Exhibit 6 is an
 6    email chain between you and Mr. Pratte.  Do you recognize
 7    this document?
 8       A.    Yeah, yes, I see it.
 9       Q.    Okay.  Have you had a chance to review it?
10       A.    Not yet.
11       Q.    Okay.  I've generally got some questions about
12    the -- well, the whole email chain, but start at the
13    bottom obviously.
14       A.    Start at the bottom.  Okay.
15              MR. MARLOWE:  Let him know when you're done
16    reviewing it.
17              THE WITNESS:  Oh, got it, got it.  Okay.
18    BY MR. COLLINS:
19       Q.    You would agree with me that in the August 13,
20    2014 email you were asking Mr. Pratte for time off, right?
21       A.    Well, I'm in a sense asking him if these days
22    are okay with him due to the fact that I always asked him.
23    You know, I didn't -- I wasn't his employee.  I didn't
24    have a number of vacation days that I was able to take.
25    But I didn't just want to leave, and leave him high and
```

Deposition of Jeffrey Bardwell

3/6/2020

Page 135

1   dry.

2        Q.    Okay.

3        A.    Mm-hm.

4        Q.    And you indicate here, "she," and you're talking

5   about your mom there?

6        A.    Yes.

7        Q.    She has been there for five days and she's in

8   the hospital.  I will keep you posted.  Thank you for the

9   two days off.  Did you see that?

10       A.    I see that.

11       Q.    And so he had agreed to give you two days off

12  previously and you had taken those two days.  You were

13  sending this to him on some other issues, but you're also

14  thanking him for those days off, right?

15       A.    That's what it looks like, yes.

16       Q.    Okay.

17                 (Deposition Exhibit No. 7 was marked for

18  identification by the reporter.)

19  BY MR. COLLINS:

20       Q.    Mr. Bardwell, I've just handed you what's been

21  marked as Exhibit 7.  Do you recognize this document?

22       A.    Yes.

23       Q.    This is an email chain that begins in December

24  of 2014 and then really runs to December -- it really

25  stays in December 2014, but then you forward it at some

Deposition of Jeffrey Bardwell

3/6/2020

Page 136

1    point to Mr. Pratte in February of 2015.  Do you see that?

2         A.    Okay.  2014, 2015.  Yes.

3         Q.    Do you know why you would have forwarded that

4    email chain back to Mr. Pratte in 2015?

5         A.    No.

6         Q.    Okay.  You had a chance to review the email?

7         A.    Yes.

8         Q.    Okay.

9         A.    Oh, yes.  I -- I probably said, hey, I'm going

10   to be out of town these days.  And probably when I'm down

11   there helping him, he probably started another project and

12   I said, hey, remember I'm not going to be here.

13        Q.    Yeah.  You probably had to remind him, right?

14        A.    Yeah.

15        Q.    Right.  Because it's December 2000 --

16   December 23, 2014.  In the bottom email here, you say, "I

17   am trying to plan a trip to Disney World with my kids on

18   March 6th thru the 14th.  Is it possible to have these

19   days off?"  Do you see that?

20        A.    I do.

21        Q.    So you're asking him for time off there, right?

22        A.    Yeah.

23        Q.    Okay.  He responds with, "Yea no worries.

24   Whatever you need."  Right?

25        A.    Yes.

Deposition of Jeffrey Bardwell

3/6/2020

Page 137

1    Q.    Okay.  And this would have been after your

2  interest in Stellar was redeemed, right?

3    A.    That's correct.

4    Q.    Okay.  And so this is during the time period

5  that your testimony is you are doing things for Mr. Pratte

6  out of moral obligation, out of the goodness of your

7  heart, all of those above?

8    A.    That's correct.

9    Q.    Yeah.  You weren't contractually obligated?

10   A.    That's correct.

11   Q.    And you weren't obligated to work for Mr. Pratte

12  during this time period because it was your responsibility

13  as a member of one of these LLCs, right?

14   A.    That's correct.

15   Q.    So you're asking him for time off even though --

16   A.    It's really -- not really.  There is a certain

17  way you have to talk to Mr. Pratte.  Okay.  You can't --

18  he's the boss of everything, and you can't say, hey, I'm

19  taking these days off.  If you say, hey, I'm taking these

20  days off, then he puffs up and says no, you're not.  So

21  there's a certain way you have to ask the man.  So if

22  you're trying to read into it that I was his employee and

23  sir, can I have this number 30 -- you know, my number

24  is -- this day off, this will be my number seventh day, it

25  didn't happen like that.

Deposition of Jeffrey Bardwell

3/6/2020

Page 149

1        A.     I mean, that's -- so he gave it to regular

2    workers to give to everyone.

3        Q.     Okay.

4               (Deposition Exhibit No. 11 was marked for

5    identification by the reporter.)

6    BY MR. COLLINS:

7        Q.     The court reporter has handed you what's been

8    marked as Exhibit 11.  Mr. Bardwell, take a second to

9    review this, and then let me know if you recognize or

10   remember this email chain.

11       A.     Yeah.  Okay.  I'm finished reading.

12       Q.     This document is dated August 15, 2016, right?

13       A.     Okay.  Yes.

14       Q.     And there in the email you indicate, "Ron.  I

15   would like to take off the 25th and 26th of this month.

16   Please let me know.  Thanks."  Right?

17       A.     That's correct.

18       Q.     So, again, you're asking him for time off here,

19   and this is in 2016, right?

20       A.     That's correct.  Well, just like I testified

21   earlier, there's a certain way you have to talk to Ron.

22   If you tell him you're not going to be around, I mean, he

23   gets irritated.  So this was my respectful way of letting

24   him know that I'm not going to be around.

25               (Deposition Exhibit No. 12 was marked for

Deposition of Jeffrey Bardwell

3/6/2020

Page 154

1    you didn't have a contractual obligation to do what Ron

2    said, right?

3         A.    That's correct.

4         Q.    Right.  And you didn't have an obligation as a

5    member of one of these LLCs to do what Ron said, right?

6         A.    That's correct.

7         Q.    Okay.  Your only obligation to Ron at this point

8    would have been a moral obligation, would have been you

9    felt like you should, right?

10        A.    I didn't feel like I should.  I wanted to.

11        Q.    Okay.

12        A.    Yeah.  I mean, this man changed my life.

13        Q.    Okay.

14        A.    He changed my life, and I will be forever

15   thankful.  If he called me today for help, I would

16   probably help him.

17        Q.    What was going on during this time period?  Why

18   did he need so much work?

19        A.    During --

20               MR. MARLOWE:  Objection to form.  Are you

21   referring to the time period of the email?

22               MR. COLLINS:  Yeah.

23               THE WITNESS:  I believe he was asking me to

24   help him for the restaurant.  I believe we were

25   remodelling the restaurant at that time period.

Deposition of Jeffrey Bardwell

3/6/2020

Page 159

1      Q.    And given what you've just said, it kind of does

2    explain to me --

3      A.    Yeah, she was --

4      Q.    -- what's going on, so.  I do want to -- I just

5    want to understand whether or not this was somebody that

6    you were communicating with as somebody who is doing work

7    for Ron?

8      A.    Oh, got it.  She was Ron's bookkeeper lady.  And

9    I used her to help me with my Executive Stone Imports

10   company, and Pristine Barber Shop.  And she's the one that

11   helped me.  I believe she's the one that got the LLCs up

12   and going for me.

13     Q.    Okay.  And what LLCs did she help you set up?

14     A.    ESI, Executive Stone Imports, and Pristine

15   Barber Shop.  And she did -- she would do the books on

16   ESI, Executive Stone Imports.  And then she would use Todd

17   to help her, because she's not at Todd's level.  So that's

18   why it says Todd needs to review it, make his changes to

19   move money and inventory.

20           So that's what she's talking about; checks

21   coming in, inventory that I -- 'cause I purchased a lease

22   on a stone quarry in Sauadeepa (phonetics); Sauadeepa,

23   Mexico.  And I was importing stone, flagstone-type rock,

24   into the United States and selling them at rock yards.  So

25   she was handling those transactions.

Deposition of Jeffrey Bardwell

3/6/2020

Page 164

1  was going on.  He was acting very strange.  And we were

2  concerned, concerned for his health.  You know, he's very

3  sometimes mean.

4      Q.    We talked a little bit about that before.  You

5  know, was he ever mean to you?

6      A.    You know, he was -- I was the brunt -- I was

7  around him a lot.  So, you know, when he was mad, he was

8  mad.  And he would voice that he's mad.  When he's happy,

9  he's happy.  You know, I was on both sides of it, right.

10 You know, yeah, he said a lot of things.  You know, he did

11 things that just wasn't him in the past.

12     Q.    He was different, that's what your testimony is?

13     A.    Yes.

14     Q.    Okay.  Do you ever remember a time when you were

15 at the dunes and he didn't talk to you, were you upset

16 that he didn't talk to you?

17     A.    Well, he didn't talk to me the whole month of

18 February.

19     Q.    Do you know why?

20     A.    It's because I didn't go down there.

21     Q.    You didn't go down there for what?

22     A.    To help him.

23     Q.    Okay.  So you remember he had asked you to go

24 down there and you didn't?

25     A.    Well, he was just used to me going down there.

Deposition of Jeffrey Bardwell

3/6/2020

Page 165

```
 1   I was going down there every week.  You know, he was used
 2   to me going down there.
 3        Q.   And so you stopped going down there and he got
 4   cold to you, fair?
 5        A.   Yes.
 6        Q.   Yeah.  Did that bother you?
 7        A.   Yes.
 8        Q.   Did you try and talk to him about it?
 9        A.   Yeah.  You know, I would walk up, right up to
10   him face-to-face this close.  And he would -- we would
11   look in each other's eyes.  And he would turn the other
12   way and leave.  And Ron, we need to talk.  Ron, hey,
13   what's up, Ron?  He'd give me his back and walk away.
14        Q.   What was the family emergency?
15        A.   Jeff Abendschein called my wife and told my wife
16   that I was talking to his girlfriend, Veronica.
17        Q.   Jeff was deposed in this case.  Have you read
18   his deposition?
19        A.   I don't know if I read the whole thing, but I
20   looked at it, yes.
21        Q.   Okay.  What's Veronica's last name?
22        A.   I don't know.
23        Q.   Okay.  We'll call her Veronica then.  I was
24   going to --
25        A.   Yeah, I don't know.  It might be Guzman maybe.
```

Deposition of Jeffrey Bardwell

3/6/2020

Page 167

1      A.    I do.

2      Q.    And this is March 12, 2018 right?

3      A.    Yes.

4      Q.    And Ron states, "Jeff, I have tried many times

5   to reach you by phone and I thought I would try the email

6   to at least let you know my thoughts."  Do you see that?

7      A.    I do.

8      Q.    Do you remember Ron trying to reach you by phone

9   during this time?

10     A.    We -- when I -- okay.  Let's go back so we can

11  get it into where we're at, because you kind of jumped a

12  whole --

13     Q.    A couple of months, that's right.

14     A.    Yeah, yeah.  You jumped a whole deal.  I was

15  trying to get Ron to talk to me when I would go down to

16  the dunes in February.  When I came back -- because I

17  think I was gone a week, then I came back.  And Ron would

18  not talk to me.  He wouldn't look at me.  Okay.  That's

19  okay.  But I was still going down there.  The whole month

20  of February I still went down there, because it was

21  important to me that I talk to Ron.

22          So I even had a conversation with his brother.

23  I said Don, you know, Ron needs to talk to me.  He's

24  totally avoiding me.  You know, I would talk to Ron

25  face-to-face just like this.  Ron, we need -- and he would

Deposition of Jeffrey Bardwell

3/6/2020

Page 168

1    go the other way.  It was like an opposite side of a

2    magnet.

3              So I told Don; Don, I'm just going to leave at

4    the end of the month, never come back.  If he doesn't want

5    to talk to me, then he doesn't want to talk to me.  Okay.

6    There's nothing I can do.

7              So I went down, like I told you, that whole

8    month.  So the first week I took off, the next three weeks

9    I continued -- I went down there for I don't know how many

10   days of the week I went down.  I went a few days.  But it

11   was to the point, it's like why am I even coming down

12   here.  This man doesn't even want to talk to me.

13             So I loaded up on the last week that I made my

14   decision, I loaded up everything that I had down there.

15   My sand rail, my RZR, my parts.  I went home.  And as I

16   went home, I can't remember if it was a Wednesday or

17   Thursday, one of those two days, went home.  And Ron

18   called me the next day.

19             Okay.  And I answered the telephone.  Hello.

20   And he said, hey, Jeffy, we need to talk.  I said, yeah,

21   we need to talk.  I go, do you want me to go to your

22   house?  Do you want me to go to the hangar?  Would you

23   like me to go to the office?  Let's just meet at the

24   office tomorrow at 8:00.  Okay.  No problem.  I'll see you

25   then.

Deposition of Jeffrey Bardwell

3/6/2020

Page 169

1         Okay.  I go to the office at 8:00 in the

2    morning.  Ron doesn't show up.  9:00, Ron doesn't show up.

3    10:00, Ron doesn't show up.  10:30 I leave.  And at that

4    point when I left I was -- I was done.  I was totally

5    done.  I went and dropped -- you know, I had an obligation

6    to take a trailer and drop it off, because I brought it

7    back with me.  So I went to drop the trailer off, like I

8    told him I would drop, 'cause it was -- needed repair.  So

9    I had to take that trailer in.  And that was it.

10        Then he called maybe 11:00, maybe 11:30.  Jeff,

11   where are you at?  And I didn't answer.  That was it.  And

12   I wouldn't answer his phone calls.

13       Q.    After that?

14       A.    That's correct.

15       Q.    Okay.  So it's your testimony that you were

16   there starting at what time?

17       A.    We were supposed to meet at 8:00.

18       Q.    Okay.

19       A.    And he didn't show up while I was there until

20   10:30.

21       Q.    There were other people there during that time,

22   right?

23       A.    Yes.

24       Q.    Who did you talk to during that time period?

25       A.    Leo, his worker that cleans the airplanes.

Deposition of Jeffrey Bardwell

3/6/2020

Page 170

1    Q.    Anybody else?

2    A.    Nope, not that I can recall.

3    Q.    And you indicated that you were done.  What does

4    that mean?

5    A.    That I wasn't going to talk to him any more.

6    That he didn't want to talk to me.  He avoided me for

7    30 days.  I went down to the dunes.  I even brought my

8    wife down there.  And she was staying in the trailer,

9    because I had my own trailer.  And she went for the three

10   full weeks that I was down there.  And he never talked to

11   me.  He would never talk to me.  He would avoid me.

12   Q.    How does the family emergency fit into any of

13   that?

14   A.    How does the family emergency?  I needed to go

15   home and talk to my wife about what had happened.

16   Q.    When did that incident happen?

17   A.    What, the telephone call from Jeff?

18   Q.    The telephone call.

19   A.    I mean, I would have to look at emails.  It's

20   whenever the email I sent Ron that said I had a family

21   emergency.

22   Q.    Okay.

23   A.    It's in the email.

24   Q.    Okay.

25   A.    It happened that day.

Deposition of Jeffrey Bardwell

3/6/2020

Page 171

1    Q.    Did your wife tell you that you couldn't come

2  back to the dunes?

3    A.    No, she went with me.

4    Q.    Did your wife tell you, you couldn't come back

5  to the dunes without her?

6    A.    No.

7    Q.    If you only had a moral obligation, not a

8  contractual obligation to work for Ron, why did you put up

9  with that?  Why did you keep going up there when he wasn't

10  talking to you?

11    A.    Because I was so -- you have to understand, you

12  grow to love this man, right.  He was like my father

13  figure.  And I had a great relationship with my own

14  father.  But Ron gave me some things that my father

15  couldn't give me; how to run business, how to be a

16  businessman, how to try to -- you know, how to work super

17  hard.  I mean, my dad was military.  He was a Marine for

18  29 years.  Okay.

19         And Ron liked that.  Ron liked that's how I grew

20  up.  I grew up if you clean the bathroom, it better be

21  clean with not a spot.  That's why Ron loves me.  That's

22  why we had the great relationship.  I wasn't going to

23  leave on a drop of a dime.  It wasn't going to happen.

24    Q.    So even though Ron wasn't talking to you, you

25  were still going up there, you were still staying up

Deposition of Jeffrey Bardwell

3/6/2020

Page 172

1    there, you were still trying to talk to him, because, you

2    know, you liked him.  You loved him, right?  You told him

3    you loved him?

4         A.    That's correct.

5         Q.    Okay.  You didn't think you had a contractual

6    obligation to do anything, right?

7         A.    I did not.

8         Q.    Okay.  I want to take a look at the last

9    paragraph of Ron's email here.  "You mean a lot to me Jeff

10   and I'm not ashamed to tell you that and I have treated

11   you very well.  I would like to sit down and talk this

12   thing thru and work out a go forward plan."  Do you see

13   that?

14        A.    Yes, I do.

15        Q.    Okay.  You would agree that Ron has treated you

16   very well, right?

17        A.    That's correct.

18        Q.    Okay.  You didn't respond to this email, right?

19        A.    I did not.

20        Q.    You didn't call him, you didn't do anything in

21   response to this email, right?

