Gregory B. Collins (#023158)
Eric B. Hull (#023934)
KERCSMAR FELTUS & COLLINS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kfcfirm.com
ebh@kfcfirm.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald H. Pratte,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Jeffrey Bardwell and Fanny F. Bardwell, husband and wife,<br><br>　　　　Defendants | Case No. 2:19-cv-00239-PHX-GMS<br><br>**PLAINTIFF RONALD PRATTE'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** |

Kercsmar Feltus & Collins PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Contrary to Bardwell's assertion (at Dkt. #63 at 5:19-20), Plaintiff does not concede this is a "he said/he said" dispute. Bardwell denies he entered into a contract with Mr. Pratte to work for Mr. Pratte for the rest of Mr. Pratte's life in exchange for getting treated like one of Mr. Pratte's children in a wealth transfer. But Mr. Pratte and at least six other witnesses, including Bardwell's friends, say otherwise. And Bardwell's own emails show otherwise. Bardwell's conduct shows otherwise. Finally, at bottom, logic dictates otherwise. As Mr. Pratte's Motion for Summary Judgment and other briefing demonstrate, this is a "they said/he said" dispute. And a "documents say/he says" dispute. And a "logic says/he says" dispute.

Bardwell bristles at being called a liar, but he his entire argument requires the Court to find that Mr. Pratte *and six other witness* are liars. In addition, Bardwell's argument requires this Court to reject the clear language in six emails where Bardwell asks for permission from Mr. Pratte for time off. Bardwell does not—and cannot— explain why he continued to perform work he asserts was detrimental to his health and family life without further compensation. Instead, he points to emails showing his loyalty and close relationship with Mr. Pratte. But those emails do not negate the overwhelming evidence that a contractual relationship existed. One can be loyal and care for the other party to a contract—these facts are not mutually exclusive.

Demonstrating his utter lack of evidence controverting the existence of the contract, Bardwell focuses on only three pieces of evidence: 1) the testimony of Mr. Pratte's former accountant, William Shisler; 2) the testimony of his divorce attorney, Diana Rader; and 3) the Form 709 Gift Tax return. But as established in Mr. Pratte's Opposition to Bardwell's Motion for Summary Judgment ("Plaintiff's Opposition"), Mr. Shisler concedes his did not know whether a contract existed. Ms. Rader's testimony is deficient for the same reason. Ms. Rader never spoke with Mr. Pratte—she acknowledges her testimony is based on conversations with Mr. Shisler, who, again, did not know whether a contract existed. And, again as established in Plaintiff's Opposition, the Form 709 does not negate the existence of a contract; this was the proper mechanism for Mr.

Pratte to cover the taxes on the wealth transfer—something everyone agrees was part of the contract.[1]

Accordingly, the facts overwhelmingly establish the existence of a contract. Bardwell has no evidentiary or factual basis to counter Mr. Pratte's evidence. Indeed, he presents no basis to even challenge the email evidence and testimony. Instead, he relies only on his own denial, witnesses who admit they lack knowledge of the material issue, and a government form that is, at worst, equivocal on the issue. Bardwell cannot show the existence of genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (citations omitted). A "mere disagreement or the bald assertion that a genuine issue of material fact exists, no longer precludes the use of summary judgment." *United States v. 403 1/2 Skyline Dr., La Habra Heights, CA*, 797 F. Supp. 796, 798 (C.D. Cal. 1992).

All Bardwell can present is his insistence (unsupported by actual facts) that all of the other witnesses are lying. Summary judgment should be granted in favor of Mr. Pratte and against Bardwell.