22        A.    That's correct.

23        Q.    Okay.  In fact, after this email -- well, in

24   fact, you haven't talked to Ron since this email, right?

25        A.    That's correct.  After the meeting that he set

Deposition of Jeffrey Bardwell

3/6/2020

Page 180

1      transferred funds to our -- transferred properties to our

2      entities.

3          Q.    Do you ever remember telling Mr. Yonker that you

4      -- you were going to work with -- for Mr. Pratte for the

5      rest of your life -- rest of his life?  I'm sorry.

6          A.    I do not.

7          Q.    Do you ever remember telling Mr. Yonker that you

8      had a contract or a deal with Mr. Pratte?

9          A.    I do not.

10         Q.    Do you ever remember telling Mr. Abendschein

11     that you had a contract or deal with Mr. Pratte?

12         A.    No.

13         Q.    You've read Jaime Ziparo's deposition, right?

14         A.    Not in full, but yes, I have seen it.

15         Q.    You're aware that Mr. Ziparo contends that you

16     told him that you had an agreement with Mr. Pratte to work

17     with -- for Mr. Pratte for the rest of Mr. Pratte's life,

18     right?

19               MR. MARLOWE:  Objection to form.

20               THE WITNESS:  You know, could I have told

21     him, hey, Ron made a life changing gift to me and I'm

22     going to work for that man for the rest of my life?  Could

23     I have said that?  You know, we were in opening companies.

24     Okay.  And my role in the company, in Stellar Development,

25     was to -- and the other entities was to take care of Ron.

Deposition of Jeffrey Bardwell

3/6/2020

Page 181

1    I thought Stellar was going to grow into this huge company

2    with the amount of money that we were going to put into

3    it.  Okay.  So if my role is going to be in that company,

4    I could have possibly stayed and, you know, helped Ron for

5    my whole life.

6    BY MR. COLLINS:

7        Q.    Okay.  So you think you may have told

8    Mr. Ziparo, Jaime, that, hey, I'm going to work for this

9    man for the rest of my life?

10               MR. MARLOWE:  Objection, misstates.

11               THE WITNESS:  You know, it's -- could I have

12   said, hey, I'm so thankful and I'll do whatever this man

13   needs, probably.  But did I have a contract with him to

14   work for Ron his whole life, I did not.

15   BY MR. COLLINS:

16       Q.    Okay.  And my question is what you told

17   Mr. Ziparo.

18       A.    Okay.

19       Q.    Right.  Do you remember having a conversation

20   with Mr. Ziparo where you said, look, I'm going to work

21   for Mr. Pratte for the rest of my life?

22       A.    I don't remember that exact conversation.  You

23   know, we were in the office joking around many times.  You

24   know, Todd would joke around saying Jeff is going to be

25   80 years old on a shovel, you know.  And what did I tell

Deposition of Jeffrey Bardwell

3/6/2020

Page 187

```
 1      A.    I don't.
 2      Q.    Do you ever remember thinking, hey, I'm going to
 3  have to work at the dunes after Ron's gone?
 4      A.    I didn't have to do anything.  I didn't -- no, I
 5  didn't ever think that.  You know, would I -- would I go
 6  down there?  I love the dunes.  I love going down there.
 7      Q.    Do you ever remember being visibly upset around
 8  a campfire at the dunes?
 9      A.    I don't.  I don't.  I mean, it's a happy place
10  down there.  I don't know where I would be upset.
11      Q.    Ever an evening that you -- I use the word
12  visibly upset.  I mean crying, that you were crying around
13  a campfire at the dunes?
14      A.    No.
15      Q.    Okay.  If somebody said that, they would be
16  lying?
17      A.    I don't know if they would be lying.  I mean, I
18  don't remember me crying at the dunes.
19      Q.    Okay.  Do you remember complaining around a
20  campfire at the dunes about what Ron was having you do?
21      A.    I don't.
22      Q.    Do you remember complaining to Larry Yonker
23  about work that Ron was having you do?
24      A.    I don't.
25            MR. MARLOWE:  Objection, timeframe.  Ever?
```

Deposition of Jeffrey Bardwell

3/6/2020

Page 189

1     A.     Well, I could have left probably with my
2     $2 million gift.  But as the other 20 percent interest, I
3     don't think they would have gave that to me.
4         Q.     What do you think would have happened to your
5     20 percent interest if you took off?
6         A.     It would have stayed in the company.
7         Q.     Okay.  Because even though there were LLC
8     agreements that gave you a right to 20 percent, you know,
9     gave you a membership interest to 20 percent of the
10    company?
11        A.     Yeah, because I was given the $2 million gift.
12        Q.     As far as the 20 percent interest in these
13    companies, in the LLCs, do you know if they could have
14    taken that away from you at any point?
15        A.     If I got -- I believe in the operating agreement
16    that if I didn't stay on all the companies, that it wasn't
17    mine.
18        Q.     That's your testimony; that if you stopped doing
19    work for the LLCs, that they could take back your interest
20    without paying you?
21             MR. MARLOWE:  Objection, misstates the
22    answer.
23    BY MR. COLLINS:
24        Q.     I'm just -- I'm trying to understand what your
25    testimony is.  Do you believe that to be true?

Deposition of Jeffrey Bardwell

3/6/2020

Page 190

```
 1      A.    Well, I believe that the properties got
 2    transferred to the entities.  And they were the entities.
 3    And that I -- if I wanted to get up and leave, I could
 4    have left with my $2 million.
 5      Q.    But you don't think that you could have left
 6    with the percentage of the assets that were in the LLCs,
 7    right, with your membership interest?
 8      A.    Right.
 9              MR. CONNELLY:  I didn't hear that.  Did you
10    answer him?
11              THE WITNESS:  Yes.  I said "right."
12    BY MR. COLLINS:
13      Q.    All right.  I want to back up to the
14    conversations that happened at the airport in Vegas.
15      A.    Okay.
16      Q.    Or what you remember, the Boulder City airport?
17      A.    Yes.
18      Q.    Is it your testimony that at the airport, Ron
19    Pratte didn't tell everyone that you were just to work for
20    him?
21      A.    He did not.
22      Q.    Do you just not remember, or do you remember
23    that that didn't happen?
24      A.    No, that did not happen.
25      Q.    That did not happen?
```

Deposition of Jeffrey Bardwell

3/6/2020

Page 194

1    Q.    -- right?  All of that.

2          And so those meetings, sometimes you would talk

3    over the phone with people?

4    A.    Right.  Yeah, I would be on the phone with Todd.

5    Q.    Okay.

6    A.    I mean --

7    Q.    Sometimes everybody would get together?

8    A.    No, I don't think everyone came until after

9    Jaime moved and -- people would come down and visit, Jaime

10   would come down, because I think he had to start looking

11   for a house.

12   Q.    Do you remember Ron Pratte being in any of those

13   meetings?

14   A.    I don't.

15   Q.    Or gatherings?

16   A.    I don't.

17   Q.    Okay.  Do you remember --

18   A.    I mean, Ron Pratte was in the office.  Could he

19   have walked through?  Anything's possible.

20   Q.    Right.  But you don't remember him coming and

21   saying, look, this is how it's going to work?

22   A.    No.

23   Q.    Okay.  And, in fact, Ron didn't dictate how the

24   LLCs were going to be set up, right?

25   A.    No.  He just said he was going to be there to

Deposition of Jeffrey Bardwell

3/6/2020

Page 197

1                    MR. MARLOWE:  Objection, form.

2                    THE WITNESS:  I don't know.

3    BY MR. COLLINS:

4        Q.    Okay.  At some point you probably had multiple

5    meetings with Ms. Rader, right?

6        A.    Yes.

7        Q.    I don't want to know what you talked about

8    during those meetings.  I'm not entitled to know what you

9    talked about during those meetings.  Was there ever a

10   meeting that you had with Ms. Rader, though, where

11   Mr. Shisler or Mr. Pratte were present?

12       A.    No.

13       Q.    Okay.  Was there ever a meeting you had with

14   Mr. Rader -- with Ms. Rader where Mr. Shisler was on the

15   phone, some sort of a conference call where you were

16   there, some sort of phone call while you were there?

17       A.    No.

18       Q.    Was there ever a meeting that you had with

19   Ms. Rader where Mr. Pratte was on the phone?

20       A.    Yes.

21       Q.    Tell me about that.

22       A.    Tell me about -- tell you about the meeting?

23       Q.    What happened, yeah.

24       A.    Diana had some questions, and I had called Ron.

25   And I was asking Ron what the questions were that Diana

Deposition of Jeffrey Bardwell

3/6/2020

Page 211

1     A.    Right.

2     Q.    Okay.  And did you ever file a tax return

3  related to that transfer?

4     A.    I did not.

5     Q.    Okay.  Did you ever remember reporting on your

6  taxes the $2 million payment?

7     A.    I did not.

8     Q.    Okay.  So you would agree with me that one of

9  the things that Ron Pratte did for you is he paid this

10 gift tax liability, right?

11    A.    Well, I don't know how I benefited from that,

12 but he paid it.

13    Q.    Somebody had to pay taxes on the transfer,

14 right?

15    A.    Oh, that's right.  Yes, yes.

16    Q.    If Mr. Pratte didn't pay the taxes, you would

17 have had to pay the taxes, right?

18            MR. MARLOWE:  Objection, calls for a legal

19 conclusion.

20            THE WITNESS:  I don't know.

21 BY MR. COLLINS:

22    Q.    Well, we've all seen game shows.  We know that

23 lottery winners, they've got to pay taxes, right?

24    A.    Lottery winners, yes.

25    Q.    Okay.  And, you know, when you get a transfer of

Deposition of Jeffrey Bardwell

3/6/2020

Page 232

1      Q.    Okay.  All four of them testified at various

2  times that you had a deal with Mr. Pratte to work for him

3  for the rest of his life?

4                 MR. MARLOWE:  Objection, misstates.

5  BY MR. COLLINS:

6      Q.    Are they wrong?

7      A.    I did not have a deal, a lifetime deal.

8      Q.    Okay.  So they're wrong, right?

9      A.    They're wrong.

10     Q.    Okay.  What reason do they have to lie?

11     A.    I don't know.  You know, they are his family.

12     Q.    Trevor doesn't speak to Mr. Pratte any more,

13  right?

14     A.    I don't think he does.

15     Q.    And other than just being his family, can you

16  think of any other reason that they would lie for him

17  under oath in a federal proceeding like this?

18     A.    I don't think they -- I don't think they would

19  lie.  But I mean, there's a lot of variables.  There is

20  Ron's will.  There's -- you know, you get more from

21  Ron and there's a lot of what-ifs.  I'm not saying they're

22  lying.

23     Q.    Okay.  Your testimony is in January 2018 you

24  didn't have a contract to work with Mr. Pratte, right?

25     A.    Right.

Deposition of Jeffrey Bardwell

3/6/2020

Page 233

1      Q.     If anything, you had a moral obligation and you

2    were fulfilling a moral obligation?

3      A.     It wasn't an obligation.  It was I was thankful.

4      Q.     Yeah.  What term do you want to use for it?

5      A.     It doesn't matter.

6      Q.     I'm not trying to put words in your mouth.

7      A.     Yeah.

8      Q.     I'm trying to make it easy to talk about.

9    That's all I'm trying to do.  So when I say moral

10   obligation, I mean, look, you're going to the dunes on a

11   regular basis in late 2017, early 2018.  You're doing it

12   for a reason.  Why are you doing it?

13     A.     To help Ron.

14     Q.     To help Ron.  Okay.  And you're helping out

15   somebody that you love, right?

16     A.     Yes.

17     Q.     That has given you a lot, according to you, --

18     A.     Yes.

19     Q.     -- right?

20            So given that you didn't have a contract with

21   Ron, according to your testimony, in 2018, you're not

22   going to testify that Ron fired you, are you?

23     A.     Well, it's not that -- no, 'cause there's no --

24   I don't have a contract, you know.  Did he tell me

25   multiple times to pack my shit and leave?  Yeah, I mean,

Deposition of Jeffrey Bardwell

3/6/2020

Page 234

1   but --

2       Q.    When did he tell you that?

3       A.    When did he tell me that?

4       Q.    Yeah.

5       A.    He told me that two times.  One was probably in

6   '15, somewhere '15.  And, you know, another one was in '17

7   sometime.  It's just when I'd disagree with him.

8       Q.    What do you remember?  What do you remember

9   about that?

10      A.    I went to Ron.  I don't agree with what you're

11  doing.  That was my exact words.  I don't agree with

12  you're doing.  And he stopped me midstream.  So I must

13  have caught him in a bad mood.  And he said, you don't

14  agree with what I'm doing.  Pack your shit and get out of

15  here.  And that was it.  And I was instantly pissed off.

16      Q.    Did you come back the next day or --

17      A.    I didn't leave.

18      Q.    You didn't leave?  You stick around, right?

19      A.    Fuck, I stayed there.  And Ron came out five

20  minutes after and said he was sorry --

21      Q.    Okay.

22      A.    -- and that he was going to change.

23      Q.    Okay.  So he didn't tell you, hey, you don't

24  have to be here, right?  Well, if he did tell you, you

25  don't have to be here, pretty soon thereafter it was all

Deposition of Jeffrey Bardwell

3/6/2020

Page 242

1    question.

2         Q.    I'm not trying to be obtuse.

3         A.    Oh.

4         Q.    I'm trying to be pretty straightforward here.

5         A.    Yeah, no, I mean, I don't mind Ron.  I respect

6    the man.  And I told you earlier today if he called me

7    tomorrow and truly needed help, would I help him,

8    absolutely.

9         Q.    If that's true, sir, why didn't you return his

10   phone calls?

11        A.    Because I was upset with him.  And we had 30

12   days to work this thing out.  And he made an appointment

13   with me.  And I felt he didn't respect me enough to at

14   least show up to the appointment that he made with me

15   after going through a full month, or at least three weeks,

16   because I was gone the first week, of trying to get in

17   touch with this man.

18        Q.    Okay.  So even though all that happened, you

19   know, he calls you right now, tells you to do something,

20   your testimony is if he really needed it, I'd do it?

21        A.    I probably would.

22        Q.    Okay.  What's changed?  I mean, he sued you.

23        A.    I understand, you know, we are in this lawsuit.

24   I get it.  But what's changed from -- you know, I still

25   respect the man.  And it may sound weird because he's



*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 15

**From:** "Ron Pratte <prattepx1@cox.net>" <Ron Pratte <prattepx1@cox.net>>
**Sent:** Sun, 13 Sep 2015 01:40:01 +0000
**To:** ["Jeff Bardwell <jbardwell@pratte.net>"]
**Subject:** Re: Happy Birthday

Thank you Jeff that means a great deal to me.  Love you too.

On Sep 12, 2015, at 7:45 AM, Jbardwell <jbardwell@pratte.net> wrote:


Ron,

I hope this day finds you well. I want to wish you a Happy Birthday. There is nothing in this world that I could buy for you that you can't buy yourself. As we all know.  What I can give you is my loyalty, my trust and my dedication which we all know you can't buy. You are a man that has changed my life forever. I will be forever grateful. Please enjoy your day as life is too short.   I love you.

Jeff

*Pratte v. Bardwell*, Case No. 2:19-cv-00239-PHX-GMS

EXHIBIT 16

1  Diana I. Rader No. 020639
   Diana.Rader@SacksTierney.com
2  Sacks Tierney P.A.
   4250 N. Drinkwater Blvd., 4th Floor
3  Scottsdale, AZ 85251-3693
   Telephone:  480.425.2600
4  Attorneys for Petitioner/Husband

5

6                    **SUPERIOR COURT OF ARIZONA**

7                      **MARICOPA COUNTY**

8  In re the Marriage of:

9  JEFFREY MICHAEL BARDWELL,          No.  FC2009-093505

10        Petitioner,                 **HUSBAND'S RESPONSE TO WIFE'S
                                      VERIFIED MOTION FOR INTERIM**
11 v.                                 **ATTORNEYS FEE AND COSTS**

12 MARIA JENNIFER BARDWELL,           **(Oral Argument Requested)**

13        Respondent.
                                      (Assigned to the Honorable David Gass)
14

15       Petitioner, JEFFREY MICHAEL BARDEWELL (hereinafter referred to as

16 "Husband") by and through undersigned counsel, Diana I. Rader, hereby files his Response

17 to Wife's Verified Motion for Interim Attorneys' Fees and Costs.  Husband respectfully

   requests that the court deny Wife's motion as Husband has already provided Wife
18
   approximately $99,675 to pay for attorneys fees, husband is paying Wife $5,000 in monthly
19
   spousal maintenance while Wife refuses to work, and Wife's request for an additional
20
   $100,000 in attorneys fees in this non-complex dissolution matter is excessive and
21
   unreasonable.  Husband's Response is supported by the attached Memorandum of Points
22
   and Authorities.
23
       **RESPECTFULLY SUBMITTED** this 8ᵗ² day of July, 2010.
24
                               SACKS TIERNEY P.A.