## I.   FACTUAL BACKGROUND

Bardwell's presentation of the facts in his Response does not refute Mr. Pratte's presentation of the facts. Bardwell's presentation largely dovetails with the facts Mr. Pratte presented in his own Motion. Instead, Bardwell sprinkles bald assertions of the facts into his argument section and in his Controverting Statement of Facts. Most glaringly, Bardwell apparently expects the Court to dismiss the testimony of six witnesses solely on Bardwell's own word. But Bardwell provides no facts controverting the testimony of five witnesses—or any evidentiary basis for calling their testimony into question.[2] Instead, Bardwell asks the Court to simply ignore the testimony of six

---

[1] Local Rule 56.1(b) states, "No reply statement of facts may be filed." Plaintiff addresses Bardwell's facts herein, relying on previously submitted evidence and the controverting facts themselves.

[2] The lone exception to this statement is Abendschein, where Bardwell concedes he "had an affair with [Abendschein's] fiancé." (Dkt. #64 at 20:20-22 (Defendant's Controverting Statement of Fact # 43).) Of course, Abendschein's testimony is wholly consistent with Mr. Pratte's statement of the facts and consistent with the other five witnesses. Bardwell's tale is the sole outlier.

2

witnesses, based not on facts, but on argument (indeed, this statement appears in his Argument section rather than the Factual Background):

> The witnesses against Bardwell are three of the four other gift recipients—all members of Pratte's family, a lifelong friend of Pratte (Wolfswinkle) who only knew Bardwell casually, a former neighbor and friend of Bardwell who has a deeply rooted personal grudge against Bardwell (Abendschein), and a Ron Pratte sycophant (Yonker).

(Dkt. #63 at 16:6-10.)

    Bardwell does not dispute any of these witnesses' actual testimony or provide any evidentiary reason to doubt them. Indeed, the fact that Wolfswinkle is a friend "who only knew Bardwell casually" does not mean that his testimony about what Bardwell said is incorrect—let alone that he has some reason to lie. Bardwell accuses Yonker of being a "sycophant." But he provides no evidentiary support for that statement—and even if he had, it does not make him a liar.

    More importantly, the facts that Bardwell concedes are true lend credence to these witnesses' testimony. For example, Mr. Carriere testified, "And I recall on various occasions Jeff and I having discussions about how long could Ron live. You know, Jeff would come in and be, like: Man, I'm going to be working until I'm 80 years old out there at the dunes." (Plaintiff's Statement of Facts #21.) Bardwell does not deny that he made this statement. He only argues that it "[m]ischaracterizes prior testimony which was represented as jokes not factual statements." (Dkt. #64 at 5:7-8.) But this "joke" simply makes no sense if, as Bardwell insists, he was free to stop working at any time.

    Mr. Pratte cited Justin Pratte's testimony: "And I remember very vividly that the structure -- or the notion of Jeff working for Ron was: Jeff -- and these were Ron's words. Jeff, you work for me and whatever I need for the rest of my life." (Plaintiff's Statement of Facts #24.) Bardwell does not cite a single fact or piece of evidence to controvert this testimony. Instead, he baldly states: "Disputed." (Dkt. #64 at 6:3-7.) Of course, if this was an acceptable basis to controvert facts, summary judgment could never

be granted. Many other facts are "disputed" based solely on Bardwell's own denials. (Dkt. #64 at 31:24-37:26, Controverting Statements of Fact #81-102.)

Regarding the emails which show Bardwell asking Mr. Pratte for permission for time off, Bardwell concedes: "Paragraphs 40-45 are emails sent from Bardwell to Pratte. Bardwell does not dispute the contents of any email or that he authored the email." (Dkt. #64 at 9:11-15.) Bardwell then argues that he "does, however, dispute the inferences and motives Plaintiff ascribes to his emails, i.e, that he was seeking or was required to seek Plaintiff's permission." (*Id*.) The emails require no "inferences." The plain language shows Bardwell seeking permission from Mr. Pratte for time off. Bardwell points to no evidence from which any other inferences in Bardwell's favor could be drawn.

Indeed, such an inference becomes outlandish in light of Bardwell's concession that he never told Mr. Pratte that he considered himself a mere volunteer:

> Q. Do you ever remember telling Ron, hey, I don't have to do this anymore, I'm doing this 'cause I want to?
>
> A. I never did.