25

26

27
                               Diana I. Rader
28                             Attorneys for Petitioner/Husband

265700

Bard7371

1    Now that the parties are getting divorced, Wife is attempting to depict a high dollar value

2    and complex matter, in order to justify her request for $100,000 in attorneys fees, and in

3    order to gain access Husband's sole and separate property gifts.  As evidenced by the

4    parties' incomes during the marriage, the parties have always lived a lower to middle class

5    lifestyle.  In 2006, husband received a substantial gift of two million dollars from his good

6    friend Ron Pratt.  Of the two million dollars that Husband was gifted, one million

7    immediately was invested in Stellar Development, a construction business where husband

8    is now employed.  Husband collects no income from Stellar Development has had no

9    access to the funds invested in 2006.  The other million was used to pay down debt and to

10    build a home which has lost substantial value due to the current real estate market.  In her

11    motion, Wife conveniently leaves out over 13 years of disclosed tax returns that

12    demonstrate the parties true earning capacity and true assets, and instead focuses on the

13    parties 2007 return which shows a capital gain of $1,150,064 which Husband received from

14    the sale of a property also gifted to him by Ron Pratt.  All of the funds received by the

15    parties after taxes were paid were used to pay construction expenses associated with the

16    home the parties were building.  Husband does not have these funds in his possession and

17    all were depleted well before the parties decided to divorce.  Husband has approximately

18    $30,000 in his checking and savings accounts combined.  In September, he has to pay

19    $23,200 in quarterly federal and state taxes.  He also pays all other community obligations

20    including the mortgage on the parties' second home in the approximate amount of $3,000,

21    the parties 2nd mortgage, all medical expenses, all insurance expenses for the parties cars

22    and recreational vehicles, and all debt listed in both parties Affidavits of Financial

   Information.

     Wife's living expenses are the following:

- House Payment - $1,121.00
- Repair & upkeep $200.00
- Yard work $180.00
- $726 for utilities (including phone services for adult child)
- Food - $1,220
- Miscellaneous Expenses - $1,105 (which included $350 per month for dog food which Husband knows is not accurate)

765799

FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

Cloud Gmail Messages

| | |
|---|---|
| ID | 1641a68ea44bf2c7 |
| Label | SENT |
| To Address(es) | jbardwellprivileged@gmail.com |
| From Address | Jeff Bardwell <jbardwell@pratte.net> |
| Subject | Fwd: First Distribution - Fund II Second Assets |
| Date/Time – UTC+00:00 (M/d/yyyy) | 6/19/2018 11:37:19 PM |
| Headers | Return-Path|<jbardwell@pratte.net>,Received|from [192.168.1.19] (ip72-197-53-220.sd.sd.cox .net. [72.197.53.220]) by smtp.gmail.com with ESMTPSA id 15-v6sm102851pfq.81.2018. 06.19.16.37.20 for <jbardwellprivileged@gmail.com> (version=TLS1_2 cipher=EC DHE-RSA-AES128-GCM-SHA256 bits=128/128); Tue, 19 Jun 2018 16:37:20 -0700 (PDT),Cont ent-Type|multipart/alternative; boundary=Apple-Mail-D4F32831-10E1-4C11-A42A-0D4C0C532EE3,C ontent-Transfer-Encoding|7bit,Mime-Version|1.0 (1.0),Date|Tue, 19 Jun 2018 16:37:19 -0700, Message-Id|<804A922F-8596-4D1B-939E-569AEFAC843D@pratte.net>,References|<A1236FA4E8F24452A 0861AB646A027AB@rprattePC>,X-Mailer|iPhone Mail (15E302) |
| Email Body | |

Begin forwarded message:

> From: "Ron Pratte" <prattepx1@cox.net>
> Date: September 2, 2014 at 8:53:24 PM PDT
> To: "Jbardwell" <jbardwell@pratte.net>
> Subject: RE: First Distribution - Fund II Second Assets
>
> You're welcome and deserving of what you have been given and thanks for your appreciatio
n. I don't hear that from the others. Hope all is well.
>
> From: Jbardwell [mailto:jbardwell@pratte.net]
> Sent: Tuesday, September 02, 2014 8:14 PM
> To: Ron Pratte
> Subject: Fwd: First Distribution - Fund II Second Assets
>
> Ron the investment money came through today. Thank you for taking care of me... Thank
you for all you have done... You truly are one of a kind.
>
>
> Jeff
>
>
> Begin forwarded message:
>
>> From: Jeff Harris <jharris@jdmaz.com>
>> Date: September 2, 2014 at 5:17:46 PM MST
>> To: "jbardwell@pratte.net" <jbardwell@pratte.net>
>> Subject: First Distribution - Fund II Second Assets
>>
>> Good Afternoon,
>> Today you received your first distribution from Fund II Second Assets.
Your monthly distribution will be $15,000.00. Today's distribution was reduced by $4,621
.00 for the one-time catch-up interest deduction, leaving a net distribution of $10,379.00
. Next month you will be receiving your full distribution amount. Please let me know if
you have any questions. Thank you and have a great day.
>>
>>
>>
>>
>>
>>
>>
>>

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 18

EXHIBIT NO. 2   DATE 2-27-2020
DEPO. OF Pratte
ANITA LANDEROS

### Promissory Note

On this 1st day of August, 2014, in return for valuable consideration received, the undersigned borrower[s] jointly and severally promise to pay to RP Investments, LLC, the "Lender", the sum of $2,000,000.00 Dollars (Two million dollars), together with interest thereon at the rate of 9% (Nine percent) per annum which will accrue as $500.00 per day starting upon the receipt of the abovementioned funds. A $15,000.00 (Fifteen thousand dollars) transaction fee will also be due upon repayment of Note. This note will be secured by Jeff Bardwell's investment in JDM Partners Opportunity Fund II LLC.

**Terms of Repayment:** This loan shall be repaid under the following terms: Due in full on Jeff Bardwell's receipt of funds from sale of Pratte Buckeye Property LLC's real estate transaction. All payments shall be first applied to interest and the balance to principal.

**Late Fees:** N/A.

**Place of Payment:** All payments due under this note shall be made at 4400 W. Earhart Way, Chandler, AZ  85226 or at such other place as the holder of this Note may designate in writing.

**Prepayment** - This Note may be prepaid in whole or in part at any time without premium or penalty. All prepayments shall first be applied to interest, and then to principal payments in the order of their maturity.

**Default** - In the event of default, the borrower[s] agree to pay all costs and expenses incurred by the Lender, including all reasonable attorney fees (including both hourly and contingent attorney fees as permitted by law) for the collection of this Note upon default, and including reasonable collection charges (including, where consistent with industry practices, a collection charge set as a percentage of the outstanding balance of this Note) should collection be referred to a collection agency.

**Acceleration of Debt** - In the event that the borrower[s] fail to make any payment due under the terms of this Note, or breach any condition relating to any security, security agreement, note, mortgage or lien granted as collateral security for this Note, seeks relief under the Bankruptcy Code, or suffers an involuntary petition in bankruptcy or receivership not vacated within thirty (30) days, the entire balance of this Note and any interest accrued thereon shall be immediately due and payable to the holder of this Note.

**Joint and Several Liability** - All borrowers and the guarantors identified in this Note and below shall be jointly and severally liable for any debts secured by this Note.

Initials _JB_ _FB_

**Modification** - No modification or waiver of any of the terms of this Agreement shall be allowed unless by written agreement signed by both parties. No waiver of any breach or default hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

**Transfer of the Note** - The borrowers hereby waive any notice of the transfer of this Note by the Lender or by any subsequent holder of this Note, agree to remain bound by the terms of this Note subsequent to any transfer, and agree that the terms of this Note may be fully enforced by any subsequent holder of this Note.

**Severability of Provisions** - In the event that any portion of this Note is deemed unenforceable, all other provisions of this Note shall remain in full force and effect.

**Choice of Law** - All terms and conditions of this Note shall be interpreted under the laws of Arizona.

Agreed to and signed, this 1st day of August, 2014

_____
Jeff Bardwell

Personal Guarantee – We Jeff and Fabiola Bardwell unconditionally personally guarantee the full payment of this note.

_____
Jeff Bardwell

_____
Fabiola Bardwell

Signed in the presence of:

_____
Witness

Catherina A. Walls
Notary Public - Arizona
Maricopa County
My Commission Expires
March 1, 2018

Initials JB FB

*Pratte v. Bardwell*, Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 19

ROBERT J. LORD, PLC
ATTORNEYS AT LAW
2111 East Highland Avenue
Suite 235
Phoenix, AZ 85016

Robert J. Lord
(480) 203-1229
Bob@boblordlaw.com

September 23, 2020

Thomas Marlowe
Thomas Connelly
6720 N. Scottsdale Road
Suite 305
Scottsdale, AZ 85253

> Re: Ronald H. Pratte vs. Jeffrey Bardwell and Fanny F. Bardwell, Docket No. 2:19-cv-00239 PHX-GMS (United States District Court, District Arizona)

Dear Messrs. Marlowe and Connelly:

Following are the opinions you requested I render with the respect to the disputed issues in the above-referenced case.

**I.      Engagement.**

I have been retained by the Law Offices of Thomas J. Marlowe and the Law Offices of Thomas M. Connelly, the attorneys representing the Defendants, Jeffrey Bardwell and Fanny F. Bardwell in United States District Court, District of Arizona, Case No. 2:19-cv-00239 PHX-GMS, to opine on matters related to the tax treatment transfers of assets made by Ronald H. Pratte (hereafter, "Pratte") to Jeffrey Bardwell (hereafter, "Bardwell") in 2006.

I charged the attorneys for Defendants and their client an hourly rate of $550 for the time spent on this engagement. In the course of preparing this report I have received and reviewed certain documents provided to me by lawyers representing Jeffrey Bardwell. The documents I have been provided and which I have reviewed are listed in Appendix A to this report. I have also relied upon certain statutes, regulations and cases which are cited to below.

This report contains my opinions, together with the facts and analysis upon which my opinions are based and the reasons for my conclusions. In the event new information becomes available to me, I reserve the right to modify my opinions and conclusions accordingly.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 2

## II.     Qualifications.

My qualifications to offer the opinions included herein are set forth in my Curriculum Vitae, which is attached hereto as Appendix B.

## III.     Relevant Statutes and Precedence.

I have relied to various degrees on the following statutes and legal precedent in coming to my opinions:

1.     The Internal Revenue Code of 1986, as amended, 26 U.S.C § 1 et. seq.

2.     Case law:

      a. *Commissioner v. Duberstein*, 363 U.S. 278 (1960);
      b. *Helvering v. Gregory, 69 F2d 809, 810 (2d Cir. 1934), aff'd sub nom. Gregory v. Helvering, 293 US 465 (1935);*
      c. *Lane III v. U.S.*, 286 F.3d 723 (4th Cir. 2002);
      d. *Farid-Es-Sultaneh v. Commissioner*, 160 F.2d 812 (2d. Cir. 1947);
      e. *Weinerts's Estate v. Commissioner*, 294 F.2d 750 (5th Cir. 1961);
      f. *Tasty Baking Co. v. U.S.*, 393 F.2d 922 (Ct. Cl. 1968);
      g. *Jeffrey B. Fleck Co. v. U.S.*, 86 AFTR 2d 2000-5749 (D. OH 2000);
      h. *Bandes v. Commissioner*, T.C. Memo 1982-355 (1982).

3.     Administrative Rulings and other Authorities:

      a. *Treas. Reg.* § 1.61-14(a);
      b. *Treas. Reg.* § 25.2512-8;
      c. *Treas. Reg* § 301.6501(c)-1(f)(2);
      d. *Rev. Rul.* 58-53, 1958-1 C.B. 152;
      e. *IRS Private Letter Ruling 7921017;*
      f. *IRS Instructions for filing Form 709, 2006.*

## IV.     Relevant Facts.

While it is not the function of an expert witness to resolve factual issues, if any exist, it is appropriate for an expert witness to rely on facts supported by the record. To the extent my opinions are based on facts, I believe those facts are supported by competent evidence. Most of the facts I rely on are based on the language of documents identified or confirmed testimony under oath. Based on my reviews of documents identified in Appendix A, I have identified and relied on the following principal facts,

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 3

which appear to be undisputed:

1. In late 2005, Pratte gave to Bardwell a cashier's check in the amount of Two Million Dollars ($2,000,000), dated January 5, 2006.

2. Later in 2006, Pratte transferred to limited liability companies in which Bardwell owned a 20% interest real property located in Arizona and Nevada. The value of the interests in the real property transferred to Bardwell at the time of the transfer was $5,335,800.

3. At or about the time of the foregoing transfers (the "Transfers"), and out of appreciation for Pratte's friendship and the wealth Pratte had bestowed upon him, Bardwell developed a willingness and desire to perform services for Pratte without contemporaneous compensation.

4. At or about the time of the Transfers, Pratte anticipated, but did not necessarily rely upon, Bardwell's willingness and desire to perform services for Pratte without contemporaneous compensation.

5. At the time of the Transfers, Bardwell and Pratte had developed a deep friendship. Pratte had complete trust in Bardwell. He viewed him as a man of his word. He thought of him as family and referred to him as his adopted son.

6. There is no written agreement stating that the Transfers were made by Pratte in consideration of the services Pratte claims he expected Bardwell to perform.

7. Pratte did not at any point after the Transfers purchase a policy insuring him against Bardwell's death.

8. At the time of the Transfers, Pratte made transfers in the same amount and type to four other individuals (the "Other Recipients" or, collectively with Bardwell, the "Recipients"): his sons, Justin Pratte and Trevor Pratte, his son-in-law, Jaime Ziparo, and Todd Carriere, who was married to Pratte's niece.

9. Pratte intended the transfers to the Other Recipients to be gifts.

10. Pratte intended the Transfers to be net of tax consequences to Bardwell and the Other Recipients. Accordingly, he intended to satisfy any tax obligations

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 4

associated with the Transfers.[1]

11. Todd Carriere is a certified public accountant and has expertise in tax matters.

12. Todd Carriere assisted Bardwell with his income tax return preparation.

13. Pratte received advice and assistance from his longtime CPA, William Shisler, and perhaps others, in connection with the tax treatment of the Transfers and the like transfers to the other Recipients.[2]

14. In 2007, Mr. Shisler prepared, and Pratte signed under penalty of perjury and filed, an IRS Form 709, Federal Gift Tax Return, pursuant to which Pratte reported the Transfers as gifts (along with the like transfers to the Other Recipients) and paid federal gift tax with respect to the Transfers in the amount of $3,374,468.[3]

15. Immediately above Pratte's signature on the Form 709 appeared a representation that he'd examined the return and to the best of his knowledge it was true, correct and complete.

16. The Form 709 signed by Pratte under penalty of perjury did not contain any disclosure regarding consideration he received for the Transfers.

17. At the time of the Transfers, Pratte stated his desire that the Recipients join together in a new company to engage in the business of residential and commercial real property development and construction.

18. The Recipients formed several limited liability companies to effectuate Pratte's desires. At the outset, Bardwell and each of the Other Recipients had a twenty percent interest in each of the limited liability companies.

19. Between 2006 and 2018, Bardwell performed services for Pratte on a schedule and in a manner mutually agreeable to them.

20. In 2018, Bardwell ceased performing services for Pratte.

---

[1] Deposition of Ronald Pratte at p. 256-57. Unless otherwise specified, all references to the Deposition of Ronald Pratte are to the transcript of his February 27, 2020 deposition testimony.
[2] Deposition of William Shisler.
[3] This amount has been determined by multiplying the value of the assets transferred to Bardwell, as reported on Pratte's Form 709, by the maximum marginal gift tax rate in 2006, 46 percent. It assumes other taxable gifts fully absorbed the benefits of Pratte's lifetime exclusion from gift tax and the lower marginal gift tax brackets.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 5

In addition to the foregoing principal facts, the opinion below may reference additional facts that appear to be undisputed.

Pratte has brought claims against Bardwell stemming from the foregoing facts for breach of contract, promissory estoppel, and unjust enrichment. The resolution of Pratte's claims turns in part on one disputed issue:

> *Was Bardwell's willingness and desire to perform services for Pratte expressly tied by mutual agreement to the Transfers, such that a contract was formed in the sense that Pratte and Bardwell agreed to an exchange of property for services, or did Pratte make the Transfers independently from his hope that Bardwell would perform services for him in the future?*

## V.     Opinions.

*1.      Pratte's tax position with respect to the Transfers, along with all the other undisputed facts and the logical inferences to be drawn from those facts, are: (a) consistent with a decision by Pratte at the time of the Transfers (i) that the Transfers would be made independent of and not in consideration for any services Bardwell might provide him in the future, (ii) that he would trust Bardwell would perform services for him out of friendship and appreciation, but not require or rely upon an express commitment on the part of Bardwell and (b) inconsistent with an intention on Pratte's part to extract a contractual commitment from Barwell to perform services in exchange for the assets transferred to him.*

**_Background: Federal Tax Treatment of Gifts and Compensation_**. A transfer of assets by a person who receives services to one who performs them may, depending on the relevant facts, be considered a gift or compensation for federal tax purposes or, in some cases, both. Whether a transfer of property is taxable as a gift for federal tax purposes turns on whether the transferor receives "adequate and full consideration in money or money's worth." 26 U.S.C. § 2512. If not, the amount by which value of the property transferred exceeds the value of the consideration received is considered a taxable gift. If consideration is the result of arm's length bargaining and free from donative intent, it will be viewed as adequate and full consideration.[4] Thus, making a bad business deal will not result in the imposition of gift tax.

Whether property received is taxable as income or considered a gift for income tax purposes turns on the intention of the transferor. *Commissioner v. Duberstein*, 363 U.S.

---

[4] *Treas. Reg. § 25.2512-8.*

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 6

278 (1960). In order to be excluded from income, the transfer must proceed from a "detached and disinterested generosity, out of affection, respect, admiration, charity, or like impulses." *Id.* Thus, even in the absence of a legal or moral obligation to perform services, and even if the transferor derives no economic benefit from the services rendered, a transfer nonetheless may be income to the recipient if the transferor is motivated by an incentive to receive the benefit of services or feels a moral obligation to compensate the service provider. While property received in the context of what would be a gift under common law principles – that is, the absence of a contract to pay consideration in return – may nonetheless constitute income for federal tax purposes, the obverse is not true. In the presence of a contractual relationship requiring the performance of services in exchange for property, it would not be possible to satisfy the standard established in *Duberstein*, as the contract would demonstrate an incentive on the part of the transferor to receive the benefit of services.