(Plaintiff's Statement of Fact #38 (undisputed at Dkt. #64 at 2:5).) He concedes he "spent several years assisting Plaintiff with this project to the detriment of his health and family life." (Plaintiff's Statement of Fact #34 (undisputed at Dkt. #64 at 2:5).) During that time, "Barwell worked as many as 3,000 hours in a year and sometimes more than 80 hours in a single week." (Plaintiff's Statement of Fact #36 (undisputed at Dkt. #64 at 2:5).) And he agrees that during that time he received no compensation. (Plaintiff's Statement of Fact #35 (disputed at Dkt. #64 at 8:23-27 only to the extent that the fact implied any money Bardwell received was compensation).)

In sum, it is undisputed that Bardwell worked long hours for 12 years for no additional compensation "to the detriment of his health and family life." It is undisputed that during that time, Bardwell sent emails to Mr. Pratte seeking permission for time off. During that whole time, Bardwell never informed Mr. Pratte of Bardwell's alleged belief that he could simply quit whenever he wanted. He concedes that he at least "joked" he

4

would "be working until I'm 80 years old out there at the dunes." (Plaintiff's Statement of Facts #21.) And at least seven people have testified that Bardwell was under contract to Mr. Pratte to perform this work.

## II.   SUMMARY JUDGMENT STANDARD

Bardwell does not counter Mr. Pratte's stated summary judgment standard. Indeed, Bardwell agrees that "[w]hile all inferences must be drawn in favor of the non-moving party, they 'cannot be created by pointing to some metaphysical doubt as to the material facts.'" (Dkt. #63 at 5:13-17 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).) In addition, Bardwell does not dispute that "[i]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted.", 477 U.S. at 249–50, 106 S. Ct. at 2511, 91 L. Ed. 2d 202. Here, the undisputed facts lay the foundation for summary judgment. The fact that Bardwell relies solely on his own denials of what seven other witnesses and emails show, is not a sufficient basis to allow this case to go to trial.

## III.   ARGUMENT

As stated at the outset, this is not a "he said/he said" dispute. It is a "they said/he said" dispute. All of the documents support Mr. Pratte's version of events (along with the version of six witnesses who testified to Mr. Pratte's version of events). Bardwell's version relies on his own assertions, strained and implausible inferences, and for the Court to ignore that Bardwell never told anyone else his version prior to this lawsuit.

Bardwell also cites two witnesses and the gift tax Form 709. But this is a house of cards. William Shisler's knowledge of the facts was thoroughly debunked in response to Bardwell's Motion for summary Judgment. (*See* Dkt. #61 at 5:17-6:8, Dkt. #62 at Facts 8-10, 26, 33-38.) Bardwell now relies on the testimony of Diana Rader—but her knowledge was based on Shisler's understanding, which was irrelevant. (*See* Dkt. # 64, Fact 62 (citing Exhibit 11, *D. Rader, 01/24/20,* 33:4-34:22).) And the 709 Form, which was prepared by Shisler, is not determinative of any facts at issue—and even if it was, Bardwell had never even seen it until this litigation.

5

**A. Shisler and Rader do Not "Refute" Mr. Pratte's Claims.**

Like he did in his own Motion for Summary Judgment, Bardwell relies extensively on the deposition of Mr. Pratte's former accountant William Shisler. And just as he did in his own Motion, Bardwell again drastically overstates the value of Shisler's testimony, stating: "William Shisler, who prepared the Form 709 Gift Tax Return, ***refuted Pratte's claims unequivocally***." (Dkt. #63 at 6:12-13 (emphasis added).) As Mr. Pratte explained in his Opposition to Bardwell's Motion for Summary Judgment (Dkt. ### at 5:17-6:8), Shisler cannot—in any way—refute Mr. Pratte's claims.