Consequently, it is possible for a transfer to constitute both a gift by the transferor for gift tax purposes and compensation to the recipient for income tax purpose. *See Farid-Es-Sultaneh v. Commissioner,* 160 F.2d 812 (2d. Cir. 1947) ("But we find nothing in this decision to show that a transfer, taxable as a gift under the gift tax, is *ipso facto* to be treated as a gift in construing the income tax law."); *see also, IRS Private Letter Ruling* 7921017.

### *Analysis*

#### *Tax structuring opportunities at time of Transfers*

Taxpayers are free to structure their affairs so as to minimize their tax obligations. As Judge Learned Hand famously stated, "there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory, 69 F2d 809, 810 (2d Cir. 1934), aff'd sub nom. Gregory v. Helvering, 293 US 465 (1935).* Once a transaction has taken place, however, a taxpayer has little control of how it will be treated for tax purposes. Although a taxpayer has some flexibility in how he reports a transaction for federal tax purposes, the transaction ultimately will be taxed according to its economic substance. *See, Weinerts's Estate v. Commissioner,* 294 F.2d 750 (5th Cir. 1961).

Thus, Pratte's ability to control the tax treatment of the Transfers existed largely at the time he decided the details of how they would be made, not at the time he filed his gift tax return in 2007. At the time he made the Transfers, Pratte had at least one tax advisor involved, Mr. Shisler, according to Pratte's own deposition testimony. One of the Other Recipients, Todd Carriere, had expertise in tax law and was married to Pratte's niece.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 7

Pratte had the ability, at the time of the Transfers, to influence their tax treatment by either making the Transfers entirely independent of the services he anticipated Bardwell would perform for him, or by connecting the Transfers to the services so as to create a contract to perform services. By making the Transfers independent of the services Pratte could not foreclose the possibility that the IRS (or the State of Arizona) would attempt to treat the Transfers as income to Bardwell. Other facts, however, would fortify Pratte's gift position. Pratte simultaneously would be making like transfers to the Other Recipients, all of whom were family members or married to family members and, therefore, natural objects of his affection. And Pratte's relationship with Bardwell was one of deep friendship. Given those facts, in the absence of a contractual obligation on Bardwell's part, it would be difficult for the IRS to sustain a position that the Transfers constituted taxable income to Bardwell.

Alternatively, Pratte could have prepared a written contract[5] specifying that the Transfers constituted consideration to Bardwell in exchange for future services. That would cause the Transfers to be taxable as compensation to Bardwell. Additionally, to the extent Pratte paid Bardwell's tax liabilities associated with the Transfers, the tax payments would constitute income to Bardwell as well. *Treas. Reg.* § 1.61-14(a). Moreover, both Bardwell and Pratte would be subject to employment tax associated with the Transfers. Finally, the real property transferred to Bardwell would be treated for income tax purposes as having been sold by Pratte for its fair market value, thereby requiring Pratte to pay tax on any unrecognized gain associated with the real property.[6]

The tax payments required of Pratte if the Transfers were structured to be independent of any future services rendered by Bardwell, so as to constitute taxable gifts by Pratte, would be limited to the incremental increase in Pratte's gift tax liability resulting from the inclusion of an additional $7,335,800 in taxable gifts on his IRS Form 709, or $3,374,468.

---

[5] An oral contract would present difficulties of proof if Pratte's gift tax return were audited and the IRS took the position the Transfers were gifts.
[6] See, *Tasty Baking Co. v. U.S.*, 393 F.2d 922 (Ct. Cl. 1968)

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 8

The tax payments that would have been required of Pratte if the Transfers were structured to be contractual consideration to Bardwell in exchange for Bardwell's legally enforceable commitment to perform services, yet leave Bardwell in the same financial position as if the Transfers were structured as gifts, would be as follows:

| | | |
|---|---|---|
| Transfers to Bardwell ($2,000,000 cash, $5,335,800 real property) ----- | | $7,335,800 |
| Tax Payments made by Pratte on Bardwell's behalf                  ----- | | **4,802,229** |
| Total Taxable Consideration to Bardwell                           ----- | | 12,138,029 |

Bardwell's tax liability on the $12,138,029 in total consideration would be as follows:

| | | |
|---|---|---|
| Federal Tax (35%) | ----- | 4,248,310 |
| Arizona State Tax (4.79%) | ----- | 581,412 |
| Less: Federal Benefit of AZ Tax (4.79% x 35%) | ----- | [203,494] |
| Federal Employment Tax (Employee Share) | ----- | 176,001 |
| Total Tax Payments Net of Federal Benefit for AZ Tax | ----- | **4,802,229** |

In addition, Pratte himself would be required to make the following tax payments on his own behalf:

| | | |
|---|---|---|
| Federal Employment Tax (Employer Share) | ----- | $176,001 |
| Gain on Sale of Property ([$5,335,800 - $5,002,666] x 20%[7]) | ----- | 66,627 |
| Total Tax Payable by Pratte | ----- | **242,628** |

The total tax payments required of Pratte under this alternative would be $5,044,857. Pratte might be able to recover some of this if the compensation paid to Bardwell were deductible by him; however, the value of the deductions in 2006 would have been entirely speculative, especially in light of Pratte's stated intention to retire,[8] and in any event would be spread out over the expected life of the contract, which the report of Brent H. Taylor states would be 22.6 years.[9]

Thus, the tax payments required if the Transfers were structured as compensation in exchange for services would have been $1,670,389 greater than the tax payments

---

[7] Pratte's gain on the transfer of the property would be taxed at a 4.79% rate by the State of Arizona and a rate between 15% and 35% at the federal level, based on the extent to which the gain constituted recovery of depreciation. I chose a 20% total rate for purposes of estimation.

[8] Deposition of Ronald Pratte at p. 31-32, 61.

[9] Report of Brent H. Taylor at p. 6.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 9

required if the Transfers were structured to be independent of any anticipated services and therefore taxable as gifts.

Moreover, the structuring of the Transfers as compensation to Bardwell in exchange for services would not necessarily protect Pratte from gift tax liability. In *IRS Private Letter Ruling 7921017*, a technical advice memorandum, the IRS concluded that a prior determination by the IRS that transfers were income to the recipient does not preclude a determination that the transfers were taxable to the transferor as gifts.

In *Private Letter Ruling 7921017*, the IRS noted that the arrangement in question involved transfers for which the transferor did not receive adequate consideration in money or money's worth. In this case, even if Pratte had secured Bardwell's contractual commitment at the time of the Transfers, the IRS, and a court, easily could conclude that Bardwell's prospective services would not constitute adequate consideration in money or money's worth. In order to avoid gift taxation, Pratte would have to show that the contract between him and Bardwell was an ordinary business transaction.[10] That would be difficult. It wasn't an ordinary business transaction. If the issue were litigated, Pratte's equal, simultaneous transfers by gift to four other family members, along with his quasi-familial relationship with Bardwell, the 20+-year term over which Bardwell would be performing services, and the undefined nature of the services to be provided would strongly indicate donative intent.

In this case, the risk that Pratte would have faced a gift tax audit had he treated the Transfers as compensation to Bardwell would have been especially high. He still would have had to file a federal gift tax return, since the transfers to the Other Recipients were gifts. That federal gift tax return would have shown the transfer of 80% of the real property involved, which would make IRS scrutiny more likely. Furthermore, the appraisals would have had to take that into account and likely would have referenced the transfer of the other 20% to Bardwell. Finally, Bardwell would have been reporting an abnormally high amount of compensation income on his income tax return, far in excess of the compensation he reported in prior years, based upon a Form W-2 issued by Pratte.

Thus, by structuring the Transfers as part of a contractual exchange for Bardwell's future services, Pratte not only would increase his ascertainable tax expenditure by $1,670,389, he would face a substantial risk of paying several million dollars in federal gift tax as well.

---

[10] In an ordinary business transaction, with no donative intent, the failure of adequate consideration would be treated simply as a bad business bargain, thus not taxable as a gift.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 10

> ***Undisputed facts and logical inferences consistent with a decision by
> Pratte to make Transfers independent of any future services and
> inconsistent with a decision by Pratte to extract a contractual
> commitment from Bardwell***

Based on the foregoing, Pratte, if receiving competent tax advice or otherwise aware of the applicable legal principles, faced a choice in 2006 with respect to the Transfers. He could structure the Transfers as a gift, independent of any services Bardwell might perform, and reduce his tax payments by $1,670,389 and avoid a significant risk of millions of dollars in additional tax. Alternatively, he could structure the Transfers as part of a contract with Bardwell for future services, thereby allowing him to define the exact nature of the services he would be receiving and creating an avenue of legal recourse should Bardwell's services not be performed in accordance with the contract.

The choice Pratte made in 2006 is a disputed issue of fact that lies at the heart of the controversy. I do not offer an opinion on that issue. Rather, my opinion focuses on whether the undisputed facts and the logical inferences to be drawn from those facts is consistent with one choice or the other.[11] In my opinion, the following are consistent with a decision by Pratte to keep the Transfers independent of any services from Bardwell in order to secure a $1,670,389 tax benefit and inconsistent with a decision by Pratte to structure the Transfers to be part of a contract for the provision of services:

a. *Pratte consulted with at least one tax advisor, William Shisler, and perhaps others,*[12] *at the time he decided to make the Transfers.* Pratte, by his own testimony, paid attention to tax matters, as the overwhelming majority of individuals at his level of wealth do. For example, Pratte created Montana limited liability companies to purchase aircraft, for the express purpose of avoiding state sales tax liability.[13] Mr. Shisler's correspondence with Pratte also suggests that Pratte paid close attention to tax matters.[14] Mr. Shisler had advised him in 2005 to consider making gifts to reduce the ultimate size of his taxable estate.[15] Doing so is advantageous tax-wise, because it allows the

---

[11] There is admittedly a third possibility; namely, that Pratte structured the Transactions without due consideration of their tax treatment, then blindly and without regard to applicable law reported them as taxable gifts.
[12] Pratte did meet with Todd Carriere in 2005 prior to making the Transfers to discuss his plan. *See,* Deposition of Todd Carriere at p. 28-29. It is possible the tax structuring of the Transfers would have been discussed at that time. In his deposition, Jaime Ziparo stated that he was "sure" Todd Carriere had something to do with Pratte's gift tax return. Deposition of Jaime Ziparo at p. 219.
[13] Deposition of Ronald Pratte at p. 315-316.
[14] File Materials of William Shisler
[15] Deposition of William Shisler at p. 51.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 11

amount of gift tax paid, as well as subsequent appreciation in the value of the gifted assets, to escape tax. For example, at the 46% top gift and estate tax rate that applied in 2006, a wealthy individual who paid tax of $460,000 on gifts of $1,000,000 would avoid the estate tax on $1,460,000, or $671,600, a savings of $211,600, even if the gifted assets did not appreciate after the transfer.

Mr. Shisler or another advisor to Pratte logically would have advised him to avoid receipt of any consideration for the Transfers, especially in the form or services from Bardwell. The tax liabilities of Pratte and Bardwell associated with Bardwell's receipt of compensation for services would be a significant cost that could be avoided by structuring the Transfers to avoid a contractual connection between the Transfers and Bardwell's services.

b. *Pratte included the Transfers on his federal gift tax return.* The inclusion of the Transfers on his gift tax return is a statement by Pratte that the Transfers in his mind were a gift to Bardwell, not compensation for services. In this regard, the decision of the Fourth Circuit Court of Appeals in *Lane III v. U.S.*, 286 F.3d 723 (4th Cir. 2002), is instructive. In that case, a personal representative of the decedent's wife sought refunds of gift tax paid by the decedent and his wife with respect to transfers made during his life to his longtime assistant, claiming that the transfers were compensation, not gifts. In *Lane III*, as here, the decedent's assistant had worked under him during his career and continued performing personal services for him after he retired. The transfers were made contemporaneous with those personal services. In affirming the decision of the district court that the transfers were gifts, the court noted the significance of the decedent having filed gift tax returns. The decedent's own characterization of the transfers as gifts evidenced his intention in making the payments.[16] The court noted that the personal representative was "not able to cite a single case in which a court has held that payments in contention were compensation where the payor submitted gift tax forms." 286 F.3d at 730.

c. *Pratte's federal gift tax return does not disclose any consideration received for the Transfers.* The IRS instructions for preparing a Form 709, Federal Gift Tax Return, in 2006 provided the following warning:

---

[16] The court in *Lane III* noted that the characterization of the transfers as gifts and filing of gift tax returns was to the decedent's own financial detriment. In the case here, Pratte's own expert witness, Mr. Tarter, reaches the same conclusion. *See*, Report of Tim A. Tarter at p. 5 ("Mr. Pratte walked away from a valuable business deduction and paid gift taxes on an incomplete or conditional gift to Bardwell, effectively overpaying taxes to the IRS of approximately $3,220,000."). That would be true if, at the time of the Transfers, Pratte could have expected to derive the maximum income tax benefits associated with claiming income tax deductions with respect to the Transfers over the remainder of Pratte's life.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 12

### Adequate Disclosure

!
CAUTION

*To begin the running of the statute of limitations regarding a gift, the gift must be adequately disclosed on Form 709 (or an attached statement) filed for the year of the gift. In general, a gift will be considered adequately disclosed if the return or statement provides the following:*

• A description of the transferred property and any consideration received by the donor;

• The identity of, and relationship between, the donor and each donee;

• If the property is transferred in trust, the trust's employer identification number (EIN) and a brief description of the terms the trust (or a copy of the trust instrument in lieu of the description); and

• Either a qualified appraisal or a detailed description of the method used to determine the fair market value of the gift.

The four requirements set forth in the instructions to the 2006 Form 709 are taken directly from the applicable regulations. *Treas. Reg* § 301.6501(c)-1(f)(2). The Form 709 prepared by Mr. Shisler and signed by Pratte reflects a clear intention to make sure the regulatory requirements for beginning the statute of limitations were satisfied. The properties transferred to Bardwell and the Other Recipients were adequately described. The identity and relationship to Pratte, if any, of each Recipient were clearly disclosed. Qualified appraisals for each parcel of real property were attached to the Form 709.

The Form 709, however, contains no mention of consideration received by Pratte in the form of services from Bardwell. At the time the Form 709 was filed, in 2007, Bardwell had been performing services for Pratte for over a year. Even if the contractual promise of future services claimed by Pratte were disregarded, the services already performed by Bardwell logically would have required disclosure in order to ensure the commencement of the statute of limitations, if indeed those services were performed in consideration for the Transfers. The non-disclosure of those services as consideration, therefore, is consistent with a choice by Pratte to make the Transfers independent of any services Bardwell might perform.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 13

    d. *Pratte did not issue a Form W-2 or 1099 to Bardwell.*

The failure of Pratte to issue a Form W-2 or 1099 to Bardwell for the 2006 year is consistent with a decision by him to make the Transfers independent of Bardwell's services, thereby negating the requirement to report the Transfers as compensation.

    e. *Bardwell did not report the Transfers as income on his 2006 income tax return.* Bardwell himself was not a tax expert and likely would not have known that he would be required to report the Transfers as income if he had contractually committed to perform services for Pratte in return. But Todd Carriere, a CPA with tax expertise, assisted Bardwell with tax matters. Had Carriere known of a contractual relationship between Bardwell and Pratte, he would have advised Bardwell that the Transfers were reportable as income by him. Thus, the non-reporting of the Transfers as income by Bardwell is consistent with a decision by Pratte to make the Transfers independent of Bardwell's future services.

    f. *There was no written agreement documenting an exchange of property for future services between Pratte and Bardwell.*

Obviously, the absence of a written agreement to memorialize what would have been a $7 million plus contract spanning a period of over 20 years is consistent with a decision by Pratte to forgo a contractual relationship and allow the Transfers to take place independent of services Pratte anticipated Bardwell would provide.

Pratte's explanation for the absence of a written contract points even further in this direction. When asked in deposition about this, Pratte stated: "I didn't think I needed it. I shook his hand."[17] With that statement, Pratte conveyed that he believed at the time of the Transfers he could trust that Bardwell would perform services for him without the need of a written agreement to compel performance and recognized that the absence of a written agreement would make it difficult to compel Bardwell's involuntary performance of services or preserve a cause of action against Bardwell if he failed to perform the hoped for services. That being the case, the logical inference is that Pratte would have dispensed with a contractual relationship entirely in order to reduce his tax payments by $1,670,389. To infer otherwise would be tantamount to concluding, illogically I believe, that Pratte would feel the need to pay an additional $1,670,389 in taxes to secure a contractual commitment from

---

[17] Deposition of Ronald Pratte at p. 110.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 14

Bardwell but wouldn't feel the need to reduce that commitment to writing.

g. *Important details of a contractual relationship were not discussed and are not clear.*

Consistent with a decision to allow the Transfers to be independent of any services from Bardwell, Pratte took no steps to clarify what would be important details of a contractual relationship, if one existed. For example, Pratte himself was not clear as to whether he could compel Bardwell to relocate.[18] He had not considered whether Bardwell's commitment would extend past the age at which Bardwell might retire.[19] There was no clear understanding of the hours Bardwell might be expected to work, and the hours Bardwell actually did work varied substantially.[20] Indeed, Pratte himself admitted that the details of a contractual relationship were not known to Bardwell at the time Bardwell supposedly committed to it.[21]

h. *At the time of the Transfers, Pratte had a deep friendship with Bardwell, considering him to be family and referring to him as an adopted son.* According to Pratte's own deposition testimony, his relationship with Bardwell was one of deep friendship. Pratte had complete trust in Bardwell. He viewed him as very honest and a man of his word.[22] He thought of him as family and referred to him as his adopted son.[23] The feeling from Bardwell's perspective was the same. Bardwell even gave his son the middle name Ronald as a reflection of his affection for Pratte.[24] This is consistent with the Transfers being independent from Bardwell's services in two respects. First, it suggests that the primary motivation for the Transfers would have been Pratte's love and affection for Bardwell, as opposed to the anticipation of consideration in the form of services. In *Lane III*, discussed above, the court, in concluding that the transfers by the decedent to his assistant were gifts, noted that he viewed her "almost as a daughter" and took a fatherly interest in her life. 286 F.3d at 726.