Shisler limited his own knowledge of the facts, flatly denying knowing anything about the contract between Bardwell and Mr. Pratte. Shisler was asked, "Q. You don't remember talking with Ron prior to any of the five guys getting their initial checks?" Shisler answered, "Ron was always, in my experience pretty typical, unwilling to discuss death or estate planning with either his attorneys, Sacks Tierney, or myself." (Pratte's Controverting Statement of Facts #8.) He further testified: "And we talked about his three children. And I never heard anything again about it until approximately January 6th." In other words, Shisler never knew about the wealth transfers until the time those events transpired. Accordingly, there is no direct connection between Shisler's testimony and the asset transfer that Mr. Pratte conducted.

Shisler was asked, "Did [Mr. Pratte] explain what his plan was? I want you to cut these checks to these five guys and some spouses. Did he explain what he was going to do?" Shisler prefaced his answer with: "All he said was -- he gave me the list, the handwritten list, and there were a couple names on there." (Dkt. #62 (Pratte's Controverting Statement of Facts #9.) When Mr. Pratte was asked about what he told Shisler regarding the gift tax, Mr. Pratte testified: "I don't think I told him to prepare anything. I just told him what I was going to do. That was his job, to figure out how to get it done." (Dkt. #62, Pratte's Controverting Statement of Facts #9.)

Regarding whether any contingencies were attached to the wealth transfer to Bardwell, Shisler was asked, "To your knowledge, without any contingencies on them?"

Kercsmar Feltus & Collins PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

He answered "Correct." The testimony does not reflect Mr. Pratte's intention. It reflects Mr. Shisler's knowledge. He testified: "I was not aware of any contingencies, so . . . yes, they could have been acknowledged on the 709." (Pratte's Controverting Statement of Facts #10.) Shisler further acknowledged that one can make gifts with contingencies attached and that "[c]ontingent gifts would still be reported on a Form 709[.]" (*Id*.)

In short, Shisler simply was unaware of the contract between Bardwell and Mr. Pratte. Nothing in his testimony "refutes" the existence of the contract—and the fact that Bardwell relies so heavily on Shisler's testimony is telling. Likewise, the testimony of Bardwell's divorce attorney, Diana Rader, is similarly limited. In the cited deposition pages, her knowledge of the events relies solely on her conversation with Shisler. (*See* Dkt. # 64, Fact 62 (citing Exhibit 11, *D. Rader, 01/24/20,* 33:4-34:22).) Bardwell cannot bootstrap Shisler's limited knowledge into a material factual dispute simply by filtering it through a second witness who spoke to Shisler.

**B.  Bardwell Has Not and Cannot Explain Working for 12 Years for Free**

"[I]f the claim is one that simply makes no economic sense, respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Electric Industrial. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356 (1986) (citations omitted). Put another way, "[i]f the factual context makes the nonmoving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Tanner v. Heise*, 879 F.2d 572, 577 (9th Cir. 1989).

Bardwell insists that his appreciation to Mr. Pratte is reason enough to work for free for twelve years. Bardwell's own testimony and disclosures reveal that he "worked as many as 3,000 hours in a year and sometimes more than 80 hours in a single week." (Plaintiff's Statement of Fact #36 (undisputed at Dkt. #64 at 2:5).) And that he performed this work "to the detriment of his health and family life." (Plaintiff's Statement of Fact #34 (undisputed at Dkt. #64 at 2:5).) Yes, he received a large transfer of wealth from Mr. Pratte and there is no doubt he appreciated it. But if there were no strings attached to the

wealth transfer, as Bardwell claims, then it makes no sense to endanger one's "health and family life" in order to show appreciation. It makes even less sense considering Bardwell claims he never told Mr. Pratte that he was doing the work solely out of appreciation. (Plaintiff's Statement of Fact #38 (undisputed at Dkt. #64 at 2:5).)

Under the prevailing law, because his position is implausible and "simply makes no economic sense," Bardwell is required to "come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Tanner*, 879 F.2d at 577. Bardwell's Response does not present "more persuasive evidence." It presents argument. That is not enough to defeat summary judgment.