Second, such a relationship would have reduced the value of a contractual

---

[18] *See,* Deposition of Ronald Pratte at p. 204-07.
[19] *See,* Deposition of Ronald Pratte at p. 207-08. When asked at deposition, Pratte stated that Bardwell could retire at the typical retirement age. *Id.*
[20] *See,* Deposition of Jeffrey Bardwell at 141-42.
[21] Deposition of Ronald Pratte at p. 197-98.
[22] Deposition of Ronald Pratte at p. 92.
[23] Deposition of Ronald Pratte at p. 142-43.
[24] Deposition of Ronald Pratte at p.181.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 15

commitment from Bardwell to perform services. People rarely see the need to secure the assistance of close family members in the form of a contractual relationship. Instead, they're comfortable that their family members will be there for them when needed. This reality is consistent with the tax considerations related to the Transfers. As discussed above, Pratte stood to benefit tax-wise, by $1,670,389, if he allowed the Transfers to be independent of any services he hoped Bardwell would provide. If Bardwell were not especially close to him, Pratte logically would require a contractual commitment from Bardwell, as it would be better to pay the additional $1,670,389 in tax than to hope for services from an individual who was not legally compelled to provide them. But given the quasi-familial relationship he had with Bardwell, who thought so highly of Pratte that he named his son after him, Pratte could forgo a contractual commitment in order to save a substantial sum in tax. Yes, there might be a risk that his relationship with Bardwell might sour, causing Bardwell to lose interest in helping him. But that risk is present in any parent-child relationship. And just as Pratte did not see the need to secure a legal commitment from his own sons, or his son-in-law, Jaime Ziparo, or the husband of his niece, Todd Carriere, at the time he made transfers to them, he logically would not have seen the need to do so with Bardwell, who he referred to as an adopted son. This reflects the reality that in the context of a familial relationship, such as the one Bardwell and Pratte enjoyed, the value of services performed is largely a function of the relationship. If the relationship sours, the services lose their value, even if there is a contractual commitment to perform them. Thus, there's no point in securing such a commitment, especially if doing so would cost $1,670,389 or more in additional tax liabilities.

i. *The value of the Transfers, $7,335,800, was far in excess of the value of Bardwell's future services.* The value of the Transfers was far in excess of the value of Bardwell's services. At the time of the Transfers, Bardwell's compensation was about $150,000 per year. Dividing the value of the Transfers by Pratte's life expectancy at the time of the Transfers, 22.6 years, according to the report of Brent H. Taylor, translates into a value of approximately $325,000 per year. But Pratte effectively paid more than that, because he paid gift tax of $3,374,468. Thus, from Pratte's perspective, he paid close to $475,000 per year for Bardwell's services.

*Lane III*, discussed above, involved a similar situation. There, the amount the decedent paid to his assistant was far in excess of the fair market value of her services. The decedent's personal representative filed for and received a refund

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 16

of income tax paid by the decedent, on the basis that the payments to the decedent's assistant were deductible as compensation. The IRS sought to recover the refunds paid and, in order to overcome a two-year statute of limitations, took the position that the failure of the personal representative to disclose, among other things, the disparity between the payments made to the assistant and the value of her services was a material misrepresentation, because the IRS would have inquired further if the disclosure had been made. The Court of Appeals sustained the IRS position.

The decision in *Lane III* thus is based in part on the relationship between transfers made by the recipient of services to the value of the services. The greater the disparity between the value of the transfers and the value of the services, the more likely it is that the transfers were not compensation for services under *Duberstein*, but instead were motivated by affection, respect, admiration, charity or like impulses.

This is again consistent with a decision on Pratte's part to make the Transfers independent of any services he hoped Bardwell might provide. If Pratte's dominant reason for making the Transfers was affection, admiration or a similar impulse, he would be more inclined to make the Transfers independent of any services Bardwell might one day provide, especially since doing so would result in a tax savings.

j.  *The pairing of the Transfers with identical transfers to the Other Recipients, all of whom Pratte intended to be the recipients of gifts, is inconsistent with the Transfers constituting consideration for Bardwell's future services.* It is hard to reconcile the notion that Pratte chose to enter into a contract with Bardwell for the performance of services with him making identical transfers simultaneously to the Other Recipients, all of which he considered to be gifts. Both the presentation of the transfers to the Recipients and the manner in which they were implemented suggested that the transfers were a collective gift. That is particularly true of the property transfers, which were made to limited liability companies, not to the Recipients themselves. There was not one aspect of the transfers that objectively indicated that the Transfer to Bardwell was qualitatively different than the transfers to the Other Recipients.

k.  *The structure of the arrangement among Bardwell and the Other Recipients is inconsistent with the Transfers constituting consideration for Bardwell's future services.* The arrangement among the Recipients, as contemplated by Pratte and as structured by the Recipients themselves, had each Recipient owning a 20% interest in each of several limited liability companies. Several of those

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 17

LLCs would hold the real property Pratte transferred to them (the "Property LLCs"), while two of the LLCs (the "Development LLCs") would be engaged in the business of residential and commercial development. The Development LLCs were not capital intensive. Their profits would be derived from the efforts of their owners, the Recipients.

Because the Development LLCs were not capital intensive, Bardwell's interests in the Development LLCs was not derived from the Transfers in the way that his interests in the Property LLCs were. Nonetheless he received the same 20% interest he had in the Property LLCs. Moreover, it was contemplated by the Recipients and Pratte that Bardwell would be spending substantial time performing services for Pratte. According to Pratte, Bardwell would not be working for the company the Recipients were going to form.[25]

This arrangement is inconsistent with the Transfers constituting payment for Bardwell's services. Instead, it suggests that the Other Recipients would be compensating Bardwell for performing services for Pratte by sharing with him the profits derived from their labor on behalf of the Development LLCs. The most logical inference to be drawn from this arrangement is that it was the Other Recipients, not Bardwell, from whom Pratte extracted consideration.

This arrangement is consistent with a decision by Pratte to make the Transfers independent of services he hoped to receive from Bardwell. At the time of the Transfers, it was contemplated that the Development LLCs would be highly profitable. Bardwell's profit share from the Development LLCs was expected to be sufficient compensation for him for services he'd be performing for Pratte. There would be no need for Pratte to sacrifice his tax position in order to secure an unnecessary contractual commitment from Bardwell.

Most significantly, Pratte's stated objective in making the transfers to Bardwell and the Other Recipients directly contradicts the objective he now claims to have had to secure Bardwell's services for life. Pratte stated that specifically that it was his "dream" the Recipients, including Bardwell, would become a "premier homebuilder."[26] He expressed the hope that they would build a company larger than the one he had built:

> I intended -- okay, my hope, my dream was that they would take that money, go out and start a business, okay, similar to and/or a home

---

[25] Deposition of Ronald Pratte at p.28-29.
[26] Deposition of Ronald Pratte at p. 79.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 18

building business or something in construction, okay. **I mean, I started with nothing. Can you imagine what they can do with that kind of stakes and keep going?** That was my hope and dream in this thing. And they were all very bright and very -- you know, not afraid of work. And that's what it takes.[27]

Given that Pratte sold his business for several hundred million dollars, his clear hope in 2006, based on his own deposition testimony, was that Bardwell and the Other Recipients each would attain a net worth approaching one hundred million dollars or more.

But that hope — that "dream" as Pratte put it -- would render a contractual commitment from Bardwell meaningless in securing Bardwell's performance of services, as Bardwell's net worth would dwarf the amount of any damages Pratte might claim for breach of contract.

Put another way, Pratte could realize his "dream" of making Bardwell and the Other Recipients extremely rich men, or he could secure his supposed objective of having Bardwell contractually bound to fetch his cigarettes,[28] stock airplane fridges with sodas,[29] or jump in holes,[30] but he could not have both. The dueling objectives of making a person insanely wealthy and coercing him financially to spend the better part of his life doing chores for you are not remotely reconcilable. If one objective is realized, the other definitively is not.

Pratte could, however, rationally had at the time of the Transfers both the objective of Bardwell becoming a very rich man and the hope that Bardwell would remain available to help him out of loyalty, appreciation, and affection. That outlook in 2006 would have been consistent with a decision by Pratte to make the Transfers independent of the services Bardwell might hopefully perform.

1.  *Pratte did not purchase insurance on Bardwell's life.* Pratte's disclosure statement does not mention the purchase by Pratte of insurance on Bardwell's life. Any such purchase would have been relevant, as it would show that Pratte had an insurable interest in Bardwell based on a contractual relationship whereby Bardwell had committed to perform services to Pratte until Bardwell's death.

---

[27] Deposition of Ronald Pratte at p. 98-99 (emphasis added).
[28] Deposition of Jeffrey Bardwell at p. 104.
[29] *Id.*
[30] Deposition of Jeffrey Bardwell at p. 111.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 19

The decision of Pratte to forgo life insurance on Bardwell is consistent with a decision on his part to make the Transfers independent of Bardwell's performance of services. Had Pratte believed he'd paid over $7 million to secure Bardwell's contractual commitment to perform services, he logically would have sought to purchase insurance against Bardwell's premature death. Such insurance would have been very inexpensive. It is hard to reconcile a decision by Pratte to secure a contractual commitment from Bardwell to perform services and pay over $7 million in advance for those services, with a decision not to protect his $7 million investment with an inexpensive life insurance policy.[31] The more logical inference here is that Pratte allowed the Transfers to be independent of Bardwell's services in order to reduce his tax payments by $1,670,389. In order to obtain that tax reduction, Pratte had to forgo having an insurable interest on Bardwell's life. In the unlikely event Bardwell had died prematurely, Pratte's decision would not have worked out, but that was a logical risk to take, given the amount of the tax savings involved.

**2.      If the facts surrounding the Transfers were as set forth in Pratte's complaint, both Pratte and Bardwell would have additional income and employment tax liabilities.**

If the actual facts in this case were as Pratte stated them to be in his complaint, both he and Bardwell would have income and employment tax liabilities. The standard set forth in *Duberstein* for determining that a payment constitutes compensation to the recipient would easily be satisfied if, as Pratte claims, he and Bardwell agreed to exchange property for the performance of future services, he relied to his detriment on a promise made by Bardwell to perform those services, and Bardwell would be unjustly enriched if he could keep the property transferred to him without fully performing the contemplated services.

In *Duberstein*, the Court contemplated that even a transfer that would be considered a gift under common law principles might nonetheless constitute compensation if the donor is motivated by an incentive to receive the benefit of services. In his complaint, Pratte has taken the position that the Transfers not only were motivated by his incentive to receive the benefit of Bardwell's services, but that he took the step of creating a contract to ensure those services would be performed. Furthermore, the facts set forth in Pratte's complaint directly contradict the notion that the Transfers proceeded from a "detached and disinterested generosity, out of affection, respect, admiration, charity, or like impulses," which would be required under *Duberstein* to prevent the

---

[31] In the case of another valuable asset, Pratte's car collection, for example, he presumably purchased insurance.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 20

Transfers from constituting compensation to Bardwell for tax purposes.

Thus, under the facts claimed by Pratte, Bardwell would have received compensation in 2006 in the amount of $7,335,800, which would be subject to federal income tax, federal employment tax, and Arizona state income tax. Pratte, as Bardwell's employer, also would be subject to federal employment tax, and would be treated for tax purposes as having sold the properties he transferred to Bardwell for their fair market values.

The income and employment tax liabilities of Pratte and Bardwell under Pratte's complaint still would exist today. Pratte's filing of a federal gift tax return and payment of gift tax would not negate his or Bardwell's income and employment tax liabilities. For the most part, the applicable statutes of limitations would bar assessment and enforcement of the liabilities by the IRS or the Arizona Department of Revenue. Some of the liabilities, however, might still be enforceable. For example, if Pratte did not file employment tax returns in 2006 for any calendar quarter in which the Transfers took place, his employment tax liability still would be assessable by the IRS. Pratte's employment tax with respect to the Transfers would be approximately $110,000. Together with interest and applicable penalties, the outstanding liability, if still assessable, would be in the $250,000 range.

**3.    An employment relationship of the type described in Pratte's complaint would undermine federal and state tax policy.**

Just as a lifelong employment arrangement with all compensation paid on day one would violate non-tax public policy, as it would essentially be a contract for indentured servitude, it also would undermine principles of federal and state tax policy.

Both federal and state tax reporting systems contemplate annual accounting of income for purposes of income and employment tax. Consequently, the bunching of multiple years' worth of income or deduction items into one annual accounting period is disfavored. 26 U.S.C. § 461, for example, provides rules for re-assigning the deduction of an expense to a taxable year other than the year in which expense is incurred. Prepaid compensation is deductible only in the year or years in which services are rendered, not in the year of payment. *See, e.g., Rev. Rul.* 58-53. 1958-1 C.B. 152; *Bandes v. Commissioner*, T.C. Memo 1982-355 (1982).

The arrangement posited by Pratte in this case would take the problem of bunching of deductions to an extreme. As discussed above, in order to implement his plan to leave Bardwell the full amount of the Transfers after payment of all taxes, Pratte would

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 21

have had to make potentially deductible expenditures of $12,314,030.[32] Pratte, however, could deduct those payments only in the years the contemplated services were performed and the payments would have to be allocated proportionately to those services. But there would be no way to know, at the outset, the nature of the services that would be performed over a period that would have been expected to last more than 20 years.

But the undermining of tax policy presented by Pratte's claimed arrangement with respect to the treatment of the employer pales in comparison to the undermining of tax policy with respect to the treatment of the employee. Individuals are required to report compensation as income in the year of receipt, even if it is paid for services to be performed in a future year. Under the compensation arrangement Pratte claims to have implemented with Bardwell, Bardwell would pay tax on 22 years' worth of compensation in one year. That undermines tax policy in four respects.

First, the federal income tax brackets are progressive. Modest, middle-class incomes are taxed at relatively low rates. The public policy served by this is in part to avoid subjecting income that is needed for bare bones, poverty-level living expenses to income tax. Under current federal tax law, the first $24,000 of a married couple's income is not subject to income tax at all. While that may not matter much in Bardwell's case, given the amount of the Transfers, it could wreak havoc if a person in Pratte's situation paid an employee one million dollars up front for 20 years of work. If paid over 20 years at $50,000 per year, that employee might pay income tax of perhaps $60,000 total, or 6% of the total compensation. But receiving the entire one million dollars in the first year would subject the employee to federal income tax at an overall rate of approximately 30%, or $300,000. That's an additional $240,000 in income tax, an extra $12,000 per year of income on a modest $50,000 income.

Second, if, as Pratte claims, the employer could recover excess compensation from an employee whose employment terminated, the modestly paid employee would face an impossible situation. Using again the example of an employee paid one million dollars up front for 20 years of work, consider where the employee would stand if his employment relationship terminated after 5 years and he were obligated to return $750,000 to his employer. After paying his first-year tax liability and living expenses for himself and his family for the first five years of the term, the employee likely would have less than $600,000 on hand. Aside from the problem he would have funding his $750,000 obligation to his former employer, the employee would wind up paying 100% or more of the $250,000 he "earned" in income tax. He'd be allowed a deduction in the year he repaid the $750,000, but his income in that year would not be sufficient to generate a tax

---

[32] In addition to the $12,138,029 of compensation paid to Bardwell, Pratte's employment tax of $176,001 would be eligible for deduction as well.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 22

benefit. At best, he could claim a loss in the year of payment and carry it forward to subsequent years. But the resulting tax benefits would not come close to offsetting the tax detriment he suffered.

Third, the arrangement Pratte posits would wreak havoc with state-level income tax systems. Bardwell's situation exemplifies this. If the Transfers were compensation to him in 2006, he would pay a substantial amount in Arizona state income tax. After 2006, Bardwell performed the bulk of his services in California and relocated to California. Because none of the compensation would have been paid to him in the years subsequent to 2006, his California tax bill could be zero, during years in which he was employed in the state and benefitting from the police protection, fire protection, road maintenance, public education, and other services California provides to its citizens.

Fourth, and exemplified well by Bardwell's situation, arrangements of this type undermine the country's system for supporting elderly and disabled citizens and the surviving spouses and minor children of deceased wage earners – that is, Social Security. Social security benefits are funded by annual contributions to the Social Security Trust Fund by employers and employees in an amount equal to a specified percentage (currently 6.2%, or 12.4% total) of wages in each calendar year up to the "contribution wage base" for that year. In 2020, the contribution wage base is $137,700. In 2006, it was $94,200. It is essentially a system of forced annual saving. The benefits for which an individual qualifies are in part a function of the contributions he has made to the Social Security Trust Fund.

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 23

Because Social Security taxes are imposed in the year wages are paid,[33] the arrangement Pratte claims he had with Bardwell would have generated a total of $11,681 in contributions to the Social Security Trust Fund, out of wages totaling in the ten-million-dollar range and allocable to a period of employment expected to span more than 20 years. If allowable, such arrangements would over time destroy the viability of the country's system for taking care of its elderly and disabled and the surviving spouses and minor children of deceased wage earners.[34]

Sincerely,

ROBERT J. LORD, PLC

Robert J. Lord

---

[33] 26 U.S.C § 3102(a).

[34] The gaming of social security tax by bunching compensation for multiple tax years into one tax year does take place, but typically is limited to shorter time periods. *See, e.g., Jeffrey B. Fleck Co. v. U.S.*, 86 AFTR 2d 2000-5749 (D. OH 2000) (scheme to bunch two years' compensation into one tax year).