**C. Form 709 Does Not Controvert Mr. Pratte's Claims.**

In Plaintiff's Opposition (at 14:16-15:24), Mr. Pratte fully debunked Bardwell's notion that the Form 709 creates a triable case. Even Shisler confirmed that "[c]ontingent gifts would still be reported on a Form 709[.]" (Dkt. #62 at ¶¶ 10, 37.) While the Form 709 here states no contingencies, Shisler testified: "I was not aware of any contingencies, so . . . yes, they could have been acknowledged on the 709." (Dkt. #62 at ¶ 38.) Indeed, Mr. Pratte's Opposition cites a case where a Form 709 similarly did not state any contingencies—but such contingencies were found to exist. In 2002, the Supreme Court of Wyoming decided a case where the owner of a business "made a gift of a thousand shares of stock to [the employee] in March of 1995." *Ewing v. Hladky Const., Inc.*, 2002 WY 95, ¶ 7, 48 P.3d 1086, 1087 (Wyo. 2002). The owner filed a "gift tax return [that] reflected the transfer of a thousand shares of stock from himself to [the employee]." *Id*.

> The gift's purpose was intended to provide [the employee] a portion of stock that he would not later have to purchase if something happened to [the owner]. [The owner] admitted that [the employee] had earned the stock but claimed that the gift carried a condition. [The owner] testified that it was always understood between himself and [the employee] that the continued ownership of [the employee's] shares in the company was conditioned on [his] continued employment.

*Id*.

After a bench trial, "[t]he trial court found that the gift was delivered with the intent that it should be returned to [the owner] in the event that [the employee's]

Kercsmar Feltus & Collins PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

employment terminated." *Id*. at ¶ 9, 48 P.3d at 1088. The Wyoming Supreme Court determined, "The trial court's finding that [the owner] had gifted the stock and placed conditions when it was made is supported by this record, and, under our proper standard of review, we must affirm the trial court's decision." *Id*. at ¶ 14, 48 P.3d at 1089–90.

In doing so, the Wyoming Supreme Court did not find that the mere filing of Form 709 was determinative of any issues in the case, it isn't.

### D. Mr. Pratte's Is Entitled to Summary Judgment on His Unjust Enrichment Claim.

Bardwell's argument (at 13:17-27) is essentially that if there is no contract, unjust enrichment must fail along with it. Bardwell is wrong. Bardwell testified that after he received the wealth transfer, he "worked as many as 3,000 hours in a year and sometimes more than 80 hours in a single week." (Plaintiff's Statement of Fact #36 (undisputed at Dkt. #64 at 2:5).) He performed this work "to the detriment of his health and family life." (Plaintiff's Statement of Fact #34 (undisputed at Dkt. #64 at 2:5).) But he also testified:

> Q. Do you ever remember telling Ron, hey, I don't have to do this anymore, I'm doing this 'cause I want to?
>
> A. I never did.

(PSOF #38 (undisputed) (citing J. Bardwell Depo. (3/6/20) at 131:5-7).) While he may characterize it as a "joke," it is undisputed he told people he would "be working until I'm 80 years old out there at the dunes." (Plaintiff's Statement of Facts #21.)

So even if the Court cannot find a contract existed, Bardwell created a situation where he benefited and allowed everyone to think that he had obligated himself to work for Mr. Pratte—until one day, twelve years later, he opted to simply walk away. That is the very definition of an unjust enrichment—Bardwell was indisputably enriched and Mr. Pratte suffered a loss, the two results were connected. And even if Bardwell did not enter into a contract (as he claims), he led everyone to believe he was bound and accepted the benefits on that basis. If there is no contract, Mr. Pratte has no legal remedy.