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 24

## APPENDIX A

### DOCUMENTS REVIEWED

Deposition Transcript of Jeffrey Bardwell, dated March 6, 2020

Deposition Transcript of Todd Carriere, dated December 5, 2019

Deposition Transcripts of Ronald Pratte, dated February 27, 2020, and August 10, 2020)

Deposition Transcript of William Shisler, dated August 14, 2020

Deposition Transcript of Jaime Ziparo, dated December 4, 2019

Expert Report of Tim A. Tarter dated August 31, 2020

Expert Report of Brent Taylor dated August 31, 2020

Federal Gift Tax Return of Ronald Pratte for 2006

Copy of Cashier's Check Issued to Jeffrey Bardwell, dated January 5, 2006

Complaint Filed by Ronald Pratte in Maricopa County Superior Court, dated December 10, 2018

Answer Filed by Defendants Jeffrey Bardwell and Fanny F. Bardwell, dated January 11, 2019

Plaintiff's Third Amended Mandatory Initial Discovery Responses, dated August 26, 2020

Defendants' Second Amended Mandatory Initial Discovery Responses, dated August 26, 2020

Operating Agreement of BCPPZ Investement Holdings, L.L.C., dated June 20, 2006

Promissory Note, dated August 1, 2014, Jeffrey and Fabiola Bardwell, Maker; RP Investments, Lender

File Materials of William Shisler, undated

Thomas Marlowe
Thomas Connelly
September 23, 2020
Page 25

**APPENDIX B**

**CURRICULUM VITAE**

## ROBERT JAMES LORD

**CURRENT POSITION**                                  **EMAIL** – BOB@BOBLORDLAW.COM

FOUNDER AND SOLE MEMBER
ROBERT J. LORD, PLC
2111 EAST HIGHLAND AVENUE, SUITE 235
PHOENIX, ARIZONA 85016

**AREAS OF LEGAL PRACTICE**

Corporate Law – Corporate formations and general representation of corporations and shareholders, including negotiation and drafting of shareholder agreements and executive employment agreements, and advice to corporate shareholders, directors and officers in dispute resolution settings.

Limited Liability Company and Partnership Law – LLC, Limited Partnership and General Partnership formations, negotiation and drafting of operating agreements and advice to individual LLC members, managers in dispute resolution settings.

Business, Income Tax and Estate Planning -- Advice to small and mid-size businesses and their owners, professionals, real estate developers and wealthy individuals.

Tax Controversies and Litigation – Representation of clients involved in tax controversies before the Internal Revenue Service, United States Tax Court, United States District Court, Ninth Circuit Court of Appeals, Arizona Department of Revenue, Maricopa County Superior Court.

Decided Cases: _Sacks v. Commissioner_, 69 F.3d 982 (9th Cir. 1995); _May v. United States_, No. CV-14-00910-PHX-NVW (D. Ariz. 2015), rev'd and remanded (9th Cir. 2017).

**LEGAL EXPERIENCE**

>          January 2010 – Present
>          Robert J. Lord, PLC (Sole Member)
>          Phoenix, Arizona

>          January 2009 – January 2010
>          Zwillinger, Greek, Zwillinger & Knecht, PC (Shareholder)
>          Phoenix, Arizona

>          September 2007 – December 2008
>          Buchalter Nemer (Of Counsel)
>          Scottsdale, Arizona

**Robert James Lord**                                                                                   **Page 2**

January 2002 – September 2007
Berens, Kozub, Lord & Kloberdanz PLC (Partner)
Scottsdale, Arizona

November 1989 – January 1996
October 1997 – December 2001
Sacks Tierney, P.A. (Shareholder)
Scottsdale, Arizona

February 1996 – October 1997
Onsager & Lord, PC (Co-founder and Shareholder)
Phoenix, Arizona

September 1987 – November 1989
O'Connor, Cavanagh, Anderson,
Westover, Killingsworth & Beshears (Junior Partner)
Phoenix, Arizona

March 1984 – September 1987
Kronish, Lieb, Weiner & Hellman (Associate)
New York, New York

"av" rated in the <u>Martindale-Hubbel Law Directory</u>.

## TEACHING ACTIVITIES

1991 – 1992, Adjunct Professor of Tax Law, Arizona State University School of Law, Tempe, Arizona

2003-2005, Instructor, Western International University (Business Ethics, Income Taxation of Corporations)

2004 – 2009, Lecturer, Arizona School of Real Estate and Business (Wills and Trusts, Like-Kind Exchanges)

## PROFESSIONAL ACTIVITIES

Judge *Pro Tempore*, Maricopa County Justice Court, 2016 – 2018

Member, Phoenix Civil Service Board, 2012 - Present

Disciplinary Hearing Officer, 2002 – 2007, Supreme Court of Arizona

Editorial Board Member, Journal of Partnership Taxation; 1989 – 1992

Member, Limited Liability Company Committee of Arizona State Bar (committee formed to draft and lobby for legislation authorizing the formation of limited liability companies in Arizona)

**Robert James Lord**                                                                                          **Page 3**

## EDUCATION

| | |
|---|---|
| LL.M. | New York University, 1987 |
| J.D. | The National Law Center, George Washington University, ***magna cum laude***, 1983 |
| | (Honors:  ***The George Washington Law Review***, staff member; The Order of the Coif) |
| M.B.A. | College of Business and Management, University of Maryland, 1979 |
| B.S. | University of Maryland, ***cum laude***, 1977 |

## EXPERT TESTIMONY IN PAST 4 YEARS

*Mid-First Bank et. al. vs. David C. Dewar et. al.*, CV2018-012364 (Maricopa County Superior Court);

*Alfonso A. Larriva et. al. vs. Brian Delia et. al.*, CV2016-015019 (Maricopa County Superior Court);

*Felice R. Appell et. al. vs. Lane & Ehrlich, Ltd. et. al.*, CV2017-005698 (Maricopa County Superior Court);

*Stephan Herold et. al. vs. Jeff White et. al.*, CV2016-006544 (Maricopa County Superior Court)

## PUBLICATIONS

*LEGAL:*      "Computer Equipment Leasing Partnerships: Were They Risky Enough?" ***5 Journal of Partnership Taxation 99*** (1988)

"***Van Roekel v. Commissioner***.  A Questionable Interpretation of the At Risk Rules," ***14 Review of Taxation of Individuals 179*** (1990)

"Amendments To Recent Regulations Clarify Ambiguities and Provide Consistency," ***7 Journal of Partnership Taxation 115*** (1990)

*NON-LEGAL:* Numerous opinion pieces, briefing papers and blog posts on tax and other policy issues, including:

The Case for a U.S. Wealth Tax (Inequality.org 2019); The Problem with Bernie Sanders' 77 Percent Estate Tax? It's Not Enough (Newsweek 2019); One-Time Bonuses, Full-Time Con: Trump's Tax Cuts Deliver Worker Layoffs (The American Prospect 2018); Trump plan taunts the dignity of labor (Dallas Morning News 2017); A Backdoor Tax on the Middle Class (U.S. News and World Report 2017);  Automation Kills Jobs and Brings Mass Poverty. Call That Progress? (Newsweek 2017);  A tax system that targets workers (Los Angeles Times, 2013) Clinton's Very Reasonable Estate Tax Plan (U.S. News and World Report, 2016), Absurd inequity is threatening U.S. (Arizona Republic 2013); and America's Ever-Expanding Tax-Exempt Pool (Inequality.org 2013).

*Pratte v. Bardwell,* Case No.: 2:19-cv-00239-PHX-GMS

EXHIBIT 20

# ROBERT J. LORD, PLC
ATTORNEYS AT LAW
2111 East Highland Avenue
Suite 235
Phoenix, AZ 85016

Robert J. Lord
(480) 203-1229
Bob@boblordlaw.com

October 15, 2020

Thomas Marlowe
Thomas Connelly
6720 N. Scottsdale Road
Suite 305
Scottsdale, AZ 85253

> Re: Ronald H. Pratte vs. Jeffrey Bardwell and Fanny F. Bardwell, Docket No.
> 2:19-cv-00239 PHX-GMS (United States District Court, District Arizona)

Dear Messrs. Marlowe and Connelly:

Following are the opinions you requested I render with the respect to the disputed issues in the above-referenced case.

## I.    Engagement.

I have been retained by the Law Offices of Thomas J. Marlowe and the Law Offices of Thomas M. Connelly, the attorneys representing the Defendants, Jeffrey Bardwell and Fanny F. Bardwell in United States District Court, District of Arizona, Case No. 2:19-cv-00239 PHX-GMS, to rebut opinions provided by Tim A. Tarter on matters related to the tax treatment transfers of assets made by Ronald H. Pratte (hereafter, "Pratte") to Jeffrey Bardwell (hereafter, "Bardwell") in 2006.

I charged the attorneys for Defendants and their client an hourly rate of $550 for the time spent on this engagement. In the course of preparing this report I have received and reviewed certain documents provided to me by lawyers representing Jeffrey Bardwell. The documents I have been provided and which I have reviewed are listed in Appendix A to this report. I have also relied upon certain statutes, regulations and cases which are cited to below.

This report contains my opinions, together with the facts and analysis upon which my opinions are based and the reasons for my conclusions. In the event new information becomes available to me, I reserve the right to modify my opinions and conclusions accordingly.

## II.    Qualifications.

My qualifications to rebut the opinions of Tim A. Tarter are set forth in my

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 2

Curriculum Vitae, which is attached hereto as Appendix B.

## III.  Relevant Statutes and Precedence.

I have relied to various degrees on the following statutes and legal precedent in coming to my opinions:

1.  The Internal Revenue Code of 1986, as amended, 26 U.S.C § 1 et. seq.

2.  Case law:

   a.  *Commissioner v. Duberstein*, 363 U.S. 278 (1960);
   b.  *Burnet v. Guggenheim*, 288 U.S. 280 (1933);
   c.  *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929);
   d.  *Helvering v. Gregory*, 69 F2d 809, 810 (2d Cir. 1934), *aff'd sub nom. Gregory v. Helvering,* 293 US 465 (1935);
   e.  *Lane III v. U.S.*, 286 F.3d 723 (4th Cir. 2002);
   f.  *Weinert's Est. v. Commissioner*, 294 F.2d 750 (5th Cir. 1961);
   g.  *Estate of Ravetti v. Commissioner*, T.C. Memo. 1993-343 (1993);
   h.  *Larsen v. CIR*, 95 TCM (CCH) 1273 (2008);
   i.  *Ewing v. Hladky Construction, Inc., 48 P.3d 1086 (2002)*

3.  Administrative Rulings and other Authorities:

   a.  *Treas. Reg. § 1.61-14(a);*
   b.  *Treas. Reg. § 25.2511-2(a);*
   c.  *Treas. Reg. § 25.2511-2(b);*
   d.  *Treas. Reg. § 25.2511-2(c);*
   e.  *Treas. Reg.* § 25.2512-8;
   f.  *Revenue Ruling 54-537, 1954-2 C.B. 316;*
   g.  *Revenue Ruling 74-365, 1974-2 C.B. 324;*
   h.  *IRS Private Letter Ruling 200308046*

## IV.  Relevant Facts.

While it is not the function of an expert witness to resolve factual issues, if any exist, it is appropriate for an expert witness to rely on facts supported by the record. To the extent my opinions are based on facts, I believe those facts are supported by competent evidence. Most of the facts I rely on are based on the language of documents identified or confirmed testimony under oath. Based on my reviews of documents

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 3

identified in Appendix B, I have identified and relied on the following principal facts, which appear to be undisputed:

1. In late 2005, Pratte gave to Bardwell a cashier's check in the amount of Two Million Dollars ($2,000,000), dated January 5, 2006.

2. Later in 2006, Pratte transferred to limited liability companies in which Bardwell owned a 20% interest real property located in Arizona and Nevada. The value the interest in the real property transferred to Bardwell at the time of the transfer was $5,335,800.

3. At or about the time of the foregoing transfers (the "Transfers"), and out of appreciation for Pratte's friendship and the wealth Pratte had bestowed upon him, Bardwell developed a willingness and desire to perform services for Pratte without compensation.

4. At or about the time of the Transfers, Pratte anticipated, but did not necessarily rely upon, Bardwell's willingness and desire to perform services for Pratte without compensation.

5. At the time of the Transfers, Bardwell and Pratte had developed a deep friendship. Pratte had complete trust in Bardwell. He viewed him as a man of his word. He thought of him as family and referred to him as his adopted son.

6. There is no written agreement stating that the Transfers were made by Pratte in consideration of the services Pratte expected Bardwell to perform.

7. At the time of the Transfers, Pratte made transfers in the same amount and type to four other individuals (the "Other Recipients" or, collectively with Bardwell, the "Recipients"): his sons, Justin Pratte and Trevor Pratte, his son-in-law, Jaime Ziparo, and Todd Carriere, who was married to Pratte's niece.

8. Pratte intended the transfers to the Other Recipients to be gifts.

9. Pratte intended the Transfers to be net of tax consequences to Bardwell and the Other Recipients. Accordingly, he intended to satisfy any tax obligations associated with the Transfers.[1]

10. Todd Carriere is a certified public accountant and has expertise in tax matters.

---

[1] Deposition of Ronald Pratte at p. 256-57.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 4

11. Todd Carriere assisted Bardwell with his income tax return preparation.

12. Pratte received advice and assistance from his longtime CPA, William Shisler, and perhaps others, in connection with the tax treatment of the Transfers and the like transfers to the other Recipients.[2]

13. In 2007, Mr. Shisler prepared, and Pratte signed under penalty of perjury and filed, an IRS Form 709, Federal Gift Tax Return, pursuant to which Pratte reported the Transfers as gifts (along with the like transfers to the Other Recipients) and paid federal gift tax with respect to the Transfers in the amount of $3,374,468.[3]

14. Immediately above Pratte's signature on the Form 709 appeared a representation that he'd examined the return and to the best of his knowledge it was true, correct and complete.

15. The Form 709 signed by Pratte under penalty of perjury did not contain any disclosure regarding consideration he received for the Transfers.

16. At the time of the Transfers, Pratte stated his desire that the Recipients joined together in a new company to engage in the business of residential and commercial real property development and construction.

17. The Recipients formed several limited liability companies to effectuate Pratte's desires. At the outset, Bardwell and each of the Other Recipients had a twenty percent interest in each of the limited liability companies.

18. Between 2006 and 2018, Bardwell performed services for Pratte on a schedule and in a manner mutually agreeable to them.

19. In 2018, Bardwell ceased performing services for Pratte.

20. Pratte has brought claims against Bardwell stemming from the foregoing facts for breach of contract, promissory estoppel, and unjust enrichment.

In addition to the foregoing principal facts, the rebuttal opinions below may reference additional facts that appear to be undisputed. The rebuttal opinions also may assume, solely for purposes of rebutting the legal reasoning of Mr. Tarter, disputed facts

---

[2] Deposition of William Shisler.
[3] This amount has been determined by multiplying the value of the assets transferred to Bardwell, as reported on Pratte's Form 709, by the maximum marginal gift tax rate in 2006, 46 percent. It assumes other taxable gifts fully absorbed the benefits of Pratte's lifetime exclusion from gift tax and the lower marginal gift tax brackets.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 5

which he assumed to be true and upon which his reasoning is based, as well as disputed facts Pratte has asserted and which presumably Mr. Tarter would have taken into account in rendering his opinion.

**Introduction**

Mr. Tarter opined that there was no legal or factual support for a thesis that reporting the cash and other assets transferred to Bardwell on Pratte's 2006 Form 709 precludes a finding of compensatory intent by Pratte. Rather, according to Mr. Tarter, the filing of the Form 709 is consistent with Mr. Pratte making a "conditional gift" to Mr. Bardwell in exchange for Bardwell's promise of lifetime employment. Alternatively, according to Mr. Tarter, the amounts transferred to Bardwell in 2006 resulted in the formation of a constructive trust, requiring repayment to Pratte when Bardwell failed to comply with their oral agreement. In addition, Mr. Tarter opined that Pratte's reliance on Bardwell's promise of lifetime employment resulted in Pratte overpaying gift taxes on the conditional gift.

As discussed below, Mr. Tarter's opinions are directly contradicted by the Internal Revenue Code, bedrock principles of tax and contract law, which, in several instances, are principles most attorneys remember learning in their introductory courses in contract law and tax law decades after graduating from law school, and common sense.

In essence, Mr. Tarter has opined that Pratte had a choice in how to be taxed on what Pratte in his complaint claims was compensation he paid to Bardwell pursuant to a contract of employment. According to Mr. Tarter, Pratte could elect to be subject to tax under federal income and employment tax law, in which case he could deduct what he claims was compensation he paid to Bardwell and Bardwell would pay tax on his compensation income. Alternatively, he could call the employment agreement a conditional gift and be subject to federal gift tax law, which Mr. Tarter concludes Pratte did and which, according to Mr. Tarter, excused Bardwell from paying federal (and presumably Arizona state) income tax on the compensation Pratte now claims Bardwell was paid.

It is hard to see why, under Mr. Tarter's reasoning, any contract could not be characterized as a conditional gift for federal tax purposes if the employer so chooses. What Mr. Tarter glaringly fails to take into account is that a gift for federal gift tax purposes is not any transfer of property. Under 26 U.S.C. § 2512(b), only a transfer for less than adequate and full consideration in money or money's worth is a gift for federal gift tax purposes. Here, Pratte has claimed he entered into a contract pursuant to which he was to receive full and adequate consideration in the form of Bardwell's services. In fact,

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 6

he has described the agreement he now claims was formed in 2006 as a "well-defined contract between two sophisticated, well-informed parties."[4] He goes on to state that he had no donative intent.[5] That description is virtually indistinguishable in substance from what the Treasury Regulations issued pursuant to 26 U.S.C. § 2512(b) define as a transfer for full and adequate consideration:

> However, a sale, exchange, or other transfer of property made in the ordinary course of business (**a transaction which is bona fide, at arm's length, and free from any donative intent**), will be considered as made for an adequate and full consideration in money or money's worth.