9

**E. Left Without a Defense, Bardwell Goes Scorched Earth**

Left with no evidence backing him up, Bardwell disparages Mr. Pratte's memory, dismisses the numerous emails in which he seeks permission from Mr. Pratte for time off (as one would do with an employer), and declares six witnesses to be liars. He provides no rationale for these witnesses to perjure themselves. He provides no documents that counter the language and intent in the submitted emails. Bardwell can disparage Mr. Pratte's memory all he wants, but it does not change the fact that the witnesses and documents align with Mr. Pratte's version of events.

*1. Mr. Pratte's Memory is Fine*

Mr. Pratte does not have an issue with his memory. He testified: "I don't know if they're medical, but I have memory problems from time to time. I'm 73 years old." (PCSOF at ¶ 20.) Mr. Pratte did not acknowledge memory "deficits." He stated he has memory "problems from time to time." At age 73, the occasional memory lapse is hardly a "deficit." And, as thoroughly demonstrated, Mr. Pratte's recollections line up with the evidence. Bardwell even concedes that he made statements that comport with Mr. Pratte's allegations of a contract: "You know, it's -- could I have said, hey, I'm so thankful and I'll do whatever this man needs, probably." (PSOF at ¶ 31.) Bardwell conceded, "And my role in the company, in Stellar Development, was to -- and the other entities was to take care of Ron [Pratte]." (PSOF at ¶ 32.)

Denying summary judgment solely on the grounds that a jury might question Mr. Pratte's memory is not only legal deficient, it is an insulting notion.

*2. Bardwell's Emails are clear*

Bardwell baldly declares that the emails submitted with the Motion prove "nothing" and any attempt to read anything into those emails is "bootstrapping." But he "does not dispute the contents of any email or that he authored the email." (Dkt. #64 at 9:11-15.) Taken alone, those emails do not prove the contract. But they perfectly dovetail with all of the other evidence showing a contract existed. And Mr. Pratte does not need

to "characterize[] these emails as Bardwell's efforts to obtain Pratte's permission . . . ." (Dkt. #63 at 15:5-7.) The very words Bardwell chose to use do that.

### 3. *Bardwell claims everyone is against him*

Unable to counter the testimony of six witnesses, Bardwell insinuates without proof that they are all lying. (*See* Dkt. #63 at 16:11-17:17.) Bardwell does not provide any evidence suggesting these witnesses are lying. Instead, he points to evidence (freely disclosed by Mr. Pratte) that Mr. Pratte collected evidence for this case and asked some witnesses to memorialize what they saw and heard. There is no evidence Mr. Pratte asked anyone to lie, he didn't. Bardwell had all of the statements when he deposed the witnesses—no witness deviated from his statement. Instead of presenting such evidence, Bardwell asks this Court to suppose that all six witnesses lied under oath. But if simply asking the Court to assume that all witnesses are liars can defeat summary judgment, summary judgment would never be entered. Bardwell cannot point to a single thing that Mr. Pratte or any witness did wrong. Denying summary judgment based on bald aspersions is not only legal deficient, it is an insulting notion.

## CONCLUSION

The defense Bardwell spins is an odd one. According to Bardwell, he toiled away for Mr. Pratte for free for 12 years solely out of an appreciation for the wealth Mr. Pratte bestowed upon him—all the while keeping it a secret that he had no obligation to do that work. He relies on witnesses (Shisler and Rader) who admittedly have no knowledge of the basis for the wealth transfer. And he relies on the title of a government form.

Bardwell cannot controvert the evidence against him. Instead, he asks the Court to call the witnesses against him liars. He asks the Court to assume that Mr. Pratte cannot remember the true facts. And he asks the Court to give him strained inferences that the words in Bardwell's own emails mean something other than what they say. Or the Court can simply accept the undisputed facts and enter summary judgment against Bardwell and in favor of Mr. Pratte.

DATED this 8th day of March, 2021.

KERCSMAR FELTUS & COLLINS PLLC

By: *s/ Greg Collins*
    Gregory B. Collins
    Eric B. Hull
    7150 East Camelback Road, Suite 285
    Scottsdale, Arizona 85251
    *Attorneys for Plaintiff*