*Treas. Reg.* § 25.2512-8 (emphasis added). It is impossible to reconcile Pratte's current position with the position he took on his federal gift tax return for 2006. He now claims that he transferred property to Bardwell pursuant to an agreement which, according to Pratte's own description fits squarely within the regulatory definition of a transfer for adequate and full consideration; hence, not a taxable gift. On his 2006 federal gift tax return, however, Pratte claimed the value of the consideration he received for the property he transferred to Bardwell was zero.

Yet Mr. Tarter somehow concluded that Pratte's position in this case is entirely reconcilable with the position he took on his 2006 federal gift tax return. The errors in Mr. Tarter's analysis explain how he reached such an illogical conclusion. I've therefore set forth below each of the seven paragraphs of Mr. Tarter's analysis, followed by an explanation of the errors contained in that paragraph. The paragraphs from Mr. Tarter's analysis appear in italics, with emphasis added in bold to highlight important passages. My own analysis appears in plain text.

**Analysis**

1. *Tarter Analysis Paragraph 1: Subtitle A of the Federal Tax Code, specifically, 26 U.S.C. §§ 61 – 63, generally includes the receipt of any and all income and property as taxable income. Although property acquired through gift or inheritance is generally excluded from gross taxable income, gifts from an employer to an employee are included in an employee's taxable income as compensation. See U.S.C. § 102(c)(1).[6]*

---

[4] Plaintiff's Mandatory Initial Discovery Responses at p.8, l. 9.
[5] *Id.* at p. 15, l. 3.
[6] It appears the reference intended by Mr. Tarter was to 26 U.S.C § 102(c)(1) and I've interpreted it accordingly.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 7

Rebuttal: Nothing in this paragraph is incorrect. However, the inclusion of gifts in an employee's income is limited to gifts received in the context of the employment relationship. See *Larsen v. CIR*, 95 TCM (CCH) 1273, 1275 (2008) ("a payment from an employer to an employee solely for personal reasons can still be a gift if the payment is completely unrelated to the employment relationship and reflects no expectation of a business benefit"). Thus, for example, if a child who happens to be working in her parents' business receives a gift from them in the context of their parent-child relationship, the gift would not be subject to income tax.

> 2. *Tarter Analysis Paragraph 2*: *Subtitle B of the Federal Tax Code, specifically, 26 U.S.C. §§ 2001 – 2801, generally subjects the transfers of wealth not otherwise taxed by Subtitle A, to Estate and Gift taxes. These Estate and Gift taxes are more properly referred to as "Wealth Transfer" or excise taxes since the tax obligation falls on the transferor, not the recipient. 26 U.S.C. §§ 2501 – 2502. 26 C.F.R. (Treas. Reg.) § 25.2511-2(a) provides clarification on this point as follows:*

>> *The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the donee at the time of the transfer. On the contrary, the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer, **is measured by the value of the property passing from the donor**, and attaches regardless of the fact that the identity of the donee may not then be known or ascertainable.*

Rebuttal: The problem here is that Mr. Tarter's recitation of the applicable principle is incomplete, as he fails to state how the highlighted language is applied. The very next section of the Tax Code, 26 U.S.C. § 2512, and the regulations thereunder, provide rules that are directly applicable to Mr. Tarter's opinion. 26 U.S.C. § 2512(b) states how property transferred by gift is valued and, by implication, whether the transfer is a gift at all:

> (b) Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 8

Under Code Section 2512(b), if property is transferred for full and adequate consideration in money or money's worth, there would be no gift, as the amount of the gift would be zero. This is where Mr. Tarter's opinion begins to take on water. Virtually all law students take a class in contract law in their first semester of law school. Within a week or so of starting law school, they learn that a contract is formed only if there is "offer, acceptance and **mutual consideration,**" and they never forget it. It is one of the most basic principles in the law. And if by any chance they do forget, they learn it a second time in order to pass the bar exam.

It's no accident that Code Section 2512(b) uses the term "consideration." It reflects the reality that property transferred in exchange for consideration pursuant to a contract generally is not a gift. But some arrangements that are considered contracts under common law nonetheless have the character of gifts for tax purposes. That is why Congress included the phrase "in money or money's worth" in Code Section 2512(b). Some things that constitute sufficient consideration to create a contract are disregarded in the determination of whether the property for which they're exchanged is a gift for federal tax purposes. Thus, Treasury Regulation § 25.2512-8 provides: "A consideration not reducible to a value in money or money's worth, as love and affection, promise of marriage, etc., is to be wholly disregarded, and the entire value of the property transferred constitutes the amount of the gift."

Services provided pursuant to a contract, however, constitute not just consideration, but consideration in money or money's worth. Indeed, Pratte's position is that the contract into which he claims he and Bardwell entered involved a bargained for exchange between "two sophisticated parties" of property for services. Thus, Pratte's current position is that Bardwell's services had a value equal to the property Pratte transferred to him in 2006. Mr. Tarter describes Pratte's intention in entering into that alleged contract as "compensatory."

Thus, according to Pratte's current position in this case, he did not under applicable law make a taxable gift to Bardwell in 2006. There is therefore no way to square Pratte's current position with his filing of a federal gift tax return including the Transfers as gifts to Bardwell.

> 3. *Tarter Analysis Paragraph 3:* However, the gift tax is not imposed on incomplete gifts. Treas. Reg. § 2511-2(b). If the donor reserves any power over the property's disposition, the gift may be wholly or partially incomplete. Treas. Reg. § 25.2511-2(c) provides that a gift is incomplete in every instance in which a donor reserves the power to revest the beneficial title to the

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 9

> *property in himself. For example, in IRS Private Letter Ruling 200308046, the IRS determined the sons' oral promise to their father to return a gifted residence back to him at his request, resulted in an incomplete gift and a constructive trust in favor of their father, requiring the sons' reconveyance of the home back to their father. See also IRS Revenue Ruling 54-537, 1954-2 C.B. 316, where the right to revest the beneficial title to property transferred in trust by the donor is an incomplete gift, and Revenue Ruling 74-365, 1974-2 C.B. 324, where the IRS determined a gift was not a completed gift because the gift was revocable.*

Rebuttal: The regulations Mr. Tarter cites simply are not applicable to this case, where Pratte claims he received consideration in money or money's worth from Bardwell pursuant to their contract. The regulations apply in the case of transfers which, **if complete**, would constitute gifts. They have no application to transfers which, if complete, would not be taxable gifts. Thus, they have no application to a transfer for consideration where the power of the transferor to revest title is conditioned only upon the failure of transferee to pay that consideration. In that situation, there would be no gift whether or not title is revested in the transferor. Such is the case here. If the Transfers were, as Pratte claims, payment by him to Bardwell for services and reversible by him upon Bardwell's non-performance, there would no gift whether or not Bardwell performed. If Bardwell did not perform, Pratte would recover his property and there would have been no gift. Mr. Tarter does not dispute this. Indeed, he relies on it later in his analysis. But he fails to recognize that if Bardwell had performed in full, such that the transfers became irreversible by Pratte, there also would be no gift. In that situation, Pratte would have received adequate and full consideration in money or money's worth.

In that critical respect, Pratte's transfer of property to Bardwell differs from reversible transfers that constitute incomplete gifts. In order for a transfer to be an incomplete gift, it would have to stand as a gift once the power of the transferor to reverse the transfer expired.

Of the three rulings Mr. Tarter cites in his analysis, one, *Revenue Ruling 54-537*, is summary in nature and includes no analysis. The other two rulings he cites, *IRS Private Letter Ruling 200308046* and *Revenue Ruling 74-365*, both expressly recognize that their application is limited to transfers without consideration. Both rely on the United States Supreme Court's decision in *Burnet v. Guggenheim*, 288 U.S. 280 (1933), which held that the Federal gift tax "**is not aimed at every transfer of the legal title without consideration.** Such a transfer there would be if the trustees were to hold for the use of the grantor. It is aimed at transfers of the title that have the quality of a gift, **and a gift is not consummate until put beyond recall.**" (emphasis added). In that case, the Supreme

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 10

Court implicitly recognized that the universe of transfers to which the federal gift tax could apply is limited to transfers without full and adequate consideration. The Court limited that universe further to include only *completed* transfers without full and adequate consideration. But it didn't expand that universe to include transfers for full and adequate consideration that don't constitute gifts in the first place.

Ultimately, in Paragraph 7 of his analysis, Mr. Tarter incorrectly applies the authority he cites in this Paragraph of his analysis to conclude that (i) Pratte made a conditional gift to Bardwell and (ii) even though he now can reverse that gift because of Bardwell's alleged breach of contract, he is unable to recover the gift taxes he paid because he filed a Form 709 reporting the supposed conditional gift.[7]

Mr. Tarter's application of the rules regarding conditional gifts to the contract into which Pratte claims to have entered with Bardwell defies common sense. If Mr. Tarter were correct, any contract which required future performance could be cast as a conditional gift. For example, if A sold real property for which he'd paid $50,000 to B in exchange for B's promise to pay $1 million cash in the future, A could treat that not as the sale of property upon which he'd be required to pay tax on $950,000 of gain, but as a conditional gift, thereby avoiding about $200,000 of income tax.

Might A be required to pay gift tax? Yes, but under current law only individuals whose lifetime gifts and bequests total over $11.5 million and married couples whose lifetime gifts and bequests total over $23.0 million pay any gift or estate tax. Those exemptions from gift and estate tax limit the percentage of Americans who actually pay gift or estate tax to about one-tenth of one percent of the population. Most of those in the remaining 99.9% would have a lot of room to label transfers for consideration as gifts before running into a gift or estate tax situation.

Another example: Attorneys sometimes enter into "earned upon receipt" fee agreements. Under those agreements, they are paid up front and their fee is deemed earned, but if they do no work on the matter they nonetheless would ordinarily be required to return the fee. According to Mr. Tarter's analysis, their clients in those situations could deem their fees to be conditional gifts, which, as discussed below, could generate an enormous tax savings to their attorneys.

Common sense tells us such a result is preposterous. The reason is that in contract situations where performance is prospective by one party there would not be a gift no

---

[7] It is not clear from Mr. Tarter's report why he believed Pratte could not recover the gift tax paid, but presumably it's because the statute of limitations for doing so has expired.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 11

matter what happens. If the other party to the contract (Bardwell in this case) breached the contract, the transferred property would be returned, and no gift would have taken place. If the other party to the contract performed in full, the transferor would have received adequate and full consideration in money or money's worth, and there still would be no gift.

> 4. *Tarter Analysis Paragraph 4:* ***The Form 709 has been used to eliminate income taxes otherwise due by the recipient (donee) of transferred property.*** *This was apparently one reason why Pratte used it here. See Deposition of Ronald Pratte dated February 27, 2020, p. 256. But as mentioned above, gifts between employer and employee are presumptively subject to the income tax regime of Subtitle A of the Internal Revenue Code. By treating the transfer of property to an employee as a gift, the employer (donor) loses a valuable tax deduction (employee compensation expense) and incurs a substantial gift tax liability.*

Rebuttal: The highlighted language may be correct but is entirely meaningless. What would not be correct is a statement that the Form 709 has ***properly*** been used to eliminate income taxes otherwise due by the recipient of transferred property, at least not in the way Mr. Tarter suggests in his analysis, where he states: "By treating the transfer of property to an employee as a gift, the employer (donor) loses a valuable tax deduction (employee compensation expense) and incurs a substantial gift tax liability."

One of the bedrock principles of tax law is that transactions are taxed according to their substance, not the labels taxpayers place on them. In hundreds of tax cases, courts have invoked this doctrine of "substance over form" to recast transactions that have been claimed to be something they are not. The court in *Weinert's Est. v. Commissioner*, 294 F.2d 750 (5th Cir. 1961), put it very succinctly: "The principle of looking through form to substance is no schoolboy's rule; it is the cornerstone of sound taxation..."

Mr. Tarter seemingly would know this principle. In *Estate of Ravetti v. Commissioner*, T.C. Memo. 1993-343 (1993), a case in which Mr. Tarter represented the IRS and prevailed, the Tax Court disregarded the form in which the taxpayer had cast its transactions because the transactions were lacking in economic substance.

Yet Mr. Tarter's opinions are premised on the notion that a taxpayer, in this case Pratte, is allowed under the tax law to choose whether to label a transaction a contract or a conditional gift and, in doing so, choose between radically different tax treatments, not only for the taxpayer, but for the person on the other side of the transaction, in this case

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 12

Bardwell. There is no basis in the tax law that allows for this, and Mr. Tarter has cited no federal tax case supporting his opinion.

Apparently, Mr. Tarter thinks this is permissible because an employer might lose a deduction for compensation expense by choosing to treat compensation as a gift and might incur gift tax liability. But those results are far from universal. As discussed above, most taxpayers under current law are highly unlikely to incur gift or estate tax liability on their gifts and lifetime bequests. And many people who pay compensation do so outside the context of a trade or business. For example, homeowners who pay for domestic help cannot deduct the compensation they pay their assistants. In this case, it is not at all clear why Mr. Tarter believed Pratte could deduct the amount he claims he paid Bardwell for services. At the time of payment, Pratte said he had retired.[8] The only business of Pratte that Bardwell might have had some involvement in was the Duner's Diner, a small burger joint Pratte opened in the California desert. But Mr. Tarter does not point to anything in the record showing Bardwell provided services to Duner's Diner and the tax benefits Pratte could have garnered by deducting the value allocable to those services.

The corollary to Mr. Tarter's theory that taxpayers may label employment arrangements as gifts for tax purposes is that the employee would be excused from both federal and state income tax and federal employment tax. But that would clash with the holding in *Commissioner v. Duberstein*, 363 U.S. 278 (1960), a landmark case in tax law, which is included in the textbooks for virtually all introductory law school classes in taxation. In *Duberstein*, the U.S. Supreme Court held that whether the receipt of property constitutes income to the recipient turns on the intent of the transferor. In order to be excluded from income, the transferor must proceed from a "detached and disinterested generosity, out of affection, respect, admiration, charity, or like impulses." Of course, that would virtually never be the case in the context of a contract for employment.

Perhaps Mr. Tarter believes that the filing of a gift tax return by the employer would confer an exemption on the employee, but that seemingly would be unworkable. Would employees be required to seek certification from their employers on this matter before completing their income tax returns? And how would Mr. Tarter's "employer choice" theory work at the state level? If the State of Arizona had audited Bardwell, would it be required to honor Pratte's election to treat what he now claims was a contract for employment as a gift? What would happen if the employer later claimed a refund of the

---

[8] Deposition of Ronald Pratte at p. 31-32, 61.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 13

gift tax paid, as occurred in *Lane III v. U.S.*, 286 F.3d 723 (4th Cir. 2002)?[9] Could employers and employees use that as a tactic to whipsaw the IRS?

Although Pratte could not arbitrarily label a contract for employment as a gift, he did have the ability to structure the Transfers in a manner that caused them to be treated for tax purposes as a gift. That right stems from another landmark tax case, *Helvering v. Gregory*, 69 F2d 809, 810 (2d Cir. 1934), *aff'd sub nom. Gregory v. Helvering*, 293 US 465 (1935). In that case, Judge Learned Hand famously stated, "there is not even a patriotic duty to increase one's taxes." Taxpayers, under *Gregory v. Helvering*, are free to structure their affairs so as to minimize their taxes.

That, I believe, provides a far more plausible explanation of Pratte's gift tax return filing. Mr. Tarter correctly refers to Pratte's deposition testimony where Pratte stated that he wanted the Transfers to be net of all required tax payments. Logically, Pratte would have advised William Shisler, his longtime tax advisor of that. Mr. Shisler, by all accounts, was a competent tax advisor. His deposition testimony evidences that, unlike Mr. Tarter, he would not have reported as a gift for tax purposes what was clearly a contract to perform services.

But a competent tax practitioner like Mr. Shisler likely would have advised Pratte how to achieve his objective. He likely would have shown Pratte the much higher cost of getting to the desired result if Pratte entered into a contractual relationship with Bardwell.[10] Mr. Shisler then could have explained to Pratte that if he did not demand from Bardwell a *quid pro quo* for the Transfers, he could achieve the optimal tax result, which I've described in my own expert report. And he could have pointed out that Bardwell still could assist him, just not as an employee compelled to do so, by contract or otherwise. Finally, he could have reminded Pratte that if his relationship with Bardwell soured, having a contract that forced Bardwell to perform services would not be all that valuable anyhow, so why make a mess of the tax situation by insisting on one? In my own report, I explained how every undisputed fact is aligned with that scenario.

---

[9] In *Lane III*, the court found that the taxpayer's filing of a gift tax return and payment of gift tax was evidence of donative, as opposed to compensatory, intent, but it did not hold that the prior treatment as a taxable gift estopped the taxpayer from later claiming otherwise.

[10] See, Expert Opinion of Robert Lord at p. 7-9.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 14

> 5. *Tarter Analysis Paragraph 5*: *Similar facts to those here were discussed by the Supreme Court of Wyoming in* Ewing v. Hladky Construction, Inc., *48 P.3d 1086 (2002), where the court reviewed a gift of shares between the company and an employee reported on a Form 709. The court noted that reporting the transfer on a Form 709 had the intended benefit of saving the employee income taxes on the transfer. Although the court found that both parties agreed the stock was a "gift" the court also found the gift had a reversionary interest, to be returned to the donor upon the employee's termination of employment. As cited in the court's opinion, Section 4552 of the Restatement of the Law Second, Property 2d, at § 31.2 provides that:*

>> *The owner of personal property may make a gift thereof to another person (the donee) in which the donor retains a reversionary interest by delivering the personal property to the donee ... with the manifested intention that the donee acquire an ownership that terminates ... on the occurrence or non-occurrence of some special event or condition.*

>> *The Wyoming court ultimately upheld the trial court's findings that the stock gift was conditional and required its return upon the employee's termination of employment.*

Rebuttal: Mr. Tarter's reliance on the decision in *Ewing* is misplaced.

Some background is helpful. The arrangement involved in the *Ewing* case is a commonplace arrangement between corporations, large and small, and their employees, especially important employees.

In these arrangements, the corporation or, sometimes in closely held corporations, the major shareholder, gives stock to an employee, with a stipulation that the employee must forfeit the stock if his employment terminates before a specified date.[11] In many cases, the stock is subject to a vesting schedule whereby the risk of forfeiture upon termination of employment is removed in stages. For example, the employee's ownership might fully vest 25% per year for four years. While the employee owns the non-vested stock, he enjoys the benefits of ownership, such as dividend and voting rights. The stock is not transferable by the employee while it is subject to a risk of forfeiture. In closely held

---

[11] In a corporation with one shareholder, there is no substantive difference between a transfer of stock by the shareholder or a transfer by the corporation. For example, in Ewing, the corporation could have issued to Mr. Ewing stock that would reduce Mr. Hladky's ownership of all outstanding shares to 90%.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 15

corporations, the stock typically will become subject to a shareholders' agreement once it has vested.

The tax treatment of these arrangements is governed by Section 83 of the Tax Code, 26 U.S.C. § 83. Section 83 provides that the employee is not required to recognize the value of the stock as income until the earlier of the date it becomes transferable or the date the risk of forfeiture is removed. 26 U.S.C. § 83(a).[12] Under Code Section 83(b), the employee may elect to treat the stock as income in the year of receipt, rather than waiting until the risk of forfeiture is removed.[13] Under Code Section 83(h), the corporation would have a deduction for the value of the stock in the same year the employee includes the stock in income.

The arrangement between Mr. Ewing and Mr. Hladky described in *Ewing* fits squarely within the class of transactions the tax treatment of which is governed by Section 83. According to the facts found by the trial court, Mr. Ewing would forfeit the stock he received from Mr. Hladky if his employment terminated prior to Mr. Hladky's death. That risk of forfeiture placed the transaction squarely under Tax Code Section 83, which, incidentally, is titled "Property transferred in connection with performance of services."

Even without Tax Code Section 83, the filing of a gift tax return and payment of gift tax by Mr. Hladky was inappropriate under Tax Code Section 2512. The Wyoming Supreme

---

[12] 26 U.S.C § 83(a) provides:

**§ 83 Property transferred in connection with performance of services.**

  (a)  **General Rule.** If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

        (1)  the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

        (2)  the amount (if any) paid for such property,

    shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

[13] Doing so can prove advantageous if the stock appreciates in value.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 16

Court even stated in its opinion: "Hladky admitted that Ewing had **earned** the stock but claimed that the gift carried a condition." If Mr. Ewing had earned the stock, as the Court noted, Mr. Haldky would have received adequate and full consideration in money money's worth. Further, according to Mr. Tarter's own analysis, the return of the stock would negate any gift. And if Mr. Ewing remained employed until the risk of forfeiture was removed, Mr. Hladky again would have received adequate and full consideration in the form of Mr. Ewing's continued services for the period between the award of the stock and the removal of the risk of forfeiture.

With that as background, it is not clear why Mr. Tarter relies upon the decision in *Ewing* for the opinions he's rendered here. Yes, an accountant in Gillette, Wyoming believed that the owner of a corporation could conditionally transfer stock to a key employee and allow the employee to avoid income tax by labeling the transfer as a gift. But the accountant was clearly wrong. Yes, the parties both labeled Mr. Hladky's transfer of stock to Mr. Ewing as a gift. But that doesn't mean the transfer was a gift for tax purposes. It wasn't. Yes, the Wyoming Supreme Court accepted the labeling of the transfer as a gift. But that didn't make it a gift for tax purposes, an issue that was not before the Court and the resolution of which would not have impacted the Court's decision under the facts presented to it. If the parties had correctly labeled Mr. Hladky's transfer of stock to Mr. Ewing as "property transferred in connection with performance of services governed by Internal Revenue Code Section 83," the Court would have reached the identical conclusion it did with the transfer incorrectly labeled as a gift.

Even putting all those problems with Mr. Tarter's reliance on *Ewing* aside, the facts in Ewing are sharply distinguishable from the facts here in several respects.

First, the property involved in *Ewing* was unique. In this case, the property involved was cash and real property that Bardwell and the Other Recipients were free to convert to cash without Pratte's consent.

Second, although the transfer in *Ewing* was conditioned on Mr. Ewing's continued employment, its value was not the measure of the services Mr. Ewing was expected to perform during his employment. He would otherwise be compensated for those services in a measured manner by the corporation. The return of the stock in *Ewing* thus could be all or nothing. Here, according to Pratte, the property he transferred to Bardwell was the measure of the value of Bardwell's services, thereby making the transferred property infinitely divisible by the quantity of services required of Bardwell (day by day, hour by hour, minute by minute, etc.).

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 17

Third, in *Ewing*, there was no contemplation that the value of the stock transferred to Mr. Ewing would be consumed during the period of his continued employment. In Pratte's case, he fully anticipated that the cash he transferred to Bardwell would be consumed, and allowed property to be sold, which indeed occurred, with no restriction on the proceeds from the sale.

Those distinctions are critical. Unlike in the *Ewing* case, there was nothing conditional about Pratte's transfer of property to Bardwell. If the contract he now claims to have been formed indeed was breached, he would be entitled to recover damages, but no specific, unique piece of property would be returned to him. If the mere right to recover damages for breach of contract were construed to create a conditional gift, as Mr. Tarter has opined, any contract calling for future performance by one party could be characterized as a conditional gift.

What's most telling about Mr. Tarter's reference to the *Ewing* case is his failure to instead refer to a tax case that says what he has said in his opinion: that a taxpayer may label a compensatory arrangement as a gift for federal tax purposes. In *Lane III v. U.S.*, 286 F.3d 723 (4th Cir. 2002), the taxpayer's representative sought to label as a compensatory arrangement what previously had been reported as a taxable gift. In rejecting the representative's argument, the court noted that the representative was "not able to cite a single case in which a court has held that payments in contention were compensation where the payor submitted gift tax forms." Mr. Tarter's position is even more precarious than that of the representative in *Lane III*. There, the representative at least acknowledged the inconsistency between the gift tax return filing and the claim of a compensatory arrangement. Here, Mr. Tarter has opined that the gift tax return filing was consistent with a compensatory arrangement. The reason for Mr. Tarter's failure to find a tax case supporting his position likely is that no such case exists.

> 6. *Tarter Analysis Paragraph 6: In 2006 the Federal tax rate on reportable gifts over $2,000,000 was 46 percent. That same year, Bardwell's tax rate on income over $336,550 was 35 percent. In effect, Mr. Pratte, by reporting the transfer of cash and property to Bardwell on Pratte's 2006 Form 709, effectively saved Bardwell at least $2,450,000 ($7,000,000 x .35) in personal income taxes. Mr. Pratte effectively lost the value of an income tax deduction of the same amount and incurred a gift tax on the transfer of over $3,220,000 (7,000,000 x .46).*

Rebuttal: This Paragraph is correct in its initial statement of the applicable federal gift and income tax rates. The remainder is entirely incorrect.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 18

Pratte did not save Bardwell tax by reporting the Transfers as a gift. Bardwell's income and employment tax consequences turned on whether the Transfers constituted compensation to him for his future services, or whether they were indeed a gift. If Bardwell and Pratte had entered into a contract, as Pratte now claims, applicable law would have required Bardwell to pay federal and state income tax and federal employment tax on the value of the property he received. Pratte's incorrect and unnecessary filing of a gift tax return would not have changed that requirement.

Further, any savings or cost would be Pratte's, not Bardwell's according to Pratte's own deposition testimony. As Mr. Pratte stated in the portion of his deposition (page 256-57) to which Mr. Tarter referred in Paragraph 4 of his analysis above, he wanted the Transfers to Bardwell to be net of tax requirements. Thus, if Bardwell were required to pay income and/or employment tax on the Transfers, Pratte logically would have had to fund that expense. Otherwise, the entire structure of Pratte's plan to start Bardwell and the Other Recipients in a real property development business would have been undermined.

Here, Mr. Tarter's analysis smacks up against yet another landmark U.S. Supreme Court decision, also included in the textbook for virtually all introductory tax law classes. In *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929), the Court held that when an employer pays an employee's income tax on the employee's behalf, the payment is taxable as income to the employee. The holding in *Old Colony Trust* applies with as much force today as it did 91 years ago. Indeed, it has been incorporated into the Treasury Regulations. *See, Treas. Reg.* § 1.61-14(a).

So, if we're comparing apples to apples here, the income tax obligation Pratte would have to pay on Bardwell's behalf if the Transfers were made pursuant to an employment contract would not just be the federal income tax on the value of the property transferred. It would be the federal and state income tax, and federal employment tax, on that value, plus all those taxes on Pratte's tax payments, plus all those taxes on those tax payments, and so on. When you do the math, the total effective tax rate would be 65.5 percent of the value of the property transferred to Bardwell, a good bit higher than the 46 percent rate Pratte paid by treating the Transfers as gifts. And that doesn't include the federal employment tax Pratte would be required to pay, or the income tax he would have to pay both at the federal and state levels on the gain he realized by using appreciated property to satisfy his contractual obligation to pay compensation to Bardwell.

Yes, Pratte lost the value of an income tax deduction by treating the Transfers as a gift. But it's not at all clear that deduction would have had significant value, given how limited Pratte's future business activities looked at the time of the Transfers. Whatever

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 19

was deductible by Pratte would have been determined on a yearly basis by allocating the amount Bardwell received over the 22+ years[14] of services Pratte anticipated Bardwell would perform, and further allocating a portion of the amount allocated to each year's services to those services the payment for which would constitute an ordinary and necessary expense incurred in a trade or business. Thus, as stated in my expert report, the value of Pratte's deductions for the amount he now claims he paid to Bardwell for services is entirely speculative.

> 7. *Tarter Analysis Paragraph 7: Therefore, the IRS was certainly not harmed by how this transfer of wealth to Bardwell was reported by Mr. Pratte on his Form 709. There was certainly no attempt to evade any taxes or commit fraud by Pratte. To the contrary, Mr. Pratte walked away from a valuable business deduction and paid gift taxes on an incomplete or conditional gift to Bardwell, effectively overpaying taxes to the IRS of approximately $3,220,000. Although Mr. Pratte should be able to recover the cash and property transferred to Bardwell since his gift was conditional, he is unable to now recover the gift taxes he paid to the IRS on these transfers as reported on the Form 709. See 26 U.S.C. § 6511(a).*

Rebuttal: Little in this Paragraph is remotely correct.

As explained above, the IRS certainly was harmed. If the Transfers truly were made pursuant to a contract for services between Pratte and Bardwell, the IRS was harmed to the tune of about $735,000 in income tax, net of an offset for the federal gift tax Pratte paid.

The IRS, however, was not the only governmental agency harmed by misreporting of income if the Transfers truly were made pursuant to a contract for services between Pratte and Bardwell.

The State of Arizona was harmed by close to $600,000 in income tax revenue it should have received.

The trustees of the Medicare and Social Security trust funds were harmed by about $350,000 in employment tax they should have received.

If Pratte knew it was not correct to report a contract to pay compensation for services as a gift and did so anyhow, then he may not have evaded his own taxes, but he certainly

---

[14] *See*, Report of Brent H. Taylor at p. 6.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 20

induced Bardwell to fail to pay tax by telling him that he, Pratte, had covered the tax.[15] A decision by Pratte to misreport a contract to pay compensation for services as a gift, thereby reducing his and Bardwell's collective tax payments by $1,670,389, would not have been made upon the advice of William Shisler, at least according to Shisler's testimony.

Pratte did not walk away from a valuable business deduction. Pratte, who at the time was no longer engaged in a business, traded a deduction of speculative value for tax avoidance totaling $1,670,389. Presumably, he did so legitimately by making the Transfers independent of any services he hoped Bardwell may perform.

Pratte's inability to recover the gift tax he paid on the Transfers is the result of his own actions, not Bardwell's. He states in his disclosure statement that he had no donative intent and that the Transfers were compensation to substitute for Bardwell's previous salary.[16] If that's true and he felt that way at the time of the Transfers, he should not have reported the Transfers on his gift tax return and paid gift tax on them. He knew that Bardwell either would or would not perform. Mr. Tarter himself says there would be no gift tax liability if Bardwell failed to perform. If Bardwell did perform, however, there also would be no gift tax liability, as Pratte would have received adequate and full consideration in money or money's worth. Pratte's reporting of the Transfers as a taxable gift and paying gift tax was his decision alone. If the facts truly were as he now claims them to be, he would not logically have filed gift tax returns. Thus, Pratte's inclusion of the property transferred to Bardwell in his gift tax return, along with every other undisputed fact in this case, points in the direction of Pratte having intentionally avoided a contractual relationship with Bardwell.

*Conclusions*

**Based on the foregoing analysis, my opinions are as follows:**

1. **Contrary to Mr. Tarter's opinion that that there was no legal or factual support for a thesis that reporting the cash and other assets transferred to Bardwell on Pratte's 2006 Form 709 precludes a finding of compensatory intent by Pratte, it is my opinion that Pratte's inclusion of the Transfers on his 2006 Form 709 filing is irreconcilable with a compensatory intent on his part. For the reasons set forth above, there is no way to reconcile Pratte's**

---

[15] See Deposition of Jeff Bardwell at p.57 ("And I said it's like winning the lottery. And he says, no, it's better than winning the lottery 'cause I'm paying the taxes on it."); see also, Deposition of Ronald Pratte at 256-57.

[16] Plaintiff's Mandatory Initial Discovery Responses at p. 15, l. 3-5.

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 21

Form 709 filing, and the associated non-reporting of income by Bardwell, with Pratte and Bardwell having entered into a contract for the performance of services.

2. Contrary to Mr. Tarter's opinion, the inclusion of the Transfers on Pratte's Form 709 filing is not consistent with Pratte making a conditional transfer to Bardwell in exchange for Bardwell's promise of lifetime employment. Re-labeling compensation as a conditional gift does not change the reality that the contract Pratte now claims to have been formed would preclude a taxable gift from having been made. As explained above, even if Mr. Tarter's characterization of the Transfers as conditional is accepted, the condition (Bardwell's lifetime services), whether satisfied or not, would not generate a taxable gift. If the condition were not satisfied, Pratte's property would be returned; hence, as Mr. Tarter readily acknowledges, no taxable gift. If the condition were satisfied, Pratte would have received adequate and full consideration in money or money's worth, which also would cause the Transfers not to be a taxable gift.

3. Mr. Tarter's alternative opinion, that the contract into which Pratte now claims he entered with Bardwell could be characterized as a constructive trust, also does not reconcile the making of a contract with Pratte's inclusion of the Transfers in gift tax return filing. The flaw in Mr. Tarter's "conditional gift" characterization applies with equal force to his constructive trust theory. Even if the constructive trust characterization is accepted, no taxable gift is possible. If Bardwell fails to perform the required services, the trust assets are returned to Pratte; hence, as Mr. Tarter readily acknowledges, no taxable gift. If Bardwell performs the required services, the trust assets are paid to Bardwell and Pratte has received adequate and full consideration in money or money's worth, which also would cause the Transfers not to be a taxable gift.

4. Mr. Tarter's opinion that Pratte's reliance on Bardwell's promise of lifetime employment resulted in Pratte overpaying gift taxes on a conditional gift finds no logical support. Pratte knew at the time of the Transfers that Bardwell either would or would not perform on the promise of lifetime employment he alleges Bardwell made as consideration for the Transfers. There were no other possibilities. If Bardwell failed to perform, there would be no taxable gift. Mr. Tarter acknowledges that, and, in fact, it forms the basis for his opinion regarding overpayment of gift taxes. If Bardwell did perform, Pratte would have received adequate and full consideration in

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 22

money or money's worth, in which case he also would not have made a taxable gift. Thus, if Pratte truly thought he'd entered into a contract with Bardwell, there was no reason for him to include the Transfers in his federal gift tax return filing. The fact that he did so directly contradicts his claim that such a contract ever was formed. As I've stated in my own report, Pratte's inclusion of the property transferred to Bardwell in his gift tax return, along with every other undisputed fact in this case, points in the direction of Pratte having intentionally avoided a contractual relationship with Bardwell.

Sincerely,

ROBERT J. LORD, PLC

Robert J. Lord

Thomas Marlowe
Thomas Connelly
October 15, 2020
Page 23

## APPENDIX A

## DOCUMENTS REVIEWED

Deposition Transcript of Jeffrey Bardwell, dated March 6, 2020

Deposition Transcript of Todd Carriere, dated December 5, 2019

Deposition Transcripts of Ronald Pratte, dated February 27, 2020, and August 10, 2020)

Deposition Transcript of William Shisler, dated August 14, 2020

Deposition Transcript of Jaime Ziparo, dated December 4, 2019

Expert Report of Tim A. Tarter dated August 31, 2020

Expert Report of Brent Taylor dated August 31, 2020

Federal Gift Tax Return of Ronald Pratte for 2006

Copy of Cashier's Check Issued to Jeffrey Bardwell, dated January 5, 2006

Complaint Filed by Ronald Pratte in Maricopa County Superior Court, dated December 10, 2018

Answer Filed by Defendants Jeffrey Bardwell and Fanny F. Bardwell, dated January 11, 2019

Plaintiff's Third Amended Mandatory Initial Discovery Responses, dated August 26, 2020

Defendants' Second Amended Mandatory Initial Discovery Responses, dated August 26, 2020

Operating Agreement of BCPPZ Investement Holdings, L.L.C., dated June 20, 2006

Promissory Note, dated August 1, 2014, Jeffrey and Fabiola Bardwell, Maker; RP Investments, Lender

File Materials of William Shisler, undated